COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

**2384CV01086 Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation**

| | | | |
|---|---|---|---|
| **CASE TYPE:** | Business Litigation | **FILE DATE:** | 05/10/2023 |
| **ACTION CODE:** | BE1 | **CASE TRACK:** | |
| **DESCRIPTION:** | Fraud, Business Torts, etc. | | |
| **CASE DISPOSITION DATE:** | 01/21/2025 | **CASE STATUS:** | Closed |
| **CASE DISPOSITION:** | Transferred to another Court | **STATUS DATE:** | 01/21/2025 |
| **CASE JUDGE:** | | **CASE SESSION:** | Business Litigation 1 |

**PARTIES**

| | |
|---|---|
| **Plaintiff**<br>Nova, For Herself And The Class, Elizabeth | **Attorney** **549049**<br>Michelle H Blauner<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108<br>Work Phone (617) 208-4713<br>Added Date: 05/10/2023<br><br>**Attorney** **663866**<br>Patrick Vallely<br>Shapiro Haber and Urmy LLP<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108<br>Work Phone (617) 439-3939<br>Added Date: 08/29/2023 |

| Defendant | Attorney | |
|---|---|---|
| Boston Medical Center Corporation<br>1 Boston Medical Center Pl.<br>Boston, MA 02118 | **Attorney**<br>Linn Foster Freedman<br>Robinson and Cole LLP<br>Robinson and Cole LLP<br>One Financial Plaza Suite 1430<br>Providence, RI 02903<br>Work Phone (401) 709-3353<br>Added Date: 08/29/2023 | **639564** |
| | **Attorney**<br>Wystan Michael Ackerman<br>Robinson and Cole LLP<br>Robinson and Cole LLP<br>One State St<br>Hartford, CT 06103<br>Work Phone (860) 275-8200<br>Added Date: 08/29/2023 | **651086** |
| | **Attorney**<br>William Maxwell Daley<br>Robinson and Cole LLP<br>Robinson and Cole LLP<br>One Financial Plaza<br>14th Floor<br>Providence, RI 02903<br>Work Phone (401) 709-3335<br>Added Date: 08/29/2023 | **694729** |

**FINANCIAL DETAILS**

| Date | Fees/Fines/Costs/Charge | Assessed | Paid | Dismissed | Balance |
|---|---|---|---|---|---|
| 05/10/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39551 Date: 05/11/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 05/10/2023 | Fee for Blank Summons or Writ (except Writ of Habeas Corpus) MGL 262 sec 4b Receipt: 39551 Date: 05/11/2023 | 5.00 | 5.00 | 0.00 | 0.00 |
| 05/11/2023 | Civil Filing Fee (per Plaintiff) Receipt: 39551 Date: 05/11/2023 | 240.00 | 240.00 | 0.00 | 0.00 |
| 05/11/2023 | Civil Security Fee (G.L. c. 262, § 4A) Receipt: 39551 Date: 05/11/2023 | 20.00 | 20.00 | 0.00 | 0.00 |
| 05/11/2023 | Civil Surcharge (G.L. c. 262, § 4C) Receipt: 39551 Date: 05/11/2023 | 15.00 | 15.00 | 0.00 | 0.00 |
| | **Total** | **520.00** | **520.00** | **0.00** | **0.00** |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

## INFORMATIONAL DOCKET ENTRIES

| Date | Ref | Description | Judge |
|---|---|---|---|
| 05/10/2023 | 1 | Complaint electronically filed. | |
| 05/10/2023 | 2 | Civil action cover sheet filed. | |
| 05/10/2023 | 3 | Plaintiff Elizabeth Nova, For Herself And The Class's Motion to appt spec process server | |
| 05/17/2023 | | Endorsement on Motion to Appoint Special Process Server (#3.0): ALLOWED (dated 5/17/2023) notice sent via email 5/17/2023 | Krupp |
| 05/17/2023 | | Endorsement on Motion to appoint Special Process Server (#3.0): ALLOWED (Dated 5/15/2023) Notice sent 5/17/2023 | Krupp |
| 05/23/2023 | 4 | Party(s) file Stipulation<br>Regarding Acceptance of Service and Defendant's Time to Respond to the complaint<br><br>Applies To: Nova, For Herself And The Class, Elizabeth (Plaintiff); Boston Medical Center Corporation (Defendant) | |
| 05/30/2023 | | Endorsement on Stipulation in regards to acceptance of service and Defendant's time to respond to the complaint (#4.0): No Action Taken<br>Defendants shall answer or otherwise respond to the complaint by 6/21/2023.<br>(Dated 5/25/2023) Notice sent 5/30/2023 | Krupp |
| 06/21/2023 | | Defendant Boston Medical Center Corporation's Notice of Motion to Dismiss | |
| 06/30/2023 | 5 | Plaintiff, Defendant Elizabeth Nova, For Herself And The Class, Boston Medical Center Corporation's Joint Motion of<br>Regarding Page Limits for Opposition and Reply om Motion to Dismiss | |
| 07/28/2023 | | Endorsement on Motion for opposition and reply on Motion to dismiss (#5.0): DENIED<br>(Dated 7/26/2023)<br>Notice sent 7/28/23 | Kazanjian |
| 08/11/2023 | 6 | Defendant Boston Medical Center Corporation's Motion to dismiss the complaint under Mass. R. Civ. P. 12(b)(1) AND (6) | |
| 08/11/2023 | 7 | Boston Medical Center Corporation's Memorandum in support of its motion to dismiss | |
| 08/11/2023 | | Exhibits/Appendix | |
| 08/11/2023 | 8 | Opposition to defendant's motion to dismiss filed by Elizabeth Nova, For Herself And The Class | |
| 08/11/2023 | 9 | Reply/Sur-reply<br><br>in further support of its motion to dismiss<br><br>Applies To: Boston Medical Center Corporation (Defendant) | |
| 08/11/2023 | | Affidavit of compliance with superior court rule 9A | |
| 08/11/2023 | | Defendant Boston Medical Center Corporation's Submission of Rule 9A Notice of filing | |

| | | | |
|---|---|---|---|
| 08/29/2023 | | Attorney appearance electronically filed. | |
| 08/29/2023 | | Attorney appearance electronically filed. | |
| 08/29/2023 | | Attorney appearance electronically filed. | |
| 08/29/2023 | | Attorney appearance electronically filed. | |
| 08/29/2023 | | Attorney appearance electronically filed. | |
| 08/29/2023 | | Attorney appearance<br>On this date Wystan Michael Ackerman, Esq. added for Defendant Boston Medical Center Corporation | |
| 08/29/2023 | | Attorney appearance<br>On this date Linn Foster Freedman, Esq. added for Defendant Boston Medical Center Corporation | |
| 08/29/2023 | | Attorney appearance<br>On this date William Maxwell Daley, Esq. added for Defendant Boston Medical Center Corporation | |
| 10/05/2023 | | Matter taken under advisement: Rule 12 Hearing scheduled on:<br>10/05/2023 02:30 PM<br>Has been: Held - Under advisement<br>Hon. Helene Kazanjian, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | Kazanjian |
| 11/10/2023 | | Endorsement on Motion to dismiss the complaint under Mass. R. Civ. P. 12(b)(1) AND (6) (#6.0): DENIED<br>The motion to dismiss is DENIED without prejudice to be renewed following a decision from the appeals court on Dockets 2384CV480-BLS1 and 2384CV857-BLS1, which cases have been reported pursuant to Mass. R. Civ. P. 64. All further proceedings in this case are stayed pending the outcome of the reported cases.<br>(Dated: 11/9/23)0<br>Notice sent 11/14/23 | Kazanjian |
| 12/19/2024 | 10 | Amended: amended complaint filed by Elizabeth Nova, For Herself And The Class | |
| 01/06/2025 | | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Wystan Michael Ackerman, Esq. wackerman@rc.com<br>Defendant: Linn Foster Freedman, Esq. lfreedman@rc.com<br>Defendant: William Maxwell Daley, Esq. wdaley@rc.com<br>Sent On: 01/06/2025 13:25:32 | |
| 01/14/2025 | 11 | Defendant Boston Medical Center Corporation's Notice of Removal<br><br>(U.S. Dist. #25-cv-10105) | |

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY CIVIL
Docket Report

| | | |
|---|---|---|
| 01/15/2025 | Event Result:: BLS Rule 16 Litigation Control Conference scheduled on: 01/15/2025 11:00 AM<br>Has been: Held via Video/Phone<br>Hon. Peter B Krupp, Presiding | Krupp |
| 01/15/2025 | The following form was generated:<br><br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Wystan Michael Ackerman, Esq. wackerman@rc.com<br>Defendant: Linn Foster Freedman, Esq. lfreedman@rc.com<br>Defendant: William Maxwell Daley, Esq. wdaley@rc.com<br>Sent On: 01/15/2025 15:23:32 | |
| 01/21/2025 | REMOVED to the U.S. District Court<br>Of Massachusetts | |
| 01/21/2025 | Case transferred to another court. | |

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
~~Asst. Clerk~~

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| ELIZABETH NOVA,<br><br>For herself and the Class,<br><br>v.<br><br>BOSTON MEDICAL CENTER CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 23-1086 BLS1<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Elizabeth Nova ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of internet communications between healthcare consumers and the defendant, Boston Medical Center Corporation ("BMC"). Specifically, BMC aided in the interception of communications between Plaintiff and other Class Members (defined below) and BMC through a website maintained by BMC (the "BMC Website").

2. BMC aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with BMC by injecting hidden code into the BMC Website. That hidden code enabled Google, Facebook, and other third parties to secretly listen to the contents of healthcare consumers' communications with BMC. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and Facebook. Google and Facebook could then use the contents of the intercepted

communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3. Healthcare consumers' wire communications with BMC were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent. BMC did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with BMC, nor did BMC seek or obtain their consent for such interception. On the contrary, BMC **falsely** told healthcare consumers, through their published online privacy policy, that it does **not** share such information.

4. The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." "Wire" communications include communications over the internet between websites and website users. The Massachusetts Wiretap Act's prohibitions apply even when one of the parties to the communications knows about the interception if that party secretly records or intercepts the communication or aids another in recording or intercepting the communication without the knowledge or consent of the other party. It is not necessary for a violation of the Massachusetts Wiretap Act that the entirety of the contents of any communication be intercepted; instead, an unlawful interception occurs when

a. the identity of the parties to the communication;

b. the existence of the communication; **or**

c. any part of the contents, substance, purport, or meaning of the communication is intercepted or recorded.

5. The Massachusetts Legislature enacted the Massachusetts Wiretap Act to counter "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which it found "pose grave dangers to the privacy of all citizens of the commonwealth." M.G.L. c. 272 § 99(A) (preamble). Internet communications fall comfortably within the Act's express terms. The purposes

for which the Massachusetts legislature enacted the Massachusetts Wiretap Act are highly significant in today's world, as technology companies continually chip away at the privacy of individuals, contrary to the public policies that animate the Massachusetts Wiretap Act.

6. Although this case concerns the interception of communications that disclose healthcare consumers' private health information, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on whether the intercepted communications reveal an individual's private health information or any other sensitive information. The Massachusetts Wiretap Act applies to all interceptions, regardless of the communication's substance.

7. Moreover, although this case concerns communications between healthcare consumers and healthcare providers, Plaintiff's claim under the Massachusetts Wiretap Act does not depend on the nature of the relationship between Plaintiff and BMC. The Massachusetts Wiretap Act applies to all interceptions, regardless of relationship, if any, among the parties to the communication.

8. The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party **and** any party that aids such an interception.

9. BMC aided interceptions by Google, Facebook, and other third parties of healthcare consumers' communications with BMC through the BMC Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act on her own behalf and for all other Massachusetts residents who accessed the BMC Website between three years prior to the date of this complaint and January 25, 2023 (the "Class Period").

## PARTIES

10. Plaintiff Elizabeth Nova is a resident of Boston, Massachusetts. Plaintiff is a patient of BMC. Plaintiff regularly uses the BMC Website to (i) obtain information about BMC doctors; (ii) search for information on particular medical procedures; (iii) obtain information about BMC's hours;

(iv) schedule and confirm details of medical appointments and (v) obtain and review her medical records through the website's patient portal.

11. Defendant Boston Medical Center Corporation is a corporation that operates in Boston, Massachusetts and the surrounding area. Its functions include providing healthcare services primarily through its hospital located in Boston, Massachusetts. BMC maintains and controls the content of the BMC Website.

## JURISDICTION

12. The exercise of personal jurisdiction over BMC is proper according to M.G.L. c. 223 § 3 because, among other things, BMC is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of BMC's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### BMC and Its Website

13. BMC operates a hospital in Boston, Massachusetts. BMC offers inpatient and outpatient care to residents near Boston and surrounding communities. BMC provides healthcare across various specialties, including heart and pulmonary care, neurology, cancer care, surgery, obstetrics and gynecology, and emergency medicine.

14. BMC maintains the BMC Website for its hospital and outpatient facilities, found at https://www.bmc.org. Through that website, healthcare consumers can obtain information about the services BMC provides, including information about doctors, services, and treatments provided by BMC for particular medical conditions, and users can access their medical records, pay bills, and schedule medical appointments.

15. The BMC Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The BMC Website provides general information about BMC.

(b) The BMC Website provides information about healthcare services provided at BMC, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Psychiatry," and "Surgery," among many others.

(c) The BMC Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(d) The BMC Website permits healthcare consumers to access and pay bills online.

(e) The BMC Website lets healthcare consumers access their private medical information online through the MyChart patient portal.

16. Because the BMC Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**<u>Reasonable Expectations of Users of the BMC Website</u>**

17. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the BMC Website.

18. Users of healthcare-related websites such as the BMC Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as BMC will not share with third parties their communications with BMC without their consent.

19. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as BMC from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E.

20. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including BMC, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

21. The expectations and understanding of users of the BMC Website are informed by what BMC told them during the Class Period about how it handles their personal information.

22. During the Class Period, the BMC Website included a Website Privacy and Security Policy, linked in small text at the bottom of the BMC Website. That policy contained numerous false and deceptive statements regarding BMC's conduct described in this complaint. These statements served not only to keep secret from website users the fact that their communications with BMC would be intercepted by Google, Facebook, and other third parties; the policy went further in repeatedly and affirmatively promising that BMC would ***not*** do exactly what it ***was*** doing: permitting third parties to intercept and use for commercial purposes website users' communications with BMC.

23. First, the policy stated: "Boston Medical Center will not intentionally share the contents of any electronic communications with a third-party entity." This was false. BMC did, in fact, share the contents of electronic communications between website users and BMC with several third parties, including Google, Facebook, and others.

24. BMC also stated in the same policy: "BMC will take reasonable steps to ensure the integrity and confidentiality of personally identifiable information, which has been obtained through this website." This too, was false. BMC facilitated the interception by third parties, including Google and Facebook, of website users' personally identifiable information, including their IP address and other personal identifiers that those third parties could use to connect intercepted communications to known individuals—information Google and Facebook could then use to serve personalized advertising on those same individuals.

25. BMC also stated: "Any information collected voluntarily from our website visitors will be used to develop or improve our programs and services. It will not be sold to any third-party marketing companies." This too, was false. The information collected from website users was not used only to improve BMC's "programs and services" but was also used by Google and Facebook for their own commercial purposes, including serving personalized advertising to individuals based on the content of their intercepted communications with BMC.

26. BMC also stated: "All personally identifiable information collected and aggregated for survey purposes will be de-identified and screened before it is shared with third-parties for analysis. Boston Medical Center will only disclose personally identifiable information if required to by a search warrant, subpoena, or court order." Multiple aspects of this statement were flagrantly false. First, personally identifiable information was not simply collected in "aggregated" form; instead, BMC facilitated third parties such as Google and Facebook to intercept communications in individual, non-aggregated form. Second, such intercepted communications were ***not*** "de-identified." Instead, as described below, the tracking technologies at issue in this case were specifically designed to permit third parties such as Google and Facebook to associate the contents of intercepted communications with particular individuals known to Google and Facebook. Third, BMC's statement that it would disclose personally identifiable information only in response to a "warrant, subpoena, or court order" was false; BMC actively facilitated the third-party interception of personally identifiable information for business reasons without any legal compulsion.

27. The same policy, although it contained a section entitled "Logging, Tracking and Monitoring," presented false information about such activities. Most crucially, that section asserted that "Online visitors utilizing this site do so anonymously." This was false. As described below, tracking technologies that BMC injected into the hidden code for the BMC Website were designed

specifically to disclose to third-parties such as Google and Facebook the real-world identities of website users. The intercepted communications were not anonymized.

28. Moreover, although that section references the use of "cookies," disclosure of "cookies" does **not** implicitly or explicitly disclose that communications are intercepted or shared with any third parties. Many cookies do not involve any interaction with parties other than the website and website user. For example, websites often use a cookie to track when a user is logged into the website. No third-party interceptions are involved in such a use of a cookie, and the communication may remain entirely between the website user and the website. Accordingly, merely disclosing the use of "cookies" does not equal disclosure of any interception of communications by any third party (i.e., a party other than the website and the website user), particularly given the other express statements in the same policy that falsely disavowed any such third-party interception of communications.

29. Finally, although the same section describes that "IP address and domain name," "time of visit," and "operating system" are logged, it does not disclose that such information (and much more, as described below), are intercepted and logged by third parties (as opposed to BMC itself).

30. In short, the degree to which BMC actively deceived website users and kept secret its facilitation of third-party interception of communications between BMC and website users is palpable. Even users who happen to find the buried Website Privacy and Security Policy would be utterly deceived by its contents.

31. Healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by BMC's deceptive statements on the BMC Website. The interceptions of website users' communications with BMC were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

32. Plaintiff describes in this complaint various tracking technologies implemented on the BMC Website that cause the secret interception, recording, and transmission of the contents of Class Members' internet communications with BMC. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with BMC and the purposes for which interceptions are made.

33. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

34. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

35. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

36. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website

[1] Facebook rebranded its parent company as "Meta" in October 2021.

owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

37. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

38. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website.... The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

39. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

40. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

41. Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

42. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

43. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

**Website Tracking Technologies on the BMC Website**

44. BMC injects hidden code into the BMC that permits third parties to contemporaneously intercept healthcare consumers' communications with BMC. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with BMC with the website user's Facebook profile.

45. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and BMC, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

46. BMC uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

47. Before describing how such technologies work, it is important to first define some basic technological terms.

48. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

49. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the BMC Website, as of the time of this complaint, is 23.185.0.3. When they connect to the internet, particular individuals also have their own unique IP addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

50. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the BMC Website is https://www.bmc.org/. URLs also often point to specific pages on that website; often, a URL will contain information about the particular webpage itself. For example, the BMC Website has a page specifically about the BMC Cancer Center; that page's URL is https://www.bmc.org/cancer.

51. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and BMC with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies,"

each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

52. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

53. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, BMC) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

54. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

55. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bmc.org/cancer); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content

each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

52. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

53. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, BMC) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

54. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

55. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bmc.org/cancer); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content

of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

56. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with BMC to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

57. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

58. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and BMC contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

59. The use of tracking technologies became an important news story in June 2022 following an investigation and report by the online magazine The Markup reporting that "Facebook Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[4] In reaction to the investigation and Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

60. BMC appears to have removed Meta Pixel from its website in 2022 near in time to The Markup Article, but BMC continued (and continues today) to use Google Analytics and other tracking technologies which facilitate third parties' interceptions of communications in a similar fashion. Current and archived historical versions of the BMC Website confirm that BMC's implementation of Google Analytics has been consistent throughout the Class Period.

**<u>BMC'S Use of Tracking Technologies on the BMC Website</u>**

61. BMC uses various tracking technologies across the BMC Website. BMC injects several of those tracking technologies into the code of all, or almost all, of the pages within the BMC Website.

---

[3] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[4] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

For example, on nearly every page of the BMC Website, BMC injects hidden code that loads Google Analytics. It also injects hidden Meta Pixel code onto most pages on the BMC Website.

62. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

63. Below is an image of the main landing page for the BMC Website:




64. When a user loads the main landing page for the BMC Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

65. The image below depicts the landing page for the BMC Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




66. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload"

reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encc

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34q0h2
_p: 131117627
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682537197
sct: 1
seg: 1
dl: https://www.bmc.org/
dr: https://www.google.com/
dt: Home Page | Boston Medical Center
en: page_view

67. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the BMC Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.bmc.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Home Page | Boston Medical Center"); and

(c) The URL of the webpage the website user visited immediately before visiting the BMC Website landing page (the text after "dr," which includes the text "https://www.google.com.").

68. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, BMC).

69. Notably, when the website user's web browser intercepts the contents of communications between the website user and the BMC Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with BMC with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

70. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the BMC Website are the same.

71. The hidden Google Analytics code not only intercepts the communication through which the website user loaded the landing page but also closely tracks the website user's every move on the page. For example, when a user scrolls down on the landing page, that communication is intercepted and transmitted to Google via hidden Google Analytics code. The screenshot below (with highlighting added) depicts the intercepted communication:

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-e

**v:** 2
**tid:** G-M8WZT4NW2R
**gtm:** 45je3530
**_p:** 725107456
**cid:** 691509645.1683479334
**ul:** en-us
**sr:** 1920x1080
**uaa:** x86
**uab:** 64
**uafvl:** Chromium;112.0.5615.138|Google%20Chrome;1:
615.138|Not%3AA-Brand;99.0.0.0
**uamb:** 0
**uam:**
**uap:** Windows
**uapv:** 10.0.0
**uaw:** 0
**_eu:** AEA
**_s:** 2
**sid:** 1683479334
**sct:** 1
**seg:** 1
**dl:** https://www.bmc.org/
**dt:** Home Page | Boston Medical Center
**en:** scroll
**epn.percent_scrolled:** 90
**_et:** 5543

That is, the hidden code monitored the user scrolling through 90% of the page and transmitted that information to Google, which it could use to measure the user's level of engagement with the website, informing Google's targeted advertising profile for the particular individual.

72. Before BMC removed Meta Pixel from its website in 2022, the same landing page for the BMC Website injected hidden Meta Pixel code onto the landing page of the BMC website. The hidden code BMC injected into its website caused the user's browser to load a JavaScript file called "fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the BMC Website.

73. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and BMC through the BMC Website, including the URL of the webpage visited, the title of the page visited, and data reflecting additional detail on the contents of each particular webpage. The graphic below depicts the information secretly intercepted by the hidden Meta Pixel code and contemporaneously transmitted to Facebook (with highlighting added):

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing Cookies

▼ **Query String Parameters** view source view URL-encoded

**id:** 353927118450000

**ev:** Microdata

**dl:** https://www.bmc.org/

**rl:**

**if:** false

**ts:** 1592855828785

**cd[DataLayer]:** []

**cd[Meta]:** {"title":"Home Page | Boston Medical Center"}

**cd[OpenGraph]:** {}

**cd[Schema.org]:** []

**cd[JSON-LD]:** [{"@context":"https://web.archive.org/web/20200622195659/http://schema.org","@type":"Organization","url":"https://web.archive.org/web/20200622195659/https://www.bmc.org","logo":"https://web.archive.org/web/20200622195659/https://www.bmc.org/sites/default/files/BMC-Logo.jpg","contactPoint":[{"@type":"ContactPoint","telephone":"+1-617-638-8000","contactType":"Customer Service"},{"@type":"ContactPoint","telephone":"+1-617-638-6157","contactType":"Bill Payment"},{"@type":"ContactPoint","telephone":"+1-617-414-5155","contactType":"Billing Support"},{"@type":"ContactPoint","telephone":"+1-617-414-4075","contactType":"Emergency"}]}]

**sw:** 1920

**sh:** 1080

**v:** 2.9.21

**r:** stable

**ec:** 1

**o:** 30

**fbp:** fb.0.1592855828272.1306496353

**it:** 1592855827125

**coo:** false

**es:** automatic

**tm:** 3

**rqm:** GET

74. The interception and transmission to Facebook also included information about the user's browser configuration (such as screen resolution—here 1920 by 1080 pixels) and various codes to associate the communications with BMC's advertising account with Facebook.

75. The JavaScript code for Meta Pixel also caused the user's web browser to reveal the user's IP address to Facebook. This identifier permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and BMC to serve personalized advertising to the website user in the future.

76. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user. This allowed Facebook to track that individual across the BMC Website and further confirm that individual's real-world identity.

77. The landing page for the BMC Website also contains a link permitting the website user to "Request an Appointment." By clicking that link, a website user would communicate to BMC that the user is a patient or prospective patient. When a website user clicks on the "Request an Appointment" button, hidden Google Analytics code that BMC has injected into its website intercepts that communication and contemporaneously transmits it to Google. The intercepted click is depicted in the screenshot below (with highlighting added);

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-enco

v: 1
_v: j100
a: 1492152562
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/
dr: https://www.google.com/
ul: en-us
de: UTF-8
dt: Home Page | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1348x947
je: 0
ec: Link
ea: https://www.bmc.org/
el: Request an appointment
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS58R
cd8:
z: 899015768

As depicted above, Google Analytics code intercepts and transmits to Google the communication through which a website user has clicked on a "Link" to "Request an appointment" on the "Boston Medical Center" website.

78. BMC configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the

website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not reflect webpages Plaintiff personally visited but are presented for illustrative purposes.

79. The BMC Website contains numerous subpages for specific "Departments and Conditions." For example, the BMC Website contains a page entitled "Neurology," designed to inform the website user about the services BMC offers for various neurological disorders. By visiting this webpage, a user communicates that the user may have a neurological disorder. When the user communicates with BMC by visiting this particular webpage, BMC causes the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Neurology webpage:



Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

80. The graphic below presents the contents of the communication between the website user and BMC that are secretly intercepted and transmitted to Google when the above page loads as a result of the hidden Google Analytics JavaScript code that BMC injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encode

v: 2
tid: G-M8WZT4NW2R
gtm: 45je3530
_p: 1503411338
cid: 450616876.1683587233
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1683587233
sct: 1
seg: 1
dl: https://www.bmc.org/neurology
dt: Neurology | Boston Medical Center
en: page_view

81. As reflected in the above screenshot, the code injected into the BMC Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting a "Neurology" webpage on the BMC Website—information that Google retains and can use for its own commercial purposes.

82. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook. The image below depicts the contents of the communication between BMC and a website user that would be intercepted when a user visited the Neurology webpage on the BMC Website (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Form Data** view source view URL-encoded

id: 353927118450000
ev: Microdata
dl: https://www.bmc.org/neurology
rl:
if: false
ts: 1592881992524
cd[DataLayer]: []
cd[Meta]: {"title":"Neurology | Boston Medical Center","meta:description":"A Message to Our Patients about COVID 19 The Neurology Department offers a full spectrum of neurological care, including examination, diagnostic evaluation, consultation, treatment, comprehensive follow-up, and rehabilitation recommendations for disorders of the nervous system. Patients receive the latest in therapies and treatments based on research that is ongoing at BMC."}
cd[OpenGraph]: {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/neurology","og:title":"Neurology","og:description":"A Message to Our Patients about COVID 19 The Neurology Department offers a full spectrum of neurological care, including examination, diagnostic evaluation, consultation, treatment, comprehensive follow-up, and rehabilitation recommendations for disorders of the nervous system. Patients receive the latest in therapies and treatments based on research that is ongoing at BMC. The department's areas of advanced clinical expertise include Parkinson's disease, epilepsy, stroke, and Alzheimer's diseas","og:updated_time":"2020-03-31T10:58:13-04:00","article:published_time":"2016-07-07T16:45:37-04:00","article:modified_time":"2020-03-31T10:58:13-04:00"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200623031302/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Patient Care","@id":"https://web.archive.org/web/20200623031302/https://www.bmc.org/conditions-we-treat"}},{"@typ

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

That is, the Meta Pixel would intercept the communication through which the website user was seeking information about "Neurology" at "Boston Medical Center," including potential care relating to Parkinson's disease, epilepsy, stroke, or Alzheimer's disease. Facebook could then use the contents of that intercepted communication for its own commercial purposes (for example, by serving advertisements relating to neurological drugs to the same individual on Facebook or Instagram).

83. The BMC Website contains dozens of similar pages on particular medical specialties and practices that BMC offers. For each such page, the BMC aids or aided Google and Facebook's secret interception of the contents of communications with BMC, similar to the above Obstetrics and Gynecology example.

84. The BMC Website also contains pages for specific services offered by BMC. By visiting such pages, a user signifies that the service may be relevant to them. For example, the BMC Website has a webpage for vaccines, testing, and treatment for COVID, depicted below:



Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

By visiting the page, the user signifies an interest in COVID treatment or testing, which could indicate the user or a person the user knows has been exposed to or is experiencing symptoms of COVID.

85. When a website user visits the COVID testing page of the BMC Website, the hidden Google Analytics code that BMC has injected into its website intercepts that communication between the user and BMC and transmits it to Google. The contents of the intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

**v:** 2
**tid:** G-MBWZT4MW2R
**gtm:** 45je34j0
**_p:** 1834931130
**cid:** 780300399.1682537198
**ul:** en-us
**sr:** 1920x1080
**uaa:** x86
**uab:** 64
**uafvl:** Chromium;112.0.5615.138|Google%20Chrome;112.0.561
5.138|Not%3AA-Brand;99.0.0.0
**uamb:** 0
**uam:**
**uap:** Windows
**uapv:** 10.0.0
**uaw:** 0
**_s:** 1
**sid:** 1682542380
**sct:** 2
**seg:** 1
**dl:** https://www.bmc.org/covid-19
**dt:** Information about COVID-19 | Boston Medical Center
**en:** page_view

That is, hidden Google Analytics code intercepts the fact that the user is seeking "Information about COVID-19" from BMC, information Google retains and uses for its own commercial purposes.

86. If a user clicks on the "Testing" link on BMC's COVID information page, that communication is likewise intercepted by hidden Google Analytics code that BMC has injected onto its website. The contents of the communication intercepted and contemporaneously transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view URL-encoded

```
v: 1
_v: j100
a: 1834931130
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/covid-19
ul: en-us
de: UTF-8
dt: Information about COVID-19 | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1311x947
je: 0
ec: Link
ea: https://www.bmc.org/covid-19
el: Testing
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS5BR
cd8:
z: 576799823
```

That is, the communication in the form of clicking on a "Link" for "Testing" from the "Information about COVID-19" webpage on the BMC Website is intercepted and transmitted to Google, and Google and use the contents of the intercepted communication for its own commercial purposes.

87. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was obtaining information from BMC about COVID-19, information that Facebook retains and can use for its own commercial purposes.

88. The BMC Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by BMC. When an individual uses the search function, BMC aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."




89. When a user performs this search on the BMC Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response »

▾ Query String Parameters view source view decoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 1797327608
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium%3B112.0.5615.138%7CGoogle%2520Chrome%3B112.0.5615.138%7CNot%253AA-Brand%3B99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
sid: 1682542380
sct: 2
seg: 1
dl: https%3A%2F%2Fwww.bmc.org%2Fsearch%3Fsearch%3Dpregnant%26form_build_id%3Dform-wnm7dhGUG70crVCX_4wAUc9RCMFnpAeNehgN6mb5V8%26form_id%3Dsite-search-form
dr: https%3A%2F%2Fwww.bmc.org%2F
dt: Search%20%7C%20Boston%20Medical%20Center
_s: 1

▾ Request Payload

en=page_view

As reflected in the above text, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world

identity for targeted advertising purposes. Those intercepted communications also remain accessible by third parties other than Google via subpoena or otherwise.[5]

90. The BMC Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to BMC that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:




91. Depicted below are the contents of the user's communication with the BMC Website that are intercepted and transmitted to Google via hidden Google Analytics Code, intercepting that the user is searching for a BMC doctor (with highlighting added):

---

[5] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers **Payload** Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 940553293
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/find-doctor
dt: Find a Doctor | Boston Medical Center
en: page_view

92. Before BMC removed Meta Pixel code from its website in 2022, communications on the Find-A-Doctor function were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Depicted below are the contents of the communication that would be intercepted when a website user visited the Find-a-Doctor feature on the BMC Website (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

**id:** 353927118450000
**ev:** Microdata
**dl:** https://www.bmc.org/find-doctor
**rl:**
**if:** false
**ts:** 1593114043856
**cd[DataLayer]:** []
**cd[Meta]:** {"title":"Find a Doctor | Boston Medical Center","meta:description":"BMC's primary care physicians, specialty providers, and nurse practitioners provide exceptional care for patients of all ages near Boston, MA. Use our Find a Doctor tool to select the right doctor for you and your family."}
**cd[OpenGraph]:** {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/find-doctor","og:title":"Find a Doctor","og:updated_time":"2019-08-21T12:08:03-04:00","article:published_time":"2016-08-09T13:44:16-04:00","article:modified_time":"2019-08-21T12:08:03-04:00"}
**cd[Schema.org]:** []
**cd[JSON-LD]:** [{"@context":"https://web.archive.org/web/20200625194037/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Patient Care","@id":"https://web.archive.org/web/20200625194037/https://www.bmc.org/conditions-we-treat"}}]}]
**sw:** 1920
**sh:** 1080
**v:** 2.9.21
**r:** stable
**ec:** 1
**o:** 30
**fbp:** fb.0.1593114043346.1886219358
**it:** 1593114042686
**coo:** false
**es:** automatic
**tm:** 3

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

93. Facebook could then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram), and Facebook could then use the content of the intercepted communications for its own commercial purposes.

94. When a user performs a search on the Find-a-Doctor page for doctors within a particular specialty, that communication between the user and BMC is intercepted and transmitted to Google via hidden Google Analytics code. For example, the page below shows the results that appear when a user searches for Obstetrics and Gynecology doctors:




95. The graphic below shows the contents of the communication between the website user and BMC that are secretly intercepted by and sent to Google via hidden Google Analytics code (with highlighting added):

× Headers **Payload** Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

**v:** 2
**tid:** G-M8WZT4NW2R
**gtm:** 45je34j0
**_p:** 940553293
**cid:** 780300399.1682537198
**ul:** en-us
**sr:** 1920x1080
**uaa:** x86
**uab:** 64
**uafvl:** Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|Not%3AA-Brand;99.0.0.0
**uamb:** 0
**uam:**
**uap:** Windows
**uapv:** 10.0.0
**uaw:** 0
**_eu:** AEA
**_s:** 2
**dl:** https://www.bmc.org/find-doctor?sm_department[]=Obstetrics%20and%20Gynecology
**dr:** https://www.bmc.org/find-doctor
**sid:** 1682542380
**sct:** 2
**seg:** 1
**dt:** Find a Doctor | Boston Medical Center
**en:** page_view
**_et:** 21078

That is, the fact that the user performed a find-a-doctor search for doctors within the "Obstetrics and Gynecology" department is intercepted and transmitted to Google, and Google can use the contents of that intercepted communication for its own commercial purposes

96. The BMC Website also contains a section permitting patients to pay bills they received from BMC. The "Bill Payment" page of the BMC Website is depicted below:




97. When a user visits this page, the user communicates that the user is an individual who has received medical services from BMC. That communication with BMC is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into its website. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encoc

v: 2
tid: G-MBWZT4NW2R
gtm: 45je34j0
_p: 611151196
cid: 780360399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/bill-payment
dr: https://www.bmc.org/make-appointment
dt: Bill Payment | Boston Medical Center
en: page_view

As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is accessing the "Billing Payment" feature on the "Boston Medical Center" website. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

98. If a user clicks on the "Guest Pay" button on the bill payment page, further indicating that the user is a BMC patient who is paying a bill, that communication is likewise intercepted by hidden Google Analytics code that BMC has injected into its website, and the contents of that

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

communication are contemporaneously transmitted to Google. The contents of the intercepted communication are shown below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encoc

v: 1
_v: j100
a: 611151196
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/bill-payment
ul: en-us
de: UTF-8
dt: Bill Payment | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1348x947
je: 0
ec: Link
ea: https://www.bmc.org/bill-payment
el: Guest Pay
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS58R
cd8:
z: 1686280199

That is, the communication through which the user has clicked on a "Link" for "Guest Pay" is intercepted and transmitted to Google, and Google can use the contents of that intercepted communication for its own commercial purposes.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

99. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was communicating with BMC about the payment of a BMC bill. Depicted below are the contents of the communication intercepted and transmitted to Facebook (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Form Data** view source view URL-encoded

id: 353927118450000
ev: Microdata
dl: https://www.bmc.org/visiting-us/patient-information#bill-pay
rl:
if: false
ts: 1593343353514
cd[DataLayer]: []
cd[Meta]: {"title":"Patient Information | Boston Medical Center","meta:description":"Banking Facilities Four full-service ATMs are located throughout the hospital for your convenience. Menino Pavilion: Santander Bank ATM (in the lobby of Yawkey Ambulatory Care Center) Menino Pavilion: Citizens Bank ATM (on the first floor near the Albany Street Emergency Department entrance) Bill Payment You may pay an existing bill by logging into MyChart or by using Guest"}
cd[OpenGraph]: {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/visiting-us/patient-information","og:title":"Patient Information","og:description":"Banking Facilities Four full-service ATMs are located throughout the hospital for your convenience. Menino Pavilion: Santander Bank ATM (in the lobby of Yawkey Ambulatory Care Center) Menino Pavilion: Citizens Bank ATM (on the first floor near the Albany Street Emergency Department entrance) Bill Payment You may pay an existing bill by logging into MyChart or by using Guest Pay. If you have questions about your health coverage or about paying your bill, please call 617.414.5155. A financial coun","og:updated_time":"2020-05-29T10:17:51-04:00","article:published_time":"2016-07-07T17:39:34-04:00","article:modified_time":"2020-05-29T10:17:51-04:00"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200628112227/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Visiting Us","@id":"https://web.archive.org/web/20200628112227/https://www.bmc.org/visiting-us"}}]}]
sw: 1920
sh: 1080

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

100. The BMC Website also contains a feature that permits website users to request medical records from BMC. By accessing this feature of the website, the website user communicates that the user is a BMC patient. The webpage on the BMC Website through which a user can request medical records is shown below:




101. When a user accesses the Medical Records feature on the BMC Website, the contents of that communication are intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

**v:** 2
**tid:** G-M8WZT4NW2R
**gtm:** 45je34j0
**_p:** 785046992
**cid:** 780300399.1682537198
**ul:** en-us
**sr:** 1920x1080
**uaa:** x86
**uab:** 64
**uafvl:** Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|Not%3AA-Brand;99.0.0.0
**uamb:** 0
**uam:**
**uap:** Windows
**uapv:** 10.0.0
**uaw:** 0
**_s:** 1
**sid:** 1682542380
**sct:** 2
**seg:** 1
**dl:** https://www.bmc.org/services/medical-records
**dt:** Medical Records | Boston Medical Center
**en:** page_view

That is, the fact that the user is accessing "Medical Records" from "Boston Medical Center" is intercepted and contemporaneously transmitted to Google, and Google can use the content of that intercepted communication for its own commercial purposes.

102. Moreover, if a user clicks on the "Request Medical Records—Authorization Form" link on this webpage, that communication is likewise intercepted and transmitted to Google via hidden Google Analytics code. The contents of that intercepted communication are depicted below (with highlighting added):

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 1
_v: j100
a: 785046992
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/services/medical-records
ul: en-us
de: UTF-8
dt: Medical Records | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1293x947
je: 0
ec: Link
ea: https://www.bmc.org/services/medical-records
el: Request Medical Records - Authorization Form
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 789300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS5BR
cd8:
z: 306423345

103. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was obtaining information about BMC medical records, information that Facebook retains and can use for its own commercial purposes.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

104. BMC's website also features a purportedly secure patient portal through which BMC patients can access medical records and other information. This is another feature of the BMC Website through which, by accessing the feature, a website user communicates the user's status as a BMC patient. The main page through which a website user enters the portal is shown below:




105. When a user communicates with BMC on the MyChart page, that communication is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into its website. The contents of the intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▼ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 2007405342
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|
Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/mychart
dr: https://www.bmc.org/department-obstetrics-and-gynecology
dt: MyChart | Boston Medical Center
en: page_view

That is, the communication through which the user accesses the "MyChart" patient portal of "Boston Medical Center" is intercepted and transmitted to Google.

106. If a website user clicks on the link to log into the MyChart patient portal, that communication too is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into the BMC Website. The contents of that intercepted communication are depicted below (with highlighting added):

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

```
v: 1
_v: j100
a: 3727937
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/mychart
ul: en-us
de: UTF-8
dt: MyChart | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1311x947
je: 0
ec: Link
ea: https://www.bmc.org/mychart
el: Log in to MyChart
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS5BR
cd8:
z: 1963223635
```

That is, BMC aids Google in intercepting the communication in which the website user has clicked on a "Link" to "Log in to MyChart." Google can then associate that communication with the user's real-world identity and use the intercepted communication for Google's own commercial purposes, including serving targeted advertising on the individual in the future based on the content of the intercepted communication.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

107. Before BMC removed Meta Pixel from its website in 2022, the same MyChart webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook. The contents of the communication intercepted and transmitted to Facebook are depicted below (with highlighting added):

× Headers **Payload** Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

**id:** 353927118450000
**ev:** Microdata
**dl:** https://www.bmc.org/mychart
**rl:**
**if:** false
**ts:** 1593550526309
**cd[DataLayer]:** []
**cd[Meta]:** {"title":"MyChart | Boston Medical Center"}
**cd[OpenGraph]:** {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/mychart","og:title":"MyChart","og:updated_time":"2020-05-27T20:07:42-04:00","article:published_time":"2020-05-27T14:30:38-04:00","article:modified_time":"2020-05-27T20:07:42-04:00"}
**cd[Schema.org]:** []
**cd[JSON-LD]:** []
**sw:** 1920
**sh:** 1080
**v:** 2.9.21
**r:** stable
**ec:** 1
**o:** 30
**fbp:** fb.0.1593550525778.1924864490
**it:** 1593550523867
**coo:** false
**es:** automatic
**tm:** 3
**rqm:** GET

108. In addition to Google and Facebook, BMC enables or has, during the Class Period, enabled communications between healthcare consumers and BMC to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Siteimprove Analytics**. Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with BMC through the BMC Website, including the URL and title of each page visited and each movement on the website (including scrolling and clicks).

(b) **New Relic**. New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Like Google Analytics and Meta Pixel, BMC inserts hidden code into their website that caused communications between the user and BMC to be intercepted and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

109. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the BMC Website's operation. The BMC Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

110. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can include links to its Facebook page or invite website users to interact with BMC via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook page; any website can have one without the other.

111. Moreover, even if BMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BMC (i) to keep secret from its

website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BMC does not share the communications with others when it does; or (iii) to claim that BMC maintains the privacy of those communications when it does not.

## Class Action Allegations

112. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bmc.org between three years prior to the filing of this initial complaint in this action and January 25, 2023.

113. This action is properly maintainable as a class action.

114. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

115. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and BMC, through the BMC Website, were wire communications under the Massachusetts Wiretap Act;

(b) Whether BMC inserted tracking technologies into the hidden code of the BMC Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the BMC Website are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3);

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BMC and users of the BMC Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BMC installed an intercepting device on their website with the intent to aid Google, Facebook, and other companies to hear and record communications between the Class Members and BMC;

(g) If Plaintiff prevails on the merits of her Massachusetts Wiretap Act claim, the remedies afforded under the Massachusetts Wiretap Act to Class Members, including statutory remedies, attorneys' fees, and litigation disbursements.

116. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the BMC Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

117. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel who have extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

118. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

119. BMC has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

## COUNT I

**(Violation of the Massachusetts Wiretap Act, M.G.L. c. 272 § 99, on behalf of the Class)**

120. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

121. The Massachusetts Wiretap Act, M.G.L. c. 272 § 99, makes it an unlawful act to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." *Id.* ¶ (B)(4), (C). The Act provides a private remedy to any "person whose oral or wire communications were intercepted." *Id* ¶ (C).

122. An individual's communications with a website constitute "wire communications" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(1). The communications between Plaintiff and other Class Members and BMC, through the BMC Website, were wire communications under the Massachusetts Wiretap Act.

123. The tracking technologies inserted into the hidden code of the BMC Website, including Google Analytics and Meta Pixel, are "intercepting devices" as defined in the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(B)(3). "Intercepting devices" also include any devices Class Members used to access the BMC Website and Class Members' web browsers used to access the BMC Website (which have been coopted by the surreptitiously deployed code for the tracking technologies.

124. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BMC and users of the BMC Website, including, but not limited to, the identity of the parties to the communication, the existence of the communication, and the communication's content, substance, purport, and meaning, including but not limited to (i) the identity of webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

125. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BMC installed an intercepting device on website users' devices with the intent to aid

Google, Facebook, and other companies to secretly hear and record communications between the Class Members and BMC.

126. Class Members' communications between the Class Members and BMC were intercepted, disclosed to Google, Facebook, and other third parties, and used without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

127. Pursuant to the Massachusetts Wiretap Act, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of BMC's violation of the Massachusetts Wiretap Act for Plaintiff and each Class Member or $1,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 10, 2023

Respectfully submitted,

*/s/ Michelle H. Blauner*

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

I HEREBY ATTEST AND CERTIFY ON January 21, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst. Clerk

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

2

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 23-1086 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|
| PLAINTIFF(S) Elizabeth Nova | | DEFENDANT(S) Boston Medical Center Corporation |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>Michelle Blauner (BBO #549049)<br>Shapiro Haber & Urmy LLP<br>One Boston Place, Suite 2600<br>Boston, MA 02108 | | ATTORNEY (if known) |

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS THIS A JURY CASE? * ________ ____________________ (B) ☑ Yes ☐ No

# BK 1 - consumer matters involving complex issues

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this class action to remedy the secret interception of the contents of internet communications between healthcare consumers and certain healthcare providers. Specifically, the defendants aided in the interception of communications between Plaintiff and other Class Members and a website maintained by Boston Medical Center Corporation. These communications were intercepted by Google, Facebook (now known as "Meta"), and other companies that provide so-called "tracking software." Class Members' communications with the Boston Medical Center Website were secretly and contemporaneously monitored, recorded, and retransmitted to these third parties without their knowledge or consent whenever Plaintiff or other Class Members visited the Boston Medical Center Website or any page within that website.

Defendants actively aided this secret interception of healthcare consumers' communications with their website. Defendants aided the interceptions by injecting hidden code into their websites to permit Google, Facebook, and others to intercept the communications.

The Massachusetts Wiretap Act (M.G.L. c. 272 § 99) makes it unlawful to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication." The Massachusetts Wiretap Act provides a private remedy for the secret interception of wire communications, enforceable against both the intercepting party and any party that aids such an interception. Boston Medical Center Corporation aided interceptions completed by Google, Facebook, and other third parties of healthcare consumers' communications with the Boston Medical Center Website. Plaintiff seeks statutory remedies under the Massachusetts Wiretap Act both on her own behalf and on behalf of all other Massachusetts residents who accessed the Boston Medical Center Website.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record /s/ Michelle H. Blauner

DATE: 05/10/2023

I HEREBY ATTEST AND CERTIFY ON
JANUARY 21, 2025 THAT THE
FOREGOING DOCUMENT IS A FULL,
TRUE AND CORRECT COPY OF THE
ORIGINAL ON FILE IN MY OFFICE,
AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M. [signature]
Asst. Clerk

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

# CIVIL ACTION COVER SHEET
# INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

BA.1 claims relating to the governance and conduct of internal of entities
BA2. claims relating to employment agreements
BA3. claims relating to liability of shareholders, directors, officers, partners etc.

BB.1 shareholder derivative claims
BB.2 claims relating to or arising out of securities transactions

BC.1 claims involving mergers, consolidation, sales of assets, issuance of debt, equity and like interests

BD.1 claims to determine the use or status of, or claims involving, intellectual property
BD.2 claims to determine the use or status of, or claims involving, confidential, property or trade secret information
BD.3 claims to determine the use or status, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, mis-representation business torts or other violations involving business relationships

BF.1 claims under the U.C.C. involving complex issues
BG.1 claims arising from transactions with banks, investment bankers

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BL.1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a party

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

TRANSFER YOUR SELECTION TO THE FACE SHEET

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK * | IS THIS A JURY CASE? |
|---|---|---|---|
| BD3 | Restrictive covenants | (B) | Yes No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, in the face sheet a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCU-RATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A special tracking order shall be created by the presiding justice of the Business Litigation Session at the Initial Rule 16 Conference.

Date Filed 5/10/2023 3:44 PM
Superior Court - Suffolk
Docket Number

3

# NOTIFY

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| ELIZABETH NOVA,<br>For herself and the Class,<br>v.<br>BOSTON MEDICAL CENTER CORPORATION,<br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br><br>CIVIL ACTION NO. 23-1086 BLS 1<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S MOTION TO APPOINT SPECIAL PROCESS SERVER

Pursuant to Mass. R. Civ. P. 4(c), Plaintiff hereby moves for an Order appointing Suvalle, Jodrey & Associates, Inc., 1 Devonshire Pl., Boston, MA 02109, a disinterested third party using process servers who are over 18 yrs of age in this matter, as special process server for service of all process in this action within the Commonwealth of Massachusetts, for all purposes contemplated by Mass. R. Civ. P. 4.

Dated: May 10, 2023

Respectfully submitted,

/s/ Michelle H. Blauner
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place, Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
mblauner@shulaw.com
pvallely@shulaw.com

5/17/23: Allowed (Krupp, J)
Attest: Bell
Asst Clerk

BY: Notice Sent via Email

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Date Filed 5/23/2023 11:14 AM
Superior Court - Suffolk
Docket Number 2384CV01086

BC

\5/30

NOTIFY NOTIFY

4

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| ELIZABETH NOVA,<br><br>For herself and the Class,<br><br>v.<br><br>BOSTON MEDICAL CENTER CORPORATION<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV01086-BLS1 |

**JOINT STIPULATION REGARDING ACCEPTANCE OF SERVICE AND DEFENANT'S TIME TO RESPOND TO THE COMPLAINT**

Plaintiff Elizabeth Nova ("Plaintiff") and defendant Boston Medical Center Corporation ("Defendant") hereby stipulate to Defendant's acceptance of service of process.

On May 10, 2023, Plaintiff filed the Complaint in this action, in which Boston Medical Center Corporation was named as a defendant. The parties have met and conferred, and the undersigned counsel for Defendant hereby stipulates to good and sufficient service of process upon Defendant as of May 22, 2023. Subject to the Court's approval, Defendant and Plaintiff also stipulate that Defendant shall have thirty days from May 22, 2023, to answer or otherwise respond to the Complaint.

Respectfully submitted this 23 of May 2023:

/s/ Michelle H. Blauner
SHAPIRO HABER & URMY LLP
Michelle H. Blauner (BBO #549049)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939
mblauner@shulaw.com

*Counsel for Plaintiff and the Proposed Class*

/s/ Linn F. Freedman
ROBINSON & COLE LLP
Linn F. Freedman (BBO #639564)
One Boston Place
26th Floor
Boston, MA 02108
(617) 557-5900
lfreedman@rc.com

*Counsel for Defendant Boston Medical Center Corporation*

5/25/23 Defendant shall answer or otherwise respond to the complaint by 6/21/23.

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Asst. Clerk

5/30/23
notice sent
BA (2)

# CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Defendant's counsel, by email, on May 23, 2023.

*/s/ Michelle H. Blauner*
Michelle H. Blauner

Date Filed 6/30/2023 10:47 AM
Superior Court - Suffolk
Docket Number 2384CV01086

5

NOTIFY

7-26-23 DENIED H. Karagian J.

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| ELIZABETH NOVA,<br><br>For herself and the Class,<br><br>v.<br><br>BOSTON MEDICAL CENTER CORPORATION<br><br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br><br>CIVIL ACTION NO. 2384CV01086-BLS1 |

**JOINT MOTION REGARDING PAGE LIMITS**
**FOR OPPOSITION AND REPLY ON MOTION TO DISMISS**

Plaintiff Elizabet Nova ("Plaintiff") and defendant Boston Medical Center Corporation ("BMC," and together with Plaintiff, the "Parties"), jointly move pursuant to Mass. Super. Ct. R. 9A(a)(6) to extend the page limits for Plaintiff's opposition to and BMC's reply in support of BMC's motion to dismiss, permitting Plaintiff to file an opposition not to exceed twenty-five (25) pages and BMC to file a reply not to exceed fifteen (15) pages. In support of this motion, the Parties state as follows:

1. Plaintiff filed her Complaint on May 10, 2023. After service, BMC served its motion to dismiss on June 21, 2023. The Parties have agreed that Plaintiff will oppose the motion to dismiss by July 14, 2023, and BMC will serve a reply and file all motion papers by August 4, 2023.

2. BMC's motion, supported by a twenty-page memorandum of law, raises legal issues that Plaintiff believes warrant analysis in response that may exceed the default 20-page limit for an opposition to a motion. Plaintiff believes the Court will benefit from Plaintiff's argument presented in a modestly overlength brief not to exceed twenty-five (25) pages.

3. The Parties have agreed that BMC may have up to fifteen (15) pages on its reply in support of its motion to dismiss to respond to Plaintiff's forthcoming opposition.

For the foregoing reasons, the Parties respectfully request that the Court approve the Parties' proposed brief lengths for the opposition to and reply in support of BMC's motion to dismiss, under which Plaintiff may serve an opposition not to exceed twenty-five (25) pages, and BMC may file a reply not to exceed fifteen (15) pages.

Respectfully submitted,

*/s/ Michelle H. Blauner*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

*/s/ Wm Maxwell Daley*
ROBINSON & COLE LLP
Linn F. Freedman (BBO #639564)
Wystan M. Ackerman (BBO #651086)
Wm Maxwell Daley (BBO #694729)
One Boston Place
26th Floor
Boston, MA 02108
(617) 557-5900
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

*Counsel for Defendant Boston Medical Center Corporation*

Dated: June 30, 2023

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: Margaret M Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon Defendant's counsel, by email, on June 30, 2023

*Michelle H. Blauner*
Michelle H. Blauner

enor Court - Suffolk
ket Number 2384CV01086

08.17 VM

NOTIFY

6

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT**
**BUSINESS LITIGATION SECTION**
**CIVIL ACTION NO. 2384CV01086 BLS1**

**ELIZABETH NOVA, for herself and the Class,**

*Plaintiff,*

v.

**BOSTON MEDICAL CENTER CORPORATION,**

*Defendant.*

**DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S**
**MOTION TO DISMISS THE COMPLAINT UNDER MASS. R. CIV. P. 12(b)(1) AND (6)**

Defendant Boston Medical Center Corporation ("BMC") respectfully moves, under Mass. R. Civ. P. 12(b)(1) and (6), to dismiss Plaintiff Elizabeth Nova's ("Plaintiff") May 10, 2023 Complaint (the "Complaint") in its entirety and with prejudice. Plaintiff failed to establish standing, and, substantively, her state law claim, under the Massachusetts Wiretap Act, G.L. c. 272, § 99 (the "Wiretap Act"), fails for a variety of reasons. *First*, for the reasons articulated by the Massachusetts Supreme Judicial Court in *Pugsley v. Police Dep't of Bos.*, 472 Mass. 367, 373, 34 N.E.3d 1235, 1240 (2015), which controls, Plaintiff cannot establish standing because her claim does not allege any "nonspeculative, direct injury" that is "sufficiently concrete and imminent"—an essential requirement of standing in the Commonwealth. This deficiency alone warrants dismissal in full. *See Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683, 131 N.E.3d 852, 859 (2019) (affirming dismissal for lack of standing pursuant to Rule 12(b)(1)). Moreover, Plaintiff's claim under the Wiretap Act fails to state a claim because she has not pled a plausible, *prima facie* entitlement to relief under that Act as a matter of law. The grounds for dismissal are

11-9-23 The motion to dismiss is Denied without prejudice to be renewed following the decision from the Appeals Court on Dockets 2384CV1480-BLS1 and 2384CV0957-BLS1, which cases have been reported pursuant to Mass. R. Civ. P. 64. All further proceedings in this case are stayed pending the outcome of the reported cases. (Kazanjian, J.)

set forth more fully in BMC's supporting Memorandum. In accordance with Superior Court Rule 9A(a)(1) and (c)(2) and (3), BMC respectfully requests a hearing on this Motion, which it believes will aid the Court in its consideration of the issues presented.

**WHEREFORE**, BMC respectfully requests that the Court grant this Motion and dismiss the Complaint in its entirety and with prejudice under Mass. R. Civ. P. 12(b)(1) and (6).

Dated: June 21, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

Linn F. Freedman

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
ROBINSON & COLE LLP
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M. Buckley
Asst. Clerk

**CERTIFICATE OF SERVICE**

I, Wm. Maxwell Daley, hereby certify that, on this 21st day of June, 2023, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley

erior Court - Suffolk
ket Number 2384CV01086

VM 7

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV01086 BLS1

ELIZABETH NOVA, for herself and the Class,

*Plaintiff,*

v.

BOSTON MEDICAL CENTER CORPORATION,

*Defendant.*

## DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
ROBINSON & COLE LLP
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 617-557-5900
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

*Attorneys for Defendant Boston Medical Center Corporation*

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES .......... ii

PRELIMINARY STATEMENT .......... 1

I. THE COMPLAINT .......... 2

II. APPLICABLE LEGAL STANDARDS .......... 5

A. RULE 12(B)(1) .......... 5

B. RULE 12(B)(6) .......... 5

III. ARGUMENT .......... 6

A. PLAINTIFF LACKS STANDING TO MAINTAIN HER CLAIMS AGAINST BMC .......... 6

B. PLAINTIFF'S WIRETAP ACT CLAIM FAILS .......... 11

1. The Wiretap Act Does Not Apply to Internet Tracking and Applying It in This Context Would Lead to Absurd Results .......... 12

2. Plaintiff Has Not Alleged that an "Intercepting Device" was Used .......... 17

3. Plaintiff Fails to Allege an "Interception" Occurred in Massachusetts .......... 19

IV. CONCLUSION .......... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Barbara F. v. Bristol Div. of Juvenile Court Dept.*,
432 Mass. 1024 (2000) ....6

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ....15

*Burbank Apartments Tenant Ass'n v. Kargman*,
474 Mass. 107 (2016) ....6

*Callahan v. First Congregational Church of Haverhill*,
441 Mass. 699 (2004) ....1, 5, 11

*Clapper v. Amnesty Intern. USA*,
568 U.S. 398 (2013) ....10

*Com. v. Dykens*,
473 Mass. 635 (2016) ....18

*Com. v. Ennis*,
439 Mass. 64 (2003) ....12

*Com. v. Moody*,
466 Mass. 196 (2013) ....13

*Com. v. Rainey*,
491 Mass. 632 (2023) ....12, 13, 15, 16

*Comm. v. Wilcox*,
63 Mass. App. Ct. 131 (2005) ....19

*Cook v. Patient Edu, LLC*,
465 Mass. 548 (2013) ....16

*Dillon v. Mass. Bay Transp. Auth.*,
49 Mass. App. Ct. 309 (2000) ....12, 16, 17

*Doe v. Partners Healthcare System Inc.*,
C.A. No. 1984CV01651 (Mass. Super. Ct. Nov. 20, 2020) ....14

*Dunn v. Comm'r of Civ. Serv.*,
281 Mass. 376 (1933) ....18

*Duqum v. Scottrade, Inc.*,
2016 WL 3683001 (E.D. Mo. July 12, 2016) ....................9

*Federal Trade Comm'n v. Ruberoid Co.*,
343 U.S. 470 (1952) ....................15

*Ginther v. Comm'r of Ins.*,
427 Mass. 319 (1998) ....................7

*Healix Infusion Therapy, Inc. v. Helix Health, LLC*,
747 F. Supp. 2d 730 (S.D. Tex. 2010) ....................19

*Iannacchino v. Ford Motor Co.*,
451 Mass. 623 (2008) ....................5, 6

*IndeckMe. Energy LLC v. Comm'r of Energy Res.*,
454 Mass. 511 (2009) ....................6

*Leavitt v. Welch & Forbes, LLC*,
2022 WL 2752532 (Mass. Super. Ct. May 4, 2022) ....................5

*Leocal v. Ashcroft*,
543 U.S. 1 (2004) ....................16

*Licea v. Cinmar, LLC*,
2023 WL 2415592 (C.D. Cal. Mar. 7, 2023) ....................15

*MacNeill Eng'g Co. v. Trisport, Ltd.*,
59 F. Supp. 2d 199 (D. Mass. 1999) ....................19

*Mahan v. Bos. Ret. Bd.*,
490 Mass. 604 (2022) ....................12, 16

*Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP*,
473 Mass. 336 (2015) ....................5

*Marquis v. Google*,
No. 11-2808, 2015 WL 13037257 (Mass. Super. Ct. Feb. 13, 2015) ....................19

*Mason v. Machine Zone, Inc.*,
140 F. Supp. 3d 457 (D. Md. 2015) ....................18

*McInnis-Misenor v. Me. Med. Ctr.*,
319 F.3d 63 (1st Cir. 2003) ....................7

*Modica v. Sheriff of Suffolk County*,
477 Mass. 102 (2017) ....................17

*O'Sullivan v. NYNEX Corp.*,
426 Mass. 261 (1997) ....................16, 17

*Pereira v. New England LNG Co.*,
364 Mass. 109 (1973) ....................15

*Pishev v. City of Somerville*,
95 Mass. App. Ct. 678 (2019)....................5, 6, 7

*In re Practicefirst Data Breach Litig.*,
2022 WL 354544 (W.D.N.Y. Feb. 2, 2022) ....................9

*Pugsley v. Police Dep't of Bos.*,
472 Mass. 367 (2015) ....................1, 6, 7, 8, 10, 11

*Reidy v. Umass Memorial Medical Center, Inc.*,
2021 WL 6777622 (Mass. Super. Ct. June 17, 2021)....................7, 8, 9

*Restuccia v. Burk Tech., Inc.*,
1996 WL 1329386 (Mass. Super. Ct. Aug. 13, 1996) ....................17

*Ross v. Jackson Nat'l Life Ins. Co.*,
2020 WL 2850290 (D. Mass. June 2, 2020) ....................19

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) ....................8, 9

*Schaer v. Brandeis Univ.*,
432 Mass. 474 (2000) ....................5

*Slama v. Attorney Gen.*,
384 Mass. 620 (1981) ....................6

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....................10, 19

*State Bd. of Ret. v. Bulger*,
446 Mass. 169 (2006) ....................15

*Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*,
448 Mass. 15 (2006) ....................5, 6, 7

*Tsao v. Captiva MVP Rest. Partners, LLC*,
986 F.3d 1332 (11th Cir. 2021) ....................8

*Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*,
2019 WL 2233535 (D. Md. May 23, 2019)....................18

*Vander Luitgaren v. Sun Life Assur. Co. of Canada*,
765 F.3d 59 (1st Cir. 2014) ........ 7

*Velazquez v. Comm.*,
491 Mass. 279 (2023) ........ 16

*Walker v. Bos. Med. Ctr. Corp.*,
2015 WL 9946193 (Mass. Super. Ct. Nov. 20, 2015) ........ 8

*Walker v. Boston Med. Ctr. Corp.*,
2017 WL 3612366 (Mass. Super. Ct. June 7, 2017) ........ 8

*Webb v. Injured Workers Pharmacy, LLC*,
2022 WL 10483751 (D. Mass. Oct. 17, 2022) ........ 8, 9

**Statutes**

G.L. c. 272, § 99 ........ *passim*

**Other Authorities**

WEBSTER'S THIRD NEW INT'L DICTIONARY (1968) ........ 18

## PRELIMINARY STATEMENT

This lawsuit is one of numerous putative class actions recently filed against healthcare providers both in Massachusetts and nationwide. Plaintiff Elizabeth Nova alleges that Boston Medical Center (BMC) used third-party code on its *publicly-available* website, www.bmc.org, and that this code caused the transmission of metadata containing search terms used and mouse clicks to third parties, such as Meta and Google (not named as defendants). But the Complaint contains *no* allegations regarding *any* information obtained by any third party concerning *Plaintiff's* use of the BMC website, or how she was harmed, if at all, by the alleged transmission of metadata. The Complaint does not allege that *any* of Plaintiff's private information was revealed to *any* human being, or even to a third-party computer server. Instead, the Complaint merely alleges that, hypothetically, people who used the BMC website may have had certain information regarding their computers' mouse clicks and search terms captured for advertising purposes.

Based on these threadbare allegations, Plaintiff alleges on behalf of a putative class a single claim under the Massachusetts Wiretap Act, Mass. Gen. Laws c. 272, § 99 (the "Wiretap Act"), seeking statutory damages of up to $1,000 for each putative class member (every Massachusetts resident who visited BMC's website during the last three years), plus attorneys' fees. She makes clear that her claim would apply to *every* website employing widely-used tracking technologies. Compl. ¶¶ 6–7. The implications of Plaintiff's suit and others like it are staggering.

Plaintiff's claim fails as a matter of law for a variety of reasons. *First*, Plaintiff lacks standing because she has failed to articulate any "non-speculative, direct injury" that is "sufficiently concrete and imminent." *Pugsley v. Police Dep't of Bos.*, 472 Mass. 367, 373 (2015). She alleges absolutely nothing about how she was injured. *Second*, Plaintiff's Wiretap Act claim fails for several reasons: (1) when the Massachusetts Legislature enacted the Wiretap Act in 1968, primarily a criminal statute, it expressly directed the Act at secret recordings of in-person,

identifiable conversations and telephone communications; the legislature never conceived, let alone intended, that the Act would apply to tracking the browsing of the then-nonexistent internet, or any activity analogous thereto; (2) Plaintiff's claim is premised on the use of computer code, which is not an "intercepting device" within the plain meaning and intent of the Wiretap Act; and (3) Plaintiff failed to allege that any alleged interception took place in Massachusetts. As explained more fully below, the Complaint should be dismissed with prejudice.

## I. THE COMPLAINT[1]

BMC is a healthcare provider in Boston, Massachusetts that provides inpatient and outpatient care to residents from Boston and surrounding communities. Compl., ¶¶ 11, 13. BMC maintains a public-facing website, www.bmc.org (the "Website"), where any web user with an internet connection can obtain information about doctors, services, and treatments offered by BMC. Separately, patients of BMC, in a secured portal called "MyChart," can sign in (with a password) to schedule medical appointments, pay bills, and access medical records. *Id.* ¶¶ 14–15.

Plaintiff alleges that she is a patient of BMC and has used the Website to obtain information about doctors, procedures and hours, schedule appointments and review information on MyChart. *Id.* ¶ 10. Plaintiff alleges that BMC implemented "various tracking technologies" on the Website that caused the interception and transmission of web browsing activities to third parties for commercial purposes, including "personalized advertisements to healthcare consumers." *Id.* ¶¶ 2, 32, 44, 69, 108. Plaintiff identifies these technologies as the "Meta Pixel," "Google Analytics," "Siteimprove Analytics" and "New Relic Browser Monitoring." *Id.* ¶¶ 36, 43, 108. The data allegedly tracked includes: words typed into a search box or search form on the Website, *id.* ¶ 45, "the URL of the webpage visited, the title of the webpage visited, and data reflecting additional

[1] BMC draws the factual background discussed here from the allegations in the Complaint, as it must, but it reserves its rights, in full, to subsequently challenge all the allegations contained therein.

detail on the contents of each particular webpage," *id.* ¶ 73, the IP address of a web user's computer, *id.* ¶ 75, and, if a web user clicked the "Request an Appointment," "Find a Doctor," "Billing Payment," "Request Medical Records," or "Log in to MyChart" links, the fact that such clicks occurred, *id.* ¶¶ 77, 90, 94, 95–97, 102, 106. Plaintiff also alleges, in a conclusory manner, that when the IP address of a computer accessing the Website is tracked, third parties purportedly might be able to associate the computer with an individual's Facebook or Google account, for example, if the individual is "known to" Google or Facebook. *Id.* ¶¶ 56, 69–70, 75. The nature and extent of this type of tracking of web browsing is revealed to anyone who uses Google's "Developer Mode" setting in their web browser. *Id.* ¶¶ 62, 65–67. There is no allegation that anyone's confidential identifiable medical information (such as an individual's communications with medical providers or any individual's medical records or test results) are ever disclosed to any third party.

Notably, the Complaint does not allege a single instance where the code on BMC's Website caused metadata derived from *Plaintiff's* computer's interactions with BMC's Website to be transmitted to third parties. Plaintiff alleges only that she "regularly uses" the BMC Website for various purposes. Compl., ¶ 10. Plaintiff does not allege that she uses Facebook, has a Google account, or is "known to Google and Facebook" as some individuals are alleged to be. *See id.* ¶¶ 56, 69. Significantly, Plaintiff does not allege how, if at all, she was harmed by her use of the Website, or that there was any transmission of her computer's browsing activity to third parties.

Instead of pleading facts specific to how *Plaintiff* was injured by BMC's alleged conduct, the Complaint walks the reader through a speculative series of *hypotheticals*. *Hypothetically*, Plaintiff alleges that anyone with internet access could click on the webpage entitled "Neurology" on BMC's Website, thus "communicat[ing] that the user *may* have a neurological disorder," and

the fact of that mouse click could be transmitted to third parties. *Id.* ¶ 79.[2] The Complaint speculates that this might result in "advertisements relating to neurological drugs" for various conditions. *Id.* ¶ 82. Similarly, if a hypothetical user of BMC's Website searches for obstetrics and gynecology doctors, the fact that the user's computer visited that webpage could be conveyed to third parties. *Id.* ¶ 94. Additionally, a hypothetical mouse click on the "Bill Payment" page of BMC's website allegedly could "communicate[] that the user is an individual who has received medical services from BMC," if the computer could be traced to a particular individual (which it cannot be). *Id.* ¶ 96–97. And, hypothetically, a web user could access the "Medical Records" or "MyChart" feature on BMC's Website, and the mere fact that the computer visited that webpage could be transmitted to third parties. *Id.* ¶ 100–101, 105–107. But Plaintiff's Complaint makes crystal clear that all these hypothetical examples "do *not* reflect webpages Plaintiff personally visited." *Id.* ¶ 78.

Plaintiff filed this action on behalf of herself and a putative class of "[a]ll Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bmc.org between three years prior to the initial complaint in this action and January 25, 2023." *Id.* ¶ 112. The Complaint contains a single count, purporting to state a claim under the Wiretap Act. *Id.* ¶¶ 120–127. Plaintiff alleges that "[a]n individual's communications with a website constitute 'wire communications'" under the Wiretap Act, and that "tracking technologies" in BMC's Website code constitute "intercepting devices" under the Wiretap Act, along with "any devices Class Members used to access the BMC Website and Class Members' web browsers." *Id.* ¶¶ 122–123. Plaintiff further alleges that by using the tracking technology code, BMC enabled "Google, Facebook, and other companies to secretly hear and record

---

[2] All emphasis is added unless otherwise indicated.

communications between the Class Members and BMC." *Id.* ¶ 125. With respect to injury, Plaintiff only claims in a conclusory fashion that Class Members' "privacy interests were violated." *Id.* ¶ 126. Plaintiff seeks statutory damages of $100 per day per Class Member, or $1,000 per Class Member, whichever is higher, plus attorneys' fees and costs, potentially amounting to many millions of dollars. *Id.* ¶ 127.

## II. APPLICABLE LEGAL STANDARDS

### A. RULE 12(B)(1)

"Standing is an issue that may be tested by a rule 12(b)(1) motion to dismiss." *Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683 (2019) (citation omitted). When evidence is not presented, the Court applies a similar standard to a Rule 12(b)(6) motion. *See Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*, 448 Mass. 15, 20–21 (2006); *Callahan v. First Congregational Church of Haverhill*, 441 Mass. 699, 709 (2004) (a Rule 12(b)(1) motion "unsupported by affidavit presents a 'facial attack' based solely on the allegations of the complaint, taken as true for purposes of resolving the complaint").

### B. RULE 12(B)(6)

To survive a Rule 12(b)(6) motion, a complaint must contain "factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief." *Iannacchino v. Ford Motor Co.*, 451 Mass. 623, 636 (2008) (adopting the standard set forth by the U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Courts accept the truth of well-pled factual allegations, but disregard "legal conclusions cast in the form of factual allegations." *Schaer v. Brandeis Univ.*, 432 Mass. 474, 477 (2000); *see also Leavitt v. Welch & Forbes, LLC*, 2022 WL 2752532, at *1 (Mass. Super. Ct. May 4, 2022) (Salinger, J.) (court "must 'look beyond the conclusory allegations in the complaint and focus on whether the factual allegations plausibly suggest an entitlement to relief'" (quoting *Maling v. Finnegan, Henderson, Farabow, Garrett & Dunner, LLP*, 473 Mass.

336, 339 (2015))). Where, as here, the "claimed damages were 'speculative and premature," the complaint must be dismissed. *Iannacchino*, 451 Mass. at 628; *see also, e.g.*, *Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107, 129 (2016) (affirming dismissal where plaintiffs "have not pointed to anything other than speculative prospective harm").

## III. ARGUMENT

### A. PLAINTIFF LACKS STANDING TO MAINTAIN HER CLAIMS AGAINST BMC

The question of standing is one of "critical significance" in that it determines "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Barbara F. v. Bristol Div. of Juvenile Court Dept.*, 432 Mass. 1024, 1024 (2000). Without proper standing, the court lacks subject matter jurisdiction and dismissal is required. *IndeckMe. Energy LLC v. Comm'r of Energy Res.*, 454 Mass. 511, 516 (2009); *see also Pishev v. City of Somerville*, 95 Mass. App. Ct. 678, 683 (2019) ("a court lacks subject matter jurisdiction over an action, and is without power 'to decide the merits of a dispute or claim,' if a plaintiff does not have standing"). Here, Plaintiff identified no harm or even any relevant conduct relating to her specifically—let alone alleging a "nonspeculative, direct injury" that is "sufficiently concrete and imminent," as expressly required by the SJC to establish standing. *Pugsley*, 472 Mass. at 373.

"To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury." *Slama v. Attorney Gen.*, 384 Mass. 620, 624 (1981); *see also Pishev*, 95 Mass. App. Ct. at 683 ("[A] plaintiff must show that he or she was injured as a result of the defendant's conduct"). "Injuries that are speculative, remote and indirect are insufficient to confer standing." *Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 448 Mass. 15, 21 (2006). "[I]t is solely the plaintiff's burden to prove his standing[,] [and] [h]e must allege sufficient facts to show that he has suffered a nonspeculative, direct injury." *Pugsley*, 472 Mass. at 373. Even where a statute confers a private right of action, a plaintiff must show both: 1) a "direct and certain injury"

that is not "speculative, remote, and indirect"; and 2) "[i]n addition . . . the injury alleged must fall 'within the area of concern' of the statute." *Ginther v. Comm'r of Ins.*, 427 Mass. 319, 323 (1998); *see also Pugsley*, 472 Mass. at 372–73 (requiring "injury [that] is sufficiently concrete and imminent" for statutory violations); *Sullivan*, 448 Mass. at 21–22. Some courts have described these two separate requirements as 1) "prudential" standing or "statutory standing"; and 2) "constitutional" standing. *E.g.*, *McInnis-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 68 (1st Cir. 2003); *Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F.3d 59, 62 (1st Cir. 2014).

To establish standing, "a plaintiff must show that he or she was injured as a result of the defendant's conduct." *Pishev*, 95 Mass. App. Ct. at 683 (citation omitted). "Simply alleging injury alone is not sufficient and '[i]njuries that are speculative, remote, and indirect' do not confer proper standing." *Pugsley*, 472 Mass. at 373 (citation omitted). A plaintiff "cannot . . . claim that there are insufficient facts for th[e] court to determine whether he lacks standing; such an argument is circular. If there are insufficient facts to determine standing, then logic dictates that the plaintiff has failed to articulate the necessary facts to prove his standing." *Id.*

Speculative allegations of potential disclosures of sensitive information, without any resulting harm, are not "identifiable, actual harm" and, therefore, cannot form the basis for standing in Massachusetts. In *Reidy v. Umass Memorial Medical Center, Inc.*, 2021 WL 6777622 (Mass. Super. Ct. June 17, 2021) (Reardon, J.), for example, the court granted the medical center's Rule 12(b)(6) motion, even where the plaintiff alleged disclosure of information including "patients' names, ages, genders, dates of birth, phone numbers, email addresses, dates of treatment, departments of service, and names of treating physicians," because "the allegations ... are speculative and conclusory and *do not sufficiently allege an identifiable, actual harm* to [plaintiff] or the members of the putative class." *Id.* at *2–3. The claims were "at best, abstract concerns

about possible future impairments of his rights as a patient, without actual damages." *Id.* at *2. The same is true here, where Plaintiff only generally alleges potential disclosure of search terms and mouse clicks (identifiable only to computers, not individuals), in stark contrast to the type of personal data at issue in *Reidy*, and without identifying *any* harm to Plaintiff. *See id.*; *Walker v. Boston Med. Ctr. Corp.*, 2017 WL 3612366 (Mass. Super. Ct. June 7, 2017) (Kaplan, J.) (finding no standing in putative data breach class action because there was no evidence that any "third party viewed the plaintiffs' records or misused the information")[3]; *Webb v. Injured Workers Pharmacy, LLC*, 2022 WL 10483751, at *2 (D. Mass. Oct. 17, 2022) (finding no standing where the "[c]omplaint does not sufficiently allege that the [data] breach caused any identifiable harm" and "Plaintiffs' alleged injuries rest entirely on the future possibility that an unauthorized third party will, at some undetermined time, misuse their PII."). As in these cases, Plaintiff lacks standing.

Similarly, federal courts—which the SJC routinely refers to on standing issues, *see, e.g.*, *Pugsley*, 472 Mass. at 371, 373—have consistently rejected claims predicated solely on an alleged disclosure of confidential information as conferring standing on a would-be plaintiff without facts demonstrating actual misuse of the information. *See, e.g.*, *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1343 (11th Cir. 2021) ("vague, conclusory allegations that members of the class have suffered any actual misuse of their personal data" did not suffice to confer standing); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 509, 522–23 (C.D. Cal. 2021) (dismissing claims relating to alleged use of tracking software for lack of standing where there was no alleged harm other than mere possession of "mouse clicks, keystrokes and payment card information").

Here, Plaintiff alleges only vaguely that Class Members' "privacy interests were violated

---

[3] In *Walker*, the court initially denied a motion to dismiss, but this was because the court inferred that "plaintiffs' *medical records* were available to the *public* on the internet." *Walker v. Bos. Med. Ctr. Corp.*, 2015 WL 9946193, at *2 (Mass. Super. Ct. Nov. 20, 2015). There is no such allegation here.

by the interception." Compl., ¶ 126. No facts are alleged regarding what allegedly private information of Plaintiff was disclosed, or to whom, let alone how that injured her.[4] Instead, she pleads her case based on hypotheticals that "*do not reflect* webpages Plaintiff personally visited." *Id.* ¶ 78. The hypotheticals she outlines in the Complaint do not allege that any of ***her*** information was allegedly disclosed to third parties or that such alleged disclosure caused her any harm. In any event, the mere disclosure of private information, even if it is personally identifiable (which Plaintiff does not allege here), is not a basis for establishing standing without actual, concrete harm to the plaintiff. *See, e.g., Reidy*, 2021 WL 6777622, at *2; *Webb*, 2022 WL 10483751, at *2 (alleging disclosure of customers' names and social security numbers); *Saleh*, 562 F. Supp. 3d at 509, 522–23; *In re Practicefirst Data Breach Litig.*, 2022 WL 354544, at *8 (W.D.N.Y. Feb. 2, 2022) (in case involving alleged data breach at medical management company in which third party obtained protected health information, "even if plaintiffs could plead facts sufficient to allege the tort of public disclosure of private information, the Court would still find a lack of subject matter jurisdiction here" because "this theory of standing has been rejected . . . where, like in this case, plaintiffs have failed to demonstrate any concrete or particularized injury associated with the disclosure"); *Duqum v. Scottrade, Inc.*, 2016 WL 3683001, at *8 (E.D. Mo. July 12, 2016) ("Plaintiffs do not allege any facts demonstrating that they suffered any damages or injury due to a loss of privacy or breach of confidentiality" and "[t]hese theories are not sufficiently concrete to establish injury in fact and do not support standing in this case"), *aff'd*, 868 F.3d 711 (8th Cir.

[4] While Plaintiff alleges that she searched the BMC Website for "information about BMC doctors" and "information on particular medical procedures," Compl. ¶ 10, she provides no details on those searches, the purpose of them, or how or why they would reveal confidential personal information to third parties. People search websites for information on medical conditions for many different reasons, often unrelated to their own personal health. Moreover, users of a public website do not reasonably expect privacy when they type in search terms or visit a webpage. To the extent Plaintiff searched for BMC's hours, *id.*, those are certainly not confidential information. The Complaint does not allege that the details of any medical appointments or medical records were revealed to third parties (and tracking technologies would not do that). *See id.*

2017). These courts found no standing when identifiable private information was disclosed.

Here, Plaintiff chose to identify no personal information that was allegedly subject to BMC's alleged conduct, further underscoring why, consistent with the foregoing decisions, she lacks standing. Plaintiff's claims here do not allege any facts demonstrating that her own browsing history was transmitted to third parties, let alone that the browsing history was identifiable to her, or caused her any harm. While Plaintiff proposes various *hypothetical* scenarios in the Complaint (*e.g.* ¶¶ 79, 94–97, 100–01), the case law is clear that, where a "plaintiff has failed to articulate an injury that is *anything but hypothetical*," she does not "ha[ve] standing to bring [her] claim." *Pugsley*, 472 Mass. at 372; *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 417 (2013) (no standing "based on . . . fears of hypothetical future harm that is not certainly impending").

Even accepting the proffered hypotheticals for whatever value they may have (likely none), they are far too speculative to serve as a basis for conferring standing. Plaintiff does not allege that she has a Facebook or Google account that allegedly could be used to try to connect a computer to an individual. *See Compl.* ¶¶ 56, 69–70, 75. And even if Plaintiff has such an account, there is no way a Google or Meta server would know for certain if the user of the computer was the same individual, or if the person was searching for information for themself, for others, or for some other unrelated purpose. An individual may conduct web searches for any number of reasons, including out of curiosity, for a friend or relative, or because they saw something about a medical condition on the news or a TV show or in a book they are reading, or because the individual works in healthcare. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("connection between a person's browsing history and his or her own state of health" found to be "tenuous"). Accordingly, even assuming Plaintiff *could* allege that her searches or web clicks were disclosed (and she does not), she would *still* lack standing. *See Pugsley*, 472 Mass. at 372 ("plaintiff does not point this

court to any fact in the record or any controlling authority that shows his 'injury' was anything more than speculative").

In sum, Plaintiff does not allege any concrete, particularized injury that she sustained by browsing BMC's Website. The Complaint is entirely devoid of any allegations relating to any actual disclosure or misuse of Plaintiff's health information, or any harm caused by her browsing of BMC's Website. Accordingly, this Court should dismiss Plaintiff's Complaint for lack of standing. *See Pugsley*, 472 Mass. at 372 (finding no standing where plaintiff's "contention is little more than an allegation that an injury *might* have occurred if a series of events transpired in a certain way" (emphasis in original)).

### B. PLAINTIFF'S WIRETAP ACT CLAIM FAILS

Even if Plaintiff can surmount the uphill battle of establishing standing, her Complaint fails as a matter of law because Plaintiff has failed to state a claim under the Wiretap Act. To state a cognizable claim under the Wiretap Act, Plaintiff must plead facts showing that BMC: (1) willfully and secretly, (2) committed or "procure[d] any other person to commit" an "interception" of, (3) the "contents" of, (4) a "wire communication," (5) through the use of an "intercepting device," (6) without the consent of all parties to the communication. G.L. c. 272, § 99(C)(1), (Q).

Here, Plaintiff's Wiretap Act claim fails for several reasons. *First,* the Legislature in 1968 never conceived, let alone intended, that the Wiretap Act would apply to public internet use and tracking, and courts should not expand the reach of the penal statute far beyond its statutory language and intent. *Second*, based on the facts alleged, the "tracking technologies" (*i.e.* computer code) installed on BMC's Website did not intercept the "contents" of a wire communication via the use of an "intercepting device" as such terms have been interpreted by courts. *Third,* Plaintiff has failed to allege that any interception took place in Massachusetts.

### 1. The Wiretap Act Does Not Apply to Internet Tracking and Applying It in This Context Would Lead to Absurd Results

Plaintiff's claim does not fit within the scope of the Wiretap Act and therefore fails. In enacting the Wiretap Act in 1968, "the Legislature sought to curtail two grave dangers": (1) "the increasing activities of organized crime," and (2) "the uncontrolled development and unrestricted use of modern electronic surveillance devices[.]" *Com. v. Ennis*, 439 Mass. 64, 68 (2003). The Supreme Judicial Court recently explained that the legislative history of the Wiretap Act "confirms" that "the Legislature was concerned principally with the investigative use of surveillance devices *by law enforcement officials* to eavesdrop surreptitiously on *conversations*." *Com. v. Rainey*, 491 Mass. 632, 645 (2023); *see also Dillon v. Mass. Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 310 (2000) (Act's purpose was to "help in the fight against organized crime by validating the limited and controlled utilization of such [surveillance] devices by law enforcement authorities"). At bottom, the Act was concerned with then-modern (now antiquated) wiretapping devices—*i.e.*, electronic surveillance devices that allowed law enforcement (and others) to eavesdrop on or record private conversations occurring in-person or by telephone. *Id.* § 99(A), (B)(1); *Ennis*, 439 Mass. at 68; *Rainey*, 491 Mass. at 645. Plaintiff's attempt to portray nearly every visit to BMC's publicly-available website (and many other publicly-available websites) as resulting in a felony under a fifty-year-old criminal statute must fail and, as explained below, adopting that approach would lead to absurd results. As a penal statute, the Wiretap Act must be interpreted *narrowly*. *See Mahan v. Bos. Ret. Bd.*, 490 Mass. 604, 617 (2022) ("we must construe [the act] narrowly because it is a penal statute").

In relevant part, the Wiretap Act applies only to an "interception" of a "wire communication," defined as "secretly hear[ing], secretly record[ing], or aid[ing] another to secretly hear or secretly record the contents of any wire or oral communication through the use of

any intercepting device." G.L. c. 272, § 99(B)(4), (C)(1). The term "wire communication" is defined as a "communication" using a "wire, cable, or other like connection." *Id.* § 99(B)(1). In 1968, the Legislature was concerned with law enforcement officials installing "bug[s]" that could be "concealed in telephones or walls" to secretly record human-to-human "conversations." *Rainey*, 491 Mass. at 645. Legislators could not have envisioned that the Wiretap Act could apply to computer "code" installed on "websites," allowing companies to track "metadata" concerning a computer's interactions with that website. Such activity cannot reasonably be construed as an "interception" of a "wire communication" within the meaning of a 1968 statute that was focused entirely on audiotaping of in-person conversations and wiretapping of telephone lines.

More specifically here, the use of a "JavaScript code" that "causes the individual's web browser to retrieve a very small file from the third-party's website" and then "communicate certain information to the third-party website," Compl. ¶¶ 53–57, cannot reasonably be construed as an "interception" of a "wire communication" within the meaning of a 1968 statute focused on audiotaping of in-person conversations and wiretapping of telephone lines. While the SJC has construed the Wiretap Act to extend to cellular telephone calls and text messages, *Com. v. Moody*, 466 Mass. 196, 205–09 (2013), those mediums are directly analogous to landline telephone communications, telegraph messages and fax machines that existed in 1968. Here, in contrast, the use of computer code ("JavaScript code" and "downloads" of small files from a website) to track internet browsing (in a manner that is not identifiable to an individual, but only an IP address of the computer that is involved in the search), goes far beyond what the Legislature could have contemplated as a "communication" that could be "intercepted" using an "intercepting device" in 1968. Nearly everything that Plaintiff alleges involves mouse clicks by an unidentified user of a computer, which are plainly not "communications" within the meaning of the Act. Search terms

typed into a website search box by an unidentified individual using a computer likewise are *not* "communications" directed to any person or entity (such as a text message sent by a smartphone), but simply a means of *using* a website to locate information the website user might want to read. In 1968, and even twenty years later, a person researching a medical condition or potential physicians might search the card catalog at a library, browse the shelves, and perhaps check out a book on cancer or a directory of Massachusetts physicians. No one would think of this activity as a "communication" that was "intercepted" if a third party saw the patron browsing a certain part of the card catalog, or browsing a particular aisle of the library and made a record of that, or obtained the library checkout record. Plaintiff seeks to contort the Wiretap Act far beyond the reasonable meaning of "secretly record[ing]" a "wire communication" found in a 1968 statute. And Plaintiff's Complaint also acknowledges that the alleged "recording" was not "secret" because anyone using the "Google Developer Mode" setting in their web browser could see what was occurring. Compl. ¶¶ 62, 65–67.[5]

Notably, since the analogous federal wiretap act was amended in 1986 to include electronic communications, the General Court has repeatedly declined to amend the Wiretap Act to address recent technological advances, rejecting attempts to "modernize" the Act. *See, e.g.*, Senate Bill No. 1128 (2023); House Bill No. 1786 (2023); House Bill No. 4347 (2022); Senate Bill No. 1136 (2021); Senate Bill No. 1030 (2019); House Bill No. 3671 (2017); House Bill No. 1554 (2015).[6] Despite these efforts, the General Court has consistently declined to expand the Act. This Court

---

[5] To the extent Plaintiff relies on an oral ruling in *Doe v. Partners Healthcare System Inc.*, C.A. No. 1984CV01651 (Mass. Super. Ct. Nov. 20, 2020) (Davis, J.), her reliance is misplaced. The decision involved minimal reasoning and no analysis of the statutory text, history or case law. Moreover, it appears no consideration was given to the principle that penal statutes are strictly construed or how the Legislature has declined to amend the Act. The court also did not appear to address standing.

[6] In 2022, then-Governor Baker wrote to the Legislature, noting that "[o]ur state's wiretap statute was enacted in 1968 yet has not been substantively revised in the past half-century." *See* 2022 House No. 4347. The Legislature did not pass the proposed amendment.

should not interpret the Wiretap Act in such an expansive manner—embracing technologies not in existence or contemplation or analogous thereto—when the Legislature has repeatedly declined to do so. *See, e.g., Pereira v. New England LNG Co.*, 364 Mass. 109, 122 (1973) (considering "two unsuccessful attempts to amend the statutes" as "some indication" of legislative intent).[7]

Ultimately, if the Legislature wishes to protect monitoring of user website interactions as "wiretapping," and criminalize that behavior, it must do so with a clear amendment to the Wiretap Act that puts website owners on clear notice of necessary changes to avoid such liability. The SJC made that clear in recently rejecting an overbroad interpretation of the Wiretap Act. *Rainey*, 491 Mass. at 640–41 (rejecting proposed overbroad interpretation of Wiretap Act under which police officer that used body camera, prosecutor, probation officer and Superior Court judge all would be "subject to criminal penalties"); *see also State Bd. of Ret. v. Bulger*, 446 Mass. 169, 175 (2006) (penal statutes, like the Wiretap Act, "must be construed narrowly, not stretched to accomplish an unexpressed result"). The Court should reject Plaintiff's attempt to expand the scope of the Wiretap Act far beyond what was reasonably contemplated in 1968—especially in light of the Legislature's repeated declination to do so and the penal nature of the statute. *See also Licea v. Cinmar, LLC*, 2023 WL 2415592, at *6 (C.D. Cal. Mar. 7, 2023) ("The fact that the Legislature has had an opportunity to amend [a section of the California wiretap act] to take into account privacy issues raised by new technologies like internet messaging [and has not done so] is indicative of its intent not to expand protections").

[7] Like the SJC, the U.S. Supreme Court has long recognized that it should "not now achieve the same result by reinterpretation [of an act] in the face of Congress' failure to pass the bills thus brought before it." *Federal Trade Comm'n v. Ruberoid Co.*, 343 U.S. 470, 479 (1952). *See also Bob Jones Univ. v. United States*, 461 U.S. 574, 601 (1983) ("In view of its prolonged and acute awareness of so important an issue, Congress' failure to act on the bills proposed on this subject provides added support [that the inaction was Congress was intentional]").

Lastly, Plaintiff's proffered interpretation would lead to absurd results, criminalizing nearly every visit to publicly-available informational websites in a manner that only creative plaintiffs' lawyers could argue fall within the intent of the Act. As the SJC recently made clear, Massachusetts courts must interpret the Wiretap Act "to be sensible, rejecting unreasonable interpretations unless the clear meaning of the language requires such an interpretation,'" and declining to "'adopt a literal construction of a statute if the consequences of such a construction are absurd or unreasonable.'" *Rainey*, 491 Mass. at 642 (citation omitted). Here, Plaintiff's reading of the Wiretap Act would criminalize behavior that—as the number of cases pending against Massachusetts health care providers makes clear—was a standard practice among website operators.[8] And Plaintiff even admits that her legal theory would apply far beyond health care. Compl. ¶¶ 6–7. Applying the rule of lenity and avoiding an impractical result requires reading the Wiretap Act, as written, to not apply to circumstances like those alleged here.[9]

Moreover, the common use of website tracking technology reflects that it is done in the ordinary course of business, which exempts BMC from liability under the Wiretap Act. An exception to the statutory definition of "intercepting device" excludes "any telephone or telegraph instrument [or] equipment" that is "being used by the subscriber or user in the ordinary course of its business." G.L. c. 272, § 99(B)(3); *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 263, 266–67 (1997) (exception applied to call monitoring for company); *Dillon*, 49 Mass. App. Ct. at 314–19

---

[8] At the time of this motion, at least 18 similar cases have been filed against 13 healthcare providers in the Commonwealth. Other similar actions are also pending nationwide.

[9] *See Velazquez v. Comm.*, 491 Mass. 279, 283 n.5 (2023) ("where the language of a criminal statute plausibly can be found ambiguous, the rule of lenity requires that the defendant receive the benefit of the ambiguity") (citation omitted); *Mahan*, 490 Mass. at 617 (applying same principle to penal statute in civil case); *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (where the same statute has both criminal and civil applications, "[b]ecause we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies"); *Cook v. Patient Edu, LLC*, 465 Mass. 548, 555–56 (2013) (similar).

(similar). Another exception applies to the use of an "office intercommunication system in the ordinary course of [the] business." G.L. c. 272, § 99(D)(1)(b). If the Wiretap Act is to be applied to the internet, far beyond its original intent, the exceptions reasonably must be extended in an analogous manner. Here, the website operator, BMC, utilized computer code in an analogous manner to how companies utilized telephone equipment to monitor phone calls in *O'Sullivan* and *Dillon*, as part of a communication system.[10] Moreover, as the volume of cases like this one pending both in the Commonwealth and nationwide make clear, the practice being challenged here is a common practice for website operators in the ordinary course of business. Accordingly, even if Plaintiff could otherwise state a *prima facie* claim (and she cannot, as explained above), the exceptions would apply, barring her claim.

**2. Plaintiff Has Not Alleged that an "Intercepting Device" was Used**

An "interception" under the Wiretap Act requires that BMC or another person acting on its behalf "secretly record the contents of any wire or oral communication through the use of any intercepting device." G.L. c. 272, § 99(B)(4), (C)(1). The Act defines the term "intercepting device" as "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication." *Id.* § 99(B)(3). While the terms "device" and "apparatus" are not defined by the Wiretap Act, Massachusetts courts interpret undefined statutory terms in accordance with their plain and ordinary meaning. *Modica v. Sheriff of Suffolk County*, 477 Mass. 102, 104 (2017) ("We derive the words' usual and accepted meanings from sources presumably

[10] While the Wiretap Act did not envision the technology at issue here, courts have applied the "ordinary course of business exception" in a manner that is consistent with the intent of the Legislature. *Dillon*, 49 Mass. App. Ct. at 314–16 (applying the intent and purpose of the exception notwithstanding the literal language requiring that the device be "furnished to a subscriber or user by a communications common carrier," because to accept plaintiffs' literal reading would "destroy the exception"); *Restuccia v. Burk Tech., Inc.*, 1996 WL 1329386, at *2 (Mass. Super. Ct. Aug. 13, 1996) (applying the exception for an "office intercommunication system" to an email backup system).

known to the statute's enactors, such as their use in other legal contexts and dictionary definitions."). The term "device," as defined by dictionaries at the time the Wiretap Act was passed, meant "something that is formed or formulated by design and usu. with consideration of possible alternatives, experiment, and testing: something devised or contrived. *See Device*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1968) (**Exhibit A**). Similarly, "apparatus" was defined as "a collection or set of materials, instruments, appliances, or machinery designed for a particular use." *Apparatus*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1968) (**Ex. A**). The plain meaning of these terms as used at that time and in the context of the Wiretap Act meant something tangible, such as a machine that could record conversations. *See also Mason v. Machine Zone, Inc.*, 140 F. Supp. 3d 457, 462–63 (D. Md. 2015) ("most natural reading of the phrase 'machine, apparatus, or device' calls to mind a piece of equipment" and computer software did not fall within that definition). "A new meaning cannot be given to the words of an old statute in consequence of the changed conditions of a time later than the enactment of that statute." *Dunn v. Comm'r of Civ. Serv.*, 281 Mass. 376, 382 (1933); *see also Com. v. Dykens*, 473 Mass. 635, 646 (2016) ("We . . . look to the ordinary meaning of the word as of 1853, the year the statute was enacted").

Here, Plaintiff alleges that the "intercepting devices" used to facilitate the interception include (1) "hidden code of the BMC Website, including Google Analytics and Meta Pixel," (2) "any devices Class Members used to access the BMC Website," and (3) "Class Members' web browsers used to access the BMC Website." Compl., ¶ 123. However, computer "code," "devices . . . used to access [a] website[]" and "web browsers" go far beyond what the Legislature could have contemplated as a "device or apparatus" capable of recording a "wire or oral communication" in enacting the Wiretap Act in 1968. *See Mason*, 140 F. Supp. 3d at 462–63 (software was not a device or apparatus); *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2233535, at

*21–22 (D. Md. May 23, 2019) (under federal wiretap act, computer server that received emails "is not a 'device' used for interception and "recipient of the emails, even if not the intended recipient, cannot be deemed to have taken action or used a device to 'intercept' the emails"); *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 744 (S.D. Tex. 2010) (similar). Accordingly, Plaintiff's Wiretap Act claim must fail as a matter of law because Plaintiff fails to plead the use of an "intercepting device," as defined by the Act.

### 3. Plaintiff Fails to Allege an "Interception" Occurred in Massachusetts

Plaintiff has also failed to allege a critical element of a Wiretap Act claim: that the alleged interception(s) took place *in Massachusetts*. A legion of Massachusetts state and federal courts agree that the Wiretap Act does not apply to interceptions occurring outside the Commonwealth. *See Marquis v. Google*, No. 11-2808, 2015 WL 13037257, at *7 (Mass. Super. Ct. Feb. 13, 2015) ("The servers on which Google scans emails of Gmail users are physically located in [redacted]. None are located in Massachusetts, and so no interceptions physically occur within our borders." (redaction in original)); *Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. June 2, 2020) ("[B]ecause the recordings took place in Michigan, they are outside the reach of the Massachusetts Wiretapping Statute."); *MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199, 202 (D. Mass. 1999) ("[S]ecretly recording a conversation outside Massachusetts does not give rise to liability under Section 99Q even if the call originated within Massachusetts."); *see also Comm. v. Wilcox*, 63 Mass. App. Ct. 131, 139 (2005) (noting that the "defendant cites no authority for the proposition that G.L. c. 272, § 99, applies to recordings made outside of Massachusetts").

Here, Plaintiff's Complaint alleges that "the computer code for tracking technologies . . . enabled ***Google, Facebook, and other third parties to record*** and disclose . . . the contents of communications between BMC and users of the BMC Website." Compl. ¶ 124. In other words, Plaintiff alleges that the "secret recordings" occurred on the servers of Google, Meta, and other

third parties. *Id.* While Plaintiff alleges that Meta is based in Menlo Park, California, she makes no claims that the other third parties—Google, Siteimprove and New Relic are located in Massachusetts. *See id.* ¶¶ 33, 108. Nor does Plaintiff allege that the purportedly intercepted communications with BMC's Website were "secretly record[ed]" by any servers located in Massachusetts. G.L. c. 272, § 99(B)(4). Because the Complaint does not allege facts that could establish that any alleged interception took place in Massachusetts, the Wiretap Act claim fails.

## IV. CONCLUSION

Plaintiff lacks standing to bring this lawsuit because she has alleged no concrete, particularized harm. Moreover, her Wiretap Act claim fails as a matter of law on multiple grounds. Accordingly, BMC respectfully requests that this Court grant its Motion to Dismiss.

Dated: June 21, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER**
**CORPORATION,**

/s/ Linn F. Freedman

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
**ROBINSON & COLE LLP**
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

## CERTIFICATE OF SERVICE

I, Wm. Maxwell Daley, hereby certify that, on this 21st day of June, 2023, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley

# EXHIBIT A

## WEBSTER'S THIRD NEW INT'L DICTIONARY (1968) EXCERPTS

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE UNABRIDGED

a meinam-texeso,
REG. U.S. PAT. OFF.

Utilizing all the experience and resources of more than one hundred years of Merriam-Webster dictionaries

EDITOR IN CHIEF
PHILIP BABCOCK GOVE, Ph.D.
AND
THE MERRIAM-WEBSTER
EDITORIAL STAFF

G. & C. MERRIAM CO PANY, Publishers
SPRINGFIELD, MASS. ACHUSETTS, U.S.A.
196,

Superior Court - Suffolk
Docket Number 2384CV01086

COPYRIGHT © 1966 BY G. & C. MERRIAM CO.

PREVIOUS EDITIONS
COPYRIGHT 1909, 1913, 1923, 1924, 1926, 1927, 1930, 1934, 1950, 1953, 1954, 1957, 1959, 1961
BY G. & C. MERRIAM CO.

PHILIPPINES COPYRIGHT 1966 BY G. & C. MERRIAM CO.
PREVIOUS EDITIONS PHILIPPINES COPYRIGHT 1950, 1953, 1954, 1957, 1959, 1961
BY G. & C. MERRIAM CO.
PREVIOUS EDITION COPYRIGHT 1925 IN PHILIPPINE ISLANDS
BY G. & C. MERRIAM CO.

ALL RIGHTS RESERVED
UNDER INTERNATIONAL AND PAN-AMERICAN COPYRIGHT CONVENTIONS
BY G. & C. MERRIAM CO.

All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information and retrieval systems—without written permission of the publisher

MADE IN THE U. S. A.
R. R. DONNELLEY & SONS COMPANY, THE LAKESIDE PRESS, CHICAGO, ILL., U. S. A.
COMPOSITORS
RAND McNALLY & COMPANY, CHICAGO, ILLINOIS, U. S. A.
PRINTERS AND BINDERS

Superior Court - Suffolk
Docket Number 2384CV01086



aport \a'-\ adv (or adj) + port (left side)]: on or toward the left side of a ship — used esp. of the helm
apos abbr apostrophe
ap.o.se.mat.ic \apəsə:mad·ik\ adj [apo- + sematic] zool : CONSPICUOUS, WARNING — used of colors or structures indicative of special means of defense against enemies (as in the skunk and certain actinians and insects) — ap.o.se.mat.i.cal.ly \-ə(k)l(ē)\ adv
ap.o.seme \'apə,sēm\ n -S [apo- + -seme] zool: a group distinguished by possession of similar aposematic coloration
ap.o.sep.al.ous \apo:-\ adj [apo- + -sepalous] bot : POLYSEPALOUS
ap.o.si.o.pe.sis \,apə,sīə'pēsəs\ n, pl aposiopeses \-ē,sēz\ [LL, fr. Gk aposiōpēsis, fr. aposiōpan to be quite silent, fr. apo- + siōpan to be silent, fr. siōpē silence]: the leaving of a thought explicitly incomplete in writing or speaking often by a sudden breaking off and shifting of grammatical construction for rhetorical purposes (as his behavior was — but I blush to mention that) or by the use of etc. — ap.o.si.o.pet.ic \apə,sīə'ped·ik\ adj
ap.o.so.ro \'apə'sərō\ n -s [prob. native name in Africa] : POTTO
ap.o.spor.ic \apə'sporik\ or ap.o.spor.ous \apə'sporəs; ə'päspərəs, a'- adj: of or relating to apospory
ap.o.spor.i.cal.ly \apə'spor(ə)k(ə)lē\ adv: in an aposporic manner
ap.o.spo.rog.o.ny \ n -ES [apo- + sporogony] biol : suppression of sporogony
ap.o.spory \'apə,spōrē; ə'päspərē, a'- n -ES [apo- + -spory] : production of gametophytes directly from somatic cells of the sporophytes without spore formation (as in certain ferns and mosses)
apos.ta.cize or apos.ta.size \ə'pästə,sīz\ also -Os-\ vi -ED/-ING/-s : APOSTATIZE
apos.ta.cy \-sē\ archaic var of APOSTASY
apos.ta.sy \ə'pästəsē\ also -Os-\ n -ES [ME apostasie, fr. LL apostasia, fr. Gk lit., revolt, defection, fr. aphistanai to remove, cause to revolt, fr. apo- + histanai to cause to stand — more at STAND] 1 : the renunciation of a religious faith 2 : an abandonment of what one has voluntarily professed : a total desertion or departure (as from one's principles or party) <apostasies of disciples who refused to accept Freud's theories — Time>
1apos.tate \ə'pä,stāt, -stət also -Os-; usu -Id+V\ n -s [ME, fr. ME & LL; MF apostate, fr. LL apostata, fr. Gk apostatēs, lit., deserter, rebel, fr. aphistanai] 1 : one who has renounced or forsaken his religious faith or given up his moral allegiance <a Church decree . . . excommunicated as all . . . "who profess . . . the materialistic and anti-Christian doctrine" — H.L.Matthews> 2 : one who has given up the principles or party to which he adhered : RENEGADE <that incomparable from intelligence, George Moore —H.J.Laski>
2apostate \"\ adj [ME, fr. apostate, n.] 1 : relating to or characterized by apostasy <the child of an . . . Catholic Time> : faithless to moral allegiance : RENEGADE <so spoke the — angel —John Milton> 2 : abandoning or involving the abandonment of any form of allegiance <a and unnatural connection with any foreign power —George Washington>
ap.o.stat.ic \apə'stad·ik\ or ap.o.stat.i.cal \-d·əkəl\ adj : APOSTATE — ap.o.stat.i.cal.ly \-d·ək(ə)lē\ adv
apos.ta.tize \ə'pästə,tīz also -Os-\ vi [MF or LL; MF apostatiser, fr. LL apostatizare, fr. L apostata + -izare -ize]: to commit apostasy : to renounce one's faith, party, or principles <the church had apostatized and gone against the commandment —Edson Jessop>
ap.o.stax.is \apə'staksəs\ n, pl apostaxes \-k,sēz\ [NL, fr. Gk apostaxis drippings, fr. apostazein to drip off, fr. apo- + stazein to drip — more at STAGNATE] bot : an abnormal exudation
apos.teme n -s [ME, fr. MF, fr. L apostema, fr. Gk apostēma abscess, distance, fr. aphistanai to remove — more at APOSTASY] obs : a swelling filled with purulent matter : ABSCESS
a pos.te.ri.o.ri \-'ō,rī; :ə,pē,stēr'ēr(,)ē. :ä-, -'ō(,)rē, -rī\ adj [L, lit., from the latter] 1 : of or relating to the kind of reasoning that derives propositions from the observation of facts or that by generalizations from facts arrives at principles <a posteriori demonstration> — contrasted with a priori 2 : of or relating to what cannot be known except from experience : proved by induction from facts obtained by observation or experiment <a posteriori truth>
apos.til or apos.tille \ə'pästəl\ n -s [MF apostille, fr. apostiller to annotate, fr. a- (fr. L ad-) + postiller to annotate — more at POSTIL] archaic : a marginal note : ANNOTATION
apostle \ə'päsəl also -Os-\ n -s [ME apostle, apostel, fr. OF & OE; OF apostle & OE apostol, fr. LL apostolus, fr. Gk apostolos, lit., messenger, fr. apostellein to send away, fr. apo- + stellein to send — more at STALL] 1 a : one who is sent forth : MESSENGER: specif : one of the 12 disciples of Christ b : one of certain early Christian missionaries (as Paul and Barnabas) or in Eastern orthodoxy one of the 70 disciples of Jesus 2 a : the first or the first prominent Christian missionary in any part of the world : one who has extraordinary success as a missionary or reformer <St. Boniface, to Germany> b : one who initiates a great moral reform or first advocates any important belief or system 3 : the highest ecclesiastical official in some church organizations (as in the Church of God in Christ and in the New Apostolic Church of No. America) 4 apostles pl, civil & admiralty law : a brief letter dimissory sent by a court appealed from to the superior court, stating the case : papers sent up on appeal, equivalent to the record in a case at law 5 : one of a council or quorum of 12 men in the Mormon Church serving principally as administrators 6 apostles pl : bollards and bitts in a sailing ship
apostle bird n, Austral : a bird that goes about in small flocks: a : BABBLER; esp GRAY-CROWNED BABBLER b : a loud-voiced gray crowlike bird (Struthidea cinerea) with brown wings and black legs and bill
apos.tle.hood \-,hüd\ n [ME apostlehed, apostlehod, fr. OE apostolhād, fr. apostol + -hād -hood]: the office or status of an apostle
apostle jug n : a jug with raised figures of apostles on it
apostle plant or apostle flower n : an irislike plant (Neomarica gracilis) of the family Iridaceae having flat lenticular ... [illegible] blotching and inner members blue and strongly reflexed
apos.tle.ship \-,ship\ n : the status, rank, or office of an apostle
apostle spoon n : a silver spoon with the handle terminating in the figure of an apostle formerly often presented by sponsors at baptism to the godchild
apos.to.late \ə'pästə,lāt, also -Os-; usu -Id+V\ n -s [LL apostolatus, fr. apostolus + L -atus -ate] 1 : the office or mission of an apostle : APOSTLESHIP <fulfillment of — to the world> 2 : an association of persons dedicated to the propagation of a religious faith or doctrine
apostoli ... [illegible] from an inferior court to a superior court
1ap.os.tol.ic \apə'stälik, -ōk sometimes ə:O:- or a:pō:-\ also ap.os.tol.i.cal \-lēkəl, -ēk-\ adj [apostolic fr. ME apostolik, fr. LL apostolicus, fr. Gk apostolikos, fr. apostolos apostle + -ikos -ic; apostolical fr. ME, fr. apostolik + -al] 1 : of, relating to, or resembling an apostle or the apostles, their times, or their spirit <— fervor> 2 a : according to the doctrine of the apostles : taught by or in the tradition of the apostles b : genuine and authoritative (— faith) 3 Roman Catholicism : PAPAL <— indulgences> 4 usu cap : of or relating to one of various Christian religious bodies usu. with the term Apostolic included in the official name that seek to bring doctrine and practice into close accord with that of the first Christian apostles and usu. distinguished from other organized forms of Christianity by their emphasis on evangelistic methods, the doctrines of entire sanctification and the direct operation of the Holy Spirit, a fundamentalistic theology, and such practices as foot washing, the gift of tongues, divine healing, and spirit baptism — ap.os.tol.i.cal.ly \-lək(ə)lē, -ēk-, \ adv
2apostolic \"\ n -s cap : a member of an Apostolic church

apostolic church n 1 usu cap A&C : the Christian church as founded by the apostles 2 : a church founded by an apostle
apostolic delegate n : an ecclesiastical plenipotentiary representing a church in a country that has no formal diplomatic relations with the church's headquarters
apostolic father n, usu cap A&F: one of the authors of a collection of 2d century A.D. writings of religious significance
ap.os.tol.i.ci \apə'stälə,sī\ n pl, usu cap [LL, fr. pl. of apostolicus apostolic]: members of various ascetic sects of the 3d and 4th centuries A.D. in Phrygia, Cilicia, and Pamphylia who sought apostolic purity of life by renouncing marriage and private property — called also Apotactici, Apostolites
apos.to.lic.i.ty \ə,pästə'lisəd·ē, -ste-, -i also apos- sometimes ,apəs-\ n -ES : the quality or character of being apostolic
apostolic see n 1 : a see established by an apostle (as Jerusalem, Antioch, or Rome) 2 usu cap A, Roman Catholicism : the Roman see
apostolic succession n : the succession or descent believed to be uninterrupted from the apostles and perpetuated by successive ordinations of bishops, held (as by Roman Catholics, Anglicans, and Eastern Orthodox) to be necessary for valid administration of the sacraments and the transmission of orders
apostolize vb -ED/-ING/-s [LL apostolus + E -ize] vt, obs : PROCLAIM vi, obs : to act as an apostle
apos.to.los \ə'pästə,läs, -Os-\ n, pl aposto.loi \ -,lȯi\ cap [LGk, fr. Gk, apostle] Eastern Church : EPISTLE
1apos.tro.phe \ə'pästrə(,)fē also -Os-\ n -s [L, fr. Gk apostrophē, lit., turning away, fr. apo- + strophe turning — more at STROPHE] 1 : the addressing of a person usu. not present or of a thing usu. personified for rhetorical purposes <an — to Shakespeare> 2 : the arrangement of chloroplasts along the lateral walls of leaf cells — called positive when caused by intense light and negative when by prolonged darkness
2apostrophe \"\ n -s [MF & LL; MF apostrophe, fr. LL apostrophus, fr. Gk apostrophos, fr. apostrophos turned away, fr. apostrephein to turn away, fr. apo- + strephein to turn — more at STROPHE]: the mark ' used to indicate omission of one or more letters or figures (as in can't for cannot, judg'd for judged, wish'd for wished, mascara'd for mascaraed, '76 for 1776), to mark the possessive case of English nouns and of certain English pronouns (as in Bill's, Moses', women's, boys', anyone's) or the plural of letters (as in two n's) or of figures (as in three 7's) and sometimes of words that are not normally nouns (as in no if's or but's), to set off an inflectional or derivational suffix from a word that is pronounced by uttering the name of each of its letters (as in their IQ's, OK'd), in GOP'er) or to constitute a terminal quotation mark
ap.os.troph.ic \apə'sträfik also \ : of or characteristic of apostrophe <a passage of — grandeur> <an — manner of writing> : given to the use of apostrophe <an — writer>
2apostrophic \"\ adj [apostrophe + -ic] : associated with or including the mark called an apostrophe <the — possessive ending> : being an apostrophe
1apos.tro.phize \ə'pästrə,fīz also -Os-\ vb -ED/-ING/-s [apostrophe + -ize] vt : to address by or in apostrophe <— the spirit of freedom> vi : to express an apostrophe <— in a speech>
2apostrophize \"\ vt -ED/-ING/-s [apostrophe + -ize]: to shorten by omitting a letter : mark with an apostrophe
apos.tro.phus \ə'pästrəfəs\ n, pl apostrophi \-,fī\ [LL — more at APOSTROPHE] 1 : APOSTROPHE 2 : the symbol ↄ of the ancient Roman numeral system used for indicating the number 500 — see NUMBER table
ap.o.tac.ti.ci \apə'taktə,sī\ n pl, cap [LL or ML, pl. of Apotacticus, fr. LGk Apotaktikos, lit., renouncer, fr. apotaktikos disposed to renounce, fr. Gk apotassein to set apart, fr. apo- + tassein to put in order, arrange — more at TACTICS] : APOSTOLICI
ap.o.tac.tites \-k,tīts\ n pl, cap [ML Apotactitae, fr. LGk Apotaktitai, fr. Gk apotaktos set apart (fr. apotassein to set apart, fr. apo- + tassein to arrange, put in a certain order) + -itai -ites] : APOSTOLICI
ap.o.tel.es.mat.ic \apə,teləz'mad·ik\ adj [Gk apotelesmatikos, fr. apotelesmat-, apotelesma effect, influence of the stars on human destiny, fr. Gk, fr. apotelein to complete, fr. apo- + telein to complete, fr. telos goal — more at WHEEL] archaic : of or relating to the casting of horoscopes
apotelesmatic adj [Gk apotelesmatikos, productive, astrologically influential, fr. apotelesmat-, apotelesma + -ikos -ic] archaic : of or relating to the casting of horoscopes
apothecaries' measure n : a system of liquid measures ... the series of liquid units of capacity (gallon, pint, fluid ounce, fluid dram, minim) that are used by pharmacists
apothecaries' weight n : the series of units of weight, including the pound of 12 ounces, the dram of 60 grains, and the scruple, used chiefly by pharmacists in compounding medical prescriptions — see MEASURE table
apoth.e.cary \ə'päthə,kerē\ n -ES [ME apothecarie, fr. ML apothecarius, fr. LL, shopkeeper, warehouseman, fr. L apotheca warehouse (fr. Gk apothēkē, fr. apotithenai to put away, fr. apo- + tithenai to put, place) + -arius -ary — more at DO] 1 : one who prepares and sells drugs or compounds for medicinal purposes — now usu. called druggist, pharmacist 2 : PHARMACY
apothecary jar n : a wide-mouthed covered usu. ceramic and ornamented jar (as for drugs, herbs, or bathroom and kitchen supplies)
ap.o.the.cial \apə'thēsh(ē)əl, -sēəl\ adj [NL apothecium + E -al] : of or relating to an apothecium
ap.o.the.ci.um \ -(h)ēsh(ē)əm, -sēəm\ n, pl apothecia \-s(h)ēə\ [NL, fr. L apotheca storehouse + NL -ium] : a spore-bearing structure in many lichens and ascomycetous fungi consisting of a disklike, saucer-shaped, or cuplike body bearing asci in an extended layer (the hymenium) on the exposed flat or concave surface

apothecary jars

ap.o.thegm or ap.o.phthegm \'apə,them\ n -s [Gk apophthegma, fr. apo- + phthengma voice, saying, word, fr. phthengesthai to speak out] : a short, pointed, and instructive saying : a short usu. pointedly concise formulation
apo.theg.mat.ic ... ap.o.theg.mat.i.cal \-'kəl\ also ap.o.phtheg.mat.ic or ap.o.phtheg.mat.i.cal \apə,th-\ adj [Gk apophthegmatikos, fr. apophthegmat-, apophthegma + -ikos -ic]: relating to or characteristic of apothegms : given to apothegms : characterized by apothegms — \-d·ək(ə)lē\ adv
ap.o.them \'apə,them\ n -s [ISV apo- + -them (fr. thema that which is laid down, proposition) — more at THEME]: the perpendicular from the center to one of the sides of a regular polygon
apoth.e.ose \ə'päthē,ōs, -Oś\ vt -ED/-ING/-s [back-formation fr. apotheosis] archaic
apo.the.o.sis \ə,päthē'ōsəs, ,apə'thēəsəs- also (,)a,pethe'ēs- sometimes ,apathe'es-\ n, pl apotheo.ses \-,sēz\ [LL, fr. Gk apotheōsis, fr. apotheoun to deify (fr. apo- + theos god) + -sis — more at THEISM] 1 : the elevation of a human to the rank of a god : the raising of a person or thing to divine status : DEIFICATION 2 : the culmination or highest development of a thing : the ultimate, quintessential, or final form <she is the — of womanhood> <the — of brute force and vulgarity> 3 a : the exaltation of a person or a thing to a final state of triumph or glory b : the ascension of a person or a thing from earthly existence to heavenly glory
apo.the.o.size \apo'thēə,sīz, ə'pathea,-\ vt -ED/-ING/-s : DEIFY raise to an apotheosis : elevate to divine status : GLORIFY




regular polygon showing A center; BD side; C midpoint of BD; AC apothem

apot.o.me \ə'pätəmē\ n -s [Gk apotomē, lit., cutting off, fr. apotemnein to cut off, fr. apo- + temnein to cut — more at TOME] in Greek music : the interval of a semitone in the Pythagorean scale that is slightly greater than half a whole tone and is equal to the difference between the tetrachord and two whole tones
ap.o.tra.che.al \:apo:-\ adj [apo- + tracheal]: not associated or contiguous with vessels or vascular tracheids — parenchyma> — compare METATRACHEAL, PARATRACHEAL, VASICENTRIC
ap.o.tro.pa.ic \apətrə'pāik\ adj [Gk apotropaios (fr. apotrepein to turn away, fr. apo- + trepein to turn) + E -ic — more at TROPE]: designed to avert or turn aside evil <an — ritual —J.H.Moulton>
ap.o.tro.pa.ism \....'..izəm\ n -s : the performance of magic ritual or incantatory formulas with the purpose of averting or overcoming evil
ap.o.type \'apə,tīp\ n -S [apo- + type]: HYPOTYPE
ap.o.typ.ic \apə'tipik\ adj, biol : varying or departing from a type
a power supply \ \ n, usu cap A P A]: a battery or transformer supplying electric power to heat the cathode in an electron tube — compare B POWER SUPPLY, C POWER SUPPLY; A BATTERY
ap.o.zem \'apə,zem\ also apoz.e.ma \ə'päzəmə\ n -s [apozem prob. fr. F apozème, fr. L apozema, fr. Gk, fr. apozein to boil till the scum is thrown off, fr. apo- + zein to boil; apozema fr. L — more at YEAST] pharmacy : DECOCTION — ap.o.zem.i.cal \:apə'zemikəl\ adj
ap.o.zy.mase \ \ n [apo- + zymase]: the protein portion of a zymase
app abbr 1 apparatus 2 apparent 3 appeal; appellate 4 appended; appendix 5 applied 6 appointed 7 apprentice
1ap.pa.la.chian \apə'lāchən, southeastern U.S. usu -achən also -chēan or -achēan or -lāshən sometimes -eshēan\ adj, usu cap [prob. irreg. fr. Apalachee + E -an] 1 : of or relating to a system of mountains in the eastern U.S. or to the region where they are found 2 : of or relating to the mountain-making movements in No. America in or near the Pennsylvanian period — see GEOLOGIC TIME table
2appalachian \"\ n -s usu cap : APALACHEE
appalachian tea n, usu cap A 1 : the leaves of either of two shrubs (Ilex glabra and I. vomitoria) of the eastern U.S. locally used as a tea 2 : any plant that yields Appalachian tea 3 : WITHE ROD
appall also appal \ə'pȯl\ vb appalled; appalled; appalling; appalls also appals [ME appallen, apallen, fr. MF appalir, apalir to grow pale, make pale, fr. OF fr. a- (fr. L ad-) + palir to grow pale, fr. L pallescere, incho. of pallere to be pale — more at FALLOW] vi, obs : to become pale, faint, or weak : FAIL <therewith her wrathful courage gan — —Edmund Spenser> vt : to overcome with consternation or horror : fill with fear, astonishment, or amazement : DISMAY, SHOCK <—ed at the deadly nature of the duel —R.W.Thorp> syn see DISMAY
appalling adj : inspiring dismay : SHOCKING : capable of appalling ... <to show intense displeasure <eating the most — food — stew, mostly, made of old mutton or goat —Oliver La Farge> syn see FEARFUL
appallingly adv : in an appalling manner
ap.pa.loo.sa ... [Palouse Indians]: one of a breed of rugged saddle horses developed in western No. America from stock of Spanish origin and distinguished by a mottled skin, vertically striped hoofs, and a patch of white hair over the rump and loins that is blotched or dotted with darker color
1ap.pa.nage also ap.a.nage \'apənij\ n -s [F apanage, fr. OF, fr. apaner to make suitable provision for a younger son or a daughter (fr. OProv apanar to feed, support, fr. a- — fr. L ad- — + -panar, fr. pan bread, fr. L panis) + -age — more at FOOD] 1 a : a grant (as of lands, offices, state revenues, or money) made by a sovereign or a legislative body for the support of dependent members of the royal family or of the ruler's principal liegemen b : a property or a privilege appropriated to or by a person as his share or perquisite <religious supremacy became a kind of — to the civil sovereignty —H.H.Milman> 2 : a customary or rightful endowment or adjunct <beauty which is the natural — of happiness —C.K.D.Patmore> 3 a : a territory or province held in possession as an appanage : PRINCIPALITY b : a territory subject to outside rule : DEPENDENCY syn see RIGHT
2appanage also apanage vt -ED/-ING/-s : to provide or endow with an appanage
ap.pa.rat ... [Russ, prob. fr. G, fr. L apparatus] : the political machine of the Communist party <the other book throws so much light on the inside story of Joseph Stalin's — . . . secret police, and rise to absolute power —B.D.Wolfe>
ap.pa.rat.chik \apə'rachik\ n, pl apparatchiks \-iks\ or apparatchiki \-'chēkē\ [Russ, fr. apparat + -chik (agent suffix)]: a Communist secret agent <after her return to Germany began work as an — —J.H.Lichtblau>
ap.pa.rat.us \apə'radəs, has sometimes -ä- n, pl apparatus or apparatuses [L, preparation, equipment, fr. apparatus, past part. of apparare to prepare, fr. ad- + parare to make ready — more at PARE] 1 obs : a preparation for action 2 a : a collection or set of materials, instruments, appliances, or machinery designed for a particular use <the — of art —Arnold Bennett> as (1) : scholarly resources used in the critical study of documents and texts (2) : FIRE APPARATUS (3) : gymnastic equipment (as parallel bars) <worked out on the — for an hour> b : any compound instrument or appliance designed for a specific mechanical or chemical action or operation : MACHINERY, MECHANISM c : a system or group of physical organs that unite in a common function <the respiratory —> 3 : the complex of instrumentalities and processes by means of which an organization functions or a systematized activity is carried out: a : the machinery of government b : the organization of a political party or of an underground movement syn see EQUIPMENT, MACHINE
apparatus crit.i.cus \...'kridəkəs, -ik-\ n [NL, critical apparatus] : supplementary data (as variant readings) provided as part of an edition of a text as a basis for critical study
1ap.par.el \ə'parəl also -er-\ vt appareled or apparelled; appareled or apparelled; appareling or apparelling; apparels [ME appareillen, fr. OF apareillier to prepare, fr. (assumed) VL appariculare, irreg. fr. L apparare] 1 obs : to make or get ready : prepare or prepare for 2 : DRESS, CLOTHE : ATTIRE <— like circuit riders in Missouri —Frederick O'Brien> 3 archaic : to furnish (as a ship) with apparatus : fit out : EQUIP <how are such ships . . . rigged and —ed —Alan Moore> 4 : to clothe with ornaments : cover with something ornamental : ADORN, DECK, EMBELLISH <the work is magnificently printed and tastefully —ed —E.E.Noth>
2apparel \"\ n -s [ME appareil, fr. OF apareil preparation, provision, furniture, fr. apareillier] 1 a obs : material designed for a particular use : APPARATUS b : the equipment of a ship (as masts, sails, rigging, and anchors) 2 a : a person's clothing : DRESS, ATTIRE, RAIMENT <his daily — was rough and shabby —Willa Cather> b : something that clothes or adorns as if with garments <the gay — of spring> 3 archaic : outward appearance : ASPECT, GUISE <to correct that she had puzzled the acutest hinters without the — of being circumspect —Lord Byron> 4 : an oblong piece of embroidery on certain ecclesiastical vestments (as on an alb or amice)
ap.par.en.cy \ə'paransē, -ti also -aar- or -er-\ n -ES [L apparentia, fr. apparent-, apparens + -ia -y] 1 obs : APPEARANCE, SEMBLANCE 2 : the quality or state of being apparent 3 : the position of being heir apparent <the bare right of — carried certain privileges with it —John Erskine (1951)>
1ap.par.ent \-ənt\ adj [ME apparaunt, apparent, fr. OF aparant, aparent (pres. part. of aparoir to appear), fr. L apparent-, apparens, pres. part. of apparere to appear — more at APPEAR] 1 : capable of easy perception: as a : readily perceptible to the senses, esp. sight : open to ready observation or full view : unobstructed and unconcealed (an — change> <the flaw in the metal was —> <deposits of transported material left by the retreating ice are perhaps the most widely — results of the glaciation —Amer. Guide Series: N. H.> b : capable of being readily perceived by the sensibilities or understanding as certainly existent or present <a face in which a strange state — was — —Thomas Hardy> <"you see — my wife —" he let it go at that because it was — that they understood —John Steinbeck> 2 : readily manifest to senses or mind as real or true and supported by credible evidence of genuine existence but possibly distinct from or contrary to reality or truth <the states are very jealous of any even — encroachment by the

deu·ter·on·o·mist \ˌd(y)üd·əˈränəmə̇st\ n -s usu cap [Deuteronomy + E -ist] : a writer or editor of the book of Deuteronomy, one of its versions, or Deuteronomic portions of the Old Testament of the Bible
deu·ter·os·co·py \...skəpē\ n -ES [deuter- + -scopy] 1 obs : something seen or perceived only at a second view 2 archaic : CLAIRVOYANCE
deu·ter·o·sto·ma·ta \ˌd(y)üd·ərō'stäməd·ə\ [NL, fr. deuter- + -stomata] syn of DEUTEROSTOMIA
1deu·ter·o·stome ... adj [NL Deuterostomia] : of or relating to Deuterostomia
2deuterostome \"\ n -s : an animal belonging to the group Deuterostomia
deu·ter·o·sto·mia ... n pl, cap [NL, fr. deuter- + -stomia] in many classifications : a major division of the animal kingdom comprising all bilateral animals (as the chordates) that lack ectomesoderm and have indeterminate cleavage and a mouth that does not arise from the blastopore
deu·ter·ot·o·kous \ˌd(y)üd·əˈräd·əkəs\ adj [deuter- + -tokous] : exhibiting deuterotoky : producing both male and female offspring parthenogenetically
deu·ter·ot·o·ky ... n -ES [deuter- + -toky] : the parthenogenetic production of both males and females — compare ARRHENOTOKY, THELYTOKY
deu·ter·o·ton·ic \ˌd(y)üd·ərə ... \ adj [deuter- + tonic] : characterized by accent on the second syllable — contrasted with prototonic
deu·ter·o·zo·oid \"+\ n [deuter- + zooid] : a zooid produced by budding or fission from a primary zooid
deuto- — see DEUT-
deu·to·cer·e·bral \ˌd ... (ˌ)ō+\ adj [deutocerebrum + -al] : of or relating to the deutocerebrum
deu·to·cer·e·brum \"+\ n [NL, fr. deut- + cerebrum] : the midsection of the brain of most arthropods formed by the paired ganglia of the second true segment and consisting of paired antennary and olfactory lobes; esp : the median lobes of the insect brain that innervate the antennal segment
deu·to·ma·la \"+ˈmālə\ n, pl deutoma·lae \-ˌlē\ [NL, fr. deut- + mala] : either member of the second pair of mouthparts of a diplopod — deu·to·ma·lal \-ˈmāl\ or deu·to·ma·lar \-ālə(r)\ adj
deu·to·mer·ite \d(y)ü'tämə̇ˌrīt\ n -s [ISV deut- + mer- (fr. Gk meros part) + -ite — more at MERIT] : the posterior segment of the trophozoite of certain gregarines
deuton var of DEUTERON
deu·to·nymph \ˌd(y)üd·ō+\ n [deut- + nymph] : a second larval form occurring in the development of most mites — compare PROTONYMPH, TRITONYMPH — deu·to·nymphal adj
deu·to·plasm \"+\ n -s [ISV deut- + -plasm; orig. formed as F deutoplasme] : the nutritive inclusions of protoplasm; esp : the yolk reserves of an egg — deu·to·plas·mic \ˌ..ˈplazmik\ adj
deu·to·plas·mol·y·sis \ˌd(y)üd(ˌ)ō+\ n [deutoplasm + -o- + -lysis] : elimination of part of the yolk content of an egg following fertilization or during cleavage
deu·to·vum \d(y)ü'tōvəm\ ... n [NL, fr. deut- + ovum] : the inactive incompletely developed larva of a mite after the rupture of the outer eggshell
deutsche mark \ˈdoichəˌmärk\ also deutsch·mark \ˈdoich..\ n -s [G deutsche mark, lit., German mark] 1 a : the German mark as established in 1948 by the German Federal Republic — see MONEY table b : the monetary unit of the German Democratic Republic 2 : a coin representing one deutsche mark
deut·zia \ˈd(y)ütsēə, ˈdoit-\ n [NL, fr. Jean Deutz †1784? Dutch patron of botanical researches + NL -ia] 1 cap : a genus of ornamental shrubs (family Saxifragaceae) that are native to Asia and Central America but widespread in cultivation and that have short-stalked toothed opposite leaves, usu. shreddy bark, and white or sometimes pink flowers mostly in panicles or cymes 2 -s : any shrub of the genus Deutzia
1dev var of DEVA
2dev var of DAEVA
dev abbr 1 developed; developer 2 deviation
1de·va \ˈdāvə\ or dev \ˈdāv\ n -s [Skt deva — more at DEITY] : a divine being or god in Hinduism and Buddhism
2deva var of DAEVA
de·va·chan \ˈdāvəˌchan\ n -s [perh. irreg. fr. Skt devas directed toward the gods, fr. deva] theosophy : a state intermediate between two earth lives into which the ego enters after leaving kamarupa — de·va·chan·ic \ˌdāvəˈchanik\ adj
de·va·da·si \ˌdāvəˈdäsē\ n -s [Skt devadāsī female servant of a god, fr. deva + dāsī] : a dancing girl and courtesan of a Hindu temple
1de·val \də̇ˈval, -vōl\ vi -ED/-ING/-s [ME devalen to descend, sink, fr. MF devaler, fr. (assumed) VL devallare, fr. L de down, away + (assumed) VL -vallare (fr. L valles, vallis valley) — more at DE-, VALE] chiefly Scot : to leave off : CEASE (it rained the whole day and never —ed)
2deval \"\ n -S Scot : CESSATION, PAUSE
de·va·lo·ka \ˌdāvəˈlōkə\ n -s [Skt, fr. deva + loka world — more at LEA] Hinduism & Buddhism : a world of gods : HEAVEN
de·val·o·rize \(ˈ)dē+\ vt -ED/-ING/-s [F dévaloriser, fr. dé- de- (fr. OF des-) + valor- (alter. — influenced by ML valor — of valeur value, fr. ML valor) + -iser -ize — more at VALOR] : to diminish the value of : DEVALUE
de·val·u·ate \(ˈ)dē+\ vb [de- + value, n. + -ate] : DEVALUE
de·val·u·a·tion \ˌdē+\ n -s [devaluate + -ion] 1 : an official reduction in the exchange value of a currency by a lowering of its gold equivalency 2 : a lessening esp. of status or stature
de·v... reduction or diminishing esp. of importance : DECLINE ...
the devaluation of (money) 2 : to cause or be responsible for a devaluation of (as a person or a literary work); sometimes : to divest of value or esteem — vi : to institute devaluation
de·va·na·ga·ri \ˌdāvəˈnägərē\ n, usu cap [Skt devanāgarī, fr. deva + nāgarī Nagari] : the alphabet having as a characteristic feature long horizontal strokes on the tops of most of the characters that is usu. employed for Sanskrit and is also used as a literary hand for various modern languages of central, western, and northern India — see ALPHABET table; NAGARI
de·vance \də̇ˈvan(t)s\ vt -ED/-ING/-s [MF devancer, fr. OF devancier, davancier, fr. devant, davant in front, forward, after OF avant before; avancier to advance] archaic : FORESTALL, ANTICIPATE, OUTSTRIP
de·vant \də̇ˈvän\ adv [F, fr. OF devant, davant, fr. de from (fr. L de) + avant before, fr. L abante — more at DE-, ADVANCE] : in front : FORWARD — used in ballet of the execution of a step or of the movement of an arm or leg in front of the body
de·vast \də̇ˈvast\ vt -ED/-ING/-s [MF or L; MF devaster, fr. L devastare to devastate] : DEVASTATE
dev·as·tate \ˈdevəˌstāt, usu -ād·+V\ vt -ED/-ING/-s [L devastatus, past part. of devastare, fr. de from, away + vastare to lay waste, fr. vastus empty, waste — more at WASTE] 1 : to lay waste : RAVAGE <whole countries devastated by storm and cold> <man has stripped the hills, devastated the valleys> 2 : OVERPOWER, OVERCOME, OVERWHELM <he was devastated by grief> <her constant mischief devastated the classroom> syn see RAVAGE
devastating adj [fr. pres. part. of devastate] : serving, tending, or having the power to devastate; broadly : highly effective <a ... portrait of human folly> — dev·as·tat·ing·ly adv
dev·as·ta·tion \ˌdevəˈstāshən\ n -S [LL devastation-, devastatio, fr. L devastatus + -ion-, -io -ion] 1 : the action of devastating or state of being devastated : a laying waste : DESOLATION <the ... of war> 2 : DEVASTAVIT 1
dev·as·ta·tive \ˈdevəˌstād·iv\ adj : tending to cause devastation : DESTRUCTIVE
dev·as·ta·tor \-ād·ə(r)\ n -s [It & LL, It devastatore, fr. LL devastator, fr. L devastatus + -or] : one that devastates
dev·as·ta·vit \ˌdevəˈstāvə̇t\ ... n -s [L, he has laid waste, 3d pers. sing. perf. indic. act. of devastare] 1 : mismanagement or waste of the goods of a deceased person by his executor who may thereby be liable 2 : a writ whereby a remedy for devastavit is sought
deve var of DEAVE
de·vein \(ˈ)dē+\ vt [de- + vein, n.] : to remove the dark dorsal vein from (shrimp)

1de·vel \ˈdevəl\ n -s [origin unknown] Scot : a severe blow
2devel \"\ vt, Scot : to strike forcibly
develin var of DEVILING
de·vel·op also de·vel·ope \də̇ˈveləp, dē-\ vb -ED/-ING/-S [F développer, fr. OF desveloper, desvoloper, desvoluper, fr. des- de- + voloper, voleper, voluper to wrap up] vt 1 a : UNFOLD, UNFURL — used only as a past participle and now only of flags b : to change the form of (a surface) by applying point by point to a specified surface; specif : to unroll (a developable surface) on a plane in this way without stretching any element c : to lay out (as a representation) in or evolve (as an idea) into a clear, full, and explicit presentation (as in a drawing or specification); specif : to determine (as by calculating or drafting) the precise size and shape of (a sheet metal blank from which an article is to be formed) 2 : to make clear by or as if by unfolding more enclosing, enveloping, or obscuring cover 3 a : EXPOUND, EXPLAIN <—ing the thesis with great skill> b : to make visible or manifest c : to treat (as a dye intermediate applied to a fiber) with an agent to cause the appearance of color; subject (as a fiber impregnated with dye intermediate) to the action of an agent to produce color; also : to produce (color or color-producing dye) by such a method d : to cause (writing in secret ink) to become visible (as by the action of heat or chemicals) e : to subject (exposed photograph material) to a usu. chemical treatment designed to produce a visible deposit in matter previously modified by radiation; also : to render (a photographic image) visible by such a method f obs : DISCLOSE, REVEAL; also : DETECT, DISCOVER g : to express (as a mathematical equation or a formula) in expanded form h : to elaborate (a piece of music) by means of development 4 : to open up : cause to become more completely unfolded so as to reveal hidden or unexpected qualities or potentialities 5 a : to make (something latent) active : cause to increase or improve : promote the growth of <he —ed his muscles by exercise, his mind by reading and study> b : to make actually available or usable (something previously only potentially available or usable) <—ing the natural resources of the region> <an engine that ... 100 horsepower> ... (1) : to convert (as raw land) into an area suitable for residential or business purposes <they —ed several large tracts on the edge of town>; also : to alter raw land into (an area suitable for building) <the subdivisions that they —ed were soon built up> (2) : to prepare (a mineral-bearing deposit) for the extraction of ore (as by driving mine workings and passageways and providing power, ventilation, and other equipment) c : to move (a chess piece) from the original position to one providing more opportunity for effective use <—ed the rook as soon as possible> 6 a : to cause to unfold gradually : conduct through a succession of states or changes each of which is preparatory for the next <he —ed his argument point by point> b : to expand by a process of growth <a precocious child that —ed mature breasts when 8 years old> <they —ed a strong militant organization> c : to cause to grow and differentiate along lines natural to its kind <warm rains and summer suns ... the grain> <the zygote is gradually —ed into the adult plant or animal> 7 : to acquire usu. gradually <—ing a taste for dry wines> <he'd —ed a strong dislike for his mother-in-law>; often : to have (something) unfold or differentiate within one — used esp. of diseases and abnormalities <too many children ... tuberculosis> ~ vi 1 a : to go through a process of natural growth, differentiation, or evolution by successive changes from a less perfect to a more perfect or more highly organized state : advance from a simpler form or state of existence to one more complex either in structure or function <a blossom —s from a bud> <the fever ... normally> <the embryo ... into a well-formed animal> b : to acquire secondary sex characters <she is ... rapidly for a girl of 12> c : EVOLVE, DIFFERENTIATE; broadly : GROW 2 a : to become gradually visible or manifest (as the photographic negative —s) <his interest ... as he watched her> b : to become apparent : come to light <it ... that neither one paid the bill> <they waited to see what would ... next> 3 : to develop one's pieces in chess syn see MATURE, UNFOLD
de·vel·op·abil·i·ty ... n : capacity or suitability for development
de·vel·op·able ... adj : capable of being developed
developable surface n [trans. of F surface développable] : a surface that may be imagined flattened out upon a plane without stretching any element
developed black n, often cap D&1st B [developed fr. past part. of develop] : DIAMINE BLACK EH
developed dye n : any of a group of direct azo dyes that after application to the fiber can be further diazotized and coupled on the fiber to form shades faster to washing — called also diazo dye; compare AZOIC DYE
de·vel·oped·ness ... n -ES : the quality or state of being developed
de·vel·op·er ... n -s 1 : a person who develops something esp. habitually or as an occupation: as a : a worker who develops photographic materials (as films and prints) b : a person who develops real estate; often : one that improves and subdivides land and builds and sells residential structures thereon 2 : something that develops or is used in developing: as a : a chemical agent used to produce a dye by reaction with a dye or dye intermediate on the fiber — see DYE table I b : a chemical bath or reagent used in developing exposed photographic materials
developing dye n [developing fr. pres. part. of develop] : a dye produced on the fiber; esp : DEVELOPED DYE
developing-out paper ... n : a photographic paper coated with silver halide gelatin emulsion on which the image is invisible until developed

de·vel·op·ment ... n -s 1 : the act, process, or result of developing : the state of being developed ... something (as a plan or method, an image upon a photographic plate, a living body) is developed <a new ... in poetry> : gradual advance or growth through progressive changes : EVOLUTION <a stage of —> : a making usable or available <well worth —> 2 a : the whole process of growth and differentiation by which the potentialities of a zygote, spore, or embryo are realized; broadly : ONTOGENY b : the gradual differentiation of an ecological community or a natural group; sometimes : PHYLOGENY 3 : the process of or position attained in developing chess pieces 4 logic : an expansion by means of which all the elements contained in a given expression are made explicit 5 : work done in developing a mine 6 a : the elaboration of a musical theme, subject, or idea by rhythmic, melodic, tonal, or harmonic modifications b or development section : the section of a musical movement where this elaboration occurs (as in the sonata form) 7 : a method of reducing grade in railroading by increasing the length of a line between two predetermined points that differ much in elevation 8 : a developed tract of land; esp : a subdivision having necessary utilities (as water, gas, electricity, roads)
de·vel·op·men·tal ... adj 1 : of, relating to, or constituting development <— processes> <— stages> <— questions> : serving to develop <... concessions for the region> <a long-range ... program> ... aid for backward areas; broadly : EXPERIMENTAL <a ... series of tests> <the ... stages of military aviation> 2 : designed to further growth (as of a child) or to bring about improvement (as of a skill) by gradual training adapted to the learner's physical and mental development <... reading> — de·vel·op·men·tal·ly ... adv
developmental anatomy n : the anatomy of the embryo or ...
de·vel·op·men·tal·ist ... also de·vel·op·ment·ist ... n -s : EVOLUTIONIST; usu : an exponent of or specialist in any school of philosophic evolution
developmental pueblo adj, usu cap D&P : of, relating to, or constituting the early Pueblo stages of the 8th to 11th centuries A.D. during which the architecture was developing toward the complexity of the Great Pueblo period
developmental quotient n : a number expressing the development of a child determined by dividing his maturity age by his chronological age and multiplying by 100 — abbr. DQ
development area n, Brit : any of certain areas in which the government encourages the establishment of new industries particularly in order to increase industrial diversification and stability

de·vel·op·pé \ˌdāvəlaˈpā\ n -s [F, fr. past part. of développer to develop] ballet : an unfolding of the free leg into the air
develops pres 3d sing of DEVELOP
devels pl of DEVEL, pres 3d sing of DEVEL
de·ver·bal \(ˈ)dē+\ adj [de- + verb + -al] : DEVERBATIVE
1de·ver·ba·tive \(ˌ)dēˈvərbəd·iv\ adj [de- + verb + -ative] : derived from a verb <the ~ noun developer is derived from develop> : used in derivation from a verb <the ... suffix -er in developer>
2deverbative \"\ n -s : a deverbative word
de·ver·te·brat·ed \(ˈ)dē+\ adj [de- + vertebrated, past part. of vertebrate] : lacking stamina — de·ver·te·bra·tion \(ˌ)..+\ n -s
de·vest \də̇ˈvest, (ˈ)dē-\ vb [MF devestir, devestir, fr. L disvestire, fr. dis- + vestire to dress, fr. vestis garment — more at WEAR] vt 1 a obs : UNCLOTHE b law : to take away (as property, an authority, or title) : ALIENATE, DIVEST c 1 to deprive or dispossess (as a person) of a vested right — now used only in law 2 obs : to cast off : DISCARD, ABANDON ~ vi, of a title or estate : to become devested
de·vi \ˈdāvē\ n -s [Skt devī, fem. of deva — more at DEVA] Hinduism : GODDESS — used in India as a title following the personal name of a married woman
de·vi·a·ble \ˈdēvēəbəl\ adj [deviate + -able] : capable of deviating or of being deflected
de·vi·ance \ˈdēvēən(t)s\ n -s [deviate + -ance] : deviant quality or state : DEVIANCY, DEVIATION
de·vi·an·cy \-ənsē\ n -ES [deviant + -cy] : the character or behavior of a deviant
1de·vi·ant \-ənt\ adj [LL deviant-, devians, pres. part. of deviare to deviate] : deviating esp. from some accepted norm <seriously — conduct> : characterized by deviation (as from a standard of conduct) <— children>
2deviant \"\ n -s : something that deviates from a norm; esp : a person who differs markedly in some respect (as intelligence, social adjustment, or sexual behavior) from what is considered normal or acceptable in the group of which he is a member
1de·vi·ate \ˈdēvēˌāt, usu -ād·+V\ vb -ED/-ING/-S [LL deviatus, past part. of deviare, fr. L de from, away + LL -viare (fr. L via way, road) — more at DE-, VIA] vi : to diverge or turn aside : veer esp. from an established way or toward a new direction <he deviated from the path> <deviating to the south> : stray esp. from a standard, principle, or topic <she never deviated from her first account> <deviating sharply from the traditional approach> : turn aside from a previous, usual, normal, or acceptable course (as of conduct) <party principles permit no one to ...> <whenever I deviated I felt guilty> ~ vt : to turn (something) out of a previous course : cause to deviate <he would ... rivers, turn the scorched plains of Lombardy into fertile pastures —P.M.Godfrey> <a deep iron keel will tend to ... the compass during heeling over> syn see SWERVE
2de·vi·ate \-vēət, usu -ād·+V\ n -S [LL deviatus, past part. of deviare] : something that differs noticeably from the average or normal range of its kind: as a : a person that is a deviant; esp : SEXUAL PERVERT b : any item of a statistical distribution that differs significantly from the norm
3deviate \"\ also de·vi·at·ed \ ... -ād·əd\ adj [deviate fr. LL deviatus; deviated fr. LL deviatus + E -ed] : characterized by or given to significant departure from the behavioral norms of a particular society
de·vi·a·tion \ˌdēvēˈāshən\ n -s [LL deviation-, deviatio, fr. deviatus + L -ion-, -io -ion] : an act or instance of deviating : DEFLECTION, VEERING, DIVERGENCE: as a : deflection of the needle of a compass caused by magnetic influences within the ship or airplane in which it is mounted b in the old Ptolemaic system : a motion of the deferent toward and from the ecliptic c (1) : the divergence, laterally unless otherwise stated of a projectile from the plane of departure caused by extraneous factors (as drift, wind) (2) : the divergence of a projectile from the mean direction of a number of shots fired at the same target — called also deviation from the center of impact (3) : the angular measurement between a burst and a target as measured from an observation post d : voluntary and unnecessary departure of a ship from the regular and usual course of a specific voyage, such departure releasing underwriters of insurance on the ship from further responsibility e : DEFLECTION 5a f : the algebraic difference found by subtracting some fixed number (as the arithmetic mean of a series of statistical data) from any item of the series g : evolutionary differentiation involving interpolation of new stages in the ancestral pattern of morphogenesis — compare ANABOLY, ARCHALLAXIS h : departure from an established body of principles, a system of beliefs, an ideology, or a party line; specif : departure from strict Marxist doctrine <he was expelled from the Communist party for —> i : noticeable or marked departure from accepted societal norms of behavior
de·vi·a·tion·al \ˌ..ˈāshənəl, -shnəl\ adj : involving or tending toward deviation esp. from political party principles — de- ...
de·vi·a·tion·ism ... n, ... : ... or divergence from a party line esp. of the Communists
de·vi·a·tion·ist \-sh(ə)nəst\ n -s : one who departs from the principles of an organization (as a political party) with which he is affiliated <... were increasingly common in Communist countries> <... protest went unheeded>
deviation warranty n : an implied warranty underlying all contracts of ocean marine insurance that a ship will not depart from the customary route between the ports for which insurance is granted
de·vi·a·tive \ˈdēvēˌād·iv, -ēəd·iv\ adj : tending to deviate
de·vi·a·tor \-ād·ə(r)\ n -s [deviate + -or] : something that deviates or causes to deviate; sometimes : DEVIATIONIST
de·vice \də̇ˈvīs\ ... n -s [ME devis, devise, fr. OF devis will, intention & OF devise dividing line, difference, wish, fr. deviser to divide, regulate, tell — more at DEVISE] 1 : something that is formed or formulated by design and usu. with consideration of possible alternatives, experiment, and testing : something devised or contrived : CONTRIVANCE, INVENTION, PROJECT, SCHEME: as a : a scheme to deceive or overreach : ARTIFICE, STRATAGEM b : something fanciful, elaborate, or intricate in design (as a trinket or a musical motive) c : something in a literary work designed to achieve a particular artistic effect (as a figure of speech, a special method of narration, or use of words or word sounds) d archaic : MASQUE, SPECTACLE e : a piece of equipment or a mechanism designed to serve a special purpose or perform a special function <a ... for measuring heat release> <an improved steering ...> 2 : WILL, DESIRE, INCLINATION, PURPOSE — now used only in pl. <left to his own ~(s)> 3 a : an emblematic design typically of one or more figures with a motto that is used esp. as a heraldic bearing denoting the historical situation, the ambition, or the desire of the person adopting it; sometimes : MOTTO b : an emblematic figure that is used to identify usu. an organization (as a publisher or navigation line) 4 archaic : INVENTION, DEVISING 5 obs : CONVERSATION, CHAT
de·vice·ful \-sfəl\ adj : full of devices : INGENIOUS — de·vice·ful·ly \-fə̇lē\ adv
1dev·il \ˈdevəl\ sometimes -(ˌ)vil, dial or as a mild imprecation ˈdivəl\ n -s often attrib [ME devel, fr. OE dēofol, fr. LL diabolus, fr. Gk diabolos, lit., slanderer, fr. diaballein to throw across, discredit, slander, fr. dia through, across + ballein to throw; akin to OE cwellan to kill, OHG quellan to well, gush, Skt galati it drips — more at DIA-] 1 sometimes cap : the personal supreme spirit of evil and unrighteousness in Jewish and Christian theology : the tempter and spiritual enemy of mankind who is the adversary of God although subordinate to him and able to act only by his sufferance and is represented frequently as the leader or prince of all apostate angels and as ruler of hell — called also Apollyon, Beelzebub, Lucifer, Satan; usu. used with the and often used as a mild imprecation or expression of surprise, vexation, or emphasis <the ... you say> <the — take it> 2 : one of the superhuman followers of the devil : a lesser evil or malignant spiritual being: as a : heathen god or idol — used chiefly in scriptural and Christian clerical writings b in the Bible : a malignant spirit possessing and responsible for the state of a demoniac 3 a : an extremely and malignantly wicked person : a human fiend; often : a person cantankerously self-centered and without regard for

erior Court - Suffolk
ket Number 2384CV01086

VM

8

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

| | |
|---|---|
| ELIZABETH NOVA,<br><br>For herself and the Class,<br><br>v.<br><br>BOSTON MEDICAL CENTER CORPORATION<br><br>Defendant. | SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION<br><br>CIVIL ACTION NO. 2384CV01086-BLS1 |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: [signature]
Asst. Clerk

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff*

# Table of Contents

I. Introduction ....................1

II. The Facts. ....................2

A. The Tracking Technologies....................2

B. The Interceptions Were Secret....................3

C. Allegations Regarding the Plaintiff....................4

III. Argument....................4

A. Plaintiff Has Standing to Assert an MWA Claim. ....................5

1. The MWA Confers Standing Upon Plaintiff. ....................5

2. Even if Standing Principles Similar to those Under Article III Were to Apply, Plaintiff Would Satisfy Them. ....................8

B. The MWA Applies to Internet Communications ....................9

C. BMC's Use of the Tracking Technologies Was Secret. ....................11

D. BMC's Interceptions Do Not Qualify for the "Telephone Equipment" Defense. ....................11

1. Tracking Technologies Are Not Telephone Equipment. ....................12

2. BMC Did Not Use the Tracking Technologies in the Ordinary Course of Business....................13

E. Plaintiff Alleges BMC's Use of an Intercepting Device....................14

F. The MWA Provides a Remedy for Interceptions of Communications Between Massachusetts Parties, Effected Through a Device Located in Massachusetts ....................16

G. The Court Should Disregard Defendant's Doomsday Scenarios....................19

IV. Conclusion....................20

erior Court - Suffolk
ket Number 2384CV01086

## Table of Authorities

Pages

**Cases**

*Barrows v. Farmum's Stage Lines, Inc.*,
254 Mass. 240 (1926) .......... 7

*Beard Motors, Inc. v. Toyota Motor Distribs., Inc.*,
395 Mass. 428 (1985) .......... 7

*Bruno v. Mallen*,
1998 Mass. Super. LEXIS 157 (Super. Ct. Jan. 20, 1998) .......... 6

*Burbank Apartments Tenant Ass'n v. Kargman*,
474 Mass. 107 (2016) .......... 8

*Byars v. Hot Topic, Inc.*,
2023 U.S. Dist. LEXIS 24985 (C.D. Cal. Feb. 14, 2023) .......... 13

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .......... 8

*Centennial Healthcare Inv. Corp. v. Comm'r of the Div. of Med. Assistance*,
61 Mass. App. Ct. 320 (App. Ct. 2004) .......... 7

*Commonwealth v Rainey*,
491 Mass. 632 (2023) .......... 10

*Commonwealth v. Browar-Jarus*,
97 Mass. App. Ct. 1108 (2020) .......... 15

*Commonwealth v. Jackson*,
370 Mass. 502 (1976) .......... 6, 11

*Commonwealth v. Minori*,
101 Mass. App. Ct. 1106 (App. Ct. 2022) .......... 16

*Commonwealth v. Wilcox*,
63 Mass. App. Ct. 131 (App. Ct. 2005) .......... 17

*Cosme v. Whitin Mach. Works*,
417 Mass. 643 (1994) .......... 18

*Doe v. Bon Secours Mercy Health*,
Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) .......... 5

*Doe v. Medstar Health, Inc.*,
No. 24-C-20-000591 (Md. Cir. Ct. 2022) ........................................ 5

*Doe v. Partners Healthcare System, Inc.*,
Case No. 1984CV01651-BLS1 (Mass. Super. Ct. Nov. 20, 2020) .................. 1, 4, 11

*Doe v. Sutter Health*,
Case No. 34-2019-00258072 (Cal. Cty. Ct. June 9, 2022) ..................... 5, 10, 15

*Doe v. University Hospitals Health System, Inc.*,
Case No. CV-20-93333357 (Ohio Ct. Com. Pleas Nov. 16, 2020) ................... 5

*Fournier v. Troianello*,
332 Mass. 636 (1955) ........................................ 7

*Gilk v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011) ........................................ 15

*Ginther v. Comm'r of Ins.*,
427 Mass. 319 (1998) ........................................ 8

*Healix Infusion Therapy, Inc. v. Helix Health, LLC*,
747 F. Supp. 2d 730 (S.D. Tex. 2010) ........................................ 16

*Heffernan v. Hashampour*,
2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009) ........................ 17, 18

*Iannachino v. Ford Motor Co.*,
451 Mass. 623 (2008) ........................................ 8

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
78 F. Supp. 3d 1051 (N.D.Cal. 2015) ........................................ 15

*In re Facebook Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........................................ 8

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
934 F.3d 316 (3d Cir. 2019) ........................................ 8

*In re Google Inc. Gmail Litig.*,
2013 U.S. Dist. LEXIS 172784 (N.D. Cal. Sept. 26, 2013) ........................ 13, 14

*In re Meta Pixel Healthcare Litig.*,
2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) ........................ 5, 15

*In re Pharmatrak, Inc. Privacy Litig.*,
329 F.3d 9 (1st Cir. 2003) ........................................ 5

*Johnson v. Frei*,
93 Mass. App. Ct. 1111 (App. Ct. 2018) ....7

*Kearney v. Salomon Smith Barney, Inc.*,
137 P.3d 914 (Cal. 2006) ....17

*Klumb v. Goan*,
884 F. Supp. 2d 644 (E.D. Tenn. 2012) ....15

*Licea v. Cinmar, LLC*,
2023 U.S. Dist. LEXIS 38233 (C.D. Cal. Mar. 7, 2023) ....10, 13

*Loc. 1445, United Food & Com. Workers Union v. Police Chief of Natick*,
29 Mass. App. Ct. 554 (App. Ct. 1990) ....7

*Luis v. Zang*,
833 F.3d 619 (6th Cir. 2016) ....15, 19

*MacNeil Eng'g Co. v. Tisport, Ltd.*,
59 F. Supp. 2d 199 (D. Mass. 1999) ....18

*Marquis v. Google Inc.*,
No. 11-2808-BLS1 (Super. Ct. Jan. 17, 2012) ....10, 11

*Marquis v. Google*,
2015 WL 13037527 (Mass. Super. Ct. Feb. 13, 2015) ....18, 19

*Martin v. Evans*,
241 F. Supp. 3d 276 (D. Mass. 2017) ....15

*Mason v. Machine Zone, Inc.*,
140 F. Supp. 3d 457 (D. Md. 2015) ....16

*Matera v. Google Inc.*,
2016 U.S. Dist. LEXIS 107918 (N.D. Cal. Aug. 12, 2016) ....13, 14

*Mount v. Pulsepoint, Inc.*,
684 Fed. Appx. 32 (2d Cir. 2017) ....9

*O'Sullivan v. NYNEX Corp.*,
426 Mass. 261 (1997) ....12

*Pendell v. AMS/Oil, Inc.*,
1986 U.S. Dist. LEXIS 26089 (D. Mass. Apr. 30, 1986) ....18

*Pishev v. Somerville*,
95 Mass. App. Ct. 678 (2019) ....8

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) .......... 19, 20

*Project Veritas Action Fund v. Rollins*,
982 F.3d 813 (1st Cir. 2020) .......... 15

*Pugsley v. Police Dep't of Boston*,
472 Mass. 367 (2015) .......... 8

*Rackemann v. LISNR, Inc.*,
2017 U.S. Dist. LEXIS 162567 (S.D. Ind. 2017) .......... 16

*Raffin v. Medicredit, Inc.*,
2016 U.S. Dist. LEXIS 181819 (C.D. Cal. Dec. 19, 2016) .......... 9

*Restuccia v. Burk Tech., Inc.*,
1996 Mass. Super. LEXIS 367 (Super. Ct. Aug. 13, 1996) .......... 13

*Ross v. Jackson Nt'l Life Ins. Co.*,
2020 U.S. Dist. LEXIS 96498, (D. Mass. June 2, 2020) .......... 18

*Sanders v. Robert Bosch Corp.*,
38 F.3d 736 (4th Cir. 1994) .......... 12

*Spokeo Inc. v. Robins*,
578 U.S. 330 (2016) .......... 6

*State v. Worthy*,
661 A.2d 1244 (N.J. 1995) .......... 17

*Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*,
448 Mass. 15 (2006) .......... 8

*Ultimate Outdoor Movies, LLC v. Funflicks, LLC*,
2019 U.S. Dist. LEXIS 86763 (D. Md. May 23, 2019) .......... 16

*United States v. Hutchins*,
2018 U.S. Dist. LEXIS 183898 (E.D. Wis. 2018) .......... 15

*United States v. Lyons*,
740 F.3d 702 (1st Cir. 2014) .......... 9

*United States v. Murdock*,
64 F.3d 1391 (6th Cir. 1995) .......... 12

*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) .......... 14

*Weld v. Glaxo Wellcome, Inc.*,
434 Mass. 81 (2001) ........ 6

*Williams v. Poulos*,
11 F.3d 271 (1st Cir. 1993) ........ 12

**Statutes**

M.G.L. c. 272 § 99 ........ passim

**Treatises**

Rest. (2d) Conflict of Laws § 152 ........ 17

Rest. (2d) of Torts § 652B ........ 17

# I. INTRODUCTION

Boston Medical Center ("BMC") aided third parties—including Google and Facebook—to secretly intercept Plaintiff Elizabeth Nova's ("Plaintiff") and other consumers' wire communications with BMC. BMC injected into its website hidden code for tracking technologies, including Google Analytics and Facebook's Meta Pixel, but did not disclose the resulting interceptions. The technologies helped third parties to secretly intercept consumers' communications with BMC about their medical conditions and doctors. Plaintiff asserts a claim under the Massachusetts Wiretap Act, G.L. c. 272 § 99 ("MWA").

Plaintiff's claim follows a well-tread path of cases arising from the undisclosed use of tracking technologies, including Google Analytics and Meta Pixel, on the websites of medical providers. At least seven courts have affirmed wiretap and similar claims relating to tracking technologies such as Meta Pixel and Google Analytics, including in *Doe v. Partners Healthcare System, Inc.*, where this Court (Davis, J.) rejected the arguments BMC makes here.[1] Each of BMC's arguments for dismissal lack merit.

*First*, BMC argues Plaintiff lacks standing to bring an MWA claim. The MWA, however, precisely defines who has standing to bring a claim to enforce its terms, and Plaintiff meets those requirements.

*Second*, BMC argues that the MWA protects only human-to-human "conversation," and Plaintiff's claims do not involve that type of communication. BMC cites no authority that limits the MWA in this fashion. The MWA's express terms do not limit it to human-to-human "conversations"; the MWA was instead designed to apply to emerging technologies. Substantial authority under the MWA and comparable wiretap laws confirm the MWA applies to website communications like those here.

*Third*, BMC argues the interceptions were not "secret." This element requires BMC to prove Plaintiff had actual knowledge of the interceptions. Nothing in the Complaint establishes such actual knowledge. To the contrary, Plaintiff alleges in detail how the code for tracking technologies is hidden from website users and how BMC utterly failed to disclose the technologies or the resulting interceptions.

[1] *See* Ex. A (motion to dismiss in *Partners*, Case No. 1984CV01651-BLS1); Ex. B (Nov. 20, 2020 order denying motion to dismiss); Ex. C (transcript of motion to dismiss hearing explaining Court's reasoning, incorporated into order denying motion to dismiss).

*Forth*, BMC argues it is exempt from liability because the tracking technologies are "telephone equipment" that BMC uses in the "ordinary course of business." Tracking technologies are not telephone equipment, and the secret deployment of tracking technologies is not part of a hospital's ordinary course of business. In any event, BMC's disclosures denying its use of such technologies negate any contention that its conduct is part of the ordinary course of BMC's business.

*Fifth*, BMC argues that the tracking technologies are not "intercepting devices" because they are implemented using computer code, and such "software" is not a "device." Ample authority under the MWA and similar laws confirms that Plaintiff's allegations describe BMC's use of an intercepting device.

*Finally*, the Court should disregard BMC's doomsday scenarios about the fallout from applying the MWA to the facts alleged here. The Complaint and the MWA make clear how BMC and other companies can use tracking technologies without violating the MWA: disclosure. Indeed, as explained below, BMC appears to have recognized this solution by recently changing its disclosures. The Court should give no weight to BMC's feigned concerns about the purported calamities that would befall the Internet if the Court sustains Plaintiff's claims.

In short, BMC's motion lacks merit. The Court should deny it.

## II. THE FACTS.

### A. *The Tracking Technologies*

Plaintiff alleges BMC injected hidden code in its website that enabled third parties, including Google, Facebook, Siteimprove Analytics, and New Relic to intercept the contents of Plaintiff's and other healthcare consumers' communications with BMC. ¶¶ 32–60, 108.[2] Plaintiff alleges in detail how these technologies worked, but in general terms, BMC caused website users' browsers to load hidden code when the user visits the website. ¶ 53–60. The code causes the browser to intercept information about the contents of each webpage Plaintiff visited and transmit that information to Google, Facebook, and other third parties. *Id.* The code is invisible to ordinary users without special web developer tools. ¶ 57.

[2] "¶ __" refers to paragraphs of Plaintiff's Complaint.

The contents of communications intercepted included: (i) the URL of each webpage visited (an identifier that acts as an address for a webpage but also describes the content of the webpage, for example, https://www.bmc.org/cancer), *e.g.*, ¶¶ 50, 67, 71, 73 (ii) the title of each page visited (such as "BMC Cancer Center"), *e.g.* ¶ 80; and (iii) actions users took on the website, including searches, the criteria for doctor searches, appointment requests, bill payments, requests for medical records, and communications with the purportedly secure patient portal, ¶ 77–108. BMC installed these trackers throughout its website. ¶ 61. The interceptions also revealed identifying information about users, which permitted Google and Facebook to confirm the real-world identities of the individuals whose communications were intercepted and to use the intercepted contents for individualized advertising. ¶¶ 49, 56, 68–70, 75–76.

The tracking technologies revealed sensitive health information about Plaintiff and other consumers, including (i) medical conditions, procedures, and specialties about which consumers sought information, ¶¶ 79–87; (ii) medical searches consumers performed on the website, ¶¶ 88–89; (iii) searches performed for doctors, including the consumers' location and symptoms for which they need treatment, ¶¶ 90–95, and (iv) various pages reflecting users' status as patients, ¶¶ 96–107.

B. *The Interceptions Were Secret*

The interceptions were secret and performed without the consent of Plaintiff and class members. The code for the tracking technologies was invisible to the website user, implemented through hidden code that is not depicted visually in any part of the website visible to the website user. ¶¶ 57–62, 71.

BMC could have but did not disclose to consumers that it shared the contents of consumers' communications with Google, Facebook, and other third parties. Instead, BMC falsely told consumers that it will not "share the contents of any electronic communication with a third-party entity," a palpably false promise, given that the tracking technologies are expressly designed to share the electronic communications with Google, Meta, and others. BMC also represented that "[o]nline visitors utilizing this site do so anonymously," which was another false promise, given that Google Analytics and Meta

Pixel are designed to identify website users so that Google and Facebook can serve such individuals personalized advertising based on the intercepted communications. ¶¶ 20–30.[3]

C. *Allegations Regarding the Plaintiff.*

Plaintiff is a resident of Massachusetts and a patient of BMC. ¶ 10. She regularly uses the BMC Website to (i) obtain information about BMC doctors; (ii) search for information on particular medical procedures; (iii) obtain information about BMC's locations; (vi) schedule and confirm medical appointments; and (iv) obtain and review her medical records through the website's patient portal. *Id.* The pages on the BMC Website that Plaintiff alleges she personally visited are the same pages on which BMC used the tracking technologies. ¶¶ 90–95 (tracking technologies used to intercept searches for information on doctors); ¶¶ 79–87 (trackers used on pages concerning medical specialties and procedures); ¶¶ 88–89 (trackers used to intercept text searches); ¶¶ 100–03 (trackers used to intercept medical records requests); ¶¶ 104–07 (trackers used on patient portal).

Plaintiff alleges that she and other Class Members are "Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed" the BMC Website. ¶ 112. That is, Plaintiff's claims are limited to communications between Massachusetts residents and a Massachusetts hospital made while Plaintiff and other Class Members were physically present within Massachusetts. *Id.*

## III. ARGUMENT

At least seven decisions have upheld claims relating to the tracking technologies that are similar to those at issue here. These include the *Partners* case (see n.2 & accompanying text, *supra*)[4]; *In re*

---

[3] After several hospitals were sued and the privacy concerns with Meta Pixel and Google Analytics became widely publicized, BMC amended its website disclosures, *see* n.25, *infra* & accompanying text. Plaintiff's Complaint is limited to the time period prior to when BMC changed its disclosures. ¶ 112.

[4] BMC erroneously asserts that Judge Davis applied "minimal reasoning and no analysis of the statutory text, history or case law, [and that he did] … not appear to address standing." MTD 14 n.5. The record from *Partners* proves these assertions false. The briefing and transcript from the motion to dismiss in *Partners* reflects in-depth consideration of substantive arguments, leading to conclusions that the hospital's arguments were inconsistent with the statutory text and case law construing it. *See* Exs. A, C. Moreover, the defendant there *did* argue that the plaintiff failed to allege an injury. Ex. C at 10 (arguing the complaint alleges no "facts…to demonstrate any damage or consequence of the alleged sharing of 'personally identifiable nature'").

*Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9 (1st Cir. 2003) (reversing dismissal of wiretap claims relating to pixel trackers on pharmaceutical websites); *In re Meta Pixel Healthcare Litig.*, 2022 U.S. Dist. LEXIS 230754 (N.D. Cal. Dec. 22, 2022) (concluding in considering preliminary injunction[5] that plaintiffs made a "strong showing as to each of the elements of their [federal] Wiretap Act claim" against Facebook relating to the use of Meta Pixel on hospital websites); *Doe v. Medstar Health, Inc.*, No. 24-C-20-000591 (Md. Cir. Ct. 2022) (Ex. D) (denying motion to dismiss Maryland wiretap act case relating to hospital use of Meta Pixel and Google Analytics); *Doe v. Sutter Health*, Case No. 34-2019-00258072 (Cal. Cnty. Ct. June 9, 2022) (Ex. E) (same, except California wiretap law); *Doe v. Bon Secours Mercy Health*, Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) (Ex. F) (denying motion to dismiss Ohio claim similar to wiretap claim based on hospital use of Meta Pixel and Google Analytics); *Doe v. University Hospitals Health System, Inc.*, Case No. CV-20-933357 (Ohio Ct. Com. Pleas Nov. 16, 2020) (Ex. G) (same).

These cases and the serious faults in BMC's arguments on particular MWA elements, to which Plaintiff responds below, compel the conclusion that Plaintiff amply states a claim under the MWA.

A. *Plaintiff Has Standing to Assert an MWA Claim.*

The MWA provides to a class of persons whom it carefully defines the right to seek judgments from Massachusetts' courts to remedy violations of the MWA's provisions. BMC asks the Court to ignore the MWA's express terms and the remedies the Legislature provided. BMC's arguments would repeal so much of the MWA as provides relief to citizens unless they prove some form of harm or injury <u>**in addition**</u> to the injury the Legislature defined in the MWA. There is no basis for this argument.

1. <u>The MWA Confers Standing Upon Plaintiff.</u>

The MWA's civil remedy provision provides:

> Any <u>**aggrieved person**</u> whose oral or wire communications were intercepted, disclosed, or used except as permitted or authorized by this section or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by this section shall have a civil cause of action against any person who so intercepts, discloses or uses such communications....

[5] The court ultimately denied the motion for a preliminary injunction based on a defense specific to the federal wiretap act that BMC does not contend applies here. *See id.* at *37–41.

M.G.L. c. 272 § 99(Q) (emphasis added). The same section mandates that such an "aggrieved person" "__shall__ be entitled to recover" liquidated damages plus other remedies. *Id.* (emphasis added).

Critically, the MWA defines specifically who qualifies as an "aggrieved person" entitled to MWA remedies. It defines an "aggrieved person" as "any individual who was a party to an intercepted wire or oral communication." *Id.* § 99(B)(6). That is, the MWA commands that upon showing that a person was a party to an intercepted wire communication, that person "shall" be awarded the remedies the MWA provides. Nothing in the MWA suggests a plaintiff must plead or prove any additional injury or damage.

The SJC has rejected BMC's argument (MTD 8)[6] that an MWA plaintiff must plead the interception of a certain "type of personal data," such as "confidential personal information" in which a plaintiff "reasonably expect[s] privacy," to state a claim (MTD 8, 9 n.4). It explained: "[W]e would render meaningless the Legislature's careful choice of words if we were to interpret [the MWA] as encompassing only those situations where an individual has a reasonable expectation of privacy." *Commonwealth v. Jackson*, 370 Mass. 502, 506 (1976); *Bruno v. Mallen*, 1998 Mass. Super. LEXIS 157, at *6 (Super. Ct. Jan. 20, 1998) (rejecting argument that plaintiff was not an "aggrieved person" because defendant's "actions were reasonable when balanced against [plaintiff's] expectation of privacy"; defendant had "failed to read the Wiretap Statute" which has "no balancing test to determine whether someone is an 'aggrieved person.'").

Half of the cases BMC cites on standing are decisions from federal courts based on Article III of the United States Constitution, which limits federal court jurisdiction.[7] Those federal court Article III cases are irrelevant for a simple reason: This case is not pending in federal court. Hence, Article III does not apply. *Weld v. Glaxo Wellcome, Inc.*, 434 Mass. 81, 88 (2001) ("State courts…are not burdened by these

[6] "MTD" is BMC's Memorandum in Support of BMC's Motion to Dismiss.
[7] Article III limits the "judicial Power" of the federal courts to "Cases" and "Controversies." U.S. Const. Art. III § 2. The United States Supreme Court has construed Article III as imposing a substantive limitation on Congress's power to confer standing for federal courts. It has explained: "Injury in fact is a constitutional requirement…. Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Spokeo Inc. v. Robins*, 578 U.S. 330, 339 (2016). Although, for purposes of establishing Article III standing, Congress may "identify intangible harms that meet minimum Article III requirements," federal courts cannot defer entirely to Congress's judgment. *Id.* at 341.

same [Article III] jurisdictional concerns and, consequently, may determine…that concerns other than standing, in its most technical sense, may take precedence.").

There is no Massachusetts equivalent to Article III that constrains the Legislature's power to define injuries and confer standing in state courts. In contrast to federal courts, the Legislature has discretion, unrestrained by any constitutional limitations, to define injuries and confer standing::

> The State has power to confer jurisdiction upon its courts to consider suits at the instance of those who have very remote and even no personal interest in the subject matter…. A stated number of citizens or a single individual may be clothed by the Legislature with authority to invoke the aid of courts in the suppression of violations of law!

*Fournier v. Troianello*, 332 Mass. 636, 639 (1955) (quoting *Barrows v. Farmum's Stage Lines, Inc.*, 254 Mass. 240, 243 (1926)); *Beard Motors, Inc. v. Toyota Motor Distribs., Inc.*, 395 Mass. 428, 432 (1985) (affirming *Fournier*, "[where] the Legislature has clearly indicated that it intends a broader grant of standing," resort to more general standing principles is unnecessary); *Mass. State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc.*, 469 Mass. 675, 683, (2014) (same); *Loc. 1445, United Food & Com. Workers Union v. Police Chief of Natick*, 29 Mass. App. Ct. 554, 488 (App. Ct. 1990) ("When a statute confers standing in relation to particular subject matter, that statute…governs who may initiate legal action in relation to the subject matter..").

Because the Legislature delineated who has standing to bring an MWA claim, the Court must apply the MWA's terms and cannot graft onto the statute an "injury" requirement that differs from the MWA's text. *Johnson v. Frei*, 93 Mass. App. Ct. 1111 (App. Ct. 2018) (because "an 'aggrieved person' is defined as 'any individual who was a party to an intercepted wire or oral communication," and "there is no dispute that [defendant] secretly recorded [the plaintiff, then the plaintiff] meets the plain reading of an 'aggrieved person under the statute **<u>and we need not look further</u>**.") (emphasis added); *Centennial Healthcare Inv. Corp. v. Comm'r of the Div. of Med. Assistance*, 61 Mass. App. Ct. 320, 326 (App. Ct. 2004) ("When a statute confers standing in relation to particular subject matter, that statute, rather than more general ideas about standing, governs who may initiate legal action….").

BMC's state court authorities requiring proof of an injury for certain statutory claims do not hold that there exists a free-floating "injury" requirement separate from injuries the Legislature has defined;

instead, those decisions either (i) fill a definitional void in statutes that limit remedies to "aggrieved" or "injured" persons but that do not define what it means to be "aggrieved" or "injured"[8] or (ii) prescribe a judicially created injury principle where the statute itself creates no private right nor defines who has standing to bring a claim.[9] None of those cases impose additional or different injury requirements where a statute defines an injury and confers standing.

2. Even if Standing Principles Similar to those Under Article III Were to Apply, Plaintiff Would Satisfy Them.

Even in federal court, where Article III constrains legislatures' ability to define who has standing, a violation of wiretap law, without more, satisfies Article III requirements. The Ninth Circuit, for example, has confirmed that violations of federal and California wiretap law confer standing without any additional allegation of injury beyond the interception itself:

> [U]nder the privacy torts that form the backdrop for these modern [wiretap] statutes, "[t]he intrusion itself makes the defendant subject to liability." Restatement (Second) of Torts § 652B cmt. B. In other words, "privacy torts do not always require additional consequences to be actionable. Thus, historical practice provides support not only for the conclusion that wiretapping is actionable, but also for the conclusion that **a wiretapping plaintiff need not allege any further harm to have standing [under Article III]**....
>
> Plaintiffs' position that this was being done without consent meant that they claimed a violation of the concrete private interests that [wiretap laws] protect, **regardless of how the collected data was later used. No more is needed to support standing**....

*Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117–19 (9th Cir. 2020) (emphasis added; some quotations omitted); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("[A] concrete injury for Article III standing purposes occurs when Google, or any other third party, tracks a person's internet browser activity without authorization."); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020) ("[T]hese statutory provisions codify a substantive right to privacy, the

[8] *Ginther v. Comm'r of Ins.*, 427 Mass. 319, 324 (1998) (construing insurance statute's grant of appeal to "any person aggrieved" by decision of insurance commissioner); *Pugsley v. Police Dep't of Boston*, 472 Mass. 367, 370–71 (2015) (construing state discrimination claims limiting remedies to "[a]ny person claiming to be aggrieved," *see* M.G.L. c. 151B § 5)); *Burbank Apartments Tenant Ass'n v. Kargman*, 474 Mass. 107 (2016) (similarly construing discrimination statute); *Iannachino v. Ford Motor Co.*, 451 Mass. 623, 629 (2008) (construing Chapter 93A requirement that plaintiff be "injured" by unfair or deceptive practice).

[9] *Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court*, 448 Mass. 15, 20–21 (2006); *Pishev v. Somerville*, 95 Mass. App. Ct. 678, 683 (2019).

violation of which gives rise to a concrete injury sufficient to confer standing."); *Mount v. Pulsepoint, Inc.*, 684 Fed. Appx. 32, 34–35 (2d Cir. 2017) ("unauthorized…monitoring of plaintiffs' web-browsing activity" sufficient to confer Article III standing); *Raffin v. Medicredit, Inc.*, 2016 U.S. Dist. LEXIS 181819, at *6 (C.D. Cal. Dec. 19, 2016) ("[T]o satisfy injury in fact, a plaintiff in a [California wiretap] action need not allege actual harm beyond the invasion of the private right conferred by the statute.").[10]

B. *The MWA Applies to Internet Communications*

BMC argues (MTD 13) the MWA should be limited to "audiotaping of in-person conversations and wiretapping of telephone lines" and other forms of communication "directly analogous" to such communications. The MWA's plain text and express stated purpose reject any such limitation.

The MWA defines "interception" as "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any <u>wire</u> or oral communication through the use of any intercepting device by any <u>person</u> other than a <u>person</u> given prior authority by all parties to such communication." M.G.L. c. 272 § 99(B)(6) (emphasis added). "Person," in turn, is defined to include "any individual, <u>partnership, association, joint stock company, trust, or corporation</u>." *Id.* § 99(B)(13). That is, the MWA expressly prohibits not only interceptions of "conversations" between "humans" but also wire communications involving business entities, including "corporations" like BMC.

Furthermore, the MWA defines a "<u>wire</u> communication" as "<u>any</u> communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." M.G.L. c. 272 § 99(B)(1) (emphasis added). The communications here plainly occurred "by the aid of wire, cable, or other like connection," as the "Internet is an instrumentality" that transmits information "by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." *United States v. Lyons*, 740 F.3d 702, 716 (1st Cir. 2014) (construing law with similar wire communication definition).

[10] In the <u>only</u> wiretap case BMC cites on standing, *Saleh*, the court found the plaintiff lacked standing for a claim for the <u>possession</u> of an intercepting device, a claim for which there was no private right of action. 562 F. Supp. 3d at 521–24. The court <u>upheld</u> a claim for an unlawful interception. *Id.* at 521.

This Court (Davis, J.) held in *Partners* that the MWA applies to tracking technologies, rejecting the defendants' technical arguments that Google Analytics and Meta Pixel do not involve any "communication." *See* Ex. A at 12; Exs. B, C; *see also Sutter* (Ex. E) at 3–4 (rejecting argument under California wiretap act that participants to communication must each be "natural persons," collecting authorities construing federal wiretap act that reject the same argument).[11]

The cases BMC cites that discuss how the MWA applies to "'bug[s]' that could be 'concealed in telephones or walls'" to record audible "conversations'" do not hold that the MWA is limited or restricted to only such interceptions or forms of communication.[12] BMC's contention that the Legislature "could not have envisioned that the [MWA] could apply to computer 'code' installed on 'websites'" (MTD 13) ignores the Legislature understood the "**grave dangers**" posed by "the **uncontrolled development** and unrestricted use of **modern electronic surveillance devices**." M.G.L. c. 272 § 99(A) (emphasis added).[13]

BMC argues the MWA was concerned with the use of "surveillance devices by *law enforcement officials*" (MTD 12), but the MWA's preamble and text reveals the **exceptions** to MWA's prohibitions assisted law enforcement, while the substantive prohibitions serve to abate "the uncontrolled development and unrestricted use of modern electronic surveillance devices." M.G.L. c. 272 § 99(A).

That the Massachusetts legislature has not amended the MWA to carve out a separate provision dealing with "electronic communications" (MTD 14–15) does not reflect any intent to exclude such communications. *See Rich*, 2011 Mass. Super. LEXIS 148 at *13–14 (confirming that even before the 1986 amendment of the federal law, the federal definition of 'wire communication' was broad enough to

[11] *Licea v. Cinmar, LLC*, 2023 U.S. Dist. LEXIS 38233 (C.D. Cal. Mar. 7, 2023), which BMC cites, does not support BMC's argument. There, the court declined to construe a particular section of California's wiretap law limited to "telephone wires, lines or cables" as including internet communications. *Id.* at *14–15. The court, notably, imposed no such limitation on a separate section of the same statute that applies more broadly, like the MWA, to "wire" communications *Id.* at *23–24.

[12] *Commonwealth v. Rainey*, 491 Mass. 632, 645 (2023) (referencing "bugs" and "conversations," but **no** holding limiting "wire communication" to human-to-human communications).

[13] *See also Marquis v. Google Inc.*, No. 11-2808-BLS1, Order on Motion to Dismiss at 4–5 (Super. Ct. Jan. 17, 2012) (Ex. H) (rejecting argument that "had the Legislature desired to include…electronic communications in the [MWA], then it would have done so expressly," concluding the MWA's "definition of 'wire communications' is sufficiently broad to include electronic communications").

include [electronic] communications, such as email"); *Marquis v. Google Inc.*, No. 11-2808-BLS1, Order on Motion to Dismiss at 4–5 (Super. Ct. Jan. 17, 2012) (Ex. H) (rejecting argument that "had the Legislature desired to include…electronic communications in the [MWA], then it would have done so expressly").

C. *BMC's Use of the Tracking Technologies Was Secret.*

BMC makes a one-sentence argument that "the alleged 'recording' was not 'secret' because anyone using the 'Google Developer Mode' setting in their web browser could see what was occurring." MTD 14. This argument is frivolous. The MWA prohibits only "secretly" intercepting wire communications. M.G.L. c. 272 § 99(B)(4). A defendant must prove plaintiff's "actual knowledge" of an interception to establish an interception was not secret. *Jackson*, 370 Mass. at 507.

Here, Plaintiff presents detailed allegations explaining how BMC implemented Google Analytics and Meta Pixel through hidden code designed to be invisible to the website user. ¶¶ 44–58. BMC nowhere disclosed it aided third-party eavesdropping. Instead, it falsely told website users that it did <u>not</u> share any such information with third parties. *See* § II-B, *supra*, and § III-D-2, *infra*.[14] That a person could have discovered Google Analytics and Meta Pixel by accessing web developer features does not demonstrate the actual knowledge required for BMC's defense. BMC's argument is equivalent to saying that a bug hidden under a table is not "secret" because the persons in the room could have looked under the table. There is no basis to construe the secrecy requirement to eviscerate the MWA's protections.

D. *BMC's Interceptions Do Not Qualify for the "Telephone Equipment" Defense.*

BMC argues (MTD 16–17) it is not liable because it acted in the ordinary course of business. This argument derives from the MWA's definition of "intercepting device," which excludes "any telephone or telegraph instrument, equipment, facility, or a component thereof…used by the subscriber or user in the ordinary course of its business." M.G.L. c. 272 § 99(B)(7). The technologies here are not "telephone or telegraph" equipment, and BMC did not use those them in the ordinary course of its business.

[14] Judge Davis disagreed that "[t]here was nothing secret about any of the Hospitals' using [Google Analytics and Meta Pixel]." Ex. A at 10; Ex. C at 22; *Marquis* (Ex. H) at 8 ("[T]he court accepts as true [plaintiff's] allegation that Google secretly intercepted her electronic communications").

1. Tracking Technologies Are Not Telephone Equipment.

The tracking technologies are not "telephone equipment." BMC argues that if the Court construes the MWA to apply to internet-related devices, it should construe the telephone equipment exemption to exclude those same devices. This simplistic argument ignores the MWA's plain text and, in essence, seeks to construe an exception to swallow the rule.

The MWA regulates "intercepting devices," defined to include "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire…communication." M.G.L. c. 272 § 99(B)(3) (emphasis added). The telephone equipment exception is narrower. It does not exempt all "intercepting devices" used in the ordinary course of business; it exempts only "telephone or telegraph instrument, equipment, facility, or…component [thereof]." *Id.* § 99(B)(3). BMC asks this Court to define "telephone equipment" as synonymous with "intercepting device." This is not a defensible construction.

The SJC holds that "'telephone equipment does not include eavesdropping devices external and extraneous to regular telephone devices." *O'Sullivan v. NYNEX Corp.*, 426 Mass. 261, 265 (1997) (quotations omitted; emphasis added). That is, the statute means what it says; far from applying to all devices, the exception is limited to what one would ordinarily understand to be "regular" telephone equipment. *See also Williams v. Poulos*, 11 F.3d 271, 280 (1st Cir. 1993) ("[W]e are at a loss to see how the monitoring system used here, consisting as it did of alligator clips attached to a microphone cable at one end and an interface connecting a microphone cable to a VCR and a video camera on the other, can be considered to be a 'telephone or telegraph instrument, equipment or facility, or a[] component thereof.'") (cleaned up).[15] BMC makes no effort at all to explain how tracking technologies could be telephone equipment under any defensible understanding of that phrase.[16]

[15] *See also Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 740 (4th Cir. 1994) (finding "voice logger" is an "intercepting device" but not telephone equipment); *United States v. Murdock*, 64 F.3d 1391, 1396 (6th Cir. 1995) (tape recorder is an intercepting device but not telephone equipment).

[16] BMC's own authority, *Licea*, yet further undermines its argument. In *Licea*, the court found that a particular section of California's wiretap law limited to "telephone wires, lines or cables" did not include internet communications, but a separate section of the same statute that applied more broadly, like the

The structure of the MWA also undermines BMC's argument. Another provision BMC cites—an exemption for an "office intercommunication system used in the ordinary course of business," M.G.L. c. 2727 § 99(D)(1)(b), confirms that not all "intercepting devices" are "telephone equipment," otherwise, the exemption for office intercommunication systems would be superfluous to the telephone equipment exemption. And, the tracking technologies are not "office intercommunication systems," as that term, by its plain meaning, applies to communications systems within an "office."[17]

2. <u>BMC Did Not Use the Tracking Technologies in the Ordinary Course of Business</u>

Even if tracking technologies could be considered telephone equipment, BMC does not explain how the use of tracking technologies is part of the "ordinary course of business" of a healthcare provider.

Even with respect to electronic communication companies (like Google), the exception "did not intend to allow [companies] unlimited leeway to engage in any interception that would benefit their business models," which would make wiretap law "superfluous if the ordinary course of business exception were [so] broad." *In re Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS 172784, at *36 (N.D. Cal. Sept. 26, 2013). The Court should reject any reading that "permits [a company] to unilaterally adopt any revenue-generating business practice, deem it 'routine,' and exempt itself from the Wiretap Act," as "[i]t is untenable" to allow a company "to 'self-define' the scope of their exemption from Wiretap Act liability." *Matera v. Google Inc.*, 2016 U.S. Dist. LEXIS 107918, at *21–23, 26 (N.D. Cal. Aug. 12, 2016).

Properly construed, the conduct at issue (i.e., the secret interception) must be "instrumental to the provision of the service" the defendant provides. *Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784, at *36. Put another way, "there must be some nexus between the need to engage in the alleged interception

---

MWA, to "wire" communications, did include internet communications. 2023 U.S. Dist. LEXIS 38233, at *14–15, 23–24. *Licea* thus supports Plaintiff's position that the tracking technologies at issue here were "intercepting devices" but not "telephone equipment." *See also Byars v. Hot Topic, Inc.*, 2023 U.S. Dist. LEXIS 24985, at *25 n.8 (C.D. Cal. Feb. 14, 2023) (phrase "telephone wire, line, cable, or instrument…concerns telephonic wiretapping specifically, which does not apply to…the internet").

[17] BMC's own authority confirms the exception protects "[a]n employer's interest in storing…information." *Restuccia v. Burk Tech., Inc.*, 1996 Mass. Super. LEXIS 367, *5 (Super. Ct. Aug. 13, 1996). BMC cites no authority applying the exception outside of an "office" environment.

and [BMC's] ultimate business." *Id.* at *40; *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) ("'in the ordinary course of business' cannot be expanded to mean anything that interests a company.").

Here, nothing in the Complaint suggests that BMC's conduct is instrumental to providing medical services. Even if one focuses on the website itself as the "service" (a questionable assumption given that BMC is a hospital, not a website company), Plaintiff expressly alleges that the secret use of tracking technologies is <u>not</u> essential to the functioning of the BMC Website, ¶¶ 109–11, further undermining any notion that such secret interceptions are part of the ordinary course of BMC's business. *Google Inc. Gmail*, 2013 U.S. Dist. LEXIS 172784 at *33 (finding ordinary course of business exception not met for Google's scanning of emails because "Plaintiffs have alleged that Google could operate its Gmail system without reading the emails for the purposes of targeted advertising"). And nothing prevented BMC from disclosing its use of the tracking technologies to Plaintiff and the Class (*see* § III(G), *infra*).

Moreover, where a company's conduct violates its own policies, such conduct cannot be considered part of the company's ordinary course of business. *Google Inc. Gmail Litig.*, 2013 U.S. Dist. LEXIS at *42–43 (denying exception to Google where Google's privacy policies did not clearly disclose the interceptions at issue—email scanning). Here, BMC's policies included numerous terms a user would reasonably understand to mean that BMC did <u>not</u> engage in the precise conduct Plaintiffs allege, including that BMC "will not intentionally share the contents of any electronic communications with a third-party entity" (a false promise) and "Online visitors utilizing this site do so anonymously" (yet again, false). ¶¶ 21–30. Under BMC's own policies, its conduct cannot be deemed part of its ordinary course of business.

E. *Plaintiff Alleges BMC's Use of an Intercepting Device.*

BMC argues that Plaintiff does not allege that the interceptions at issue involve an "intercepting device" because they were accomplished through "code" and "devices used to access a website" are not "devices." BMC ignores compelling authorities on this precise issue.

This Court in *Rich v. Rich* confirmed, in discussing hidden software that records activities on a computer, the "program is an 'intercepting device' (at least when surreptitiously installed on a computer)

because it 'is capable of…recording a wire…communication.'" *Rich*, 2011 Mass. Super. LEXIS 148, at *15–16. Similarly, in *Martin v. Evans*, the District of Massachusetts held that recording software on cell phones is an "intercepting device," reasoning that the MWA "is not obviously susceptible to a limiting construction that excludes the audio recording function of cell phones." 241 F. Supp. 3d 276, 286 (D. Mass. 2017). And, this Court in *Partners* denied a motion to dismiss claims focused on the same tracking technologies at issue here. *Rich*, *Martin*, and *Partners* align with the weight of authority construing the same word, "device," under federal and other states' wiretap laws. *In re Meta Pixel Healthcare*, 2022 U.S. Dist. LEXIS 230754, at *37 (Meta Pixel transmits communications "through the use of 'devices'"); *Sutter* (Ex. E) at 5–6 (rejecting argument that California wiretap act does not cover computer "code" for Meta Pixel and Google Analytics); *Luis v. Zang*, 833 F.3d 619, 634 (6th Cir. 2016) (manufacturer of computer spyware software sold a "device" designed for interceptions in violation of federal wiretap act); *United States v. Hutchins*, 2018 U.S. Dist. LEXIS 183898, at *34–37 (E.D. Wis. 2018) (software is "device" under the federal Wiretap Act given the "ordinary meaning of" a "device"); *In re Carrier IQ, Inc. Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1084 (N.D. Cal. 2015) ("[S]oftware [which records websites visited on a cell phone] is a 'device' for purposes of the Wiretap Act."); *Klumb v. Goan*, 884 F. Supp. 2d 644, 661 (E.D. Tenn. 2012) (affirming wiretap liability where "program has been installed on a computer which [caused] emails sent…through the internet to be rerouted…to a third party address").

These decisions align with common sense. Practically all modern devices are a combination of hardware and software. Under BMC's construction of the MWA, secret cell phone recordings would be beyond the MWA's reach because cell phones use a recording app (i.e., "software") to record, and BMC says "software" is not a "device." This is not the law. Recordings made using cell phones and similar computing devices are within the MWA's scope.[18]

[18] *Gilk v. Cunniffe*, 655 F.3d 78, 86 (1st Cir. 2011) (cell phone recording falls within MWA's scope); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 817 (1st Cir. 2020) (MWA "makes it…a crime…to use a smartphone to [secretly] record"); *Martin*, 241 F. Supp. 3d at 286 (rejecting argument that cell phone recordings involve no "device"); *Commonwealth v. Browar-Jarus*, 97 Mass. App. Ct. 1108 (2020) (affirming

Construing the phrase "intercepting device" to exclude modern computing devices (such as computers and cell phones) would effect a judicial repeal of the MWA as to most modern technology, contrary to the Legislature's intent to address the "uncontrolled development and unrestricted use of modern electronic surveillance devices," M.G.L. c. 272 § 99(A).[19] Plaintiff's allegations fall comfortably within the MWA's definition of an "intercepting device."

F. *The MWA Provides a Remedy for Interceptions of Communications Between Massachusetts Parties, Effected Through a Device Located in Massachusetts*

BMC argues the MWA does not apply to "interceptions occurring outside the Commonwealth." MTD 8. Under any conflicts-of-law analysis, the MWA applies to the interceptions here of communications between two Massachusetts parties accomplished through the user's device located in Massachusetts. ¶¶ 10, 112. Plaintiff's factual allegations must be accepted as true in deciding this issue. *Rackemann v. LISNR, Inc.,* 2017 U.S. Dist. LEXIS 162567, at *23–24 (S.D. Ind. 2017) (same) ("[T]he precise manner and degree to which [defendant's] software or server were involved in any alleged interception involves the consideration of facts (and, the Court may only assume, highly technical ones). This type of consideration is neither possible nor appropriate in response to a motion to dismiss.").

The only Massachusetts decision that applies to a wiretap claim current Massachusetts conflicts-of-law principles is *Heffernan v. Hashampour*, 2009 Mass. Super. LEXIS 409 (Super. Ct. Dec. 19, 2009).

a criminal conviction under MWA for cell phone recording); *Commonwealth v. Minori*, 101 Mass. App. Ct. 1106 (App. Ct. 2022) (same).

[19] The cases BMC cites either do not hold as BMC contends or construe materially different statutes. In *Mason v. Machine Zone, Inc.*, 140 F. Supp. 3d 457, 461 (D. Md. 2015), the court construed the phrase "slot machine" in the context of a gambling law. Needless to say, its analysis does not negate the wealth of authorities construing "device" under wiretap laws to include software and modern computing devices. BMC's other two cases are even further afield. Neither contains any holding that modern computing devices cannot be intercepting devices; instead, both involved disputes over the control of internet domain names and whether receiving emails intended for other recipients count as interceptions. Those courts, in holding that computer servers were not a "'device' used for interception" (MTD 19), did not hold that such servers and other computing devices can <u>never</u> be intercepting devices but simply that those devices were not used to accomplish interceptions under the facts of those cases. *Ultimate Outdoor Movies, LLC v. Funflicks, LLC*, 2019 U.S. Dist. LEXIS 86763, at *60–68 (D. Md. May 23, 2019) ("This case does not involve the covert use of a surveillance device, but simply revolves around which entity has the right to receive emails associated with a trademarked domain name.") (quotations omitted); *Healix Infusion Therapy, Inc. v. Helix Health, LLC*, 747 F. Supp. 2d 730, 743–44 (S.D. Tex. 2010) (same).

There, an out-of-state defendant secretly recorded telephone conversations with an in-state plaintiff. *Id.* at *1–2. The court applied a conflicts analysis, drawing upon Restatement (2d) of Conflict of Laws and SJC precedent construing it. *Id.* at *4.[20] The court held that "'[w]hen the [privacy] intrusion involves an intrusion upon the plaintiff's solitude,' as plaintiffs allege here, 'the place of invasion of the place where the plaintiff was at the time.'" *Id.* at *6 (quoting Rest. (2d) Conflict of Laws § 152 cmt. c).

*Heffernan* aligns with the MWA's purpose of abating "the uncontrolled development and unrestricted use of modern electronic surveillance devices," which the Legislature found "pose grave dangers to the privacy of all <u>citizens of the Commonwealth</u>." M.G.L. c. 272 § 99(A) (emphasis added). It would be perverse to construe the MWA to deny the "citizens of the Commonwealth"—the persons for whose benefit the Legislature enacted the MWA—a remedy expressly afforded to them.[21]

Here, Plaintiff is a Massachusetts resident who regularly visited the BMC Website, and she and other Class Members, "while in the Commonwealth of Massachusetts, accessed" that website. ¶¶ 10, 112. Therefore, under *Heffernan*, the MWA applies here.

BMC cites several cases that diverge from *Heffernan*, focusing on where a defendant made a recording instead of the location of the injured party. The decisions trace their origins to one of two decisions—the Appeals Court decision in *Commonwealth v. Wilcox*, 63 Mass. App. Ct. 131, 139 (App. Ct. 2005), or a federal magistrate judge's 1986 decision in *Pendell v. AMS/Oil, Inc.*, 1986 U.S. Dist. LEXIS

[20] The Court applied Restatement principles on invasions of a right of privacy because a wiretapping claim is 'an action for an invasion of privacy….'" *Id.* at *6. The Restatement (2d) of Torts § 652B confirms that "intrusion upon seclusion" includes wiretapping. *Id.* cmt. b. & illus. 3 ("intrusion upon seclusion" includes attempt to "overhear the plaintiff's private affairs," including by "tapping his telephone wires").

[21] *See State v. Worthy*, 661 A.2d 1244, 1249 (N.J. 1995) (applying New Jersey wiretap law to call to New Jersey resident recorded outside of the state, reasoning, "there can be no doubt that the legislative concern for privacy embraces privacy interests that a resident in New Jersey has in telephone conversations that originate from…out-of-state."); *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 931 (Cal. 2006) ("[T]here can be no question but that the principle purpose of [the California wiretap law] is to protect the privacy of confidential communications of California residents *while they are in California*") (emphasis in original).

26089 (D. Mass. Apr. 30, 1986).[22] *Wilcox* involved a dispositively different factual scenario: <u>all parties</u> to an <u>in-person</u> verbal conversation were <u>in Rhode Island</u> and were recorded using a <u>tape recorder present with them in Rhode Island</u>. *Wilcox*'s holding that the MWA does not regulate "recordings made outside of Massachusetts" does not apply here, where <u>both parties</u> to the communication were in Massachusetts, recorded through Plaintiff's <u>device located in Massachusetts</u>.

As for the *Pendell* line of cases, *Pendell* followed "[t]he *lex loci delecti*" principle, which applies "the local law of the place of the wrong" for a tort claim. *Pendell*, 1986 U.S. Dist. LEXIS 26089, at *8. The court focused on the "physical act of recording," which there was a tape recording. *Id.* Massachusetts conflicts-of-law principles, however, have changed since *Pendell.* The SJC in 1994 (eight years after *Pendell*) announced a new rule adopting Restatement (2d) of Conflict of Laws (published in 1988, also after *Pendell*), which provides that for tort claims, the "state where the injury occurred applies, unless [another state] has a more significant relationship' to the parties." *Cosme v. Whitin Mach. Works*, 417 Mass. 643, 647 (1994) (cleaned up). *Heffernan* recognized this change in Massachusetts conflicts law, explaining:

> The defendants misplace their reliance on [*Pendell*], which a United States District Court magistrate decided in 1986 before the Supreme Judicial Court announced the two-step Restatement analysis [in *Cosme*] in 1994..... *Pendell*, a non-binding opinion, applied the now-outdated *lex loci delecti* approach.

2009 Mass. Super. LEXIS 409 at *8 n.6.

Even under *Pendell's* "lex loci" standard focusing on the place of the interception, the MWA applies here. BMC distorts Plaintiff's allegations to argue that the location where a third party <u>received</u> intercepted communications is where the "interception" occurred, but this is not so. Plaintiff alleges the interceptions are accomplished through code executed in users' web browsers[23] and that she and other

---

[22] *See Ross v. Jackson Nt'l Life Ins. Co.*, 2020 U.S. Dist. LEXIS 96498, at *24–25 (D. Mass. June 2, 2020) (applying *Pendell*); *MacNeil Eng'g Co. v. Tisport, Ltd.*, 59 F. Supp. 2d 199, 202–03 (D. Mass. 1999) (applying *Pendell* to decline to apply MWA to telephone conversation with Massachusetts party recorded in England); *Marquis v. Google*, 2015 WL 13037527, at *7 (Mass. Super. Ct. Feb. 13, 2015) (applying *Wilcox*).

[23] ¶ 53 ("JavaScript code [for the tracking technologies] is...executed automatically within the individual's web browser"); ¶ 55 ("[T]he JavaScript code causes the user's web browser to retrieve a file from the third party's website [and] also causes the browser to communicate certain information to the third-party

Class Members accessed the BMC Website "while in the Commonwealth of Massachusetts." ¶ 96. The place where "[e]lectronic communications are… 'intercepted' when software reroutes communications to an interceptor." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022). When an interception involves tracking code executed in a website user's browser, "the point where [tracking technologies] routed [the] communications to [third parties] was **[the plaintiff's] browser, not where the signals were received at [the third party's] servers**." *Id.* at 131 (emphasis added); *Luis v. Zang*, 833 F.3d 619, 633 (6th Cir. 2016) (an "intercept of a communication…occurs at the point where [tracking software] captures the communication and reroutes it").[24] Because the interceptions occurred on devices in Massachusetts, the MWA applies here, even under the outdated *Pendell* rule.

G. *The Court Should Disregard Defendant's Doomsday Scenarios.*

BMC insists that if the Court upholds Plaintiff's claims, "absurdities" will ensue. "Routine" website visits, BMC claims, will become "felonies." MTD 12. "[N]early every visit to publicly-available information websites" would be "criminaliz[ed]." *Id.* at 16. There's just one problem. None of this is true. BMC ignores a basic element of Plaintiff's claim that, when considered, solves BMC's feigned concerns.

An essential element of an MWA claim is that an interception be "secret." M.G.L.c. 272 § 99(B)(4) ("interception" defined as "to <u>secretly</u> hear, <u>secretly</u> record, or aid another to <u>secretly</u> hear or <u>secretly</u> record the contents of any wire or oral communication"). Plaintiff acknowledges this required element in her complaint, alleging in detail how the interceptions were secret and explaining (¶ 111):

> [I]f BMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BMC (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim

website…."); ¶ 56 ("When the JavaScript code causes the browser to communicate the information…to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address…."); ¶ 64 (the "user's web browser…execute[s] the JavaScript code" for Google Analytics); ¶ 73 (same for Meta Pixel); ¶ 125 ("By inserting the computer code for [tracking technologies], BMC installed an intercepting device on website users' devices….").

[24] That the interception occurs on Plaintiff's device in Massachusetts distinguishes this case from *Marquis*, where email scanning occurred on Google's servers after the servers received the emails. *Marquis*, 2015 WL 130375277. *See* n.23 & accompanying text).

that BMC does not share the communications with others when it does; or (iii) to claim that BMC maintains the privacy of those communications when it does not.

BMC notes several lawsuits have been filed against hospitals in this Court and other courts. On the other hand, many hospitals have not been sued, and few companies other than medical providers have been sued. The reason why is simple: many healthcare providers and the vast majority of businesses that use tracking technologies like Google Analytics and Meta Pixel disclose them. Significantly, after several lawsuits were filed against other hospitals for violation of the MWA, BMC amended its website privacy disclosure to disclose "Google" and other "Service Providers" who help "track and analyze our website user activity" through "pixels" and other "tracking technologies."[25] Although Plaintiff takes no position on the adequacy of BMC's current disclosures (Plaintiff's claim is limited to the period prior to BMC's amended disclosures, *see* ¶ 112), BMC may well not have faced any lawsuit had it prominently displayed these disclosures to website users throughout the time it used the tracking technologies.

The Third Circuit in *Popa*, another case concerning website tracking technologies, rejected similar doomsday scenarios the defendant pitched there. Its analysis is on point:

> So does this mean websites can never use cookies or third-party marketing companies to analyze customer data? Though the Defendants try to convince us about the certainty of any number of "parade of horribles," the [Pennsylvania wiretap act] is not so unreasonable. It…includes many exceptions from liability. One is the all-party consent exception, under which [there is no liability] when the person being recorded knew…that the conversation was being recorded [such as by a] privacy policy [that] sufficiently alert[s] [website users] that [website] communications [are] being sent to a third-party company.

52 F.4th at 132 (quotations omitted). BMC's hyperventilating over the possible criminalization of ordinary website activity is itself absurd. Only those who make false or deceptive statements and/or fail to disclose the tracking technologies face liability.

In short, the Court should disregard the defendant's doomsday scenarios, given the simple solution available to all website owners, which BMC has belatedly invoked: <u>disclosure</u>.

## IV. CONCLUSION

The Court should deny BMC's motion to dismiss.

[25] https://www.bmc.org/website-privacy-security-policy.

Dated: August 1, 2023

Respectfully submitted,

/s/ Patrick J. Vallely

SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

***Counsel for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on August 1, 2023.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

# Exhibit A

erior Court - Suffolk
ket Number 2384CV01086

VM

9

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT**
**BUSINESS LITIGATION SECTION**
**CIVIL ACTION NO. 2384CV01086 BLS1**

| | |
|---|---|
| **ELIZABETH NOVA, for herself and the Class,** | : |
| *Plaintiff,* | : |
| **v.** | : |
| **BOSTON MEDICAL CENTER CORPORATION,** | : |
| *Defendant.* | : |

**DEFENDANT BOSTON MEDICAL CENTER CORPORATION'S**
**REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS**

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
ROBINSON & COLE LLP
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 617-557-5900
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

*Attorneys for Defendant Boston Medical Center Corporation*

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.
John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

Plaintiff's Opposition to BMC's Motion to Dismiss fails to demonstrate that she can establish standing or a violation of the Wiretap Act.[1] She fails to allege any harm, any conduct that falls within the scope of what the General Court had in mind in enacting the Wiretap Act, or that there was an "interception" in Massachusetts, as applicable law requires.

## I. PLAINTIFF HAS FAILED TO ESTABLISH STANDING

Plaintiff addresses the SJC's leading decisions on standing only in footnotes that distort their holdings. *See* Opp. at 8 n. 8-9; *Pugsley v. Police Dep't of Bos.*, 472 Mass. 367, 372–73 (2015) (requiring "injury [that] is sufficiently concrete and imminent" for statutory violations); *Ginther v. Comm'r of Ins.*, 427 Mass. 319, 323 (1998) (no standing where plaintiffs had "not alleged sufficient facts to show that they suffered a direct and certain injury"). In *Pugsley*, the SJC addressed an alleged violation of violation of G.L. c. 151B, applicable to "[a]ny person *claiming* to be aggrieved," holding that "plaintiff has failed to articulate an injury" and, therefore, did not have standing. 472 Mass. 371–72. Plaintiff's claim that any statutory violation, without more, confers standing is directly contradicted by *Ginther* and *Pugsley*.

Plaintiff relies on isolated quotations from inapt cases to support her contention that the Legislature has broad power "unrestrained by any constitutional limitations, to define injuries and confer standing," Opp. at 7, but those cases predate the SJC's seminal standing decisions in *Ginther* and *Pugsley* and do not support Plaintiff's position. For example, Plaintiff relies on *Beard Motors, Inc. v. Toyota Motor Distrib., Inc.*, 395 Mass. 428 (1985), which held that the plaintiff had "*not* alleged an injury" under the statute, explaining that:

> We have often recognized that not every party who can claim an injury as a result of violations of a statute or regulation has standing to bring an action thereunder. This is true even when a literal reading of the statute, without regard to the

[1] All terms defined in BMC's Memorandum in Support of its Motion to Dismiss retain the same meaning here. Emphasis is added and quotations and citations omitted unless otherwise indicated.

> Legislature's purpose in enacting it, would appear to provide a broader grant of standing.

*Id.* at 431 (collecting cases); *see also Mass. State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc.*, 469 Mass. 675, 682–85 (2014) (quoting *Beard* and affirming the dismissal of statutory claim for lack of standing).[2] Plaintiff also cites *Fournier v. Troianello*, 332 Mass. 636 (1955), which is easily distinguishable—the court found that the plaintiff had standing to seek injunctive relief because the "illegal acts of the defendant might cause [plaintiff] irreparable damage," and "had caused unrest among the plaintiff's customers." *Id.* at 639. Plaintiff cannot overcome the SJC's clear holdings in *Pugsley* and *Ginther*, which plainly require a plaintiff to allege *both* an act that falls within the area of concern of the statute *and* a nonspeculative, direct injury. *Ginther*, 427 Mass. at 323.[3] To the extent Plaintiff argues that the Wiretap Act "mandates" liquidated damages in the absence of *any* harm (Opp. at 6), the SJC has rejected such claims under Chapter 93A. *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 503 (2013) ("distinct injury or harm" necessary to recover

---

[2] Plaintiff's other authorities fare no better and fail to support her broad, unrestrained theory of standing. *See Loc. 1445, United Food & Com. Workers Union v. Police Chief of Natick*, 29 Mass. App. Ct. 554, 558–59 (1990) (no standing where claim could only be pursued by a public officer); *Johnson v. Frei*, 93 Mass. App. Ct. 1111 (2018) (Rule 1:28 mem.) (did not address standing); *Centennial Healthcare Inv. Corp. v. Comm'r Of Div. Of Med. Assistance*, 61 Mass. App. Ct. 320, 326–28 (2004) (affirming dismissal because plaintiff could not circumvent *stricter* statutory standing requirements by arguing for broader standing under common law).

[3] Plaintiff makes much of the unremarkable proposition that federal Article III standing does not apply to Massachusetts state courts (Opp. at 6–7), but BMC does not argue that it does. Rather, the SJC's clear, controlling precedent outlines the contours of standing in the Commonwealth and requires a concrete, nonspeculative harm. *See Pugsley*, 472 Mass. at 372–73. A case cited by Plaintiff on this point does not even address standing. *Weld v. Glaxo Wellcome Inc.*, 434 Mass. 81, 88 (2001) (addressing ability of plaintiff to serve as a class representative). In any event, the Massachusetts Constitution is not fundamentally different from the federal constitution: it refers to "cases" and "controversies" as being what courts decide. *See* MASS. CONST. ART. III (courts decide "actions," "causes," "any matter in controversy"); art. XV (right to trial by jury applies to "controversies" and "cases"). A separate constitutional provision provides the SJC with authority to answer questions of law from legislature, governor or governor's council, undoubtedly because that may not present a "case" or "controversy." MASS. CONST. ART. LXXXV.

nominal damages); *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 445 Mass. 790, 798–99 & n.18, 801–02 (2006) (same).

Plaintiff argues for standing by virtue of being an "aggrieved person," i.e., "a party to an [alleged] intercepted wire or oral communication," asserting that "the Legislature delineated who has standing to bring an MWA claim," and that the Court cannot apply an "'injury' requirement." (Opp. at 6–7.) This is incorrect. In *Sweenie v. A.L. Prime Energy Consultants*, 451 Mass. 539 (2008), the SJC addressed standing in a zoning case where the statute defined "[a] 'person aggrieved' [a]s one who 'suffers some infringement of his legal rights.'" *Id.* at 543. The SJC held that "the creation of a protected interest (*by statute*, ordinance, bylaw, or otherwise) cannot be conflated with the *additional, individualized requirements that establish standing*," finding that the plaintiff's "speculative" claims were insufficient. *Id.* at 545; *see also Ginther*, at 323–24 (plaintiffs must "allege[ ] sufficient facts to show that they suffered a direct and certain injury").[4] The SJC recognized that a protected statutory interest still requires a concrete injury to establish standing. *See id.*; *Murchison v. Zoning Bd. of Appeals of Sherborn*, 485 Mass. 209, 214 (2020) ("[s]tanding as an 'aggrieved' person requires evidence of an injury particular to the plaintiffs" that "must be more than de minimus"). Plaintiff's proposed reading of the Wiretap Act as requiring *no harm* is directly at odds with the SJC's precedent.[5]

Likewise, Plaintiff's reliance on federal case law predating *TransUnion* is unpersuasive, to the extent it even remains good law. Plaintiff primarily relies on *Campbell v. Facebook*, Inc., 951

---

[4] The definition of a "person aggrieved" in the Wiretap Act, M.G.L. c. 272, § 99(B)(6), goes on to state that it applies to an individual "who *would otherwise* have standing," which implies that the definition of a "person aggrieved" is intended to harmonize with general standing principles.

[5] This line of SJC cases (*Sweenie*, *Ginther*, *Pusgley*, etc.) is entirely consistent with the U.S. Supreme Court's recent pronouncement that "[o]nly those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

F.3d 1106 (9th Cir. 2020), but *Campbell* was issued before *TransUnion*, a point that courts in the Ninth Circuit have emphasized in departing from it.[6] More recent federal case law, addressing more factually similar claims, makes clear that mere disclosure of data without more is insufficient to confer standing. *See, e.g.*, *Dinnerstein v. Google, LLC*, 73 F.4th 502, 513–15 (7th Cir. 2023) (affirming dismissal of claims stemming from a medical center sharing anonymized patient's actual medical records (not merely internet metadata) with Google because plaintiff lacked standing where he did not "allege that Google had already used the disclosed patient records to discern his identity" or even "taken any steps to identify him"; expressing skepticism that plaintiff alleged "any injury at all," let alone a concrete one).

Plaintiff completely failed to rebut the thrust of BMC's Motion—that ***her*** Complaint is devoid of ***any facts*** demonstrating ***any*** injury. The Complaint does not allege that Plaintiff's own personal interactions with BMC's Website were revealed to any third party, nor does the Complaint allege any actual disclosure or misuse of Plaintiff's private information. Plaintiff does not even allege that she has a Facebook or Google account, or is otherwise "known to Google and Facebook." *See* Compl. ¶¶ 56, 59. The Complaint does not allege how Plaintiff was harmed by her use of BMC's Website. Indeed, instead of pleading any facts specific to Plaintiff, the Complaint merely recites a series of speculative *hypotheticals*. *See* Compl. ¶¶ 77–107. And Plaintiff admits

[6] *See Byars v. Sterling Jewelers, Inc.*, 2023 WL 4195768, at *4 (C.D. Cal. May 18, 2023) ("to the extent *Campbell* indicates that every technical violation of [the California wiretap act] necessarily establishes a concrete injury regardless of the facts of the case, such a rule may not be consistent with the Supreme Court's subsequent instruction [in *TransUnion*]"; maintaining dismissal of similar claims for lack of standing); *Massie v. Gen. Motors LLC*, 2022 WL 534468, at *3 (D. Del. Feb. 17, 2022) (granting motion to dismiss for lack of standing, distinguishing plaintiff's reliance on pre-*TransUnion* authorities, including *In re Facebook*). The remaining cases relied on by Plaintiff all predate *TransUnion*'s edict that a mere statutory violation, without injury in fact, does not confer standing. *TransUnion* aligned federal caselaw with the SJC's similar pronouncements in *Ginther* and *Pusgley*.

that these hypotheticals "*do not reflect* webpages Plaintiff personally visited." *Id.* ¶ 78. Under any reasonable interpretation of Massachusetts law on standing, Plaintiff's speculative claim based on hypotheticals is insufficient. *See Pugsley*, 472 Mass. at 372 (plaintiff "failed to articulate an injury that is anything but hypothetical and, therefore, we cannot say that he has standing"); *Reidy v. UMass Memorial Medical Center, Inc.*, 2021 WL 6777622, at *2 (Mass. Super. Ct. June 17, 2021) (granting motion to dismiss because plaintiff alleged "at best, abstract concerns about potential future impairments of his rights as a patient, without actual damages").

## II. PLAINTIFF FAILED TO STATE A CLAIM UNDER THE WIRETAP ACT

### A. Plaintiff's Overbroad Interpretation of the Wiretap Act Fails

Plaintiff seeks to have this Court adopt an overbroad interpretation of the Wiretap Act—a penal statute[7]—that far transcends both what the Legislature contemplated in 1968 and how Massachusetts courts have interpreted the Act. *See Comm. v. Rainey*, 491 Mass. 632, 640–41 (2023) (rejecting overbroad interpretation of Wiretap Act under which unintended conduct would be "subject to criminal penalties"); *Comm. v. Morris*, 212 N.E.3d 812, 820 (Mass. 2023) (similar).

Plaintiff's reliance on cases like *Rich v. Rich*, 2011 WL 3672059 (Mass. Super. Ct. July 8, 2011) and *Marquis v. Google, Inc.*, 2015 WL 13037257 (Mass. Super. Ct. Feb. 13, 2015) is flawed. (Opp. at 10–11.) Those cases addressed application of the Act to *emails*—a medium of identifiable and interactive communication that was directly analogous to, *inter alia*, fax communications that were available in 1968. Those cases provide no support for applying the Act to the use of a website—equivalent to a library in 1968. The SJC continues to reject expansive readings of the Act. Very recently, in *Morris*, the SJC refused to adopt a literal interpretation of the Act because

[7] The Act must be narrowly construed as a penal statute. *See Mahan v. Boston Retirement Bd.*, 490 Mass. 604, 617 (2022) (penal statutes must be construed "narrowly," including in civil context).

"nothing in the statute as a whole, including its codified preamble, supports the conclusion that the Legislature intended to criminalize" the conduct at issue, and "[t]he Legislature . . . did not have in mind the type of [conduct], much less to sanction criminally the conduct" when enacting the Act. *Morris*, 212 N.E.3d at 820. Here, the same is true: in 1968, the Legislature never intended to criminalize anything remotely analogous to websites. *See id.*; *Rainey*, 491 Mass. at 640–41.

### B. Plaintiff Has Not Alleged the Use of an Intercepting Device

Plaintiff cites *Rich* for the proposition that the Wiretap Act's definition of "intercepting device" should be construed broadly. (Opp. at 14–15.) But in interpreting the term "intercepting device," *Rich* held only that the computer program was "capable of . . . recording a wire . . . communication." 2011 WL 3672059, at *6. Significantly, the key logger program in *Rich* captured *actual communications—i.e.*, the verbatim text of "emails and instant messages" between two or more persons. *Id.* at *1–2; *see also Martin v. Evans*, 241 F. Supp. 3d 276, 286 (D. Mass 2017) (cited by Plaintiff; involving a cell phone capable of recording an aural conversation). In contrast, what Plaintiff alleges here involves metadata containing search terms and mouse clicks relating to the use of a website, which are plainly not "communications" directed to any person or entity within the meaning of the Act. Instead, these actions are simply means of *using a website* to navigate and search for information, much like an individual browsed a library in 1968.

Moreover, Plaintiff does not address how "hidden code on the BMC Website," "devices Class Members used to access the BMC Website," or "Class Members' web browsers"—the alleged "intercepting devices" Plaintiff identifies—are, in fact, "intercepting devices" under the Wiretap Act. *See* Compl. ¶ 123. Such technologies go far beyond anything analogous to what the Legislature conceived of being a "device or apparatus" capable of recording a wire communication

in 1968.[8] Under the Act, mere *possession* of interception devices is prohibited "under circumstances evincing an intent to commit an interception not permitted or authorized," M.G.L. c. 272 § 99(C)(5), meaning that Plaintiff's interpretation of the Act would potentially criminalize anyone operating a website or web browser employing widely-used technology. Such a broad interpretation must be rejected "given the absurdity of such a result." *Morris*, 212 N.E.3d at 819.

### C. Plaintiff Does Not Allege Interceptions in the Commonwealth

Plaintiff attempts to distort and pivot away from the statutory requirement under the Wiretap Act that the "secret[] recording" must take place in Massachusetts. *MacNeill Eng'g Co. v. Trisport, Ltd.*, 59 F. Supp. 2d 199, 202 (D. Mass. 1999). Plaintiff relies on *Heffernan v. Hashampour*, 2009 WL 6361870 (Mass. Super. Ct. Dec. 19, 2009), which is contrary to the weight of the case law and engages in a conflict-of-law analysis to determine if the Massachusetts or Virginia wiretap act applied.[9] Here, the issue presented is not one of conflict of law but whether the Act is intended to apply to an alleged "recording" that occurred outside of Massachusetts. The preamble to the Act and a reading of the Act as a whole demonstrate that it was intended to apply to the use of intercepting devices in Massachusetts, as the cases cited by BMC held.

Plaintiff argues that because she accessed BMC's website while in the Commonwealth,

---

[8] Plaintiff's claim that cell phone recording software would be exempt from the Act under BMC's reading (Opp. at 15) is incorrect. When used to record a conversation, cell phone recording software would be equivalent to a tape recorder attached to a telephone line. But when a cell phone is used to browse the internet and browsing history is captured by the website, the statute, which must be narrowly construed, is stretched far beyond any reasonably-contemplated meaning.

[9] Even if a conflicts of law analysis were required, "under the Commonwealth's more pragmatic and functional approach to conflicts questions," the law of the state where the recording was made should govern. *Pendell v. AMS/Oil, Inc.*, 1986 WL 5286, at *3-4 (D. Mass. Apr. 30, 1986) (reasoning, *inter alia*, that "[t]here is no language whatsoever to indicate that the statutes was intended to be given extraterritorial effect," and "[c]onsidering the interstate system as a whole, the better rule is that a local statute should not be given extraterritorial effect so as to regulate conduct in another jurisdiction"); *see also MacNeill*, 59 F. Supp. 2d at 202 (agreeing with *Pendell* "under the more modern choice-of-law approach").

with her own device located in Massachusetts, this is enough to sustain her claim. (Opp. at 17-19). Such allegations are insufficient, as the court held in *Marquis v. Google, Inc.*, 2015 WL 13037257, at *2 (Mass. Super. Ct. Feb. 13, 2015) (holding that the relevant inquiry is whether the recording occurred on servers located in Massachusetts); *see also Ross v. Jackson Nat'l Life Ins. Co.*, 2020 WL 2850290, at *8 (D. Mass. June 2, 2020) (analyzing where "the recordings took place"); *MacNeill*, 59 F. Supp. 2d at 203 (same). These cases demonstrate that the Plaintiff's domicile and the fact that she accessed BMC's website in the Commonwealth are irrelevant to whether the "secret recordings," required for an "interception" under the Act, took place in Massachusetts. *See also Com. v. Maccini*, 2007 WL 1203560, at *2 (Mass. Super. Apr. 23, 2007) ("nothing in the wiretap statute suggests any intention to regulate conduct outside the Commonwealth"). Here, the "secret recordings" did not occur in Massachusetts. Compl. ¶ 124.

Moreover, the rule of law that Plaintiff advocates would be unworkable given the impossibility of knowing where individuals are located when they are browsing a website. *See Marquis*, 2015 WL 13037257, at *8 ("Google has no way of knowing where the [user] resides. ... Applying the Massachusetts wiretap statute ... would thus make compliance a game of chance."). "[T]here is no reason to suspect that the Massachusetts legislature intended, in 1968 or since, that our statute be applied to out-of-state conduct." *Id.*[10]

---

[10] Although the federal statute is differently worded, some federal courts have viewed where the recording took place as the relevant inquiry in an extraterritoriality analysis. *See, e.g., Huff v. Spaw*, 794 F.3d 543, 547 (6th Cir. 2015) (under federal wiretap act, "[t]he relevant location is not where the [plaintiff's] conversations took place, but where [the defendant] used a device to acquire the contents of those conversations"); *Morrison v. Dietz*, 2010 WL 395918, at *4 (N.D. Cal. Feb. 1, 2010) (under federal wiretap act, "where an interception takes place determines whether the [act] applies"). Plaintiff's non-Massachusetts cases are inapposite. *See State v. Worthy*, 661 A.2d 1244, 1249–50 (N.J. 1995) (involving restriction on law enforcement activities absent prosecutorial consent); *Kearney v. Salomon Smith Barney, Inc.*, 137 P.3d 914, 936, 938 (Cal. 2006) (involving recording of telephone calls where court presumed that location of other party could be determined; court applied California law only for prospective injunctive relief, not for monetary liability for

## III. PLAINTIFF'S REMAINING ARGUMENTS FAIL

As to the Wiretap Act's exceptions (Opp. 12–14), Massachusetts appellate decisions recognize that courts cannot broaden liability far beyond what was contemplated in 1968 while simultaneously narrowly restricting the Act's exceptions to long-outdated technology. (*See* BMC Memo. at 16–17.) When the "ordinary course of business" exception is applied to modern technology, all that is required is that the "intercepting device" is "being used by the subscriber or user in the ordinary course of its business." M.G.L. c. 272, § 99(B)(3). The statutory exception does not provide for courts to police the precise mechanics in which technology is being used. There can be no serious dispute that operation of a website is part of the "ordinary course of business" of a hospital (and virtually any business) in 2023, as the Complaint acknowledges. (Compl. ¶¶ 14–15.) There is also no dispute that website analytic technology is widely used by businesses. Nothing more is required for the exception to apply. As to the second exception for an "office intercommunication system" (Opp. at 13), the plain meaning of that term is not limited to communication *within* an individual office. If websites fall within the scope of the Act, this exception applies because websites enable communications between offices, as well as other locations, in the ordinary course of business.. Nearly everyone accesses business websites, and many of them access hospital websites, from their workplace or home office.

Plaintiff further argues that similar claims have survived motions to dismiss (Opp. 4–5), but the cases she cites are inapposite. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (addressing issues of consent, "interception," and "intent"—none of which BMC raises here—under federal wiretap act); *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, *11-15 (N.D.

---

past conduct); *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 130 (3d Cir. 2022) (giving broad meaning to "acquisition" under different statutory definition of "interception"); *Luis v. Zang*, 833 F.3d 619, 633 (6th Cir. 2016) (similar; not addressing an issue of extraterritoriality).

Cal. Dec. 22, 2022) (addressing issues under federal and California wiretap acts not raised here).[11]

Plaintiff incorrectly suggests that BMC made an independent argument that the alleged tracking activity was not "secret." (Opp. at 11.) BMC does not seek a ruling on that issue on this motion.

Lastly, Plaintiff argues that BMC's concerns about overbroad application of the Act can be remedied by improved disclosures. (Opp. at 19–20.) But Plaintiff does not dispute that an overbroad interpretation would mean criminal liability for the use of commonplace technology by many businesses if they lacked "sufficient" disclosures.[12]

---

[11] The California case plaintiff cites, *Doe v. Sutter Health*, Case No. 34-2019-00258072 (Cal. Cnty. Ct. June 9, 2022) (Pl. Ex. E), addressed irrelevant arguments related to consent and the scope of the California statute, and is contrary to other decisions. *See Barbour v. John Muir Health*, 2023 WL 2618967, at *5 (Cal. Super. Ct. Jan. 05, 2023) (dismissing California wiretap act claim). Plaintiff also cites two Ohio decisions, one of which did not address any wiretap claims or standing, *Doe v. Bon Secours Mercy Health*, Case No. A 2002633 (Ohio Cm. Pl. Nov. 23, 2021) (Pl. Ex. F), while the other included allegations of disclosure of communications with the hospital *made in the patient portal*, which is not alleged here. *Doe v. Univ. Hosp. Health Sys., Inc.*, Case No. CV-20-933357, at 4–5 (Ohio Ct. Com. Pleas Nov. 16, 2020) (Pl. Ex. G). Lastly, *Doe v. Medstar Health, Inc.*, No. 24-C-20-000591, at 3–4 (Md. Cir. Ct. 2022) (Pl. Ex. D) provides little analysis and it is unclear what arguments the defendant made.

[12] While Plaintiff focuses heavily on BMC's privacy policies, this is only potentially relevant to a "consent" defense, which BMC has not raised on this motion. In any event, Plaintiff's allegations acknowledge that BMC disclosed that IP addresses would be logged (Compl. ¶ 29), and IP addresses temporarily identify only a device, not an individual.

Dated: August 11, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER**
**CORPORATION,**

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
**ROBINSON & COLE LLP**
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

**CERTIFICATE OF SERVICE**

I, Wm. Maxwell Daley, hereby certify that, on this 11th day of August, 2023, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley

VM 10

**COMMONWEALTH OF MASSACHUSETTS**

**Suffolk, ss.**

| | |
|---|---|
| ELIZABETH NOVA,<br><br>For herself and the Class,<br><br>v.<br><br>BOSTON MEDICAL CENTER CORPORATION,<br><br>Defendant. | **SUPERIOR COURT DEPARTMENT OF THE TRIAL COURT BUSINESS LITIGATION SESSION**<br><br>CIVIL ACTION NO. 2384CV01086-BLS1<br><br>**JURY TRIAL DEMANDED** |

**AMENDED COMPLAINT**

Plaintiff Elizabeth Nova ("Plaintiff"), on behalf of herself and the proposed Class (defined below), alleges as follows:

**Preliminary Statement**

1. Plaintiff brings this action to remedy the secret interception of the contents of highly sensitive communications between healthcare consumers and the defendant, Boston Medical Center Corporation ("BMC"), including those consumers' individually identifiable health information ("IHII") and protected health information ("PHI") (referred to collectively as "Private Information"). Specifically, BMC aided in the interception of communications between Plaintiff and other Class Members (defined below) and BMC through a website maintained by BMC (the "BMC Website").

2. BMC aided Google, Facebook (now known as "Meta," but referred to in this complaint as "Facebook"), and other companies to secretly intercept healthcare consumers' communications with BMC by injecting hidden code into the BMC Website. That hidden code enabled Google, Facebook, and other third parties to secretly eavesdrop on healthcare consumers' communications with BMC. Those third parties, including Google and Facebook, could then associate the intercepted communications with the real-world identities of individuals known to Google and

Facebook. Google and Facebook could then use the contents of the intercepted communication for their own commercial purposes, such as serving personalized advertisements to healthcare consumers based on the contents of the secretly intercepted communications.

3. Healthcare consumers' electronic communications with BMC were contemporaneously intercepted, recorded, and transmitted to these third parties without the consumers' knowledge or consent through tracking technologies hidden on almost all webpages of the BMC Website. Those tracking technologies permitted third parties to intercept Private Information, including requests for information on particular conditions and treatments, keyword searches, requests for doctors using particular criteria, bill payments, requests for medical records, and access to BMC's patient portal. Those interceptions enabled the third parties to know that a specific patient was seeking confidential medical care. That recipient, in turn, sold Plaintiff's and Class Members' Private Information to marketers who targeted Plaintiff and Class Members with online advertisements based on the content of the communications intercepted via the tracking technologies.

4. BMC did not disclose to healthcare consumers that it helps third parties such as Google and Facebook to intercept the contents of their communications with BMC, nor did BMC seek or obtain their consent for such interception. On the contrary, BMC **falsely** told healthcare consumers, through their published online privacy policy, that it did **not** share such information.

5. BMC owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class Members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, BMC assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

6. Despite the privacy consumers reasonably expect with respect to medical issues and treatments, BMC chose to put its business interests over the privacy of its patients. The unilateral

disclosure of consumers' Private Information in this manner violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104-191, 110 Stat. 1936 (codified as amended in scattered § of 42 U.S.C.S.), among other statutory and common laws.

7. As described more fully below, Plaintiff and Class Members have suffered injury as a result of BMC's conduct. These injuries include (i) invasion of privacy; (ii) unwanted targeted advertisements; (iii) loss of the benefit of the bargain; (iv) diminution of value of the disclosed Private Information; (v) statutory damages; (vi) unjust enrichment; and (vii) the continued and ongoing risk of further disclosure of their Private Information.

8. In this lawsuit, Plaintiff initially asserted a single claim under the Massachusetts Wiretap Act, M.G.L. c. 272 § 99(A). On October 31, 2023, the Massachusetts Superior Court, in similar cases against two other hospitals—Beth Israel Deaconess Medical Center, Inc. and New England Baptist Hospital—denied those hospitals' motions to dismiss but reported that decision for interlocutory review. The Massachusetts Supreme Judicial Court took direct appellate review of those cases. On October 24, 2024, the Supreme Judicial Court reversed the Superior Court's order denying the motion to dismiss in those cases, holding that the Massachusetts Wiretap Act does not encompass the electronic website communications upon which the plaintiffs' claims in those cases were based (which are similar to the communications Plaintiff alleges in this case). *Vita v. New England Baptist Hospital*, 494 Mass. 824 (2024). The Court, however, "emphasize[d] that the Legislature has provided other statutory and common-law causes of action" that may be "cognizable," including "negligence, breach of implied contract, unjust enrichment, breach of fiduciary duty, [and a] right to privacy," including referencing, in particular, the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B. *Id.* at 849-50. The Court also observed that the federal wiretap act, known as the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. § 2511(1), *et seq.*), had been amended (unlike the

Massachusetts act) to unambiguously cover "electronic communications," which is defined in a way that "would appear to cover many website browsing activities." *Id.* at 846.

9. In light of the Supreme Judicial Court's decision, which Plaintiff recognizes implicates her claim here under the Massachusetts Wiretap Act, Plaintiff now amends her complaint to assert new claims under the ECPA, the Massachusetts Privacy Act, and several claims under common law.

10. The ECPA, like the Massachusetts Wiretap Act, prohibits the interception of the content of any electronic communication. Although the ECPA is often described as a one-party consent wiretap statute, the ECPA's prohibitions apply even when one of the parties to the communications knows about the interception if the communication is intercepted for the purpose of committing any criminal or tortious act—that is, in such circumstances, the ECPA becomes a two-party consent statute similar to the Massachusetts Wiretap Act. Here, BMC intercepted the electronic communications at issue in a manner that violated HIPAA. The ECPA thus provides a private remedy for BMC's interception of electronic communications, enforceable against both the intercepting party and any party that aids such an interception.

11. Plaintiff now asserts statutory remedies under the ECPA both on her own behalf and on behalf of all other Massachusetts residents who accessed the BMC Website. Plaintiff also asserts class claims under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, and common claims for breach of fiduciary duty, negligence, breach of confidence, breach of contract, and unjust enrichment.

## PARTIES

12. Plaintiff Elizabeth Nova is a resident of Boston, Massachusetts. Plaintiff is a patient of BMC. Plaintiff regularly used the BMC Website to (i) obtain information about BMC doctors; (ii) search for information on particular medical procedures; (iii) obtain information about BMC's hours; (iv) schedule and confirm details of medical appointments; and (v) obtain and review her medical records through the website's patient portal.

13. As described below, BMC implemented tracking technologies that intercepted communications between BMC and healthcare consumers on nearly every page of the BM website. The webpages Plaintiff visited on the BMC website were among the webpages on which BMC embedded code for various tracking technologies, including Meta Pixel and Google Analytics. *See* ¶¶ 96-101, *infra* (tracking technologies embedded on pages relating to doctors); ¶¶ 85-93, *infra* (tracking technologies embedded on pages about medical procedures); ¶ 83, *infra* (tracking technologies embedded on webpages for making medical appointments); ¶¶ 106-13, *infra* (tracking technologies embedded on webpages for obtaining medical records).

14. Plaintiff did not consent to or authorize the use of Private Information by third parties or BMC enabling third parties to access and use such Private Information.

15. Defendant Boston Medical Center Corporation is a corporation that operates in Boston, Massachusetts and the surrounding area. Its functions include providing healthcare services primarily through its hospital located in Boston, Massachusetts. BMC maintains and controls the content of the BMC Website.

## JURISDICTION

16. The exercise of personal jurisdiction over BMC is proper according to M.G.L. c. 223 § 3 because, among other things, BMC is located in and conducts business in Massachusetts, and Plaintiff's claim arises out of BMC's activities and conduct in the Commonwealth of Massachusetts.

## FACTUAL ALLEGATIONS

### BMC and Its Website

17. BMC operates a hospital in Boston, Massachusetts. BMC offers inpatient and outpatient care to residents near Boston and surrounding communities. BMC provides healthcare across various specialties, including heart and pulmonary care, neurology, cancer care, surgery, obstetrics and gynecology, and emergency medicine.

18. BMC maintains the BMC Website for its hospital and outpatient facilities, found at https://www.bmc.org. Through that website, healthcare consumers can obtain information about the services BMC provides, including information about doctors, services, and treatments provided by BMC for particular medical conditions, and users can access their medical records, pay bills, and schedule medical appointments.

19. The BMC Website is designed for communications with healthcare consumers. The website includes the following functions:

(a) The BMC Website provides general information about BMC.

(b) The BMC Website provides information about healthcare services provided at BMC, communicated through service-specific pages for a range of services such as "Obstetrics and Gynecology," "Cancer Center," "Psychiatry," and "Surgery," among many others.

(c) The BMC Website permits healthcare consumers to use a "Find a Doctor" function to search for doctors by condition, specialty, gender, language, and location.

(d) The BMC Website permits healthcare consumers to access and pay bills online.

(e) The BMC Website lets healthcare consumers access their private medical information online through the MyChart patient portal.

20. Because the BMC Website provides an interactive experience through which a healthcare consumer can obtain information about particular medical services, doctors, specialties, and the website user's own healthcare condition and needs, a website user's interaction with the website reveals personal information about the website user.

**Reasonable Expectations of Users of the BMC Website**

21. Healthcare consumers in Massachusetts have an interest in preserving the confidentiality of communications with healthcare providers. Among the ways healthcare consumers communicate with healthcare providers is through those providers' websites, such as the BMC Website.

22. Users of healthcare-related websites such as the BMC Website have a legitimate expectation and understanding that their communications with healthcare providers made through websites will be private. They also have a legitimate expectation that healthcare providers such as BMC will not share with third parties their communications with BMC without their consent.

23. The expectations and understandings of website users are supported by state law, which prohibits healthcare providers such as BMC from using or disclosing individuals' "communications" with healthcare providers without valid authorization from the individual. *See* M.G.L. c. 111 § 70E. The expectations and understandings of website users are supported further by federal law, including HIPAA, which prohibits healthcare providers such as BMC from using or disclosing individuals' protected health information without valid authorization from the individual. *See* 45 C.F.R. § 164.508(a)(1), (3). No exception allows healthcare providers to share protected information with social media and other technology companies for marketing purposes.

24. Healthcare consumers would **not** anticipate or expect that their communications with healthcare providers, including BMC, which reveal information about that individual's personal health conditions, will be intercepted and secretly shared with third parties such as Google and Facebook for marketing purposes.

25. The expectations and understanding of users of the BMC Website are informed by what BMC told them during the Class Period about how it handles their personal information.

26. During the Class Period, the BMC Website included a Website Privacy and Security Policy, linked in small text at the bottom of the BMC Website. That policy contained numerous false and deceptive statements regarding BMC's conduct described in this complaint. These statements served not only to keep secret from website users the fact that their communications with BMC would be intercepted by Google, Facebook, and other third parties; the policy went further in repeatedly and

affirmatively promising that BMC would ***not*** do exactly what it ***was*** doing: permitting third parties to intercept and use for commercial purposes website users' communications with BMC.

27. First, the policy stated: "Boston Medical Center will not intentionally share the contents of any electronic communications with a third-party entity." This was false. BMC did, in fact, share the contents of electronic communications between website users and BMC with several third parties, including Google, Facebook, and others.

28. BMC also stated in the same policy: "BMC will take reasonable steps to ensure the integrity and confidentiality of personally identifiable information, which has been obtained through this website." This too, was false. BMC facilitated the interception by third parties, including Google and Facebook, of website users' personally identifiable information, including their IP address and other personal identifiers that those third parties could use to connect intercepted communications to known individuals—information Google and Facebook could then use to serve personalized advertising on those same individuals.

29. BMC also stated: "Any information collected voluntarily from our website visitors will be used to develop or improve our programs and services. It will not be sold to any third-party marketing companies." This too, was false. The information collected from website users was not used only to improve BMC's "programs and services" but was also used by Google and Facebook for their own commercial purposes, including serving personalized advertising to individuals based on the content of their intercepted communications with BMC.

30. BMC also stated: "All personally identifiable information collected and aggregated for survey purposes will be de-identified and screened before it is shared with third-parties for analysis. Boston Medical Center will only disclose personally identifiable information if required to by a search warrant, subpoena, or court order." Multiple aspects of this statement were flagrantly false. First, personally identifiable information was not simply collected in "aggregated" form; instead, BMC

facilitated third parties such as Google and Facebook to intercept communications in individual, non-aggregated form. Second, such intercepted communications were ***not*** "de-identified." Instead, as described below, the tracking technologies at issue in this case were specifically designed to permit third parties such as Google and Facebook to associate the contents of intercepted communications with particular individuals known to Google and Facebook. Third, BMC's statement that it would disclose personally identifiable information only in response to a "warrant, subpoena, or court order" was false; BMC actively facilitated the third-party interception of personally identifiable information for business reasons without any legal compulsion.

31. The same policy, although it contained a section entitled "Logging, Tracking and Monitoring," presented false information about such activities. Most crucially, that section asserted that "Online visitors utilizing this site do so anonymously." This was false. As described below, tracking technologies that BMC injected into the hidden code for the BMC Website were designed specifically to disclose to third parties such as Google and Facebook the real-world identities of website users. The intercepted communications were not anonymized.

32. Moreover, although that section referenced the use of "cookies," disclosure of "cookies" does **not** implicitly or explicitly disclose that communications are intercepted or shared with any third parties. Many cookies do not involve any interaction with parties other than the website and website user. For example, websites often use a cookie to track when a user is logged into the website. No third-party interceptions are involved in such a use of a cookie, and the communication may remain entirely between the website user and the website. Accordingly, merely disclosing the use of "cookies" does not equal disclosure of any interception of communications by any third party (i.e., a party other than the website and the website user), particularly given the other express statements in the same policy that falsely disavowed any such third-party interception of communications.

33. Finally, although the same section described that "IP address and domain name," "time of visit," and "operating system" were logged, it did not disclose that such information (and much more, as described below), was intercepted and logged by third parties (as opposed to BMC itself).

34. In short, the degree to which BMC actively deceived website users and kept secret its facilitation of third-party interception of communications between BMC and website users is palpable. Even users who happen to find the buried Website Privacy and Security Policy would have been deceived by its contents.

35. Healthcare consumers expect that their communications with healthcare-related websites will not be shared with third parties without their consent—an understanding reinforced by BMC's deceptive statements on the BMC Website. The interceptions of website users' communications with BMC were, therefore, truly secret and made without any consent from Plaintiff or the other class member website users.

**Third-Parties Offering Tracking Technologies**

36. Plaintiff describes in this complaint various tracking technologies implemented on the BMC Website that caused the secret interception, recording, and transmission of the contents of Class Members' internet communications with BMC. The next section presents a basic overview of how the technologies work. This section provides a brief overview of the third parties that intercept and record the contents of Class Members' internet communications with BMC and the purposes for which interceptions are made.

37. Meta Platforms, Inc., referred to in this complaint by its former and more familiar name, "Facebook,"[1] is a multinational technology conglomerate based in Menlo Park, California. It

[1] Facebook rebranded its parent company as "Meta" in October 2021.

owns and operates social media platforms, including Facebook and Instagram, as well as various other software and technology products and services.

38. Facebook maintains detailed profiles on individuals that include the users' real names, locations, email addresses, friends, and communications that Facebook associates with personal identifiers, including IP addresses and device identifiers.

39. Facebook derives most of its revenues from selling targeted advertising to users of its platforms, including Facebook and Instagram. Facebook tailors advertising toward particular individuals by building extensive behavioral profiles about each individual. These profiles are based not only on those individuals' use of Facebook products, such as Facebook and Instagram, but also on the activities of those individuals on other websites that Facebook does not own.

40. Among the ways Facebook tracks users on websites not owned by Facebook to supplement its detailed individual profiles is by offering websites with the tracking technology known as Meta Pixel, formerly known as Facebook Pixel. Facebook advertises that Meta Pixel allows website owners to track users across their website and to optimize Facebook advertising based on how they use the websites.

41. Facebook explains on its own website: "The Meta Pixel is a snippet of JavaScript code that allows [companies] to track visitor activity on your website."

42. Facebook explains further: "Once you've set up the Meta Pixel, the Pixel will log when someone takes an action on your website…. The Meta Pixel receives these actions, or events, which you can view on your Meta Pixel page in Events Manager."

43. Therefore, the Meta "pixel allows Facebook to be a **silent third-party watching whatever you're doing**."[2]

---

[2] *Facebook spies on us but not by recording our calls. Here's how the social network knows everything*, Jefferson Graham, USA Today, https://www.usatoday.com/story/tech/2020/03/04/facebook-not-

44. Google LLC is a multinational technology conglomerate and a wholly owned subsidiary of Alphabet Inc. Google LLC is referred to in this complaint as simply "Google." Google owns and operates various software services, including the popular Gmail email service, Google's search platform, and numerous other internet software services. It also manufactures technology products, including cell phones, smart home devices, and computers.

45. Google maintains detailed profiles of individuals, including their real names, dates of birth, email addresses, phone numbers, and details on their interactions with Google's services, such as Gmail. Google maintains detailed profiles of individuals whether or not they have a Google account.

46. Google derives a substantial portion of its revenues through individually targeted advertising. Specifically, Google uses the information it collects on individuals to tailor advertising specifically to the individual, making Google's advertising more valuable than other forms of advertising that are not customized to the individual.

47. One way Google collects information to build its detailed profiles on individuals is through the tracking technology known as Google Analytics. Google incentivizes websites to use Google Analytics by offering it as a free tool for websites to track the behavior of users on its website. The tracking information recorded through Google Analytics and accessible by the website owner provides the website owner with insights about how users use the website, which the owner can use to improve the website. Although Google provides Google Analytics to website owners for "free," Google benefits and profits from Google Analytics by using the data collected through Google Analytics for its own commercial purposes, including using that data to build individuals' profiles further. Google can then use this information to serve such individuals with better-targeted individualized advertisements.

---

recording-our-calls-but-has-other-ways-snoop/4795519002/(last visited Aug. 11, 2022) (emphasis added).

**Website Tracking Technologies on the BMC Website**

48. BMC injects hidden code into the BMC that permits third parties to contemporaneously intercept healthcare consumers' communications with BMC. The tracking technologies permit third parties such as Google and Facebook to associate a website user's browsing activity with particular individuals known to Google and Facebook. This includes, for example, associating the content of the user's communications with BMC with the website user's Facebook profile.

49. These tracking technologies transmit to Google, Facebook, and other companies, contemporaneously with the website communications between Class Members and BMC, the contents of those communications and identifying information about the Class Members. The contents intercepted include private health information, including the individual's status as a patient, medical conditions, doctors they may be seeing, medical searches the individual performs on the website, and personal medical information the user enters into forms on the website.

50. BMC uses or has used several tracking technologies on its website, including Google Analytics and Meta Pixel. The tracking technologies are implemented through similar means.

51. Before describing how such technologies work, it is important to first define some basic technological terms.

52. A **"browser"** or **"web browser"** is software on a computer or other device (such as a tablet or cell phone) that permits a website user to view a webpage. Examples include Google Chrome, Safari, and Firefox.

53. An **"IP address"** is a unique combination of four numbers, each between 0 and 255, that serves as a particular device's address on the internet. Both websites and website users have IP addresses. For example, the IP address for the BMC Website, as of the time of this complaint, is 23.185.0.3. When they connect to the internet, particular individuals also have their own unique IP

addresses. Companies such as Google and Facebook associate particular individuals with IP addresses to help track them across the internet for commercial purposes.

54. A **"URL"** is another form of an address specifically for websites (or a webpage on a website) that a web browser can translate into an IP address to load the website. A URL is the familiar address often preceded by "http://." For example, the URL for the main landing page for the BMC Website is https://www.bmc.org/. URLs also often point to specific pages on a website. Sometimes, the text contained in a URL will reveal information about the particular webpage itself or the substance of the information communicated through it. Such URLs are called "descriptive" URLs. The BMC Website was configured to make broad use of descriptive URLs, which means that the URLs revealed the substance of the communications made through a particular page on the BMC Website. For example, the BMC Website has a page specifically about the BMC Cancer Center; that page's URL is https://www.bmc.org/cancer. One call tell from that URL the substance of the communication between BMC and the healthcare consumer—that the consumer is requesting information regarding cancer from BMC.

55. A **"cookie"** is a file saved on a website user's device that helps track the user across different webpages or websites. Google Analytics and Meta Pixel are not themselves cookies but are instead, as described below, implemented by JavaScript code; they do, however, use cookies as one way to associate particular communications between website users and BMC with individuals known to Google and Facebook. Because Google Analytics and Meta Pixel are not themselves "cookies," each technology continues to intercept communications even if a user has set their browser settings to turn off cookies.

56. **"JavaScript"** is a type of computer code that can be included on a website. A website user's browser downloads and "runs" the code within the browser. The JavaScript code can perform various functions, including causing the browser to load components of the website, providing

interactive functionality in the website, transmitting information from the browser to servers on the internet, or performing other functions in the background. Unlike many other components of a website, such as text and images, which are visible to the website user, the JavaScript code itself is not visible. The execution of JavaScript code may or may not result in the presentation of visible components of the website.

57. With those basic terms in mind, the tracking technologies described in this complaint—in particular, Google Analytics and Meta Pixel—work as follows. In general terms, a website owner (here, BMC) inserts into its website code that causes an individual's web browser, when loading the website, to also load a JavaScript file from a third-party server (such as Google or Facebook). That JavaScript code is then executed automatically within the individual's web browser.

58. The execution of the JavaScript code causes the individual's web browser to retrieve a very small file from the third-party's website, such as a transparent single-pixel image file from Facebook's server (hence the origin of the phrase "Meta Pixel" or "Facebook Pixel" to describe the tracking technology).

59. When the JavaScript code causes the user's web browser to retrieve a file from the third-party's website, the JavaScript code also causes the browser to communicate certain information to the third-party website. That information can include: (i) the URL of the website the user is visiting (that is, the website address, such as https://www.bmc.org/cancer); (ii) the title of the particular webpage being visited; (iii) metadata from the website, including information describing the content of the website; (iv) information the user has submitted to the website, such as search terms or any other information inputted out into a form (even if the user has not yet "submitted" the form); (v) whether and to what degree the user has scrolled through the website; (vi) if a user has made a selection on any drop-down menu on the website, the content of that selection; and (vii) prior pages the website user has visited before viewing the current page.

60. When the JavaScript code causes the browser to communicate the information described in the paragraph above to third-party servers such as Google or Facebook, the code also causes the browser to reveal the website user's IP address to the third-party website. This disclosure permits the third party, such as Google or Facebook, to associate the information it has received about the individual's communications with the website to the identity of a particular individual known to Google and Facebook. A third-party such as Google or Facebook can then add the content of the user's communications with BMC to its collection of information it already has about the individual, which it can then use for advertising purposes. For example, when Meta Pixel's JavaScript code causes a "pixel" to be loaded from Facebook's servers, Facebook records and associates the content of the communications it has intercepted with an individual's Facebook and Instagram profiles, which includes the individual's real name and other information about them.

61. The code for tracking technologies is invisible to a website user. By design, the tracking technologies work so that no visible evidence of the technology is shown to the user. For example, even though some technologies may load a small single-pixel image or another file, that image is not displayed as part of the website; instead, it is loaded in the background solely for the purpose of transmitting the content of the user's communications and the user's identity to the third party such as Google or Facebook. The tracking technologies are detectible only by using specialized tools that divulge the code underlying a webpage and the network traffic the website components generate.

62. The tracking technologies described in this complaint intercept and transmit to third parties the contents of communications between healthcare consumers and BMC contemporaneously with those communications. The tracking technologies intercept and transmit the contents of those communications to third parties before the webpage has even completed loading.

63. The use of tracking technologies became an important news story in June 2022 following an investigation and report by the online magazine The Markup reporting that "Facebook

Is Receiving Sensitive Medical Information from Hospital Websites."[3] (the "Markup Article"). That article detailed how many of the nation's top hospitals had Meta Pixel code on their websites, which caused the unauthorized disclosure of individuals' communications and other personal information to Facebook. The Markup Article has triggered Congressional investigations and increased scrutiny of hospitals' data practices.[4] In reaction to the investigation and Markup Article, some healthcare providers removed Meta Pixel code from their websites completely or severely limited its use.

64. BMC appears to have removed Meta Pixel from its website in 2022 near in time to The Markup Article, but BMC continued to use Google Analytics and other tracking technologies, which facilitate third parties' interceptions of communications in a similar fashion, until shortly after this case was filed. An analysis of the BMC Website shortly before this case was filed and archived historical versions of the BMC Website confirm that BMC's implementation of Google Analytics was consistent during the Class Period.

**BMC'S Use of Tracking Technologies on the BMC Website**

65. During the class period, BMC used various tracking technologies across the BMC Website. BMC injected several of those tracking technologies into the code of all, or almost all, of the pages within the BMC Website. For example, on nearly every page of the BMC Website, BMC injected hidden code that loads Google Analytics. It also injected hidden Meta Pixel code onto most pages on the BMC Website during most of the class period.

66. Within a couple of months after the initial complaint was filed in this case, it appears BMC significantly limited its use of Google Analytics and other tracking technologies. The examples

---

[3] *See* "Facebook Is Receiving Sensitive Medical Information from Hospital Websites," https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

[4] *See* "Meta Faces Mounting Questions from Congress on Health Data Privacy As Hospitals Remove Facebook Tracker," https://www.healthcareitnews.com/news/senator-questions-zuckerberg-over-metas-healthcare-data-collection-policies.

provided below of BMC's deployment of Google Analytics and other tracking technologies on the BMC Website reflect such deployment around the time of the original complaint in this action (or, as to Meta Pixel, prior to when BMC removed Meta Pixel in 2022). BMC controls when and how it uses tracking technologies on its own website and can change or remove tracking technologies at any time. Therefore, the examples provided below may not reflect BMC's current use of tracking technologies—either at the time of this amended complaint or at the time a reader reads this amended complaint.

67. The code for tracking technologies such as Meta Pixel and Google Analytics is invisible to website users but becomes visible only when using special "developer" software such as Google's "Developer Mode," a tool designed for web developers. Google's Developer Mode displays hidden components of websites and records the content of network traffic generated by website components (including the loading and execution of JavaScript code and the text that the JavaScript code causes to be transmitted to third-party web servers when it loads a small file or image).

68. Below is an image of the main landing page for the BMC Website:




69. When a user loads the main landing page for the BMC Website, the webpage causes the user's web browser to download from Google's servers a file called "analytics.js," which contains the JavaScript code for Google Analytics ("analytics" refers to "Google Analytics," and "js" standards for JavaScript). The website then causes the user's web browser to execute the JavaScript code contained in the "analytics.js" file. That code, in turn, causes the user's web browser to connect to Google's servers again to load a small file. When the user's web browser loads this small file, the Google Analytics JavaScript code causes the user's web browser to intercept and transmit certain information to Google.

70. The image below depicts the landing page for the BMC Website on the left-hand-side, and to the right of it, Google Developer Mode, which inspects the components of the website and the network traffic those components generate:




71. A closer view of Google Developer Mode, focusing specifically on the contents of the communication intercepted and transmitted to Google, is presented below (with highlighting added). The "Payload" is a technological term that refers to information transmitted from a user's web browser to a web server when the browser retrieves a file from that web server. In this case, the "Payload" reflects the information that the Google Analytics JavaScript code causes the user's web browser to intercept and transmit to Google when a small file is loaded from Google's servers:

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encc

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34q0n2
_p: 131117627
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682537197
sct: 1
seg: 1
dl: https://www.bmc.org/
dr: https://www.google.com/
dt: Home Page | Boston Medical Center
en: page_view

72. Among the information transmitted to Google's servers contemporaneously with the communications between the website user and the BMC Website are:

(a) The URL of the webpage visited (the text after the letters "dl," which includes the text "www.bmc.org"); and

(b) The title of the webpage (after the letters "dt," which includes "Home Page | Boston Medical Center"); and

(c) The URL of the webpage the website user visited immediately before visiting the BMC Website landing page (the text after "dr," which includes the text "https://www.google.com.").

73. The other information Google intercepts includes data about the user's web browser configuration (including screen resolution, device information, and browser settings); a unique identifier for the particular user visiting the website (which enables Google to track that individual across the website); and identification codes used to connect the browsing activity with a Google Analytics account held by the website (here, BMC).

74. Notably, when the website user's web browser intercepts the contents of communications between the website user and the BMC Website and contemporaneously transmits those contents to Google, the connection established between the user's web browser and Google's servers reveals the user's IP address to Google. Google then uses that IP address to associate the user's communications with the website with particular individuals known to Google, including those individuals' Google accounts and real-world identities (whether or not the individual has a Google account). After Google associates the website user's communications with BMC with the identity of particular individuals known to Google, Google can use that information for its own commercial purposes, including serving personalized advertisements upon that individual on other websites owned by Google or any other third parties that use Google's advertising platforms (many do).

75. Moreover, by communicating information about the website user's browser configuration and device (such as screen resolution and other browser configuration settings), Google can confirm the user's identity through a technique known as "browser fingerprinting." In short, browser fingerprinting associates particular individuals with unique combinations of web browser settings. This permits Google to confirm that a specific individual using Google's services (for example, a person with a Gmail account) and an individual visiting the BMC Website are the same.

76. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[5] Browser fingerprints are also considered personal identifiers, and tracking pixels can collect browser fingerprints from website visitors. Browser fingerprints are protected personal identifiers under HIPAA. *See* 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

77. The hidden Google Analytics code not only intercepts the communication through which the website user loaded the landing page but also closely tracks the website user's every move on the page. For example, when a user scrolls down on the landing page, that communication is intercepted and transmitted to Google via hidden Google Analytics code. The screenshot below (with highlighting added) depicts the intercepted communication:

[5] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-e

v: 2
tid: G-M8WZT4NW2R
gtm: 45je3530
_p: 725107456
cid: 691509645.1683479334
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;1:
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_eu: AEA
_s: 2
sid: 1683479334
sct: 1
seg: 1
dl: https://www.bmc.org/
dt: Home Page | Boston Medical Center
en: scroll
epn.percent_scrolled: 90
_et: 5543

That is, the hidden code monitored the user scrolling through 90% of the page and transmitted that information to Google, which it could use to measure the user's level of engagement with the website, informing Google's targeted advertising profile for the particular individual.

78. Before BMC removed Meta Pixel from its website in 2022, the same landing page for the BMC Website injected hidden Meta Pixel code onto the landing page of the BMC website. The hidden code BMC injected into its website caused the user's browser to load a JavaScript file called

"fbevents.js." That JavaScript code, in turn, caused the website user's browser to secretly and contemporaneously intercept and transmit to Facebook the website user's communications with the BMC Website.

79. Similar to Google Analytics, Meta Pixel caused the user's web browser to intercept and transmit to Facebook the contents of the communications between the website user and BMC through the BMC Website, including the URL of the webpage visited, the title of the page visited, and data reflecting additional detail on the contents of each particular webpage. The graphic below depicts the information secretly intercepted by the hidden Meta Pixel code and contemporaneously transmitted to Facebook (with highlighting added):

Date Filed 12/19/2024 2:42 PM
Superior Court - Suffolk
Docket Number 2384CV01086

× Headers **Payload** Preview Response Initiator Timing Cookies

**▾ Query String Parameters** view source view URL-encoded

**id:** 353927118450000

**ev:** Microdata

**dl:** https://www.bmc.org/

**rl:**

**if:** false

**ts:** 1592855828785

**cd[DataLayer]:** []

**cd[Meta]:** {"title":"Home Page | Boston Medical Center"}

**cd[OpenGraph]:** {}

**cd[Schema.org]:** []

**cd[JSON-LD]:** [{"@context":"https://web.archive.org/web/20200622195659/http://schema.org","@type":"Organization","url":"https://web.archive.org/web/20200622195659/https://www.bmc.org","logo":"https://web.archive.org/web/20200622195659/https://www.bmc.org/sites/default/files/BMC-Logo.jpg","contactPoint":[{"@type":"ContactPoint","telephone":"+1-617-638-8000","contactType":"Customer Service"},{"@type":"ContactPoint","telephone":"+1-617-638-6157","contactType":"Bill Payment"},{"@type":"ContactPoint","telephone":"+1-617-414-5155","contactType":"Billing Support"},{"@type":"ContactPoint","telephone":"+1-617-414-4075","contactType":"Emergency"}]}]

**sw:** 1920

**sh:** 1080

**v:** 2.9.21

**r:** stable

**ec:** 1

**o:** 30

**fbp:** fb.0.1592855828272.1306496353

**it:** 1592855827125

**coo:** false

**es:** automatic

**tm:** 3

**rqm:** GET

80. The interception and transmission to Facebook also included information about the user's browser configuration (such as screen resolution—here 1920 by 1080 pixels) and various codes to associate the communications with BMC's advertising account with Facebook.

81. The JavaScript code for Meta Pixel also caused the user's web browser to reveal the user's IP address to Facebook. This identifier permits Facebook to associate the content of the website user's communications with the website to the user's Facebook profile (or the profile of other websites owned by Facebook, such as Instagram). With that information, Facebook can then use the contents of communications between the website user and BMC to serve personalized advertising to the website user in the future.

82. The text fields communicated to Facebook by the Meta Pixel code also included a persistent identifier for each particular user. This allowed Facebook to track that individual across the BMC Website and further confirm that individual's real-world identity.

83. The landing page for the BMC Website also contains a link permitting the website user to "Request an Appointment." By clicking that link, a website user would communicate to BMC that the user is a patient or prospective patient. When a website user clicks on the "Request an Appointment" button, hidden Google Analytics code that BMC has injected into its website intercepts that communication and contemporaneously transmits it to Google. The intercepted click is depicted in the screenshot below (with highlighting added);

Date Filed 12/19/2024 2:42 PM
Superior Court - Suffolk
Docket Number 2384CV01086

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-enco

v: 1
_v: j100
a: 1492152562
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/
dr: https://www.google.com/
ul: en-us
de: UTF-8
dt: Home Page | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1348x947
je: 0
ec: Link
ea: https://www.bmc.org/
el: Request an appointment
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS58R
cd8:
z: 899015768

As depicted above, Google Analytics code intercepts and transmits to Google the communication through which a website user has clicked on a "Link" to "Request an appointment" on the "Boston Medical Center" website.

84. BMC configured its website to intercept and retransmit to Google, Facebook, and other third parties specific information about the webpages a healthcare consumer visits within the

website, which in turn may reveal personal information about the healthcare consumer. The further examples presented below do not necessarily reflect webpages Plaintiff personally visited but are presented for illustrative purposes. To maintain her medical privacy, Plaintiff does not identify in this complaint all specific pages she visited, but Plaintiff visited webpages within the categories of pages described below into which BMC embedded Meta Pixel, Google Analytics, and other tracking technologies. Her communications with BMC, including Private Information, were intercepted similarly to the illustrative examples set forth below.

85. The BMC Website contains numerous subpages for specific "Departments and Conditions." For example, the BMC Website contains a page entitled "Neurology," designed to inform the website user about the services BMC offers for various neurological disorders. By visiting this webpage, a user communicates that the user may have a neurological disorder. When the user communicates with BMC by visiting this particular webpage, BMC causes the secret interception and transmission of that communication to Google, Facebook, and other third parties. Below is a screenshot of the Neurology webpage:




86. The graphic below presents the contents of the communication between the website user and BMC that are secretly intercepted and transmitted to Google when the above page loads as a result of the hidden Google Analytics JavaScript code that BMC injects into the website (with highlighting added):

× Headers Payload Preview Response Initiator »

▾ **Query String Parameters** view source view URL-encode

v: 2
tid: G-M8WZT4NW2R
gtm: 45je3530
_p: 1503411338
cid: 450616876.1683587233
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1683587233
sct: 1
seg: 1
dl: https://www.bmc.org/neurology
dt: Neurology | Boston Medical Center
en: page_view

87. As reflected in the above screenshot, the code injected into the BMC Website causes the user's browser to contemporaneously intercept and transmit to Google the fact that the website user is visiting a "Neurology" webpage on the BMC Website—information that Google retains and can use for its own commercial purposes.

88. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook. The image below

depicts the contents of the communication between BMC and a website user that would be intercepted when a user visited the Neurology webpage on the BMC Website (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Form Data** view source view URL-encoded

**id:** 353927118450000
**ev:** Microdata
**dl:** https://www.bmc.org/neurology
**rl:**
**if:** false
**ts:** 1592881992524
**cd[DataLayer]:** []
**cd[Meta]:** {"title":"Neurology | Boston Medical Center","meta:description":"A Message to Our Patients about COVID 19 The Neurology Department offers a full spectrum of neurological care, including examination, diagnostic evaluation, consultation, treatment, comprehensive follow-up, and rehabilitation recommendations for disorders of the nervous system. Patients receive the latest in therapies and treatments based on research that is ongoing at BMC."}
**cd[OpenGraph]:** {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/neurology","og:title":"Neurology","og:description":"A Message to Our Patients about COVID 19 The Neurology Department offers a full spectrum of neurological care, including examination, diagnostic evaluation, consultation, treatment, comprehensive follow-up, and rehabilitation recommendations for disorders of the nervous system. Patients receive the latest in therapies and treatments based on research that is ongoing at BMC. The department's areas of advanced clinical expertise include Parkinson's disease, epilepsy, stroke, and Alzheimer's diseas","og:updated_time":"2020-03-31T10:58:13-04:00","article:published_time":"2016-07-07T16:45:37-04:00","article:modified_time":"2020-03-31T10:58:13-04:00"}
**cd[Schema.org]:** []
**cd[JSON-LD]:** [{"@context":"https://web.archive.org/web/20200623031302/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Patient Care","@id":"https://web.archive.org/web/20200623031302/https://www.bmc.org/conditions-we-treat"}},{"@typ

That is, the Meta Pixel would intercept the communication through which the website user was seeking information about "Neurology" at "Boston Medical Center," including potential care relating to Parkinson's disease, epilepsy, stroke, or Alzheimer's disease. Facebook could then use the contents

of that intercepted communication for its own commercial purposes (for example, by serving advertisements relating to neurological drugs to the same individual on Facebook or Instagram).

89. The BMC Website contains dozens of similar pages on particular medical specialties and practices that BMC offers. For each such page, the BMC aids or aided Google and Facebook's secret interception of the contents of communications with BMC, similar to the above Obstetrics and Gynecology example.

90. The BMC Website also contains pages for specific services offered by BMC. By visiting such pages, a user signifies that the service may be relevant to them. For example, the BMC Website has a webpage for vaccines, testing, and treatment for COVID, depicted below:




By visiting the page, the user signifies an interest in COVID treatment or testing, which could indicate the user or a person the user knows has been exposed to or is experiencing symptoms of COVID.

91. When a website user visits the COVID testing page of the BMC Website, the hidden Google Analytics code that BMC has injected into its website intercepts that communication between the user and BMC and transmits it to Google. The contents of the intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 1834931130
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/covid-19
dt: Information about COVID-19 | Boston Medical Center
en: page_view

That is, hidden Google Analytics code intercepts the fact that the user is seeking "Information about COVID-19" from BMC, information Google retains and uses for its own commercial purposes.

92. If a user clicks on the "Testing" link on BMC's COVID information page, that communication is likewise intercepted by hidden Google Analytics code that BMC has injected onto

its website. The contents of the communication intercepted and contemporaneously transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 1
_v: j100
a: 1834931130
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/covid-19
ul: en-us
de: UTF-8
dt: Information about COVID-19 | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1311x947
je: 0
ec: Link
ea: https://www.bmc.org/covid-19
el: Testing
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS58R
cd8:
z: 576799823

That is, the communication in the form of clicking on a "Link" for "Testing" from the "Information about COVID-19" webpage on the BMC Website is intercepted and transmitted to Google, and Google and use the contents of the intercepted communication for its own commercial purposes.

93. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was obtaining information from BMC about COVID-19, information that Facebook retains and can use for its own commercial purposes.

94. The BMC Website also includes a search function that permits an individual to search for medical or other information relevant to them. Healthcare consumers often enter search terms that reveal private health information about them, for example, when an individual uses the search function for particular symptoms, conditions, or medical specialties offered by BMC. When an individual uses the search function, BMC aids in the secret interception of the contents of that search and transmission of those contents to Google and other third parties. Below, for example, is the search results page for "pregnant."




95. When a user performs this search on the BMC Website, and the results page then loads, the Google Analytics code is activated, causing the individual's web browser to intercept the user's precise search terms and transmit them to Google. Below is the portion of the communication Google Analytics code intercepts and transmits to Google (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view decode

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 1797327608
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium%3B112.0.5615.138%7CGoogle%2520Chro
me%3B112.0.5615.138%7CNot%253AA-Brand%3B99.0.0.
0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
sid: 1682542380
sct: 2
seg: 1
dl: https%3A%2F%2Fwww.bmc.org%2Fsearch%3Fsearch%3
pregnant%26form_build_id%3Dform-wnm7dhGUG70crVCX
_4wAUc9RCMFnpAeNengN6mb5V8%26form_id%3Dsite-sear
h-form
dr: https%3A%2F%2Fwww.bmc.org%2F
dt: Search%20%7C%20Boston%20Medical%20Center
_s: 1

▾ **Request Payload**

en=page_view

As reflected in the above text, the hidden Google Analytics code causes the precise search terms entered by the user to be intercepted and transmitted to Google, which Google can then use for its own commercial purposes, including associating those search terms with the individual's real-world

identity for targeted advertising purposes. Those intercepted communications also remain accessible by third parties other than Google via subpoena or otherwise.[6]

96. The BMC Website also includes a "Find A Doctor" feature that permits healthcare consumers to search for doctors using filtering criteria, such as specialties, location, doctor gender, and language. By using the "Find a Doctor" function, the user communicates to BMC that the user is a current or prospective patient. The screenshot below depicts the Find A Doctor page:




97. Depicted below are the contents of the user's communication with the BMC Website that are intercepted and transmitted to Google via hidden Google Analytics Code, intercepting that the user is searching for a BMC doctor (with highlighting added):

---

[6] *See, e.g.,* "How data from period-tracking and pregnancy apps could be used to prosecute pregnant people," https://www.latimes.com/business/story/2022-08-17/privacy-reproductive-health-apps.

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 940553293
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|
Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/find-doctor
dt: Find a Doctor | Boston Medical Center
en: page_view

98. Before BMC removed Meta Pixel code from its website in 2022, communications on the Find-A-Doctor function were likewise intercepted by and transmitted to Facebook via hidden Meta Pixel code. Depicted below are the contents of the communication that would be intercepted when a website user visited the Find-a-Doctor feature on the BMC Website (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 353927118450000
ev: Microdata
dl: https://www.bmc.org/find-doctor
rl:
if: false
ts: 1593114043856
cd[DataLayer]: []
cd[Meta]: {"title":"Find a Doctor | Boston Medical Center","meta:description":"BMC's primary care physicians, specialty providers, and nurse practitioners provide exceptional care for patients of all ages near Boston, MA. Use our Find a Doctor tool to select the right doctor for you and your family."}
cd[OpenGraph]: {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/find-doctor","og:title":"Find a Doctor","og:updated_time":"2019-08-21T12:08:03-04:00","article:published_time":"2016-08-09T13:44:16-04:00","article:modified_time":"2019-08-21T12:08:03-04:00"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200625194037/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Patient Care","@id":"https://web.archive.org/web/20200625194037/https://www.bmc.org/conditions-we-treat"}}]}]
sw: 1920
sh: 1080
v: 2.9.21
r: stable
ec: 1
o: 30
fbp: fb.0.1593114043346.1886219358
it: 1593114042686
coo: false
es: automatic
tm: 3

99. Facebook could then associate the "Find a Doctor" communications with the individual's accounts held by Facebook-owned platforms (including Facebook and Instagram), and Facebook could then use the content of the intercepted communications for its own commercial purposes.

100. When a user performs a search on the Find-a-Doctor page for doctors within a particular specialty, that communication between the user and BMC is intercepted and transmitted to Google via hidden Google Analytics code. For example, the page below shows the results that appear when a user searches for Obstetrics and Gynecology doctors:




101. The graphic below shows the contents of the communication between the website user and BMC that are secretly intercepted by and sent to Google via hidden Google Analytics code (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 940553293
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|N
ot%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_eu: AEA
_s: 2
dl: https://www.bmc.org/find-doctor?sm_department[]=Obstetrics%
20and%20Gynecology
dr: https://www.bmc.org/find-doctor
sid: 1682542380
sct: 2
seg: 1
dt: Find a Doctor | Boston Medical Center
en: page_view
_et: 21076

That is, the fact that the user performed a find-a-doctor search for doctors within the "Obstetrics and Gynecology" department is intercepted and transmitted to Google, and Google can use the contents of that intercepted communication for its own commercial purposes

102. The BMC Website also contains a section permitting patients to pay bills they received from BMC. The "Bill Payment" page of the BMC Website is depicted below:




103. When a user visits this page, the user communicates that the user is an individual who has received medical services from BMC. That communication with BMC is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into its website. The contents of the communication that are intercepted by and transmitted to Google are depicted below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encoc

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 611151196
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0
615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/bill-payment
dr: https://www.bmc.org/make-appointment
dt: Bill Payment | Boston Medical Center
en: page_view

As reflected in the above screenshot, hidden Google Analytics code intercepts that the user is accessing the "Billing Payment" feature on the "Boston Medical Center" website. Google retains this intercepted communication and may use it for its own commercial purposes, including associating the communication with the individual's real-world identity for targeted advertising purposes.

104. If a user clicks on the "Guest Pay" button on the bill payment page, further indicating that the user is a BMC patient who is paying a bill, that communication is likewise intercepted by hidden Google Analytics code that BMC has injected into its website, and the contents of that

communication are contemporaneously transmitted to Google. The contents of the intercepted communication are shown below (with highlighting added):

× Headers Payload Preview Response »

▾ **Query String Parameters** view source view URL-encoc

v: 1
_v: j100
a: 611151196
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/bill-payment
ul: en-us
de: UTF-8
dt: Bill Payment | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1348x947
je: 0
ec: Link
ea: https://www.bmc.org/bill-payment
el: Guest Pay
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS5BR
cd8:
z: 1686280199

That is, the communication through which the user has clicked on a "Link" for "Guest Pay" is intercepted and transmitted to Google, and Google can use the contents of that intercepted communication for its own commercial purposes.

105. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was communicating with BMC about the payment of a BMC bill. Depicted below are the contents of the communication intercepted and transmitted to Facebook (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Form Data** view source view URL-encoded

id: 353927118450000
ev: Microdata
dl: https://www.bmc.org/visiting-us/patient-information#bill-pay
rl:
if: false
ts: 1593343353514
cd[DataLayer]: []
cd[Meta]: {"title":"Patient Information | Boston Medical Center","meta:description":"Banking Facilities Four full-service ATMs are located throughout the hospital for your convenience. Menino Pavilion: Santander Bank ATM (in the lobby of Yawkey Ambulatory Care Center) Menino Pavilion: Citizens Bank ATM (on the first floor near the Albany Street Emergency Department entrance) Bill Payment You may pay an existing bill by logging into MyChart or by using Guest"}
cd[OpenGraph]: {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/visiting-us/patient-information","og:title":"Patient Information","og:description":"Banking Facilities Four full-service ATMs are located throughout the hospital for your convenience. Menino Pavilion: Santander Bank ATM (in the lobby of Yawkey Ambulatory Care Center) Menino Pavilion: Citizens Bank ATM (on the first floor near the Albany Street Emergency Department entrance) Bill Payment You may pay an existing bill by logging into MyChart or by using Guest Pay. If you have questions about your health coverage or about paying your bill, please call 617.414.5155. A financial coun","og:updated_time":"2020-05-29T10:17:51-04:00","article:published_time":"2016-07-07T17:39:34-04:00","article:modified_time":"2020-05-29T10:17:51-04:00"}
cd[Schema.org]: []
cd[JSON-LD]: [{"@context":"https://web.archive.org/web/20200628112227/http://schema.org","@type":"BreadcrumbList","itemListElement":[{"@type":"ListItem","position":1,"item":{"name":"Visiting Us","@id":"https://web.archive.org/web/20200628112227/https://www.bmc.org/visiting-us"}}]}]
sw: 1920
sh: 1080

106. The BMC Website also contains a feature that permits website users to request medical records from BMC. By accessing this feature of the website, the website user communicates that the user is a BMC patient. The webpage on the BMC Website through which a user can request medical records is shown below:




107. When a user accesses the Medical Records feature on the BMC Website, the contents of that communication are intercepted and transmitted to Google via hidden Google Analytics code. The contents of the communication intercepted are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4MN2R
gtm: 45je34j0
_p: 785046992
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|N
ot%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/services/medical-records
dt: Medical Records | Boston Medical Center
en: page_view

That is, the fact that the user is accessing "Medical Records" from "Boston Medical Center" is intercepted and contemporaneously transmitted to Google, and Google can use the content of that intercepted communication for its own commercial purposes.

108. Moreover, if a user clicks on the "Request Medical Records—Authorization Form" link on this webpage, that communication is likewise intercepted and transmitted to Google via hidden Google Analytics code. The contents of that intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 1
_v: j100
a: 785046992
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/services/medical-records
ul: en-us
de: UTF-8
dt: Medical Records | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1293x947
je: 0
ec: Link
ea: https://www.bmc.org/services/medical-records
el: Request Medical Records - Authorization Form
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PW558R
cd8:
z: 386423345

109. Before BMC removed Meta Pixel from its website in 2022, the same webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook, including that the user was obtaining information about BMC medical records, information that Facebook retains and can use for its own commercial purposes.

110. BMC's website also features a purportedly secure patient portal through which BMC patients can access medical records and other information. This is another feature of the BMC Website through which, by accessing the feature, a website user communicates the user's status as a BMC patient. The main page through which a website user enters the portal is shown below:




111. When a user communicates with BMC on the MyChart page, that communication is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into its website. The contents of the intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 2
tid: G-M8WZT4NW2R
gtm: 45je34j0
_p: 2007405342
cid: 780300399.1682537198
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;112.0.5615.138|Google%20Chrome;112.0.5615.138|Not%3AA-Brand;99.0.0.0
uamb: 0
uam:
uap: Windows
uapv: 10.0.0
uaw: 0
_s: 1
sid: 1682542380
sct: 2
seg: 1
dl: https://www.bmc.org/mychart
dr: https://www.bmc.org/department-obstetrics-and-gynecology
dt: MyChart | Boston Medical Center
en: page_view

That is, the communication through which the user accesses the "MyChart" patient portal of "Boston Medical Center" is intercepted and transmitted to Google.

112. If a website user clicks on the link to log into the MyChart patient portal, that communication too is intercepted and transmitted to Google via hidden Google Analytics code that BMC has injected into the BMC Website. The contents of that intercepted communication are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing

▾ **Query String Parameters** view source view URL-encoded

v: 1
_v: j100
a: 3727937
t: event
ni: 0
_s: 1
dl: https://www.bmc.org/mychart
ul: en-us
de: UTF-8
dt: MyChart | Boston Medical Center
sd: 24-bit
sr: 1920x1080
vp: 1311x947
je: 0
ec: Link
ea: https://www.bmc.org/mychart
el: Log in to MyChart
ev: 0
_u: SACAAEABAAAAACAAI~
jid:
gjid:
cid: 780300399.1682537198
tid: UA-4735899-4
_gid: 1612928618.1682537198
gtm: 45He34j0n71PWS58R
cd8:
z: 1963223635

That is, BMC aids Google in intercepting the communication in which the website user has clicked on a "Link" to "Log in to MyChart." Google can then associate that communication with the user's real-world identity and use the intercepted communication for Google's own commercial purposes, including serving targeted advertising on the individual in the future based on the content of the intercepted communication.

113. Before BMC removed Meta Pixel from its website in 2022, the same MyChart webpage previously contained hidden code that intercepted the user's communication with BMC and transmitted similar content of those intercepted communications to Facebook. The contents of the communication intercepted and transmitted to Facebook are depicted below (with highlighting added):

× Headers Payload Preview Response Initiator Timing Cookies

▾ **Query String Parameters** view source view URL-encoded

id: 353927118450000
ev: Microdata
dl: https://www.bmc.org/mychart
rl:
if: false
ts: 1593550526309
cd[DataLayer]: []
cd[Meta]: {"title":"MyChart | Boston Medical Center"}
cd[OpenGraph]: {"og:site_name":"Boston Medical Center","og:type":"article","og:url":"https://www.bmc.org/mychart","og:title":"MyChart","og:updated_time":"2020-05-27T20:07:42-04:00","article:published_time":"2020-05-27T14:30:38-04:00","article:modified_time":"2020-05-27T20:07:42-04:00"}
cd[Schema.org]: []
cd[JSON-LD]: []
sw: 1920
sh: 1080
v: 2.9.21
r: stable
ec: 1
o: 30
fbp: fb.0.1593550525778.1924864490
it: 1593550523867
coo: false
es: automatic
tm: 3
rqm: GET

114. In addition to Google and Facebook, BMC caused communications between healthcare consumers and BMC to be intercepted and transmitted to various other companies without the consumer's knowledge or consent. These additional third parties include:

(a) **Siteimprove Analytics.** Siteimprove Analytics is a service similar to Google Analytics. It markets itself as providing "powerful insights into visitor behavior and website performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams." Siteimprove functions similarly to Google Analytics in using hidden code to secretly intercept and transmit to Siteimprove the contents of website users' communications with BMC through the BMC Website, including the URL and title of each page visited and each movement on the website (including scrolling and clicks).

(b) **New Relic.** New Relic offers a "Browser Monitoring" analytics service that is similar to Google Analytics. Like Google Analytics and Meta Pixel, BMC inserts hidden code into their website that caused communications between the user and BMC to be intercepted and transmitted to New Relic at bam.nr-data.net. The contents intercepted include the URL of each webpage visited and the user's IP address.

**The Secret Use of Website Tracking Technologies Such as Meta Pixel and Google Analytics Is Not Necessary**

115. The secret use of tracking technologies such as Meta Pixel and Google Analytics is not necessary for the BMC Website's operation. The BMC Website can and would operate just the same from the perspective of healthcare consumers without the secret use of tracking technologies described in this complaint.

116. Tracking technologies such as Google Analytics and Meta Pixel are distinct from and are not necessary to feature Google or Facebook-associated functionality on the website. For example, a website can include links to its Facebook page or invite website users to interact with BMC via Facebook without using Meta Pixel. Meta Pixel is an entirely distinct feature from a Facebook button or a link to a Facebook page; any website can have one without the other.

117. Moreover, even if BMC wanted to use tracking technologies to optimize its website or its marketing for a website, there is no legitimate or lawful reason for BMC (i) to keep secret from its website users the use of these tracking technologies; (ii) to falsely and deceptively claim that BMC

does not share the communications with others when it does; or (iii) to claim that BMC maintains the privacy of those communications when it does not.

**BMC Violated HIPAA and the FTC Act.**

118. Under federal law, a healthcare provider may not disclose personally identifiable, nonpublic medical information about a patient, a potential patient, or a household member of a patient without the patient's express written authorization.[7]

119. Although healthcare providers regulated under HIPAA are not entirely prohibited from using third-party tracking technologies such as Google Analytics or the Meta Pixel, their ability to use such tools is strictly constrained by the purpose for which such tools are used and the adequacy of consent obtained from healthcare consumers for such use.

120. HIPAA's Privacy Rule defines IIHI as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and either (i) "identifies the individual"; or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

121. The HIPAA Privacy Rule sets forth policies to protect all IIHI that covered entities hold or transmit. HIPAA sets forth a non-exhaustive list of 18 identifiers that are IIHI because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual.[8]

[7] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).
[8] Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html

122. Under the HIPAA de-identification rule, "health information is **not** individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed." 45 C.F.R. § 164.514 (emphasis added). The listed identifiers include device identifiers, dates related to an individual, email addresses, web URLs, and IP addresses, plus "[a]ny other unique identifying number, characteristic, or code." *Id.* Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

123. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

124. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

125. "Covered entities" include "a health care provider who transmits any health information in electronic form" in connection with HIPAA-related transactions. 45 C.F.R. § 160.103. "Health care provider" includes providers of "medical or health services," including "physicians' services," i.e., "services and supplies . . . furnished as an incident to a physician's professional service,"

(HIPAA identifiers include among other things, device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

including diagnostic services, psychologist and clinical social worker services, and a variety of other services. *See* 42 USCS § 1395x(s).

126. An individual's patient status with a particular entity is PHI. The Department of Health and Human Services instructs health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[9]

127. Consistent with this restriction, HHS marketing guidance provides: "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[10]

128. In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of tracking technologies on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[11]

[9] Guidance Regarding Methods for De-Identification of Protected Health Information, *supra* n.8.
[10] Marketing, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.
[11] Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (Dec. 1, 2022), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. (emphasis added)

129. In other words, the HHS has expressly stated that entities like BMC that implement Meta Pixel and Google Analytics and disclose patient information have violated HIPAA Rules unless those entities obtain a HIPAA-complaint authorization.

130. The HHS Bulletin discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.

131. Additionally, HHS has warned healthcare providers that protected information is not limited exclusively to patient portals that require a patient to log in to access a secure portion of a website. Instead, healthcare providers must also protect information on publicly accessible, non-password-protected (i.e., "unauthenticated") webpages. Citing the 2013 Final Rulemaking, HHS observed that "information that connects the individual to a regulated entity (i.e., that is indicative that the individual has received or will receive health care services or benefits from the covered entity)...relates to the individual's past, present, or future health or health care or payment for care."

132. The HHS Bulletin went on to state:

> Tracking technologies on a regulated entity's unauthenticated webpage that addresses specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

133. BMC's provision of Private Information to third parties such as Facebook and Google violated the Privacy Rule.

134. BMC is a "covered entity" under HIPAA and thus subject to the Privacy Rule.

135. BMC's use of tracking technologies violates the Privacy Rule because those technologies intercept and transmit healthcare consumers' Private Information to third parties without their authorization.

136. BMC improperly disclosed to third parties Plaintiff's and Class Members' Private Information, including information regarding (a) patient symptoms and health conditions, (b) patients' doctors, (c) appointment requests, and (d) patients' status as patients of BMC by using tracking technologies on webpages that are designed specifically for patients (including doctor searches, medical records access, and the login page for patient portals).

137. For example, by using tracking technologies on the webpages Plaintiff visited—including those containing information on doctors, medical procedures, appointment requests, and requests for medical records, BMC permitted third parties to intercept information about Plaintiff's doctors, specific treatments connected to Plaintiff, and Plaintiff's patient status, each of which is protected information under HIPAA notwithstanding that the pages are publicly accessible.

138. BMC improperly disclosed to third parties Plaintiff's and Class Members' HIPAA identifiers, including their computer IP addresses, device identifiers, web URLs visited, browser fingerprints, and other identifiers that would permit third parties such as Facebook, Google, and others to identify the individual. BMC disclosed HIPAA identifiers together with PHI, such as conditions and treatments for which consumers sought information, their status as patients, provider information, and appointment information.

139. BMC violated HIPAA by failing to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of

electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

140. BMC further violated other HIPAA regulations as follows:

(c) BMC failed to ensure the confidentiality and integrity of electronic PHI that BMC created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

(d) BMC failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

(e) BMC failed to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to BMC in violation of 45 C.F.R. § 164.308(a)(6)(ii);

(f) BMC failed to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

(g) BMC failed to protect against reasonably anticipated uses or disclosures of electronic PHI of individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3); and

(h) BMC failed to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

141. Commenting on a June 2022 report discussing the use of tracking technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[12]

142. BMC's undisclosed use of tracking technologies on their website violates Plaintiff's and Class Members' privacy rights under federal law. While HIPAA does not have a private right of

[12] 'Deeply Troubled': Security experts worry about Facebook trackers on hospital sites, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers.

action, BMC's violation demonstrates its unlawful conduct, which is relevant to other claims and establishes a breach of its duty to maintain patient privacy.

143. Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. Rather, **it is anything that conveys information—or enables an inference—about a consumer's health**. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.[13]

144. The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.

145. The federal government takes violations of health data privacy and security seriously, as reflected in several high-profile FTC settlements with healthcare providers.

146. For example, FTC enforcement actions such as "BetterHelp, GoodRx, Premom, and Flo make clear that [the use of tracking technologies] may run afoul of the FTC Act if they violate

---

[13] See Elisa Jillison, Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases, the FTC Business Blog (July 25, 2023) (emphasis added), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases.

privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[14]

147. Last year, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive personal health information with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with online counseling service BetterHelp after it had shared customer health data with Facebook and Snapchat for advertising purposes. The FTC ordered Easy Healthcare to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premon shared health data for advertising purposes.[15]

**<u>BMC Violated Industry Standards</u>**

148. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

149. The American Medical Association's ("AMA") Code of Medical Ethics creates rules protecting the privacy of patient data and communications.

150. AMA Code of Ethics Opinion 3.1.1 provides:

---

[14] *Id.* (noting further that GoodRx & Premom underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC, and, in some cases, the media, of disclosures of health information without consumers' authorization).

[15] *See How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, https://www.techtarget.com/healthtechsecurity/answer/How-FTC-Enforcement-Actions-Will-Impact-Telehealth-Data-Privacy; *see also Allison Grande, FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-underhealth-breach-rule?copied=1 ("The Federal Trade Commission signaled it won't hesitate to wield its full range of enforcement powers when it dinged GoodRx for allegedly sharing sensitive health data with advertisers, teeing up a big year for the agency and boosting efforts to regulate data privacy on a larger scale."); https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-finalapproval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-willbe-barred-sharing-health-data-advertising-under-proposed-ftc.

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)[.]

151. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been deidentified [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

152. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must: (c) Release patient information only in keeping ethics guidelines for confidentiality.[16]

153. BMC, through the conduct described in this complaint, violated the AMA Code of Medical Ethics by gathering and recording information about patients that BMC failed to keep confidential by sharing it with Facebook, Google, and other third parties without de-identifying the data or fully informing patients about the purposes for which access would be granted.

[16] AMA Principles of Medical Ethics: I, IV, Chapter 3: Opinions on Privacy, Confidentiality & Medical Records, https://code-medical-ethics.ama-assn.org/chapters/privacy-confidentiality-medical-records.

**Plaintiff and Class Members Suffered Harm from BMC's Unlawful Interceptions and Disclosures of Plaintiff's and Class Member's Private Information**

154. As a direct and proximate cause of BMC's unauthorized interceptions and disclosures of Plaintiff's and Class Member's Private Information, Plaintiff and Class Members have been damaged by BMC's conduct in the following ways:

(a) Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private, thus reducing its value to Plaintiff and Class Members;

(b) Plaintiff and Class Members face ongoing unwanted targeted advertisements based upon the improperly intercepted and disclosed Private Information;

(c) BMC denied Plaintiff and Class Members the benefit of the bargain insofar as Plaintiff and Class Members would not have used BMC's services or would have demanded compensation for BMC's use of their Private Information if they had known of BMC's practices;

(d) BMC eroded the essential confidential nature of the provider-patient relationship;

(e) General damages for invasion of Plaintiff's and Class Member's rights in an amount to be determined by a jury;

(f) Nominal damages for each independent violation;

(g) BMC took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

(h) BMC's actions violated the property rights Plaintiff and Class members have in their Private Information; and

(i) Statutory damages, where applicable (in particular, with respect to Plaintiff's and Class Members' ECPA claim).

**Class Action Allegations**

155. Plaintiff brings this action under Mass. R. Civ. Proc. 23 on behalf of herself and the Class, which includes:

> All Massachusetts residents who, while in the Commonwealth of Massachusetts, accessed any portion of the website at www.bmc.org between three years prior to the filing of the initial complaint in this action and January 25, 2023.

156. This action is properly maintainable as a class action.

157. The Class Members are so numerous that joinder of all members in a single lawsuit is impractical.

158. Common questions of law and fact exist for all Class Members, and those questions predominate over any questions solely affecting individual members of the Class. Among the predominant questions of law and fact common to the Class are:

(a) Whether communications between Class Members and BMC, through the BMC Website, were electronic communications under the ECPA;

(b) Whether BMC inserted tracking technologies into the hidden code of the BMC Website, including Google Analytics and Meta Pixel;

(c) Whether the tracking technologies inserted into the hidden code of the BMC Website are "electronic devices" as defined in the ECPA;

(d) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BMC and users of the BMC Website;

(e) Whether the computer code for tracking technologies such as Google Analytics, Meta Pixel, and others disclosed to third parties such as Google, Facebook, and others the identity of the parties to the communication, the existence of the communication, and the communications' content, substance, purport, and meaning;

(f) Whether by inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BMC installed an electronic device on its website with the intent to aid Google, Facebook, and other companies to intercept communications between the Class Members and BMC;

(g) Whether and to what extent BMC had a duty to protect the IHII and PHI of Plaintiff and Class Members;

(h) Whether BMC had duties not to disclose the IHII and PHI of Plaintiff and Class Members to unauthorized third parties;

(i) Whether the promises made in BMC's Website Privacy Policy either were or formed part of a contract between BMC and Plaintiff and Class Members;

(j) Whether BMC's disclosure of Plaintiff's and Class Members' IHII and PHI breached BMC's promises set forth in its Website Privacy and Security Policy, giving rise to liability for breach of contract;

(k) If Plaintiff prevails on the merits of her statutory or common law claims, the remedies afforded under those causes of action to Class Members, including statutory remedies, actual damages, disgorgement, attorneys' fees, and litigation disbursements.

159. Plaintiff's claims are typical of Class Members' claims because, like Plaintiff, each Class Member accessed the BMC Website and had their communications with that website secretly intercepted and transmitted to third parties without their knowledge or consent.

160. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained counsel with extensive experience prosecuting consumer class actions and who, with Plaintiff, are fully capable of, and intent upon, vigorously pursuing this action. Plaintiff has no interest adverse to the Class.

161. A class action is superior to all other available methods for this controversy's fair and efficient adjudication. Furthermore, any individual Class Member's damages are not likely substantial enough to justify the expense and burden of individual litigation. Hence, it would be impracticable for all Class Members to redress the wrongs done to them individually. There will be no difficulty in managing this action as a class action.

162. BMC has acted on grounds generally applicable to the Class, making appropriate the relief Plaintiff seeks for the Class as a whole.

**COUNT I**

**(Violation of the ECPA, 18 U.S.C. § 2511, on behalf of the Class)**

163. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

164. The ECPA, 18 U.S.C. § 2511, prohibits the intentional interception of the content of any electronic communications.

165. An individual's communications with a website constitute "electronic communications" as defined by the ECPA, 18 U.S.C. § 2510(12). The communications between Plaintiff and other Class Members and BMC, through the BMC Website, were electronic communications under the ECPA.

166. The tracking technologies inserted into the hidden code of the BMC Website, including Google Analytics and Meta Pixel, are "electronic devices" as defined in ECPA, 18 U.S.C. § 2510(5). "Electronic devices" also include (i) any devices Class Members used to access the BMC Website; (ii) Class Members' web browsers used to access the BMC Website; (iii) BMC's own computer servers; and (iv) the computer servers of third parties such as Google and Facebook which intercepted Class Members' communications with the BMC Website.

167. The computer code for tracking technologies such as Google Analytics, Meta Pixel, and others enabled Google, Facebook, and other third parties to record and disclose to Google, Facebook, and other third parties the contents of communications between BMC and users of the BMC Website, including, but not limited to, (i) information about the webpages the user visited; (ii) the precise text of search queries; (iii) the search criteria individuals used to find doctors; and (iv) the precise contents of information the individuals inputted onto forms on the website.

168. As reflected in the facts presented in this complaint, including a technical analysis of the substance of information intercepted by third parties through the tracking technologies, BMC configured both its website and the tracking technologies in a manner that revealed the contents of communications between healthcare consumers and BMC, including by using and permitting the interception of descriptive URLs (URLs that contain words that provide information on the substance of the communication between the consumer and BMC), permitting the interception of descriptions of services for which patients sought treatment, the substance of requests for information on particular doctors, and interception of the precise words used in searches inputted by healthcare consumers.

BMC also used tracking technologies on pages that would confirm to third parties such as Google and Facebook the user's likely status as BMC patients, including pages through which patients could make appointments and request medical records.

169. With respect to Plaintiff, the tracking technologies revealed information regarding the doctors, treatments, and patient status for Plaintiff by configuring the tracking technologies to reveal the substance of communications regarding searches for doctors, requests for information on particular conditions, requests for appointments, and requests for medical records through the patient portal.

170. By inserting the computer code for Google Analytics, Meta Pixel, and other tracking technologies, BMC intentionally intercepted, endeavored to intercept, and procured another person to intercept the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

171. Additionally, through the above-described tracking technologies, after BMC intercepted communications, the intercepted information was, in turn, used by third parties, such as Facebook and Google, to 1) place Plaintiff in specific health-related categories based on their past, present, and future health conditions and 2) target Plaintiff with particular advertising associated with their specific health conditions.

172. BMC facilitated the interception of communications between the Class Members and BMC, and BMC disclosed such intercepted communications to Google, Facebook, and other third parties without their knowledge or consent. Moreover, their privacy interests were violated by the interception.

173. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

174. BMC intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, violation of HIPAA and the FTC Act, as well as the other causes of action set forth in this complaint.

175. Because of BMC's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Private Information, Defendant does not qualify for the party exemption.

176. As alleged above, BMC violated a provision of HIPAA, specifically 42 U.S.C. § 1320d-6(a)(3), which imposes a criminal penalty for knowingly disclosing IIHI to a third party.

177. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-(6).

178. Plaintiff's Private Information that BMC disclosed to third parties qualifies as IIHI, and BMC violated Plaintiff's expectations of privacy and constitutes tortious and/or criminal conduct by violating 42 U.S.C. § 1320d(6). BMC used the intercepted electronic communications to increase its revenues.

179. The penalty for violating HIPAA is enhanced where "the offense is committed with intent to sell, transfer, or use IIHI for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6. BMC specifically used tracking technologies to intercept and disclose Plaintiff's and Class Members' Private Information for financial gain.

180. BMC's conduct violated 42 U.S.C. § 1320d-6 in that it: (i) used and caused to be used identifiers associated with specific patients without patient authorization; and (ii) disclosed IIHI to Facebook and other third parties without patient authorization.

181. BMC's conduct is subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because BMC's use of the Facebook source code was for BMC's commercial advantage to increase revenue from existing patients and gain new patients.

182. The ECPA (18 U.S.C. § 2520(a)) provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of the ECPA.

183. Pursuant to the ECPA, Plaintiff seeks for herself and each Class Member statutory damages of $100 for each day of BMC's violation of the ECPA for Plaintiff and each Class Member or $10,000 with respect to the Plaintiff and each Class Member, whichever is higher, plus reasonable attorneys' fees and other litigation disbursements that her counsel has incurred and will reasonably incur in prosecuting this action.

## COUNT II

**(Violation of the Massachusetts Right to Privacy Act,
M.G.L. c. 214 § 1B, on behalf of the Class)**

184. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

185. The Massachusetts Right to Privacy Act, M.G.L. c. 214 § 1B, confers a right to Massachusetts citizens against unreasonable, substantial, or serious interference with the individual's privacy and confers a private right of action for an award of damages for any violation of the statute.

186. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

187. BMC had a legal duty to adequately safeguard the confidentiality and privacy of Plaintiff's and Class Members' Private Information.

188. Plaintiff and Class Members did not authorize Defendant to disclose their IHII to Facebook, Google, or any other third party for a purpose unrelated to their medical care and treatment.

189. BMC distributed Plaintiff's and Class Members' Private Information to unauthorized third parties to market its services and increase profits, and those third parties can and did provide or permit the use of the same information to numerous other third parties (including advertisers and data brokers), and therefore, BMC's conduct reflected a public disclosure of private facts.

190. Additionally, BMC's injection of hidden code into their website that disclosed Private Information to third parties constituted an intrusion upon the seclusion of Plaintiff and Class Members by invading Plaintiff's and Class Member's private affairs—their communications with healthcare providers—in a manner that a reasonable person would deem highly offensive.

191. BMC's conduct constitutes an unreasonable and substantial invasion of Plaintiff's and Class Members' privacy, which has subjected them to unnecessary attention, stigma, and other harms.

192. Plaintiff and Class Members suffered injuries as a direct and proximate result of BMC's disclosure of their Private Information and intrusion upon Plaintiff's and Class Members' seclusion.

193. BMC's acts or omissions violate the Massachusetts Right to Privacy Act.

194. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees.

**COUNT III**

**(Breach of Fiduciary Duty, on behalf of the Class)**

195. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

196. A fiduciary relationship existed between BMC, a healthcare provider, and Plaintiff, a BMC patient. Furthermore, BMC assumed the role of a fiduciary by undertaking to collect the Private Information of Plaintiff.

197. When possessing nonpublic medical information, medical providers such as BMC have a duty to keep such information completely confidential.

198. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BMC through its website, which included highly sensitive Private Information. BMC's policies bolstered that expectation, given BMC's promises to Plaintiff that BMC would not disclose communications on the website to third parties.

199. Contrary to its duties as a healthcare provider and its express promises of confidentiality, BMC installed the tracking technologies to disclose and transmit to third parties Plaintiff's and Class Members' Private Information, including information relating to their healthcare.

200. These disclosures were made without Plaintiff's knowledge, consent, or authorization.

201. BMC's secret and unauthorized disclosures of Plaintiff's Private Information constituted a breach of BMC's fiduciary duties to Plaintiff to safeguard and protect their Private Information.

202. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*).

## COUNT IV

**(Negligence, on behalf of the Class)**

203. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

204. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, BMC owed a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

205. BMC breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

206. It was reasonably foreseeable that BMC's failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Private Information for no lawful purpose.

207. BMC's duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship between BMC and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

208. In addition, BMC had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

209. BMC's conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii)

implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

210. BMC's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted negligence at common law.

211. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees.

**COUNT V**

**(Breach of Confidence, on behalf of the Class)**

212. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

213. Medical providers have a duty to their patients to keep nonpublic medical information completely confidential and to safeguard sensitive personal and medical information. This duty arises from the implied covenant of trust and confidence that is inherent in the physician-patient relationship.

214. Medical providers also have a duty to maintain the confidentiality of Plaintiff's PHI under HIPAA and its implementing regulations.

215. When possessing nonpublic medical information, medical providers such as BMC have a duty to keep such information completely confidential.

216. Plaintiff had a reasonable expectation of privacy in the responses and communications entrusted to BMC through its website, which included highly sensitive Private Information. BMC's policies bolstered that expectation, given BMC's promises to Plaintiff that BMC would not disclose communications on the website to third parties.

217. In light of the special relationship between BMC and Plaintiff and Class Members, whereby BMC became a guardian of Plaintiff's and Class Members' Private Information, BMC became a fiduciary by its undertaking and guardianship of the Private Information to act primarily for the benefit of its patients, including Plaintiff and Class Members: (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of disclosure of their Private Information to unauthorized third parties; and (3) to maintain complete and accurate records of what patient information (and where) BMC did and does store and disclose.

218. Contrary to its duties as a medical provider and its express and implied promises of confidentiality, BMC installed tracking technologies that disclosed and transmitted to third parties Plaintiff's and Class Members' communications with BMC and the contents of those communications, including Private Information.

219. BMC made these disclosures for its own commercial purposes without Plaintiff's or Class Members' knowledge, consent, or authorization.

220. The unauthorized disclosures of Plaintiff's and Class Members' Private Information were intentionally caused by BMC's employees acting within the scope of their employment. Alternatively, the disclosures of Plaintiff's and Class Members' Private Information occurred because of BMC's negligent hiring or supervision of its employees or agents, its failure to establish adequate policies and procedures to safeguard the confidentiality of patient information, or its failure to train its employees or agents to discharge their duties under those policies and procedures properly.

221. BMC disclosed Plaintiff's and Class Members' Private Information to third parties in a manner that allowed them to identify the Plaintiff and the individual Class Members.

222. The harm arising from a breach of provider-patient confidentiality includes eroding the essential confidential relationship between the healthcare provider and the patient.

223. Accordingly, Plaintiff, individually and on behalf of members of the Class, seeks compensatory damages (including damages to compensate for the injuries described in paragraph 154, *supra*), plus costs and attorneys' fees.

**COUNT VI**

**(Breach of Contract, on behalf of the Class)**

224. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

225. BMC required Plaintiff and Class Members to provide their Private Information, including names, email addresses, phone numbers, computer IP addresses, appointment information, and other content submitted to the BMC Website as a condition of receiving healthcare services. Plaintiff's and Class Member's provision of such Private Information provided consideration for BMC's provision of services through the BMC Website, including the provision of information and the use of the website to obtain medical services.

226. In so doing, Plaintiff and Class Members entered into contracts with BMC (or, in the alternative, implied contracts) by which BMC agreed to safeguard and protect such information, in its privacy policies and elsewhere, to keep such information secure and confidential. BMC's contractual promises included that (i) BMC will "not share the contents of electronic communications with a third-party entity"; (ii) "BMC will take reasonable steps to ensure the integrity and confidentiality of personally identifiable information, which has been obtained through this website"; (iii) "Any information collected voluntarily from our website visitors…will not be sold to any third-party marketing companies"; (iv) "All personally identifiable information collected and aggregated for survey purposes will be de-identified and screened before it is shared with third-parties for analysis"; and "Online visitors utilizing [the BMC Website] do so anonymously."

227. Plaintiff and Class Members fully performed their obligations under the contract with BMC.

228. BMC breached its agreement with Plaintiff and Class Members by directly breaching its promises to collect information only anonymously and not to share information regarding website communications with third parties.

229. As a direct and proximate result of BMC's above-described breaches of contract, Plaintiff and Class Members have suffered the compromise and disclosure of their Private Information and have been denied the benefit of the bargain of their agreement with BMC.

230. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members should recover actual, consequential, and nominal damages, including without limitation the forms of damages set forth in paragraph 154, *supra,* plus costs and attorneys' fees.

**COUNT VII**

**(Unjust Enrichment, on behalf of the Class)**

231. Plaintiff incorporates the foregoing paragraphs of the complaint as if fully set forth in this count.

232. This claim is pleaded in the alternative to Plaintiff's other causes of action.

233. BMC benefits from using Plaintiff's and Class Members' Private Information and unjustly retained those benefits at Plaintiff's and Class Members' expense.

234. Plaintiff and Class Members conferred a benefit upon Defendant in the form of the monetizable Private Information that Defendant collected from them and disclosed to third parties, including Facebook and Google, without authorization and proper compensation.

235. BMC consciously collected and used this information for its own gain, providing BMC with economic, intangible, and other benefits, including substantial monetary compensation.

236. BMC unjustly retained those benefits at the expense of Plaintiff and Class Members because BMC's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

237. The benefits that BMC derived from Plaintiff and Class Members were not offered by Plaintiff or Class Members gratuitously and, thus, rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for BMC to retain any profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

238. Had BMC informed Plaintiff that it collected and shared Plaintiff's Private Information with Facebook, Google, and other third parties, Plaintiff would have refused to consent to such use of her Private Information or would have demanded compensation for such usage. Now knowing of BMC's practices, Plaintiff demands compensation for the unauthorized use of their Private Information.

239. The Court should compel BMC to disgorge into a common fund for the benefit of Plaintiff and the Class the value of all unlawful or inequitable benefits that BMC unjustly received and such other relief as the Court may deem just and proper.

## Prayers for Relief

WHEREFORE, Plaintiff prays for relief in the form of an order as follows:

a. Certifying this action as a class action under Massachusetts Rule of Civil Procedure 23, and appointing Plaintiff as class representative and her attorneys as class counsel;

b. Awarding damages (including statutory damages) to Plaintiff and Class Members;

c. Awarding attorneys' fees, expenses, and the costs of this suit, together with prejudgment and post-judgment interest at the maximum rate allowed by law; and

d. Awarding such other and further relief which the Court finds just and proper.

**Jury Demand**

Plaintiff demands a trial by jury on all claims so triable.

Dated: December 19, 2024

Respectfully submitted,

*/s/ Patrick J. Vallely*
SHAPIRO HABER & URMY LLP
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Patrick J. Vallely (BBO #663866)
One Boston Place
Suite 2600
Boston, MA 02108
(617) 439-3939 – Telephone
(617) 439-0134 – Facsimile
ehaber@shulaw.com
mblauner@shulaw.com
pvallely@shulaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on December 19, 2024

*/s/ Patrick J. Vallely*
Patrick J. Vallely

I HEREBY ATTEST AND CERTIFY ON January 21, 2025 THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: Margaret M Buckley
Asst. Clerk

Date Filed 1/14/2025 6:52 PM
Superior Court - Suffolk
Docket Number 2384CV01086

ML

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV01086 BLS1

ELIZABETH NOVA, for herself and the Class,

*Plaintiff,*

v.

BOSTON MEDICAL CENTER CORPORATION,

*Defendant.*

**NOTICE OF FILING OF NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

**TO THE CLERK OF THE COURT AND ALL PARTIES OF RECORD:**

**PLEASE TAKE NOTICE** that defendant Boston Medical Center Corporation ("BMC") has removed the above-titled action from the Suffolk County Superior Court to the United States District Court for the District of Massachusetts. The Notice of Removal was filed in the United States District Court for the District of Massachusetts on January 14, 2025.

A copy of the Notice of Removal and supporting documents filed in the United States District Court for the District of Massachusetts is attached as **Exhibit A** to this Notice, has been served on plaintiff, Elizabeth Nova, and is fully incorporated herein by this reference, thus effecting removal pursuant to 28 U.S.C. § 1446(d). Accordingly, this Court may proceed no further unless and until the case is remanded. *See* 28 U.S.C. § 1446(d).

Dated: January 14, 2025

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
**ROBINSON & COLE LLP**
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

## CERTIFICATE OF SERVICE

I, Wm. Maxwell Daley, hereby certify that, on this 14th day of January, 2025, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

[signature]
Wm Maxwell Daley

I HEREBY ATTEST AND CERTIFY ON January 21, 2025, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT
BY: [signature]
Asst. Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ELIZABETH NOVA, for herself and the Class,** *Plaintiff,* | |
| **v.** | **C.A. NO.:** ________________ |
| **BOSTON MEDICAL CENTER CORPORATION,** *Defendant.* | |

**NOTICE OF REMOVAL**

Defendant Boston Medical Center Corporation ("BMC"), by and through its undersigned counsel, hereby files this Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1367, 1441, and 1446. After the Massachusetts Supreme Judicial Court gutted Plaintiff, Elizabeth Nova's central theory of liability in this action—declaring that, as a matter of law, the Massachusetts Wiretap Act does not apply to the subject matter of Plaintiff's claims, *Vita v. New England Baptist Hosp.*, 494 Mass. 824, 825 (2024)—she filed an Amended Complaint on December 19, 2024 (the "Amended Complaint"), which turns course and purports to state a claim against BMC under a federal statute, the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), et seq. (the "ECPA"). This Court has original, federal-question jurisdiction over this action pursuant to § 1331, because the Amended Complaint purports to state a claim under the ECPA. Accordingly, and as set forth in further detail below, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, supplemental jurisdiction over the remaining claims pursuant to § 1367, and removal is otherwise proper under 28 U.S.C. §§ 1441 and 1446. In support of this Notice, BMC states as follows:

# I. BACKGROUND AND PROCEDURAL HISTORY

## A. THE STATE COURT ACTION

1. Plaintiff originally commenced a civil action on May 10, 2023, by filing her Complaint (the "Complaint") in the Massachusetts Superior Court for Suffolk County, captioned as *Elizabeth Nova v. Boston Medical Center Corporation*, Case No. 2384-CV-01086 (the "State Court Action"). The Complaint names BMC as the only defendant.

2. BMC moved to dismiss the original Complaint, which was denied. After orders denying similar motions to dismiss in companion cases against other hospitals were reported to the Massachusetts Appeals Court—with the SJC eventually exercising discretionary jurisdiction to hear a direct appeal—the State Court Action was stayed by the presiding judge on November 10, 2023, pending the resolution of the two, then-pending appeals in *Vita v. Beth Israel Deaconess Medical Center, Inc.* (No. 2384CV00480-BLS1; No. SJC-13542) and *Vita v. New England Baptist Hospital* (No. 2384CV00857-BLS1; No. SJC-13542).

3. Subsequently, on October 24, 2024, the SJC issued its decision in the consolidated appeals, finding that the plaintiff's Massachusetts Wiretap Act claim failed as a matter of law. *Vita*, 494 Mass. at 825, 243 N.E.3d at 1188 ("[w]e therefore cannot conclude, in 'the absence of an express textual provision or an indication of legislative intent,' that browsing and other similar website interactions of the kind [plaintiff] alleges she engaged in on the hospitals' websites are 'wire communication[s]' under the wiretap act").

4. After the SJC issued the *Vita* decision, Plaintiff filed the Amended Complaint in the Massachusetts Superior Court, abandoning her claims under the Massachusetts Wiretap Act and asserting a number of other claims for the first time in this litigation, including her ECPA claim.

5. BMC has assembled a copy of the state-court docket and all process, pleadings, and orders served on BMC in the State Court Action, a copy of which is attached hereto as **Exhibit A** and made a part hereof.

6. While the matter originally proceeded in state court, this Notice of Removal is timely filed because Plaintiff filed the Amended Complaint on December 19, 2024, within the last thirty days, which includes the federal, ECPA claim, thereby triggering the federal question jurisdiction of this Court. *See* 28 U.S.C. § 1446(b)(3) ("if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable"); *Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 72 (1st Cir. 2014) ("Section 1446(b)'s thirty-day clocks are triggered only when the *plaintiffs'* complaint or *plaintiffs'* subsequent paper provides the defendant with sufficient information to easily determine that the matter is removable" (emphasis in original)).

7. Given that Plaintiff only recently amended the operative pleading in this action to include a federal claim and because is BMC filing this Notice of Removal within thirty days of the filing of the Amended Complaint, this Court has jurisdiction over the claims made in this action pursuant to 28 U.S.C. § 1331, 1367, 1441.

## B. PLAINTIFF'S CLAIMS

8. In the Amended Complaint, Plaintiff alleges that Boston Medical Center used third-party code on its publicly-available website, www.bmc.org (the "Website"), and that this code caused the transmission of metadata containing search terms used and mouse clicks to third parties,

such as Meta and Google (entities that are not named as defendants in this action). Am. Compl., ¶¶ 48–49, 57–59.

9. Plaintiff alleges that she is a patient of BMC and has used the Website to obtain information about doctors, procedures and hours, schedule appointments and review information on MyChart. *Id.* ¶ 12. She claims that BMC implemented "various tracking technologies"—specifically "Meta Pixel," "Google Analytics," "Siteimprove Analytics" and "New Relic Browser Monitoring"—on the Website that allegedly caused the interception and transmission of web browsing activities to third parties for commercial purposes, like "personalized advertisements to healthcare consumers." *Id.* ¶ 1–2, 13, 65–67, 114.

10. The data allegedly tracked on the Website includes: words typed into a search box or search form on the Website, *id.* at ¶ 94; "the URL of the webpage visited, the title of the webpage visited, and data reflecting additional detail on the contents of each particular webpage," ¶ 79; the IP address of a web user's computer, ¶ 60; and, if a web user clicked the "Request an Appointment," ¶ 83, "Find a Doctor," ¶ 96 "Billing Payment," ¶ 103, "Request Medical Records," ¶ 106, or "Log in to MyChart" links, ¶ 112, the fact that such a click on the hyperlink occurred. Plaintiff also alleges, in a conclusory manner, that when the IP address of a computer accessing the Website is tracked, third parties purportedly *may* be able to associate the computer with an individual's Facebook or Google account, *if* the individual is "known to" Google or Facebook. *Id.* at ¶¶ 2, 74. Plaintiff does not allege that anyone's confidential identifiable medical information (like an individual's communications with medical providers, his or her medical records, or test results) are disclosed to any third party. *See generally* Am. Compl.

11. Rather than alleging a single instance where the code on BMC's Website caused metadata derived from Plaintiff's computer's interactions with BMC's Website to be transmitted

to third parties, Plaintiff merely alleges only that she used the BMC Website for various purposes and then walks the reader through a speculative series of hypotheticals. *Id.* at ¶¶ 86–114. Plaintiff's Amended Complaint makes crystal clear that these hypothetical examples "do not necessarily reflect webpages Plaintiff personally visited" and she only vaguely suggests that she had "similar" interactions with the Website. *Id.* at ¶ 84.

12. Based on the foregoing allegations, the Amended Complaint asserts seven causes of action against BMC: Count I–an ECPA claim, ¶¶ 163–83; Count II–a claim under the Massachusetts Right to Privacy Act, G.L. c. 214 § 1B, ¶¶ 184–94; Count III–breach of fiduciary duty, ¶¶195–202; Count IV–negligence, ¶¶ 203–211; Count V–breach of confidence, ¶¶ 212–23; Count VI–breach of contract, ¶¶ 224–30; and Count VII–unjust enrichment, ¶¶ 231–39. Plaintiff seeks damages, attorneys' fees, and costs. *Id.* at pp. 79–80.

## II. VENUE

13. Venue is proper in this Court, because it is the district embracing the place where the State Court Action is pending. 28 U.S.C. § 1441(a); *see also Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 666 (1953).

## III. BASIS FOR REMOVAL

14. 28 U.S.C. § 1441(a) states that:

> any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant [to a federal court].

15. Section 1331 provides that this Court "shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Under § 1367(a), the Court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article

III of the United States Constitution." Given that the Amended Complaint purports to state a claim under a federal statute for the first time, BMC's removal is timely because it is being done "within 30 days after receipt of the . . . . amended pleading." 28 U.S.C. 1446(b)(3). Consistent with the foregoing and as expounded on below, this Court has jurisdiction over all of Plaintiff's claims alleged in the Amended Complaint, and the removal is timely.

### A. The Amended Complaint Presents a Federal Question and the Court has Supplemental Jurisdiction Over the Remaining Claims

16. Plaintiff's Amended Complaint asserts a violation of the ECPA. Given that one of Plaintiff's claims therefore "aris[e] under the . . . laws . . . of the United States," this Court has original jurisdiction over this action and supplemental jurisdiction over the remaining claims. *See* 28 U.S.C. §§ 1331, 1367.

17. Federal question jurisdiction grants federal district courts original jurisdiction over cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Determination of federal question jurisdiction normally depends upon analysis of the "well-pleaded complaint" rule. *See Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983). That rule generally provides that:

> a defendant may not remove such a case to federal court unless the plaintiff's complaint establishes that the case "arises under" federal law within the meaning of § 1331 . . . .

*Id.* at 2. Essentially, the "well-pleaded complaint" rule means that a case may be removed only if the plaintiff could have brought the case originally in federal court asserting a federal claim. *See id.*; *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986). *See also R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt.*, 585 F.3d 42, 48 (1st Cir. 2009) ("[A] plaintiff's well-pleaded complaint must exhibit, within its four corners, either an explicit federal cause of action

or a state-law cause of action that contains an embedded question of federal law that is both substantial and disputed.").

18. Here, Plaintiff expressly alleges a claim under the ECPA, Am. Compl., ¶¶ 163–83. Given that the ECPA is a federal statute—and Plaintiff's theory of liability further relies on the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), *id.* ¶¶ 118–47—this case clearly invokes the Court's federal question jurisdiction under § 1331. *See Thompson v. Evolve Bank & Tr.*, 728 F. Supp. 3d 202, 206 (D. Mass. 2024) (Guzman, J.) ("Plaintiff's Complaint clearly asserts . . . claims that arise under federal law" where plaintiff alleged violation of federal statutes); *Vigier v. Marin*, 568 F. Supp. 2d 193, 195 (D.P.R. 2008) ("A state-court suit that includes at least one claim 'arising under the Constitution laws, or treaties of the United States' can be removed to federal court"). This Court is therefore bound to exercise jurisdiction over Plaintiff's ECPA claims. *See Ortiz-Bonilla v. Federacion de Ajedrez de Puerto Rico, Inc.*, 734 F.3d 28, 36 (1st Cir. 2013) ("[plaintiffs'] federal question appears on the face of their request," and "[a]ccordingly, the federal courts must entertain the suit").

19. The Court also has supplemental jurisdiction over Plaintiff's remaining claims in the Amended Complaint. When deciding if supplemental jurisdiction is proper, federal courts examine whether, as compared to the federal law claims, the state law claims "derive from a common nucleus of operative fact." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165, (1997). Courts have discretionary, supplemental jurisdiction over a plaintiff's common law claims where they are tied to the same set of operative facts as the federal claim. *See Rodriguez v. FastMed Urgent Care, P.C.*, 2024 WL 3541582, at *6 (E.D.N.C. July 24, 2024) (noting that the court has "jurisdiction over count one[, ECPA,] under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims . . . because they arose from the same

nucleus of operative fact"); *Cedar Hill Assocs., Inc. v. Paget*, 2005 WL 3430562, at *1 (N.D. Ill. Dec. 9, 2005) (similar)).[1] Here, Plaintiff's ECPA claims and claims made under Massachusetts state law are based on the same nucleus of operative fact.

20. For example, Plaintiff's ECPA claim asserts that BMC's alleged use of web beacons (like Meta Pixel or Google Analytics) purportedly constituted a violation of the ECPA. *See* Am. Compl., ¶¶ 163–83. Likewise, her remaining common law and statutory claims are all premised on that *same alleged use of web beacons* on BMC's Website—relying on that conduct to assert her individual claims. *See, e.g.*, *id.* ¶¶ 184–94 (Plaintiff's Massachusetts Right to Privacy Act claim relying on the alleged use of web beacons to assert a claim); ¶¶ 195–202 (similar with respect to the breach of fiduciary duty claim); ¶¶ 203–211 (similar with respect to Plaintiff's negligence claim); ¶¶ 212–23 (similar for Plaintiff's breach of confidence claim); ¶¶ 224–30 (similar with regard to the breach of contract claim); ¶¶ 231–39 (similar as it relates to the claim for unjust enrichment). As a result, the Court's supplemental jurisdiction under § 1367 is invoked by the non-federal claims asserted in the Amended Complaint. *See Rodriguez*, 2024 WL 3541582, at *6 (reaching a similar conclusion for similar web beacon claims).

21. Accordingly, the Court has jurisdiction over all of the claims at issue in this litigation pursuant to 28 U.S.C. §§ 1331, 1367, making removal proper.

### B. REMOVAL IS TIMELY BECAUSE PLAINTIFF ADDED THE FEDERAL CLAIMS WITHIN THE LAST THIRTY DAYS

22. Under 28 U.S.C. § 1446(b)(3), "if the case stated by the initial pleading is not removable, a notice of removal may be filed within 30 days after receipt by the defendant, through

[1] In *Rodriguez*, the court dismissed the plaintiff's ECPA claims for failure to state a claim under Rule 12(b)(6). *See id.*

service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."[2]

23. Here, Plaintiff's original Complaint did not assert any federal claims. However, Plaintiff served a copy of the Amended Complaint on BMC on December 19, 2024, which, for the first time, stated a claim under the ECPA and relied on HIPAA in an attempt to state a claim under the ECPA. Given that this Notice is being filed within thirty days of Plaintiff's service of the Amended Complaint, removal is timely under § 1446(b)(3). *See id.*; *Yerton v. New Mexico*, 2001 WL 37124878, at *2 (D.N.M. Sept. 13, 2001) ("There is no time limit on the removal of a federal question case").

## IV. CONCLUSION

24. A copy of this notice of removal is being served upon all known counsel of record in accordance with 28 U.S.C. § 1446(d).

25. As required by 28 U.S.C. § 1446(a) and Local Rule 81.1(a), a copy of the docket from the State Court Action, along with a copy of all process, pleadings, and orders served on BMC is attached hereto as **Exhibit A.**[3]

26. In accordance with 28 U.S.C. § 1446(d), a copy of this Notice is being filed in the State Court Action so that the Clerk of Court for the Superior Court of Suffolk County, Massachusetts will have notice of the removal, which is attached hereto as **Exhibit B**.

**WHEREFORE**, pursuant to 28 U.S.C. §§ 1441, 1446, 1331 and 1367, Defendant Boston Medical Center Corporation requests that this action be removed from the Superior Court of

---

[2] Section 1446(b)(3) includes an exception, expressly provided for in 1446(c), but it only applies where jurisdiction is based on diversity under § 1332, which is not the case here.

[3] If certified or attested copies are not available, BMC will timely comply with and Local Rule 81.1(a) by filing those documents within 28 days after filing this Notice.

Suffolk County, Massachusetts to the United States District Court for the District of Massachusetts, and that this Court enter such further orders as may be necessary and appropriate.

Dated: January 14, 2025

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

*Wystan M. Ackerman*
Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley BBO #694729
**ROBINSON & COLE LLP**
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

# EXHIBIT A

## STATE COURT DOCKET ALONG WITH A COPY OF ALL PROCESS, PLEADINGS, AND ORDERS SERVED ON BMC

# 2384CV01086 Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation

- Case Type:
- Business Litigation
- Case Status:
- Open
- File Date
- 05/10/2023
- DCM Track:
-
- Initiating Action:
- Fraud, Business Torts, etc.
- Status Date:
- 05/10/2023
- Case Judge:
-
- Next Event:
- 01/15/2025

All Information | Party | Event | Docket | Disposition

## Party Information

**Nova, For Herself And The Class, Elizabeth**
- Plaintiff

**Alias**

**Party Attorney**
- Attorney
- Blauner, Esq., Michelle H
- Bar Code
- 549049
- Address
- Shapiro Haber and Urmy LLP
One Boston Place
Boston, MA 02108
- Phone Number
- (617)208-4713
- Attorney
- Vallely, Esq., Patrick
- Bar Code
- 663866
- Address
- Shapiro Haber and Urmy LLP
One Boston Place
Suite 2600
Boston, MA 02108
- Phone Number
- (617)439-3939

More Party Information

**Boston Medical Center Corporation**
- Defendant

**Alias**

**Party Attorney**
- Attorney
- Ackerman, Esq., Wystan Michael
- Bar Code
- 651086
- Address
- Robinson and Cole LLP
One State St
Hartford, CT 06103
- Phone Number
- (860)275-8200
- Attorney
- Daley, Esq., William Maxwell
- Bar Code
- 694729
- Address
- Robinson and Cole LLP
One Financial Plaza

14th Floor
Providence, RI 02903
- Phone Number
- (401)709-3335
- Attorney
- Freedman, Esq., Linn Foster
- Bar Code
- 639564
- Address
- Robinson and Cole LLP
One Financial Plaza Suite 1430
Providence, RI 02903
- Phone Number
- (401)709-3353

**More Party Information**

## Events

| Date | Session | Location | Type | Event Judge | Result |
|---|---|---|---|---|---|
| 10/05/2023 02:30 PM | Business Litigation 1 | BOS-10th FL, CR 1015 (SC) | Rule 12 Hearing | Kazanjian, Hon. Helene | Held - Under advisement |
| 01/15/2025 11:00 AM | Business Litigation 1 | BOS-10th FL, CR 1015 (SC) | BLS Rule 16 Litigation Control Conference | Krupp, Hon. Peter B | |

## Docket Information

| Docket Date | *Docket Text* | File Ref Nbr. | *Image Avail.* |
|---|---|---|---|
| 05/10/2023 | Complaint electronically filed. | 1 | Image |
| 05/10/2023 | Civil action cover sheet filed. | 2 | Image |
| 05/10/2023 | Plaintiff Elizabeth Nova, For Herself And The Class's Motion to appt spec process server | 3 | Image |
| 05/17/2023 | Endorsement on Motion to Appoint Special Process Server (#3.0): ALLOWED (dated 5/17/2023) notice sent via email 5/17/2023 | | Image |
| 05/17/2023 | Endorsement on Motion to appoint Special Process Server (#3.0): ALLOWED (Dated 5/15/2023) Notice sent 5/17/2023 | | Image |
| 05/23/2023 | Party(s) file Stipulation<br>Regarding Acceptance of Service and Defendant's Time to Respond to the complaint<br><br>Applies To: Nova, For Herself And The Class, Elizabeth (Plaintiff); Boston Medical Center Corporation (Defendant) | 4 | Image |
| 05/30/2023 | Endorsement on Stipulation in regards to acceptance of service and Defendant's time to respond to the complaint (#4.0): No Action Taken<br>Defendants shall answer or otherwise respond to the complaint by 6/21/2023.<br>(Dated 5/25/2023) Notice sent 5/30/2023 | | Image |
| 06/21/2023 | Defendant Boston Medical Center Corporation's Notice of Motion to Dismiss | | Image |
| 06/30/2023 | Plaintiff, Defendant Elizabeth Nova, For Herself And The Class, Boston Medical Center Corporation's Joint Motion of<br>Regarding Page Limits for Opposition and Reply om Motion to Dismiss | 5 | Image |
| 07/28/2023 | Endorsement on Motion for opposition and reply on Motion to dismiss (#5.0): DENIED<br>(Dated 7/26/2023)<br>Notice sent 7/28/23 | | Image |
| 08/11/2023 | Defendant Boston Medical Center Corporation's Motion to dismiss the complaint under Mass. R. Civ. P. 12(b)(1) AND (6) | 6 | Image |
| 08/11/2023 | Boston Medical Center Corporation's Memorandum in support of its motion to dismiss | 7 | Image |
| 08/11/2023 | Exhibits/Appendix | | Image |
| 08/11/2023 | Opposition to defendant's motion to dismiss filed by Elizabeth Nova, For Herself And The Class | 8 | Image |

| Docket Date | Docket Text | File Ref Nbr. | Image Avail. |
|---|---|---|---|
| 08/11/2023 | Reply/Sur-reply<br>in further support of its motion to dismiss<br>Applies To: Boston Medical Center Corporation (Defendant) | 9 | Image |
| 08/11/2023 | Affidavit of compliance with superior court rule 9A | | Image |
| 08/11/2023 | Defendant Boston Medical Center Corporation's Submission of Rule 9A Notice of filing | | Image |
| 08/29/2023 | Attorney appearance electronically filed. | | Image |
| 08/29/2023 | Attorney appearance electronically filed. | | Image |
| 08/29/2023 | Attorney appearance electronically filed. | | Image |
| 08/29/2023 | Attorney appearance electronically filed. | | Image |
| 08/29/2023 | Attorney appearance electronically filed. | | Image |
| 08/29/2023 | Attorney appearance<br>On this date Wystan Michael Ackerman, Esq. added for Defendant Boston Medical Center Corporation | | |
| 08/29/2023 | Attorney appearance<br>On this date Linn Foster Freedman, Esq. added for Defendant Boston Medical Center Corporation | | |
| 08/29/2023 | Attorney appearance<br>On this date William Maxwell Daley, Esq. added for Defendant Boston Medical Center Corporation | | |
| 10/05/2023 | Matter taken under advisement: Rule 12 Hearing scheduled on:<br>10/05/2023 02:30 PM<br>Has been: Held - Under advisement<br>Hon. Helene Kazanjian, Presiding<br>Staff:<br>Gloria Brooks, Assistant Clerk Magistrate | | |
| 11/10/2023 | Endorsement on Motion to dismiss the complaint under Mass. R. Civ. P. 12(b)(1) AND (6) (#6.0): DENIED<br>The motion to dismiss is DENIED without prejudice to be renewed following a decision from the appeals court on Dockets 2384CV480-BLS1 and 2384CV857-BLS1, which cases have been reported pursuant to Mass. R. Civ. P. 64. All further proceedings in this case are stayed pending the outcome of the reported cases.<br>(Dated: 11/9/23)0<br>Notice sent 11/14/23 | | Image |
| 12/19/2024 | Amended: amended complaint filed by Elizabeth Nova, For Herself And The Class | 10 | Image |
| 01/06/2025 | The following form was generated:<br>Notice to Appear - BLS was generated and sent to:<br>Plaintiff: Michelle H Blauner, Esq. mblauner@shulaw.com<br>Plaintiff: Patrick Vallely, Esq. pvallely@shulaw.com<br>Defendant: Wystan Michael Ackerman, Esq. wackerman@rc.com<br>Defendant: Linn Foster Freedman, Esq. lfreedman@rc.com<br>Defendant: William Maxwell Daley, Esq. wdaley@rc.com<br>Sent On: 01/06/2025 13:25:32 | | |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Pending | | |

VM

# Exhibit A

29:1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM, HEALTH INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

Defendants.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2: 44
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals")[1] move under Massachusetts Rule of Civil Procedure 12(b)(6) ("Rule 12") to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. Plaintiffs have filed a 111-

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

page, 419-paragraph First Amended Complaint ("FAC"), replete with graphics, flowcharts, links to YouTube videos, snippets of code, and digressions from academic articles.[2] In fact, Plaintiffs spend 73 pages before even trying to allege a single cause of action against the Hospitals, inveighing against Google, Facebook, a hodgepodge of lesser-known companies, and the way the Internet generally functions. (Indeed, Plaintiffs' counsel, Simmons Hanly Conroy, sues these non-profit hospitals after suffering dismissal of a similar suit against Facebook itself, and a group of other hospitals, in California.) With this bulk of extraneous material, Plaintiffs seek to obscure their fundamental failings and proceed into costly class discovery, threatening non-profit hospitals with millions in damages. They cannot do so. Even assuming all their factual allegations to be true, the FAC does not "raise a right to relief above the speculative level." Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008) (adopting the Fed. R. Civ. P. 12 standard set forth in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 558 (2007)). To the contrary, a close examination of the allegations and the law compels dismissal.

## I. SUMMARY OF ARGUMENT

Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99 ("Wiretap Act"). To the contrary, the FAC and referenced documents show that the Hospitals extensively disclosed what everyone already knows – that websites in 2019 use third-party cookies. Further, the actions that Plaintiffs describe in their FAC do not amount to "interception" at all.

[2] To say Plaintiffs' initial filings are voluminous is an understatement. Plaintiffs have filed: (i) two complaints, the first was fifty pages and 218 paragraphs, and the second is over one hundred pages and four hundred paragraphs (without any change in the underlying facts); (ii) two motions for preliminary injunction and memoranda in support; and (iii) two affidavits by their expert, totaling over one-hundred pages.

Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy" as required to recover under G.L c. 214, § 1B ("Invasion of Privacy"). The Hospitals' disclosures, incorporated by reference in the FAC, amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients. To sustain such a claim, the Court would have to create a new fiduciary duty under Massachusetts law. Members of the public engaging with general informational websites is certainly not compelling grounds upon which to build such a duty.

Lastly, Plaintiffs fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are non-profit, charitable institutions and by offering publicly-available informational websites they are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally-cognizable injury.

## II. FACTUAL ALLEGATIONS AND FACTS SUBJECT TO JUDICIAL NOTICE

### A. The Hospitals' Non-Profit Status Is Subject to Judicial Notice

Plaintiffs accuse the Hospitals of violating patient privacy for economic gain. Plaintiffs are wrong. The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. The Hospitals' non-profit status is a fact subject to judicial notice. That status is a "fact that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction," and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Mass. G. Evid., § 201(b). For example, the Secretary

of the Commonwealth maintains records of the status of non-profit (and for profit) corporations;[3] and the Office of the Attorney General maintains a registry of non-profit entities in the state.[4] The Hospitals' non-profit status is listed on each of these sources. Therefore, the Court can take judicial notice of that non-profit status, even at this stage. Mass. G. Evid., § 201(c) ("A court may take judicial notice at any stage of the proceeding, whether requested or not[.]").

**B. Hospital Website Disclosures Incorporated By Reference**

The FAC cites continuously to websites maintained by the Hospitals. These include massgeneral.org, brighamandwomen's.org, and dana-farber.org (the "Informational Websites"). The FAC not only references these websites, but provides multiple screenshots. Therefore, the disclosures made on each of these sites is incorporated by reference and subject to the Court's notice on this Motion. See, e.g., Martin v. Lefkowitz, 93-7454, 1994 Mass. Super. LEXIS 37, at *6 (Aug. 3, 1994) (granting motion to dismiss after giving defendants the benefit of documents incorporated by reference into the complaint).

**1. The Hospitals' Websites' Disclosures Make Clear Their Informational Nature**

The Informational Websites each provide disclaimers about the nature of the websites themselves. For example, MGH states on its Informational Website: "Disclaimer: The Massachusetts General Hospital website is intended to provide general educational information and to help users more easily access information about health care services at Mass General."

---

[3] SEC. OF THE COMMONWEALTH OF MASS., CORPORATIONS DIV., SEARCH FOR A BUSINESS ENTITY, http://corp.sec.state.ma.us/corpweb/corpsearch/CorpSearch.aspx (last visited Sept. 10, 2019).
[4] OFFICE OF THE MASS. ATT'Y GEN., NON-PROFITS & CHARITIES DOCUMENT SEARCH, http://www.charities.ago.state.ma.us/charities/ (last visited Sept. 10, 2019).

TERMS OF USE, https://www.massgeneral.org/notices/terms-of-use.aspx (last visited Sept. 10, 2019).

Brigham and Women's Hospital's Informational Website states:

> The Brigham and Women's Hospital (BWH) web site is intended to provide general educational information and to help users arrange more easily for health care services...This site is not an attempt to practice medicine or provide specific medical advice . . . . Use of programs on the BWH site does not establish a doctor-patient relationship.

DISCLAIMER, https://www.brighamandwomens.org/about-bwh/disclaimer (last visited Sept. 10, 2019).

DFCI's Informational Website states:

> The Dana-Farber Cancer Institute website is intended to provide general information about the Institute, its care and research programs, and about cancer and related diseases. This site also provides links to health information that may be written by Dana-Farber staff or by outside providers, and access (links) to some external websites for your convenience . . . . This site is not an attempt to practice medicine or provide specific medical advice, nor does the use of the site establish a doctor-patient relationship.

LEGAL STATMENTS, https://www.dana-farber.org/legal-statements/ (last visited Sept. 10, 2019).

**2. The Informational Websites Make Any Necessary Privacy Disclosures**

On any fair reading, the Informational Websites disclose an active web environment, with data being gathered automatically and subject to analysis, potentially with the help of third parties. For example, MGH affirmatively states:

> The Mass General websites use "cookies", tracking pixels and related technologies. Cookies are small data files that a website can transfer to your computer. Examples of information we collect include how often someone visits our site and what they do while on our site. We use this information in the aggregate to understand how our visitors as a group use different resources and to help us improve our site. We also collect information about the activity of individual website users. This information may be used to target related Mass General advertisements to you on other third-party sites.

WEBSITE PRIVACY POLICY, https://www.massgeneral.org/notices/privacy/websiteprivacy.aspx (last visited Sept. 10, 2019). Similarly, the BWH privacy policy discloses:

> The Brigham and Women's website[s] use web analytics, tag management services, and remarketing tools provided by Google, Inc. ("Google") and other third parties to collect certain information relating to your use of the website. Google Analytics uses "cookies", which are text files placed on your computer, and tags (such as tracking codes and event codes) to help us analyze how users use different resources and to help us improve our site. This information may also be used to target related Brigham and Women's Hospital advertisements to you on other third-party sites.

WEBSITE CONTENT AND PRIVACY POLICY, https://www.brighamandwomens.org/about-bwh/privacy (last visited Sept. 10, 2019). Both provide a link to opt out of interest-based advertising.

Likewise, DFCI discloses the use of cookies "to track traffic coming to our site." DANA-FARBER WEBSITE PRIVACY STATEMENT, https://www.dana-farber.org/privacy-policy/ (last visited Sept. 10, 2019). Thus, the Hospitals' Informational Website policies clearly disclose the use of cookies and other tracking tools.

**C. The First Amended Complaint Is Overstuffed with Irrelevant Red Herrings**

The First Amended Complaint starts with a quote from a speech by an executive of one of the Hospitals. In this quote, she is discussing the values of the organization, and promoting privacy. In that context, she states that "[t]he trust and the confidence that you place in your potential or existing health care provider is sacred." *FAC*, Ex. 1.[5] The Hospitals, of course, stand by that quote and act accordingly. But the First Amended Complaint does not say what legal relevance this quote has and, without offering any support to the contrary, misappropriates and weaponizes it against well-meaning Hospitals.

---

[5] All "¶" references are to the FAC unless otherwise noted.

As an initial matter, Plaintiffs patently misstate the purpose and functionality of the Informational Websites. The Informational Websites are sources of information about the Hospitals, recent medical news and research, events, and other health-related issues.[6] Plaintiffs attempt to augment this reality with phrases like "the precise content of the patient's communication" (¶¶ 12, 14, 16), implying the false narrative that visitors are able to communicate directly with medical professionals through the Informational Websites as opposed to the reality that visitors are merely navigating through publicly-available materials. Plaintiffs contend, for example, that the Informational Websites "are designed for patient communications, including . . . signing up [for] and signing in to a personal patient portal" (¶ 30), and that clicking a link from each of the Informational Websites is all that is required to sign up and sign in (¶¶ 103-11). This clever wordplay obscures the fact that the Informational Websites merely provide a link to a separate website, where one may sign up or sign in – a fact that Plaintiffs concede later in the FAC. See ¶ 146 (belatedly referencing a "specific webpage within [a Partners] website that contained the Patient Portal log-in").[7]

The FAC also generally maintains the fiction that every person who visits the Informational Websites is, in fact, a patient. ¶¶ 29-30. The websites on their face make clear that their purpose

---

[6] While the Hospitals respect that, for the purposes of a Motion to Dismiss, they must accept all well-pled allegations as true, it is notable that Plaintiffs misrepresent the functionality of the Informational Websites (see, e.g., ¶ 30), which only provide visitors with *information about* actions such as payment and accessing the patient portal, not the ability to complete those tasks. In fact, the Informational Websites direct visitors to Hospital personnel and/or a separate online resource for direct communications with doctors and other functions related to their actual medical care or records.

[7] Although Partners need not respond to the contention in ¶ 146 that any action taken by that separate website – which is used for a distinct purpose from the Informational Websites and against which Plaintiffs raise no allegations – was related to the instant suit (in fact, it was not), it is absurd to suggest that the Informational Websites be treated the same as a patient login portal.

is to provide information to the public at large – for example, providing a history of the institutions, the offerings at each facility, and information about various health issues, among other content. Further, those websites expressly disclaim the creation of a patient relationship, and there is nothing unique about a patient's interaction with any of the Informational Websites as compared to that of a member of the public at large. Critically, Plaintiffs do not allege (nor could they) that the Hospitals know whether the visitors to their Informational Websites are patients, medical professionals, medical students, employees, or other members of the public.

The FAC spends dozens of pages describing the general business practices of third parties not named as defendants in this action, only vaguely relating these practices to the instant claims. Plaintiffs never explain how the Hospitals would be liable for the business model of these third parties. For example, Plaintiffs speculate that Facebook may have tools that allow it to scrape appointment request forms from the Hospitals' websites, but admit "Plaintiff is without knowledge whether Mass General and Partners have actually implemented form-scraping functionality." ¶ 123.

Further, Plaintiffs surmise that Facebook and Google cookies may be synched up in a nefarious tracking scheme on the Hospitals' respective websites, but admit that without further discovery, "it is impossible to know whether and how much data is disclosed to Facebook through this method." ¶ 176. Without any supporting facts, Plaintiffs allege that tag manager tools are deployed as "invisible tracking" (¶¶ 63-64); then, they concede, in the following paragraph, that tag managers improve website functionality (¶ 65). The continuing implication is that Plaintiffs need to engage in full-scale discovery to determine whether there is any merit to their claims against the Hospitals; but, the reality is that Plaintiffs want to start a fishing expedition targeting

these non-defendant third parties, without sufficiently alleging that it would result in any liability against the Hospitals.

**D. Almost Nothing in The FAC is Actually About Plaintiffs**

By contrast, John Doe and Jane Doe, the supposed parties in interest, barely appear in their own FAC. Fewer than a dozen of the 419 paragraphs concern John Doe or Jane Doe, as opposed to the countless allegations that if "a patient" were to do this or that, the Informational Websites would respond in such and such a way. ¶ 25. Plaintiffs make no allegations about the privacy settings they deployed on their own Internet browsers, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

The FAC alleges in a conclusory fashion that "Defendants disclosed Plaintiffs John Doe's and Jane Doe's communications, including patient status and personally identifiable information associated with these communications to third parties," and were, thereby, compensated "in the form of enhanced marketing services." ¶¶ 294-95. Plaintiffs do not identify what "personally identifiable information" was disclosed to third-parties, and deliberately use the term "compensate" to create the misleading impression that the Hospitals received money in connection with the allegations in the FAC. But, Plaintiffs stop short of actually making any such allegation. There is no allegation, nor could there be one in good faith, that any of the Hospitals received financial remuneration in connection with the operation of their Informational Websites.

The FAC does not allege with whom John Doe's or Jane Doe's information was shared, by which Hospital, or for what purpose. FAC Paragraphs 95-101 criticize browser fingerprinting, in general, but the FAC does not allege that John Doe's or Jane Doe's browser was fingerprinted. Long sections of the FAC concern appointment schedulers and how the Informational Websites can be searched ("queries"), but neither John Doe nor Jane Doe alleges that they used the appointment scheduler or made any queries on the website. The FAC discourses at length on

alleged inadequacies, gaps, or lacunae in the online disclosures but does not allege that John Doe or Jane Doe read or relied on any of them.

Nor does the FAC allege any facts specific to John Doe or Jane Doe to demonstrate any damage from or consequence of the alleged sharing of "personally identifiable information". The FAC relies on academic musings about the economic value of personal information, ¶ 227, but does not allege that John Doe or Jane Doe were ever looking to sell their personal information or were somehow thwarted by the Hospitals in those (hypothetical) efforts. See, e.g., Tyler v. Michaels Stores, Inc., 840 F. Supp. 2d 438, 451 (D. Mass. 2012) (dismissing claim for "value" of personal information involved in a data security breach). Like their pseudonyms, John Doe and Jane Doe are ciphers in this suit, which is first, last, and only about the desire by Plaintiffs' counsel to make money suing non-profit hospitals.

## III. LEGAL ANALYSIS

### A. Plaintiffs State No Claim Under The Wiretap Act

Under the Massachusetts Wiretap Act, it is unlawful to intercept, disclose, or use intercepted oral or wire communications. Mass. Gen. Laws ch. 272, § 99. The critical limiting term in the statute is "interception," expressly defined to mean "to *secretly* hear, *secretly* record, or aid another to *secretly* hear or *secretly* record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Id., § 99(B)(4) (emphasis added). There was nothing secret about any of the Hospitals using third-party cookies to track activity. Each of them disclosed that fact in their respective privacy policies posted on their websites. Under § 99(C)(1), a recording made pursuant to public notice is not secret, and hence not a violation. See, e.g., Glik v. Cunniffe,

655 F.3d 78, 87-88 (1st Cir. 2011) (finding "actual knowledge" does not require that there be any explicit acknowledgment of or reference to the fact of the recording).[8]

Even apart from the specific privacy policies, it is common knowledge that cookies "are part of routine Internet functioning and can easily be blocked." See In re Facebook Internet Tracking Litig., 263 F. Supp. 3d 836, 846-847 (N.D. Cal. 2017) (dismissing privacy claims, and noting that "websites routinely embed content from third-party servers in the form of videos, images, and other media, as well as through their use of analytics tools, advertising networks, code libraries and other utilities"). There, the Court noted that the Plaintiffs did not "have a reasonable expectation of privacy in the URLs of the pages they visit," in part because they "could have taken steps to keep their browsing histories private." Id. at 846.

For almost two decades, the plaintiffs' bar has been trying to cash in on hyper-technical claims surrounding cookies, and for almost two decades the courts consistently have rebuffed these efforts. See, e.g., In re DoubleClick Privacy Litig., 154 F. Supp. 2d 497 (S.D.N.Y. 2001) (dismissing claims against ad network for using cookies to target advertisements). Indeed, the DoubleClick court's legal decision and reasoning has withstood the test of time. It noted that the Internet is predicated on sharing information between computers: "The Internet is accurately described as a 'network of networks.' Computer networks are interconnected individual computers that share information. Anytime two or more computer networks connect, they form an 'internet.'" Id. at 501. DoubleClick provided website advertisements for its clients, promising

[8] Plaintiffs make much of the standard of consent under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). However, that is not the applicable law. Plaintiffs did not and cannot sue under it. See, e.g., Miller v. Nichols, 586 F.3d 53, 59-60 (1st Cir. 2009), cert. denied, 559 U.S. 1008 (2010) (refusing to create a private cause of action since one did not already exist for a HIPAA violation); Padilla-Ruiz v. United States, 593 F. App'x 1, 4 (1st Cir. 2015) (affirming District Court decision that HIPAA does not create a private right of action).

that it "will place their banner advertisements in front of viewers who match their demographic targets," and "creat[ing] value for its customers in large part by building detailed profiles of Internet users and using them to target clients' advertisements." Id. at 502. Critical to the DoubleClick court's analysis in dismissing plaintiffs' complaint with prejudice was the fact that "users can easily and at no cost prevent DoubleClick from collecting information from them." Id. at 504. Thus, at least as a general matter, website visitors understand that third-party cookies are part of virtually any website.

Further, the actions that the Plaintiffs allege do not amount to "interception" of any communication at all. The FAC first describes the GET request, by which a web user asks to see a page (¶ 56); then, describes the POST request, by which a web user can send form information (¶ 57); and finally, alleges that the Hospital servers, in response to these requests, send commands to the web user's browser (¶ 58). Allegedly, these commands tell the browser to redirect the GET or POST information to a third party. Even if this were true, it would not constitute the "interception" of any communication. See, e.g., In re Facebook Internet Tracking Litig., 263 F. Supp. 3d at 844 (dismissing Wiretap Act claim).

Here, as in In re Facebook, Plaintiffs allege several communications, but none is intercepted. In the first, the user sends a GET or POST request to the web server. The web server sends instructions back. The third party is not a part of these communications. Then, following directions, the web user's browser sends information to the third party. Dismissing the Wiretap Act claim, the court held that "[t]he fact that a user's web browser automatically sends the same information to both parties does not establish that one party intercepted the user's communication with the other." Id. at 844.

A contrary conclusion would subject almost all websites to catastrophic potential liability pursuant to the liquidated damages available under the Wiretap Act. Further, the Wiretap Act is a criminal statute; and Plaintiffs' interpretation of that statute would criminalize basic Internet functionality (which has been recognized by courts in the United States for nearly twenty years). See, e.g., Flemings v. Contributory Ret. Appeal Bd., 431 Mass. 374, 375-76 (2000) ("If a sensible construction is available, we shall not construe a statute to make a nullity of pertinent provisions or to produce absurd results").

**B. Plaintiffs State No Claim For Invasion of Privacy**

To sustain a claim for invasion of privacy, "the invasion must be both unreasonable and substantial or serious." Nelson v. Salem State Coll., 446 Mass. 525, 536 (2006). Relevant to the analysis is the "location, the means used, the frequency and duration of the intrusion, and the underlying purpose behind the intrusion." Polay v. McMahon, 468 Mass. 379, 383 (2014). In this case, to the extent that anything can be gleaned from the FAC concerning John Doe and Jane Doe specifically, the "intrusion" is nothing more than placing standard cookies files on their browsers; the frequency and duration is minimal; and, the underlying purpose is to help with retargeting, ¶ 220, which is a standard advertising practice. As a matter of law, even if what Plaintiffs say is true, it is not an actionable invasion of privacy. Cf., Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 409 Mass. 514 (1991) (finding that scattered telephone calls over a period of years from stock brokerage firm advertising sale of securities, which did not disrupt daily routine, did not constitute an actionable invasion of privacy). Moreover, courts in other jurisdictions assessing allegations similar to those made by Plaintiffs have concluded that disclosure of unique device identifier data, personal data, and geolocation information (including physical addresses) does not constitute "an egregious breach of social norms" but rather "routine commercial behavior." See

In re iPhone App. Litig., 844 F. Supp. 2d 1040, 103 (N.D. Cal. 2012) (citing Folgelstrom v. Lamps Plus, Inc., 195 Cal. Rptr. 4th 986, 992 (Cal. Ct. App. 2001)).

The FAC's perpetual reference to the health care context does not help them avoid dismissal. See, e.g., Kelley v. CVS Pharmacy, Inc., No. CIV.A. 98-0897-BLS2, 2007 WL 2781163 (Mass. Super. Aug. 24, 2007) (Gants, J.). In Kelley, the plaintiff obtained prescription drugs from defendant CVS to help with his diabetes. CVS, in conjunction with defendant Merck & Co, Inc., sent Kelley a letter promoting the use of high cholesterol medication. The plaintiff sued CVS, Merck, and a third-party mailing company used to coordinate the promotion for invasion of privacy. The Suffolk County Superior Court found that plaintiff had no actionable claim under Massachusetts law for invasion of privacy:

> Even if this Court were to assume that it would constitute a substantial or serious interference with Kelley's privacy for CVS to reveal the medication he was prescribed or his diagnosis of diabetes, there is no evidence that CVS did so here. CVS did not even provide Kelley's name to Merck. It provided his name, address, and date of birth to Elensys, and directed Elensys to send him the letter described above, but it did not reveal to Elensys his prescription or medical diagnosis. Nor could anyone from Elensys determine what his prescription or medical diagnosis was from the fact that this particular letter was sent to him because Elensys never was informed of the criteria that CVS used to determine which of its customers would receive this letter.

Id. at *2. The Kelley court found that "[t]he limited dissemination of this information falls well below the threshold of a substantial or serious interference with privacy." Id. at *3. The court went on to note that there was "plainly nothing improper" about a pharmacy using its own records to do targeted, knowledge-based outreach, and it "[could] not imagine any good reason" to prohibit pharmacies from doing so in conjunction with third parties. Id.

In contrast, here, neither John Doe nor Jane Doe even allege any specific targeted communication that they received (Kelley at least provided the court a letter). Neither John Doe nor Jane Doe allege what information was supposedly breached (diabetic condition for Kelley).

Nor do Plaintiffs say to whom that information was allegedly provided (Kelley specifically named multiple recipients). Kelley fell short in his drive to prove an actionable violation of Massachusetts law, and lost his case on summary judgment – John Doe and Jane Doe do not even get so far as pleading the requisite facts, and their invasion of privacy claim should be dismissed at the pleading stage.

Nothing about the online, cookie context changes these common sense standards. See, e.g., Smith v. Facebook, 262 F. Supp.3d 943 (N.D. Cal 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) (dismissing claim for invasion of privacy). In Smith, the plaintiffs[9] sought to sue the social media company and a series of hospitals. Those hospitals, Smith alleged, had websites that incorporated Facebook plug-ins. Therefore, Smith claimed, the hospitals were impermissibly disclosing confidential health care information to Facebook, *i.e.*, the fact that a certain website user may be browsing pages associated with a certain medical condition. The court dismissed the action on a variety of grounds, including for failure to state a privacy claim. As the Smith court told this same Plaintiffs' counsel, utilizing cookie-generated information that includes "general health information that is accessible to the public at large" is not an invasion of privacy. Id. at 955.

More generally, Plaintiffs constantly use the term "personally identifiable information" in their allegations, yet in an effort to obfuscate those allegations, they leave this term undefined. See discussion supra, at Part I.D. By contrast, G.L. c. 93H, § 1, defines "personal information" as a resident's first name and last name or first initial and last name in combination with any 1 or more of the following data elements that relate to such resident:

---

[9] Plaintiffs in Smith were represented by Simmons Hanley Conroy, lead Plaintiffs' counsel in this case. Apparently, after unsuccessfully pursuing the likes of Facebook and Google, Plaintiffs' counsel has trained their sights on non-profit hospitals that simply utilize Facebook and Google technology.

(a) Social Security number;
(b) [D]river's license number or state-issued identification card number; or
(c) [F]inancial account number, or credit or debit card number, with or without any required security code, access code, personal identification number or password, that would permit access to a resident's financial account[.]

Plaintiff does not allege that any "personal information," so defined, is at issue in connection with these Informational Websites.

### C. Plaintiffs State No Claim for Breach of Fiduciary Duty

"To establish a breach of fiduciary duty, there must be a duty owed to the plaintiff by the defendant and injury to the plaintiff proximately caused by the breach." Estate of Moulton v. Puopolo, 467 Mass. 478, 492 (2014). Here, Plaintiffs allege that the Hospitals breached some unprecedented, unsupported duty by claiming obliquely that the Hospitals "owe Plaintiffs ... a fiduciary duty of confidentiality in the data and content of communications between [the Hospitals] and the Plaintiffs []." ¶ 349. No Massachusetts court has ever imposed such a duty on a hospital owing to a patient, nor any other type of fiduciary duty. See, e.g., Doe v. Boston Med. Ctr., 88 Mass. App. Ct. 289, 289 (2015) (evaluating hospital on negligence standard, and not from a fiduciary perspective, in connection with claims made by a patient relating to an assault that occurred during patient's stay at hospital).

Under Massachusetts law, a fiduciary duty only "arises out of a unique or intimate one-to-one relationship[.]" Petrell v. Rakoczy, No. CA012849F, 2005 WL 1683600, at *4 (Mass. Super. July 11, 2005) (finding no fiduciary relationship between a diocese and the parishioner of a diocesan church); cf. Knelman v. Middlebury Coll., 570 F. App'x 66, 68 (2d Cir. 2014) ("While schools, colleges, and educators assume the responsibility of educating their students, the law does not recognize the existence of a special relationship for the purposes of a breach of fiduciary duty claim"). Thus, for certain purposes, Massachusetts law recognizes a fiduciary duty as between physicians and their patients. See, Korper v. Weinstein, 57 Mass. App. Ct. 433, 437 (2003). No

Massachusetts court has extended this fiduciary duty to hospitals, and certainly not in this factual context.

Plaintiffs allege that they used websites available to the general public. The use of public websites does not create a "unique or intimate one-on-one relationship" between users and the website operator. Further, each of the websites disclaims the offering of advice and/or creation of a physician-patient relationship. Dismissal at the Rule 12 stage is appropriate. See Smith v. Massimiano, 414 Mass. 81, 85 (1993) (noting that the viability of a legal theory should be tested on Rule 12 rather than waiting until summary judgment).

**D. Plaintiffs State No Claim Under Chapter 93A**

Chapter 93A makes it unlawful to engage in "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). This proscription "must be read to apply to those acts or practices which are perpetrated in a business context." Hubert v. Melrose-Wakefield Hosp., 40 Mass. App. Ct. 172, 175-76 (1996). Plaintiffs cannot assert a c. 93A claim against the Hospitals because none of these charitable institutions were acting in a business context when Plaintiffs voluntarily engaged with their websites, and, accordingly, the Hospitals were not engaged in "trade or commerce" within the meaning of c. 93A.

The Hospitals are all non-profit institutions, chartered and dedicated to serve the public interest. See discussion, supra, Part II.A. Through the operation of their websites, the Hospitals were engaged in incidental activities necessary to meet their charitable purpose—*i.e.*, providing information regarding health care services and increasing educational opportunities and awareness of health care related issues. Furthermore, the Hospitals did not seek to profit from maintaining their websites or from providing information about their institutions to the Plaintiffs. Therefore, c. 93A does not apply as a matter of law. See All Seasons Servs., Inc. v. Comm'r of Health and Hosps. of Boston, 416 Mass. 269, 271-72 (1993) (declining to extend c. 93A to a non-profit

hospital that did not seek to profit from a contract with a food service company because providing food services was incidental to primary hospital activity); Hubert, 40 Mass. App. Ct. at 176 (affirming denial of motion for leave to add c. 93A claim against non-profit hospital because "[n]othing in the record indicated that the hospital, a non-profit organization, was acting in a business context so as to generate a profit" in land purchase from home owners).

Furthermore, the Plaintiffs cannot assert a Chapter 93A claim against the Hospitals merely as interested citizens who believe that an unfair or deceptive act or practice has occurred. Chapter 93A is not intended "to authorize purely 'vicarious suits by self-constituted private attorneys-general.'" Bellerman v. Fitchburg Gas & Elec. Light Co., No. WOCV200900023B, 2013 WL 518526, at *15 (Mass. Super. Jan. 7, 2013) (quoting Leardi v. Brown, 394 Mass. 151, 161 (1985)); see also Roberts v. Enterprise Rent-A-Car Co., 445 Mass. 811, 813-14 (2006) (concluding that plaintiff had no standing to allege that car rental company's collision damage waivers were deceptive for purposes of c. 93A because plaintiff never purchased such a waiver). Rather, the Plaintiffs must allege that they have "suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself." Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). "[T]he violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Id.

Here, Plaintiffs recite the same general five-category description of their purported damages in each Count. ¶¶ 334, 346, 351, 419. The three additional allegations relating to "harm" made in connection with Plaintiffs' c. 93A claim demonstrate that Plaintiffs have not suffered any distinct injury: (i) "Defendants shared Plaintiffs' . . . personally identified information with third parties;" (ii) "Defendants bartered and sold Plaintiffs' personally identifiable information . . . ;" and (iii) "Defendants used Plaintiffs' . . . personally identifiable information and communications

for marketing purposes." ¶ 419 (b), (c), (e).[10] Even if these alleged actions could be considered unfair or deceptive (they were not), Plaintiffs have not alleged that they suffered any separate, identifiable harm resulting from these actions. Therefore, Plaintiffs have failed to allege distinct injuries, and their Chapter 93A claim should be dismissed for this reason as well.

## IV. CONCLUSION

For the foregoing reasons, the Hospitals respectfully request that the Court grant the Hospitals' motion to dismiss.

---

[10] Plaintiffs make no allegations about the security settings they deployed on their own Internet browsers, no allegations about what free and publicly-available tools they used to protect their Internet behavior, and no allegations about when, where, why, or the manner in which they used the Informational Websites.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM HEALTH, INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:40
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

Dated: September 20, 2019

## CERTIFICATE OF SERVICE

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

Suffolk 2019 1651



#70392032_v1

# Exhibit B

Date Filed 8/11/2023 5:27 PM
Superior Court - Suffolk
Docket Number 2384CV01086

10.23 NOTIFY

11/25 ✓

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 1984CV01651-BLS1

NOTICE SENT 12.07.20
H.&K.
C.A.M.
C.M.I.
M.T.M.
K.B.
K.&C.
J.M.C.
S.H.C.
E.S.J.
T.A.V.T.

SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
2019 OCT 18 P 2:44
MICHAEL JOSEPH DONOVAN
CLERK / MAGISTRATE

JOHN DOE AND JANE DOE, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM, HEALTH INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

Defendants.

**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Partners Healthcare System, Inc. ("Partners"), The General Hospital Corporation ("Massachusetts General Hospital" or "MGH"), Brigham Health, Inc. ("Brigham and Women's Hospital" or "BWH"), Dana-Farber Cancer Institute, Inc. ("Dana-Farber" or "DFCI"), Dana-Farber, Inc., and Dana-Farber/Partners Cancer Care, Inc. (collectively, "the Hospitals"),[1] through their undersigned counsel, move under Massachusetts Rule of Civil Procedure 12(b)(6) to dismiss this case in its entirety for failure to state a claim upon which relief can be granted. As grounds for this motion, the Hospitals state as follows:

[1] Defendants contend that the Complaint misnames Dana-Farber/Partners Cancer Care, Inc. and Dana-Farber, Inc. as parties in this case.

① After a virtual hearing, this motion is Allowed in Part. The motion is denied as to Counts I and II of the plaintiffs' First Amended Complaint for the reasons stated on the record at the hearing. The motion also is denied as to Count III of the Complaint alleging breach of fiduciary duty. The Massachusetts Supreme Judicial Court has held that a physician has a "fiduciary obligation to hold in [strict] confidence information" of his or her patient. Alberts v. Devine, 395 Mass. 59, 69 (1985). See also Harper v. Weinstein, 57 Mass. App. Ct. 433, (cont. below)

② 437 (2003) ("[A] physician has a duty to maintain the confidentiality of a plaintiff's medical records."). An individual's fiduciary obligations also can extend to the organization of which he or she is a member. See, e.g., Baker v. Wilmer Cutler Pickering Hale and Dorr LLP, 91 Mass. App. Ct. 835, 847 (2017) (law firm potentially liable for breach of fiduciary duty to client based on actions of law firm's attorneys). The motion is allowed as to Count III alleging violations of [illegible]

③ core mission, and, "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission." Linkage Corp. v. Trustees of Boston Univ., 425 Mass. 1, 26 (1997).

11/20/20

1. In their First Amended Complaint, Plaintiffs attempt to allege claims individually and on behalf of the unsubstantiated Class and Subclasses against the Hospitals for: interception of wire communications in violation of G.L. c. 272, § 99 (Count I); invasion of privacy in violation of G.L c. 214, § 1B (Count II); breach of fiduciary duty (Count III); and, unfair and deceptive business practices in violation of G.L. c. 93A, § 9 (Count IV).

2. Plaintiffs fail to allege any "secret interception" of communications that would allow them to recover under G.L. c. 272, § 99. Indeed, the actions that Plaintiffs describe in their First Amended Complaint do not amount to "interception" at all.

3. Plaintiffs' allegations do not support an "unreasonable, substantial, or serious interference with [their] privacy," as required to recover under G.L c. 214, § 1B. The Hospitals' disclosures amply rebut any idiosyncratic, unrealistic privacy expectation Plaintiffs may now claim to have had.

4. Plaintiffs do not – and cannot – establish a breach of fiduciary duty. Massachusetts law has never recognized a fiduciary duty owed by hospitals to patients.

5. Plaintiffs also fail to state a claim under G.L. c. 93A, § 9 because, among other reasons, the Hospitals are nonprofit, charitable institutions that are not engaged in "trade or commerce," as required under the statute, and Plaintiffs' claims fall short of showing that they have suffered any legally cognizable injury.

For the foregoing reasons, explained in detail in the accompanying Memorandum of Law, the Court should (A) grant this Motion, (B) dismiss all counts of the First Amended Complaint with prejudice and without leave to amend, (C) award the Hospitals costs and reasonable attorney's fees, and (D) grant such further relief as justice requires.

**REQUEST FOR ORAL ARGUMENT**

The Hospitals respectfully request a hearing on this Motion at the Court's earliest convenience.

PARTNERS HEALTHCARE SYSTEM, INC., THE GENERAL HOSPITAL CORPORATION D/B/A MASSACHUSETTS GENERAL HOSPITAL, BRIGHAM HEALTH, INC., DANA-FARBER CANCER INSTITUTE, INC., DANA-FARBER/ PARTNERS CANCER CARE, INC., AND DANA-FARBER, INC.,

By their attorneys,

Adam J. Bookbinder (BBO No. 566590)
Michael T. Maroney (BBO No. 653476)
Holland & Knight LLP
10 St. James Avenue
Boston, MA 02116
(617) 523-2700
michael.maroney@hklaw.com
adam.bookbinder@hklaw.com

Mark S. Melodia (*pro hac vice* pending)
Holland & Knight LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
mark.melodia@hklaw.com

Dated: September 20, 2019

**SUPERIOR COURT RULE 9C CERTIFICATION**

Pursuant to Mass. Sup. Ct. R. 9C(a) and (b), Adam J. Bookbinder (counsel for Defendants) and J. Michael Conley (counsel for Plaintiffs) met and conferred on August 14, 2019 by telephone. Despite good faith efforts, the parties were unable to eliminate or narrow the issues of dispute.

Michael T. Maroney

**CERTIFICATE OF SERVICE**

I, Michael T. Maroney, hereby certify that on September 20, 2019, I served, via email and first class mail, a copy of the foregoing document upon counsel for Plaintiffs, J. Michael Conley, 100 Grandview Road, Suite 218, Post Office Box 9139, Braintree, Massachusetts 02185, michael@kenneyconley.com.

Michael T. Maroney

# Exhibit C

Volume: I
Pages: 1-88
Exhibits: 0

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS SUPERIOR COURT

```
* * * * * * * * * * * * * * * * * *
* JOHN DOE,                        *
*                                  *
*                                  *
*                                  *
*         Plaintiff,               *
*                                  *
* v.                               *
*                                  *
* PARTNERS HEALTHCARE SYSTEM INC*
*                                  *
*         Defendant                *
* * * * * * * * * * * * * * * * * *
```

No. 1984CV01651

RULE 12 HEARING
BEFORE THE HONORABLE BRIAN A. DAVIS

APPEARANCES:

For the Plaintiffs, Mr. J. Michael Conley, Esquire
For the Plaintiffs, Mr. Jason Barnes, Esquire
For the Defendants, Mr. Michael Maroney, Esquire
For the Defendants, Mr. Mark Melodia, Esquire
(Full Appearance list on Page 2)

Boston, Massachusetts
November 20, 2020

(Transcript prepared from Audio Recording)
Reporter: Raymond F. Catuogno, Jr.

APPEARANCES:

For the Plaintiffs John & Jane Doe:
Kenney & Conley, P.C.
100 Grandview Road
Post Office Box 9139
Braintree, Massachusetts 02185
By: J. Michael Conley, Esquire

Simmons Hanly Conroy
One Court Street
Alton, Illinois 62002
By: Jason Barnes, Esquire

For the Defendants Partners Healthcare System Inc.; The General Hospital Corporation Doing Business as Massachusetts General Hospital; Brigham Health Inc.; Dana-Farber Cancer Institute Inc.; Dana-Farber Partners Cancer Center Inc.; Dana-Farber Inc.:
Holland & Knight LLP
10 Saint James Avenue
Boston, Massachusetts 02116
By: Michael T. Maroney, Esquire
Mark Melodia, Esquire

(Court in session.)

(2:01 p.m.)

THE CLERK: Good afternoon, your Honor. Calling Docket No. 1984CV1651; John Doe versus Partners Healthcare System Incorporated. This matter is before the Court for a Rule 12 hearing.

Counsel, will you please state your name for the record beginning with plaintiff's counsel, followed by the defense counsel.

THE COURT: Good afternoon. You can hear me?

MR. BARNES: Yes, your Honor.

MR. CONLEY: Yes, your Honor. Mike Conley for the plaintiffs.

THE COURT: Okay. Welcome.

Again, who's here on behalf of plaintiffs?

MR. CONLEY: In addition to me Mike Conley, Jay Barnes is present, and -- Jay, who else is --

MR. BARNES: Your Honor, Eric Johnson is on the phone. And Mitchell Bright is here. Mr. Bright has not entered his appearance in the case. But of course I want to note his presence --

THE COURT: Okay.

MR. BARNES: -- on the call.

THE COURT: Welcome. So who will be arguing on behalf of plaintiffs?

MR. BARNES: I will, your Honor --

THE COURT: Mr. Barnes.

MR. BARNES: -- Jay Barnes.

THE COURT: Mr. Barnes. Got it.

All right. And who's here on behalf of defendants?

MR. MARONEY: Good afternoon, your Honor. Michael Maroney on behalf of defendants. And my colleague Mr. Melodia will be arguing. I'll let him introduce himself.

MR. MELODIA: Good afternoon, your Honor. Mark Melodia from Holland and Knight on behalf of all of the defendants on this motion. And I'll just note that a number of my colleagues who are not necessarily needed in the case but who are attending arguments are in attendance; Chris Iaquinto, Teresa Lahoy, Ester Clovitz, Courtney Grow and Chelsea Rogan.

THE COURT: Mm-hm. All right.

MR. MELODIA: But I'll be arguing, your Honor.

THE COURT: Got it. So counsel, for those of you who are, you know, interested but not arguing, would you be kind enough to turn off your microphones and your cameras. It does reduce the Hollywood Squares effect for me during the course of the argument. So

I appreciate that. Thank you.

Counsel, we're here -- I think we're here officially on the motion to dismiss. However, we still have the motion for preliminary injunction that I need to address which is -- and you should note I've read all the materials on the motion to dismiss and I've gone through the stack of materials that were sent to me, some of which I asked for, some of which I didn't necessarily ask for, with respect to the preliminary injunction. So I have submissions from both sides; defendant's response on the preliminary order, I received the plaintiff's response to preliminary order, and then I received a series of letters with attachments. And I've reviewed those materials.

So what I intend to do here today is I'd like to start with the motion to dismiss. And then I -- don't worry, I intend to circle back on the motion for the preliminary injunction.

So we're going to start with the motion to dismiss. All right, folks, again I've read the papers. So we've got four counts here that we're fighting over, correct? We've got a count -- first count is wiretap act, the Massachusetts Wiretap Act. Then we've got the invasion of privacy claim which is

also officially statutory in Mass. We've got the breach of fiduciary duty claim. And we have the 93A claim. And defendants are moving forward to dismiss all of those claims. Okay.

MR. MELODIA: Correct, your Honor.

THE COURT: All right. So again I've read the papers Mr. Melodia. I've -- recognizing that I've read your papers and I've reviewed the arguments, is there information that isn't in your papers that you wish to share with me or anything that you want to highlight at this point in time?

MR. MELODIA: I think there are some fundamental things, your Honor, that cut across each of the counts. And I would be happy to address each of the specific counts as well. But I do recognize that the (inaudible -- indecipherable at 2:05:10) plaintiff. But let me focus on some of the fundamental reasons that really require dismissal of this case in its entirety as reflected in the first amended complaint.

Is anybody else getting an echo? Perhaps --

THE COURT: No.

MR. MELODIA: -- somebody's not on mute.

THE COURT: No. And again, and I'll give you an opportunity to speak Mr. Melodia. I am going to -- if you're going to jump into all the fundamental

aspects, again a reminder -- so I read the papers. I read the papers. And I have questions for both sides. And again it's an -- and let me remind you as well as you address the issues this is a motion to dismiss. So I accept the factual allegations as true. There seems to be some back and forth with respect to voracity of some of the factual allegations, but I have to accept the factual allegations as true. So what we're really doing here is we're testing the legal viability of the claims. That's all that this proceeding is about. And I make no determination at the motion to dismiss stage regarding the merits of the claims, just their legal viability.

MR. MELODIA: Yes, your Honor. And this complaint is legally not viable for fundamental reasons that can assume the truth of the properly pled parts of the first amended complaint. And I say properly pled because there are some things that this court can see and take judicial notice of from the websites themselves which are I think fair game on a motion to dismiss under Massachusetts State case law.

The privacy cases always need to be about an identifiable person. And here we don't have an identifiable person. We have at most an (inaudible

-- indecipherable at 2:06:54) which as the Court knows really just identifies a machine and really identifies the random physical numbers that changes every few months. And any one of those devices can in fact be held by any number of people at any given moment using it, but doesn't identify a person.

And similarly, even the Facebook ID and the Google ID that are used to somehow identify a person, even identify a patient according to plaintiff's theory don't, because a web point visitor has to first allow, set up their browser in a way that would allow for that information to pass to Facebook and Google, and would have to have a relationship with Facebook and Google ahead of time with their own terms and condition.

So I'm just talking about a privacy case needs to be about identifiable people. And this one, even if you take the first amended complaint as true, legally and technically is not.

Second, successful privacy cases like the cases that the plaintiff cite in this case; "Pharmatrak", "Google Cookies" from the third circuit, the "Nickelodeon" case in the third circuit, each and every one of those cases had deception by the defendant at their core. And we have no deception or

secrecy here. Instead we have website privacy policies that were and are on each of these hospital websites. And each and every one of those discloses the use of cookies, and discloses (inaudible -- indecipherable at 2:08:38.)

Third, you need a private space to be intruded upon in some way in a privacy case. And here we have public websites, literally public websites that anybody with an internet connection anywhere in the world can access.

And so I think it's important, your Honor, given that you've already mentioned the preliminary injunction motion -- I'm going to reference your Honor's order from April on that motion, there's a reference in the factual summary on page one of that order that talks about the hospital websites as providing direct portals that allow for access to health records and services. That is factually incorrect. And not because I say so or because an expert says so, but because it's obvious from the face of the websites which are specifically referenced in the first amended complaint and therefore are properly considered by the Court on a motion to dismiss. The three hospital websites referenced in the first amended complaint do not

share personal and protected health information. And the only way the plaintiff's counsel confuses the issue repeatedly in the first amended complaint is by referencing information pages on each hospital website that are about the patient gateway, your Honor, about it, descriptive of it. Not --

THE COURT: Pause for a moment Mr. Melodia.

MR. MELODIA: -- allowing --

THE COURT: So the allegation is -- pause. And here's one thing -- I apologize in advance to everyone. One thing I don't like about Zoom is it's difficult -- it's more difficult to sort of modulate the back and forth between counsel and -- between me and counsel. So I apologize if at some points in time I feel like I'm barging in. But unfortunately unless I mute you, which I think is even more offensive, I have no choice but to sort of get your attention.

So what's alleged in the complaint -- and here's what I recall from our discussion around the preliminary injunction, is that it is possible -- so someone can go on what you call the informational website -- and I recognize that there's a separate patient portal. That really doesn't seem to be in dispute in this proceeding. I got that.

MR. MELODIA: Correct.

THE COURT: I think. I recognize that. So what we're talking about is what the defendants refer to as the informational websites. What plaintiffs allege is that someone can go on the informational websites. They claim -- they're representing patients; existing patients, go on the informational website, look at information, pull down information. For example, look at the information about specific medical providers, say a particular doctor at MGH or the like, and that that information gets conveyed -- it's what's alleged, gets conveyed through Facebook in such a way that Facebook can match that information perhaps with its own Facebook identifier. So Facebook can put together, do a, you know, one and one, they can conclude that that individual who has a Facebook page -- which isn't -- is not that unusual, that person is cruising for for example a breast cancer specialist or something for that, looking for information about breast cancer on the MGH website. So Facebook can say this particular person -- you have someone in the waiting room with you? Would you mind? Thank you. This particular person is looking for information about breast cancer specialists, which -- and doesn't say it for sure, but it could

lead to an inference that that person has a real concern or perhaps a diagnosis of breast cancer, which would be confidential information perhaps. So that's what I understand to be the allegations. And again, it seems to me I have to take those allegations as true for purposes of the motion to dismiss.

I understand that there are disputes about whether in fact that information gets conveyed or how useful it is to Facebook. But at this point in time I've got to accept the allegations if that information flows to Facebook that they can match it with an individual, and therefore that there is a disclosure of patient confidential information.

Don't I have to look at it that way?

MR. MELODIA: You do have to look at it in terms of taking the allegations are true, your Honor, but no, you don't have to pile supposition upon supposition, and inference and possibility upon possibility to perhaps find some probability. We're not in a, you know, (inaudible -- indecipherable at 2:13:15) state. I mean (inaudible -- indecipherable at 2:13:20) standard of pleading. And these do need to be probable allegations, and these are not. Number one, because it's not personally identifiable.

THE COURT: If there's one thing plaintiffs didn't do in this case is under-plead, okay?

MR. MELODIA: Well certainly --

THE COURT: Actually they're not guilty of under-pleading. But go ahead.

MR. MELODIA: -- well, in some senses that's true, your Honor. It's a 111 page complaint. It's over 400 paragraphs. True enough. However, literally page 67 is the only page that deals with the named plaintiffs in this case. So they absolutely did under-plead with respect to the only two people who are before this Court. And they do not state anything about themselves. They don't tell us about their browser settings. They don't tell us whether they're Google and Facebook members. They don't tell us whether they had information accessed. They don't tell us whether they took privacy protective measures like trying to block cookies and that somehow those were overcome by something the defendant did. They don't even say if they ever looked at the privacy policy or the notice of privacy practices; the NPP, which I want to make sure we talk about, which is inapplicable to this website because it only deals with protected health information as required by HIPAA and OCR.

So we know nothing actually, notwithstanding the 111 pages, about the actual named plaintiffs and their claims in this case. And ultimately they have to stand, as this court knows, on their own two feet before they can claim to represent other people with similar claims.

But let me go back to the IP address idea that somehow that identifies a person. It doesn't.

THE COURT: So you -- no, I get -- I picked up on that argument in your papers Mr. Melodia.

MR. MELODIA: Okay.

THE COURT: So I did go back and I took a look at the amended complaint because I wanted to see what was -- specifically was alleged. And I look at for example page 74 of the complaint which is part of the Count One interception of wire communications, the wiretap act claim. Paragraph 327 says "Defendants engaged in and continue to engage in an interception by aiding others including Facebook and Google to secretly record the contents of plaintiff's and class member's wire communications."

So that's what's alleged. And I read your argument about that there isn't much meat on the bone with respect to these individual plaintiffs.

MR. MELODIA: Okay.

THE COURT: Again but I look at the -- so that's why I pulled the complaint to see what allegations were made with respect to these individual plaintiffs. And it looks like they covered their bases in terms of making allegations that these plaintiffs are representative with respect to at least the complaints that are made in this amended complaint.

MR. MELODIA: Yes, I was just responding to your Honor's sense of volume. That the volume is mostly generalized pleadings discussed in almost like a white paper about the internet, as opposed to about what happened to identifiable people. But I'll move on --

THE COURT: Let me -- can I -- can we talk about the claims one at a time?

MR. MELODIA: Sure.

THE COURT: So wiretap act claim, really you have two arguments. One of the arguments is that it's not an interception, but -- and there are various cases cited, but I'm dealing with the Massachusetts statute which is Chapter 272, Section 99. And that defines an interception as among other things -- and I'm inserting some letters in here, but aiding another to secretly hear or secretly record a wire

communication.

And I'm going to come back to the secret piece for a second.

But the Massachusetts Wiretap Act alleges -- it prohibits aiding someone else in secretly hearing or secretly recording.

So doesn't that address the arguments in your papers that it's not an interception because what they're -- what's alleged in this case is that these defendants have configured their websites in such a way as to aid Facebook and Google? And I just read you the allegation in Google and others --

MR. MELODIA: But --

THE COURT: -- and secretly recording or listening and to hearing the communications between MGH and its patients.

So doesn't that, at least for purposes of this statute, qualify as an interception?

MR. MELODIA: No, it doesn't, your Honor. Putting aside the secrecy issue for the moment and just focusing on the interception, there needs to be a third party at some point while the communication is in transit between person number one and person number two. There needs to be a third person --

THE COURT: The statute doesn't say that. The

statute doesn't say that. The statute says aiding --

MR. MELODIA: Well --

THE COURT: -- aiding somebody. It doesn't say if it has to be contemporaneous or the like. It simply says aiding a third party in hearing or -- in secretly hearing or secretly recording.

MR. MELODIA: -- right. But we don't -- even by the allegation the hospital's website does not aid in the interception. It does not in any way allow Facebook to eavesdrop or get in the middle of in the way that one can intercept a passing football or intercept anything else. You need to get in the middle of a communication that is ongoing. That communication has already finished. The get communication, communication number one -- may I share my screen, your Honor? We have a couple of demonstratives that I've shown to Mr. Barnes a couple of days ago.

THE COURT: Yes. I'll let you share a screen. One moment. All right, you should have that capability now.

MR. BARNES: Your Honor, Mr. Melodia did share them with me. I have no objection -- assuming they're the same, and I assume they are going to be the same, particularly in regards to the preliminary

injunction. I would note however on the motion to dismiss, to the extent they go beyond anything in the motion itself, that's not entirely proper. But I've seen them. They're fine for the Court to consider. Particularly that we're taking up both motions here today. Thank you, your Honor.

THE COURT: Mr. Melodia?

MR. MELODIA: So what we've tried to do, your Honor, is just diagram based upon the way it's described in the complaint and the way it's described in the plaintiff's expert's report, the so-called get communication; communication number one, and the so-called post communication; communication number two. And there are two distinct communications here. One is between the hospital's website and the visitor's browser -- that is the plaintiff, if the plaintiff has configured their browser in a way that allows that communication to occur. And --

THE COURT: Meaning if they allow third-party cookies?

MR. MELODIA: To allow third-party cookies, your Honor.

THE COURT: Yes.

MR. MELODIA: And so in that case there's a communication there that Facebook is not a part of.

So there is no interception or aiding and abetting. And then that communication complete --

THE COURT: So pause for a moment. Mr. Melodia, would it be possible for Facebook to gain access to that communication if for example defendants did not include Facebook, did not permit Facebook to post cookies through their website?

MR. MELODIA: -- I don't believe so.

THE COURT: You don't believe it would be possible?

MR. MELODIA: I don't believe it would be possible. But of course --

THE COURT: So isn't that -- doesn't that at least qualify as aiding?

MR. MELODIA: -- it's aiding, but not aiding a communication that is communication number two, the post communication, yes.

THE COURT: Got it.

MR. MELODIA: Aiding an interception, no.

THE COURT: But again, we're talking about --

MR. MELODIA: An interception --

THE COURT: -- an interception is defined as aiding another party in its ability to hear --

MR. MELODIA: -- hearing, hearing.

THE COURT: -- or secretly -- to hear or secretly

record. And here --

MR. MELODIA: To hear or secretly record.

THE COURT: -- yes.

MR. MELODIA: But there is no -- let me show you the next slide, your Honor, which -- okay, these are the actual communications. This is the code, your Honor, in the Smith affidavit that shows the actual communication. These are not the same communications. So you can't aid and abet somebody either hearing or recording something they don't hear or record. Communication number one is neither heard nor recorded by Facebook.

THE COURT: So you read "hear" -- and the definition of interception you mean it really has to be audibly heard as opposed to communicated --

MR. MELODIA: No.

THE COURT: -- no? I see.

MR. MELODIA: No. I accept -- I'm not taking some luddite approach to the wiretap act, even though it's been around 40 years and has not been applied to this exact scenario. Nonetheless, I'm not taking that approach. I'm saying that these are separate communications. And one way we know they're separate communications, not just a (inaudible -- indecipherable at 2:22:43) but it is the actual

separateness, the content of the communication as reflected on these slides from the Smith affidavit.

The next is you can see communication number one is over and communication number two continues. You cannot aid and abet somebody in intercepting something that is neither heard in any technological sense, or recorded by Facebook. They're simply not a part of communication number one. In the same way hospital is not a part of communication number two. So there is true separateness in the way that they're -- so in other words, using the football analogy, you know, here's -- if there's no completion, you know, if there's a completion of a transmission, a completion of a pass, and then the other team gets it, that's called a fumble. And the difference is there has -- there's a complete transmission in communication number one. And then communication number two occurs, and that is a different communication. It's a communication between the individual plaintiff; the website visitor and Google and Facebook, or any other third party. And that's the way the internet works across the internet; healthcare companies and all sorts of other companies including law firms.

So your Honor, again this whole theory, I mean

every --

THE COURT: Mr. Melodia, let me -- if you don't mind, let me jump in here and help you with your argument which is I don't buy this argument. Okay. I don't buy it. The language of the wiretap act in Mass is broad, is different than what I -- I looked at the language of some of the other jurisdictions that were cited.

So it seems to me that what you're describing is aiding. And so -- and let me just -- I'll help you along by saying you're not going to win that one. I'm not persuaded.

I want to talk briefly about the secret piece. Which is I did -- this is another situation where I went back to see what was alleged, because again I've got to -- I'm bound by the allegations of the complaint, the amended complaint. And it's alleged, at least in paragraph 327, among other places, I think, that there was a secret recording of plaintiff's wire communications by Facebook, Google and others. So again, if I'm dealing with a motion to dismiss, and I have to accept that allegation as true, why are we fighting about whether it's secret?

MR. MELODIA: Because that's a legal label, your Honor, that plaintiffs added. That's not a factual

statement. That is not something the Court has to accept as true. That is a legal conclusion. The word "secret" is in the wiretap act, and they have merely (inaudible -- indecipherable at 2:25:30) back to the Court. That is not a sufficient pleading. There is no secret here. In addition to these being -- this is the way in which the internet works. Literally this hasn't been secret for 20 years. The "Double-Click" case in 2001 acknowledged that the use of cookies and the use of tracking on websites is not secret.

In this particular case each hospital disclosed the use of cookies and disclosed tracking on the website, including references to Google analytics, as well as the pixels. So where is the secret? There can't be a secret by people who are using a free website from a device and looking at -- and clicking around. In the same way that if somebody visited a law firm website, your Honor, they don't become a client. These people don't become patients by virtue of simply clicking around on a public website. There's no secrecy going on.

THE COURT: Right, but these plaintiffs allege they are patients. They're already patients.

MR. MELODIA: It doesn't matter, your Honor. If

a client of a law firm who is a client goes on to the general website of a law firm and clicks around and searches anti-trust law, or searches breach of contract, or fraud, and then looks at attorney bios, and looks at email addresses and phone numbers for contacting, that does not make that person a client in that setting. They are not for example -- the clicking and the searching is not for example attorney/client privilege, is it? That can't be attorney/client privilege. Does the law firm have a duty all of a sudden -- for example, if they looked up breach of contract and then they missed a statute of limitations, can the law firm be sued for malpractice because they missed the statute of limitations on behalf of somebody who was a client but didn't tell the law firm in engagement that they are a client for purposes of a contract claim? No. Those --

THE COURT: See the problem with that -- actually, Mr. Melodia, that's interesting that you choose that analogy, because I've been bouncing that one around in my head for some time. And here's the problem I ran into with that analogy, which is assume for the moment that the person who's using the website is a client of the law firm. And they're

getting on and looking at some of the law firm materials about their particular legal problem, which is confidential. And the law firm then takes that communication and makes it available to Facebook, such that Facebook can then match the fact that that client of the law firm has been rummaging around the law firm's website with respect to a particular legal issue that's confidential, and can match that information with the identity of the user? So that's more like what we have here. And in those circumstances would that be deemed again -- there are a number of claims here that are made with respect to that type of activity, but it seems to me that at least again -- and I understand you have an argument with respect to disclosure, I've got that, but the allegation is it's done secretly. It seems to me that in those circumstances that's potentially a violation of the wiretap act.

Let me also mention yet again this is a motion to dismiss. You read the prologue to the wiretap act -- and the wiretap act is designed really for different circumstances I'll have to say. And so again the -- let me pull up the actual language in the act. But the preamble says, "The general court finds that organized crime exists within the Commonwealth and

that the increasing activities of organized crime constitute a grave danger to the public welfare and safety."

So I agree with you this statute I think was targeted towards a different set of problems. But what I have to deal with in this context is how does it apply here, and does plaintiff state a viable claim? And I have to say under the wiretap act, I think they do, based on the allegations of the complaint. I recognize you disagree. I recognize that. But I'm bound by what the allegations of the complaint are in a motion to dismiss. And it seems to me that they do, they state a viable claim under the wiretap act. Whether that claim will succeed or not is a completely different matter. But I'm --

MR. MELODIA: Understood, your Honor, but --

THE COURT: -- yes?

MR. MELODIA: -- the Court respectfully does not need to take as true the secrecy allegation when the secrecy is how the internet works across the entire internet. Logically, just realistically, sociologically, technically, there is no secret here. This is all public information that anybody who is using the internet ought to know and is charged with knowing. And our law all the time charges people

with knowing things they may or may not actually in fact know, but that doesn't make it secret and that doesn't make it improper. And even the "Pharmatrak" case, your Honor, which is the one case they can point to that applies to in the Federal Wiretap Act context apply, you know, these types of statutes to facts that are somewhat similar in the sense that they're happening on a website and they involve deflection of information. But they're still different. I mean "Pharmatrak", it was an anonymous party. There was absolutely no disclosure whatsoever of a PII being collected. PII being collected was name, and address, and gender, and insurance information, and medical conditions and medications. And in there -- and this is the case, the main case the plaintiffs rely upon your Honor for their wiretap act theory. In that case the court did not decide this timing issues as Mr. Barnes calls it on this -- and what I think of as separate communications, they didn't resolve the timing issue. They in fact explicitly reserved the timing issue and said the facts here do not require us to enter the debate over the existence of a real time requirement. And why was that? Because they found a simultaneous communication, which we don't have here, and an

identical communication, which we -- I showed on the screen, we don't have here. So "Pharmatrak" really doesn't get them where they need to go. Nor does the "Facebook" case out of the ninth circuit. I mean that case only --

THE COURT: Again -- again, Mr. Melodia, I don't see any simultaneous or contemporaneous requirement in the Massachusetts Wiretap Act. I don't see it. Am I missing something? Is it there? Have I just overlooked it?

MR. MELODIA: -- well I think it doesn't say the word "simultaneous", your Honor, that is true. However, what it does say is a third party needs to have heard or recorded a communication. And that didn't happen here. As alleged, it didn't happen here. There was no recording, secret or otherwise. And there was no hearing, secret or otherwise by Facebook, or Google, or any third party to communication number one, the get communication, as pled by Mr. Barnes in the complaint and as is obviously found in the Smith affidavit repeatedly.

THE COURT: Okay. Let me pause for a moment --

MR. MELODIA: So that's my point.

THE COURT: -- Mr. Melodia. I'm going to ask you to pause there. I'm going go through these claims

one at a time.

Mr. Barnes, briefly what do you have to say in response to Mr. Melodia's point that it's not the same communication?

MR. BARNES: Well, your Honor, if you have Mr. Smith's declaration -- well, do you have the complaint in front of you?

THE COURT: I do. The amended complaint, yes.

MR. BARNES: Right. If you go to paragraphs 103 and 104, they are on pages 24 and 25. Mr. Melodia says --

THE COURT: I have them.

MR. BARNES: -- Mr. Melodia says there are two separate communications here. And I want to provide just one example from the complaint to show that there are not two separate communications. Your Honor has it right. The Massachusetts law makes no distinction that the federal law does. But if you look at paragraph 103 there is the button up there at the top right screen in the screenshot that says "enroll or sign in to patient gateway."?

THE COURT: Yes.

MR. BARNES: Okay. When a patient clicks that button what happens is that's the patient's communication. That is the patient's sole

communication to Mass General Hospital in that example. It starts a transmission of data and exchange of content between Mass General and the patient's web browser. But immediately upon clicking that button the source code Mass General puts on its website redirects the content, the precise content of that button click to Facebook. And that's shown in paragraph 104. You see --

THE COURT: I see.

MR. BARNES: -- at the top of the graph where it says "EV subscribe button click", and then it says "button text enroll or sign in to patient gateway." That's not a -- the patient did nothing else to send that data to Facebook. That's entirely the result of the source code that Mass General put on its web property. And the same is true of every other communication we're talking about in this case. As it relates to the Facebook tracking pixel, your Honor, this piece of source code is set up in a way that Facebook actually gets the content of the communication in most circumstances before Mass General even receives it. And the reason for that is Facebook wants to make sure that it gets it.

I also heard Mr. Melodia say that this is only because the plaintiff's web browsers are configured

-- they had to choose to let this happen. First of all the default setting out of the box, this happens in the default setting out of the box.

Second of all, I believe we've alleged in the complaint -- I don't have the particular paragraph, we've alleged the deployment of what's called cookies syncing technology. And what cookie syncing technology means is that even if a user tried to block Facebook's cookies and tracking on a website like MGH, it happened anyway because of this cookie syncing. They've hacked -- they've figured out a way to hack their way around the browser settings that would block this tracking behavior.

So there is no separate communication of the patient. And the Massachusetts Wiretap Act is set up to protect the communications of people, not of the redirections caused by intercepting devices.

What Mr. Melodia is essentially asking this Court to do is repeal the wiretap act. Because if you think even in the context of a traditional wiretap act, right, where there's a bug on a telephone, a bug on a telephone results in the content of that communication being delivered to the recording interceptor along a separate path from the communication between the victim's phone and the

person they're speaking with's phone. The bug sends it this way. And that's exactly what this Facebook source code does. That's why they're called web bugs, your Honor.

THE COURT: Got it. All right, I think I've got it Mr. Barnes. Thank you, sir.

So Mr. Melodia, I think I've got this one, sir. I -- this is a motion to dismiss. I'm going to deny the motion to dismiss with respect to the wiretap claim. Again, a different matter whether that claim ultimately succeeds, but on a motion to dismiss I've got to -- I have to deny the motion with respect to -- that's Count One.

We talked briefly about the invasion of privacy claim. That's statutory as well. "Has to be an unreasonable, substantial or serious interference with privacy, and whether the intrusion is unreasonable, substantial or serious presents a question of fact." That's the "Polay" case from the SJC back in 2014. And again when I look at the allegations of a complaint of what the plaintiff allege is that the defendants are disclosing confidential patient medical information to third parties, including information about their medical condition. Here's what -- okay, you can -- I'll

listen to you in a moment Mr. Melodia, but here's what I saw in the complaint. And if I'm misreading it you can point it out to me. But what I see in the complaint is plaintiffs allege that the defendants are disclosing confidential patient medical information to third parties, like Facebook and Google, that the information includes information about the patient's medical condition and diagnoses, and interest in particular specialists. For example what we just discussed, the perhaps a patient's interest in a breast cancer specialist. And that they're doing it in a way that allows the third parties like Facebook to correlate that information and identify the particular user.

So again, you say that's not an unreasonable, or substantial or serious invasion of the privacy of those people. I am not sure I see it that way.

MR. MELODIA: Well, your Honor, I would never say that the disclosure of an individual's personally identifiable health information was not serious and substantial. The hospitals completely understand that. I understand that. Nobody is disputing that. But that's not what's happening. Not because --

THE COURT: But pause one moment. What's happening is a different animal.

MR. MELODIA: Okay.

THE COURT: So that's the point I'm trying to get across here --

MR. MELODIA: I get it.

THE COURT: -- is there's a huge dispute between these parties with respect to how this technology actually works and what's being transmitted. I got that. I understand that. But my point is simply I've got a motion to dismiss. So what I have to do is I have to accept plaintiff's version which is no, it is happening, it is happening. That's what plaintiffs allege. And in those circumstances if it is happening isn't that an invasion of privacy?

MR. MELODIA: Well if a true medical condition of an identified individual were being transmitted to Facebook and Google from our website that would be actionable, that would be an invasion of privacy, that would be substantial and serious. But that's not what really is alleged. They use the word medical conditions, but what they're talking about is searches, and URLs and search terms on a public website like these hospitals. And that is not actionable. That is not PHI. That is not covered by HIPAA. That is no way protected health information. PHI is defined by the law. It's also not even

personal information as defined by Massachusetts law.

THE COURT: If a patient has --

MR. MELODIA: And --

THE COURT: -- has breast cancer for example. Again, obviously something that can be deeply disturbing to that patient for good reason --

MR. MELODIA: -- certainly.

THE COURT: -- there's something that they do not wish to disclose publicly. They get on the MGH website and start cruising the MGH website for information about breast cancer and about breast cancer specialists. Maybe they're looking at Dana-Farber. I don't know. But they're looking on your defendant's websites for information that will help inform them about, you know, their diagnosis, about what alternative treatment alternatives exist, who their treatment, you know, provider should be. All of that information seems to me that can be, very possibly is, confidential information, confidential patient information. That patient doesn't want other people to know that the looking for information about breast cancer diagnosis, and treatment and potential providers. But that's the kind of information that plaintiff say is shared with Facebook and that Facebook can then trace back and say we know that

this particular Facebook user is looking for a breast cancer specialist. That's what they allege. And I don't -- again, I don't think I've got the allegations wrong. That's -- whether again that's true in the real world is not a matter for me to resolve today. But that's what they allege. Isn't that enough to support a claim for invasion of privacy under Mass law?

MR. MELODIA: Not to an unidentified individual, your Honor. They may be a patient in the same way again that somebody may be a client going onto a law firm website, but they are not a patient on a public website with disclosures telling them that cookies are being used and tracking is happening. Not to mention the disclosures that they agreed to which Facebook and Google when they became users of those products to begin with. So no, your Honor, somebody -- whether they're a patient or not, that visits a general website -- they could be on Google.com, they could be on WebMD, they could be anywhere doing that search, and if their information went to Facebook and Google from any of those websites, it is not the website operator's business whether that operator is a hospital or anybody else; Google, or WebMD, or anybody else, to know that that person's a patient.

In fact, the hospitals don't know. And they don't try to know in any way who a device ID represents, because as I mentioned at the outset, a device ID could represent -- I'm sorry, not a device ID, an IP address, can represent any number of people, any number of devices. And it doesn't tell us that that person is a patient doing a search on their condition. That is not what personal health information is, protected health information is. It has to be identifiable to an individual. And that's not, because all you're doing is a search on a public website from a certain IP address that can change over time, can change that day. And it could be you, it could be somebody doing medical research for a friend or a family member, it could be somebody doing a term paper in eighth grade or in medical school. It could be a competing research facility that wants to know what's going on at Dana-Farber because they just won, you know, a Nobel Prize in that particular area, and so let's find out more about the research. That does not signify patient status.

And importantly, this idea -- I want to go back to paragraph one of three that Mr. Barnes was highlighting. That's a really important paragraph in the complaint because that shows us the page from

which the Court seems concerned that there could be a direct portal into actual patient records and the types of HIPAA protected information that does deserve full protection and is subject to HIPAA, and is subject to the notice of privacy practice; NPP that is prominently displayed as it is required to be by federal law on the website. Not because there's PHI on the website, but because that notice has to be disclosed on a website in the same way for example that you put a notice of a federal employment law like a parental leave policy. You put that on the bulletin board of the employer. That doesn't mean that everybody who walks by the parental leave policy becomes a parent and has a right to all of a sudden get leave and get paid for leave. It doesn't create a new right, nor does the NPP create rights or signify that there's PHI or patient activity going on on these websites. Instead these websites are about the services being offered in the appropriate places, in the protected places. These hospitals know how to handle HIPAA. And as your Honor pointed out in his paragraph 146 of the amended complaint makes really clear this is not about the patient gateway. This is not about what's behind a firewall. Where you get if you log in with a user name, and credentials and a

password, that's where you can make an appointment with a doctor. That's where you can communicate with a doctor. That's where your PHR or your pharmacy records are. None of this that is going on on a public website is protectable. And it's certainly not a substantial and serious privacy concern. If it is, then websites across the world -- not just for hospitals, because this basic principle would flow through to virtually every profession, every website dealing with any sort of information that if it were linked truly to an individual, an identifiable individual could be of concern. But it's not. That's the entire reason to have a general website, and then a separate distinct URL which is the patient gateway. Which I'm not sure whether that's become clear enough yet that that is a separate URL --

THE COURT: No, it's clear.

MR. MELODIA: Okay. I --

THE COURT: I promise you it's clear. And also -- I'll also tell you I think at a macro level I agree with you I think that HIPAA is a bit of a red herring in this proceeding and in these arguments, okay? I'm not persuaded that HIPAA really has much of a role to play in the analysis that I have to undertake. But I'm taking it --

MR. MELODIA: Well --

THE COURT: -- in a much more maybe mundane pragmatic level, which is I've got a complaint that alleges that take aside, ignore the patient portals, that patients who use the defendant's website for other purposes, their own personal medical purposes, that that information is in fact being shared with third parties through the website. And that -- we'll get to -- at some point in time again I want -- we need to re-circle, circle back on the question of disclosure and consent, we're going to get there. But I -- and that's what I've got is alleged here.

So Mr. Melodia I'm going to ask you to pause for a second.

MR. MELODIA: Mm-hm.

THE COURT: Mr. Barnes, two minutes, anything you want to say on this -- we're talking about invasion of privacy.

MR. BARNES: Right, your Honor. I think I want to answer that I think there is a question there in HIPAA's role and the analysis. We would agree that the Court doesn't have to ultimately reach any HIPAA question here. But HIPAA does play some role in the analysis. And let me explain why. And the first place I think to start is paragraph one where Mass

General's chief marketing officer says the trust and confidence that you have in your --

THE COURT: This is the sacred language, the sacred language that if I -- I wish I could search your complaint for sacred, I think it would pop up a number of times. Certainly plaintiff's made good use of that language. I got it.

MR. BARNES: -- right. And those are their words.

THE COURT: Yes, I understand.

MR. BARNES: And part of that is patients to a person understand -- they might not know the line and detail of the HIPAA statute and HIPAA regs, but they've got this idea that HIPAA protects their personally identifiable information from disclosure from their healthcare provider. And that idea is furthered when they show up for their first appointment and it's required by law that the HIPAA notice is provided to them. And as you noted in the previous hearing, that HIPAA notice says we never share your personal information for marketing purposes without your written authorization. And "never" is in italics. And so any time that a patient goes to these web properties they go to -- they go there with the -- they're bringing with them

this baggage so to speak, this trust and confidence that their healthcare provider is not like Zappos.com. They're not buying shoes here, Judge, they're talking to their healthcare provider. Okay? And so that colors every other disclosure that there may or may not have. And I want to -- we can get further into those disclosures later but that colors everything.

In addition to that Mr. Melodia keeps talking about public websites, oh, and basically making the argument I think that there is no privacy on public websites on the internet. Well, your Honor, the "Pharmatrak" case called that argument frivolous. Not my words. That's the first circuit's words to the argument that hey if you go on the internet you need to be wary.

The second thing is that didn't prevent the court in "Medstar" -- "Doe versus Medstar" from finding a claim, or "Doe versus Virginia Mason", or the "Google Cookie" case that I happened to argue, or the "Nickelodeon" case that I happened to be counsel for the plaintiffs on, or "Weld versus -- well, "Weld versus CVS" was not an internet privacy case, or the Facebook" internet case that the ninth circuit said was actionable on which I represented the plaintiffs.

This is squarely in the line of those cases. If anything, the conduct of the defendants here are worse.

THE COURT: Thank you.

MR. MELODIA: Your Honor, may I respond?

THE COURT: Mr. Melodia, one minute, I'll give you one minute to respond. But then we're going to keep moving.

MR. MELODIA: It's absurd to say that the conduct here was worse. The whole idea of the "Google" case in the third circuit, the "Nickelodeon" case in the third circuit, and the "Pharmatrak" decision is outright deception by the plaintiff -- by the defendants against the plaintiffs, the active hoarding of their efforts to protect their privacy and active deception; saying one thing and doing another. The only thing that plaintiffs can come up with to try to create the impression of that here is by tying us to a promise in the NPP which only applies, according to OCR, when you have PHI. So if your Honor is true to his words --

THE COURT: Believe me -- pause for a moment Mr. Melodia. I've got it. There's always a certain level of hyperbole in these arguments. Okay? And so I've got it. I heard what Mr. Barnes had to say.

Here's what we're going to do. I'm denying the motion to dismiss with respect to the invasion of privacy claim. Folks, that's a very ambiguous right in Massachusetts, but it seems to extend to confidential medical information. And the allegations of the complaint are that patient's confidential medical information is being shared probably without their knowledge or understanding with third parties. That it seems to me that at least states a viable claim for invasion of right of privacy under Massachusetts law. So I'm going to deny it.

We've got a breach of fiduciary duty claim. Here's the -- I think we can deal with this one pretty quickly.

Mr. Melodia, I read the arguments. Not a lot of ink was spilled on either side on this one. But I did. So I was interested to see actually the SJC has recognized a fiduciary obligation on the part of physicians not to disclose medical information. They did that in the "Alberts versus Devine" case. And the appeals court has picked up on that as well in the "Corper versus Weinstein" case. So --

MR. BARNES: Yes.

THE COURT: -- those cases seem to recognize yes

in Mass a physician could have a fiduciary obligation not to disclose -- or the opposite side, flip side of the coin is to maintain the confidentiality of a patient's medical information.

So basically what we've got alleged here, it seems to me that it's potentially -- potentially it's a breach of fiduciary duty. And it seems a little bit of an odd fit. But those cases recognize a fiduciary obligation.

MR. MELODIA: But we're being -- no, that would be I think clear error to find that in this case. Because --

THE COURT: It wouldn't be the first time, but go ahead.

MR. MELODIA: -- no. But this one -- clearer than most, your Honor, because of this reason. Look, the -- if you take as a given that a physician can have such a personal fiduciary relationship with a patient in the same way that for example a priest might have with a parishioner like the "Petrelvy Reposi"(phonetic) case we've cited, case nine of our brief. That's fair enough, those are personal relationships. I'm not contesting that. I don't think we ever contested that. The point here is nobody has sued a physician. We've sued hospital

systems and hospitals. Fundamentally what the "Petrelvy Reposi" case stands for is that the church as an organization and the diocese is not the priest. Nor is the physician, the hospital or the hospital system. There's fundamentally a difference in a fiduciary --

THE COURT: So you're argument essentially that an organization can't owe a fiduciary obligation? It has to be an individual obligation? Am I characterizing --

MR. MELODIA: -- it has to --

THE COURT: -- correctly?

MR. MELODIA: -- but I think there are times when you could have a sole proprietorship or something, your Honor, where there's an organization technically speaking, but there is a personal relationship. I'm not suggesting that it only has to do with how many people or the corporate form. I'm having -- I'm talking about where the reality of the relationship rests, where the duty rests. And the duty rests not with the hospital in terms of an individualized personal relationship with the plaintiff here, with the patient. Rather it rests with the physician. In the same way that --

THE COURT: Well pause, Mr. Melodia. You're

confusing me. So are you saying for example that MGH doesn't have any duty or obligation to its patients?

MR. MELODIA: -- well --

THE COURT: You have MGH -- let me finish the question. Does MGH, or Dana-Farber, or Brigham, have any duty as organizations not to disclose their patient's confidential information? Do they have a duty?

MR. MELODIA: Yes, under HIPAA, absolutely, your Honor. They have a --

THE COURT: You don't think they have any common law duty? So when the SJC talks about a physician's obligation not to disclose confidential medical information of a patient again you don't think that there's a comparable duty on the part of the organizations as well?

MR. MELODIA: -- I don't think there's a fiduciary duty, your Honor. I think you could have a negligence claim, your Honor. There could be a duty in the negligence sense. So you could have a breach of a duty in the negligence claim potential. But I can't see -- I mean and of course if an institution says one thing and does another, you know, there's a problem there. But that's not what we have here. We're trying to impose a fiduciary duty. And that is

different in the law than other types of duties, including duty in the negligence sense. So I'm not suggesting in any way that any of these hospitals don't fully understand and meet their obligations for privacy. But these are highly regulated institutions. And HIPAA does (inaudible -- indecipherable at 2:57:51) how they approach these issues. So to sort of suggest that HIPPA defines the expectation as Mr. Barnes would have it, of everybody walking in the door, and yet HIPAA doesn't really technically have to apply and we don't really have to find that PHI is present (inaudible -- indecipherable at 2:58:10). That's disingenuous. So I think here there is no case law that extends anything in terms of a fiduciary duty to institutions in the (inaudible -- indecipherable at 2:58:23) of hospitals here.

THE COURT: Got it. All right.

MR. MELODIA: And I think it would be a mistake.

THE COURT: Mr. Barnes, he says institutions, that the duty that's been recognized by the Supreme Judicial Court and the Mass Appeals Court doesn't extend to the institutions, it's personal to the physicians. What do you say?

MR. BARNES: Can you hear me, your Honor?

THE COURT: I can hear you, sir.

MR. BARNES: Okay. Sorry. I got -- the technology got mixed up here. Well we disagree, your Honor. I don't think that should surprise you, for a number of reasons. First, the case "Doe versus Harbor Schools", the Massachusetts -- the Supreme Judicial Court outlined that a fiduciary duty exists quote, "When one reposes faith, confidence and trust in another."

Paragraph one -- to go back to it, the quote from Mass General's own chief marketing officer was "The trust and confidence you place in your existing or potential healthcare provider is sacred."

That fits the Massachusetts test and we're there.

The "CVS" case found a breach of fiduciary duty of the first go-around. That's a corporate entity. And I think the "Alberts versus Devine", which you mentioned your Honor, that court -- the court clearly said just because a certain fact pattern hasn't come before us before doesn't mean the common law doesn't recognize a cause of action in that fact pattern. And it's not a far stretch. And it's interesting because the remedy for a dismissal for failure to name the corporate entity is to bring in every doctor at all of these hospitals as defendants in this case, which would be somewhat unwieldy and we don't really

think that's the thing to do because the corporate entities were the ones making the decision to put this source code on these web pages.

And your Honor, there's one thing I'd like to -- Mr. Melodia said -- seemed to suggest we were making the argument that HIPPA defines the expectations. I think that's the opposite of the argument I made. It's that HIPAA colors the expectations. And I'd like to give you an example as it relates to this breach of fiduciary claim.

THE COURT: Yes.

MR. BARNES: Okay? If an oncologist clinic took down the phone numbers of everyone who called the public phone line for that clinic and some basic notes on the topics of what the caller discussed, and at the end of the day they bundled all of that up and they sent it off to a third-party marketing firm and said hey, we want to advertise to these people to potentially come in for treatment at our clinic, would that be a breach of fiduciary duty for that subset of callers who were patients? I think there is no doubt that it would be. But we also know that there would likely be some pharmaceutical drug reps who had called. There may be some random advertising people who had called. There may be other doctors

who had called, who would have been in that batch of phone numbers that was sent to the third-party marketing company. But the fact that those positives might exist in the data does not negate the hospital's duty to its patients. It can't just give patient information away. And the other thing, your Honor that's relating to this is it's not just the enroll or sign in to the patient portal click that attaches patient status to a person at the primary website, it's also all kinds of other things, like when they look up to request an appointment, when they look up at Dana-Farber to get a second opinion. Those examples are in our complaint. And we specifically pled that our clients -- and you stated this earlier, we specifically pled that our clients used that sign in button to get where they were going, which attaches patient status to them. It's as if they called the phone line and the phone number said hey, press one if you're a patient --

THE COURT: I'm not sure I --

MR. BARNES: -- and you press one.

THE COURT: -- I agree with you on that point Mr. Barnes. But okay, I think I've got it.

So here's what I'm going to do with respect to this claim. Folks, I want to reserve -- I want to

take a look. I want to take closer look at the point that Mr. Melodia raised. Certainly again I agree with the Mass law definitely recognizes some sort of fiduciary obligation. And it's kind of interesting. You read -- I read the "Alberts" case earlier. You can see sort of the SJC wrestling with the notion of there is this obligation and how they're going to characterize it. Ultimately they say it's a fiduciary obligation. I can't say they look like they're entirely comfortable with that. But I -- but that's what they hold. I need to go back and take a look, and see whether that would extend to the organization as well. So I'm going to defer on that one.

That leaves the 93A claim. Let me jump on that one.

So Mr. Barnes, front and center, you have on that one, 93A. So the SJC has held -- let me pull it up, they held in the "Linkage Corp versus Trustees of Boston" case, "That in most circumstances a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission."

So you have to agree with me Mr. Barnes that these websites definitely are part of the core

mission of these institutions.

MR. BARNES: Well I -- accept that the reason for the -- for the use of these marketing tools is to increase revenue, gain more patients --

THE COURT: I saw that.

MR. BARNES: -- your Honor.

THE COURT: But that's not what we're talking about here. We're talking about the relationship, the interaction between these organizations and the patients, your clients. So your patients, they're going to this website, they're going to these websites because they're looking for healthcare information. Part of what these defendants provide. That's their core mission is to provide healthcare to people who need it. And so it's a little difficult to say that really anything that goes on at these websites is trade or commerce when it's part of the core. It's the core mission of these not-for-profit healthcare institutions. And I'll hear you, but I'm wrestling with it. I don't see how you can see it any other way.

MR. BARNES: Well, thank you for that warning, your Honor. And I --

THE COURT: Laughing. Go for it. Go for it. You know, it's never caused people to hold back in

the past. Go for it.

MR. BARNES: -- okay. So your Honor, I think that the Massachusetts Consumer Protection Act is out there to -- it's not just to protect consumers, it's to protect businesses engaged in commerce from unfair methods or practice in their business.

There is no doubt that these hospitals compete against other institutions that are not nonprofit institutions; that are for-profit institutions. And that --

THE COURT: But you're not pursuing a claim on behalf of other institutions against these hospitals. You've got individuals. So if anything, this is a Section 9 claim, 93A, Section 9. It's not business to business.

MR. BARNES: -- correct. And I want to connect the dots to why it involves commerce. It's because it involves competition for the dollars that are attached to those consumer patients that it involves commerce. And in -- first of all we have alleged it, but in addition to that I think the opposition papers on the motion for preliminary injunction it's conceded that this was to increase patient volume to -- it's a marketing effort. That's what these tools are, they're marketing efforts. Maybe it would be

more appropriate to -- do you want me to talk about -- we've got a couple documents in discovery that we're going to provide for the Court relating to the motion for preliminary injunction that I guess can wait, or if you want me to speak about them now, your Honor, I can.

THE COURT: No, well actually, let's stay on -- if you don't mind just stay on this point for the moment, which again is what we're talking about are the websites. That's the core.

MR. BARNES: Yes. That --

THE COURT: That's the core of the complaint, is what happens on the websites. And again it seemed -- I don't think you actually -- with all due respect, I don't think you answered the question which is the website --

MR. BARNES: -- well, I wanted --

THE COURT: -- the websites --

MR. BARNES: -- what --

THE COURT: -- seem to be again to be front and center even these days. There are probably more people interact with these institutions via their websites than in person I'm guessing. But in any event, that the websites are part and parcel of what these folks deliver which is healthcare, healthcare

advice and it's part of -- when you look at it that way you can't characterize it I don't think fairly as anything other than part of the core mission.

So Mr. Barnes, you want to take another crack at it?

MR. BARNES: Yes. I think the Court should narrow in a little bit further. It is about the websites. It's also about the deployment of these specific invisible marketing tools on those websites, and how those marketing tools are used by the defendant to increase revenues by bringing more patients to their facilities to increase revenues. That's the purpose of this, is to increase revenue. And our argument is look, when you have an entity engaged in commerce -- and they are engaged in commerce and they're taking -- making an effort to increase their revenue that falls under the Chapter 93A, Section 9.

THE COURT: It seems to me -- I hear you Mr. Barnes. What I think you're saying though is you're focusing on what you allege are the unfair or deceptive acts or practices. But again, the context in which those purportedly arise is in the websites.

Mr. Melodia, do you want to say something on this point?

MR. MELODIA: Just a little bit, your Honor. You know the case your Honor cited, the "Linkage" case from the Supreme Judicial Court was actually the case the plaintiffs cited. There are two other cases; the "All Seasons Services" case against the "Boston" -- then called "Boston City Hospital" and the "Melrose Wakefield Hospital" case, both cited in our briefs. Those are cases that show where hospitals; nonprofits, were engaged in conduct that if a for-profit were doing it could be something that makes money. But that doesn't mean, according to the Supreme Judicial Court, that automatically because one markets, or advertises or amplifies the message of these public charitable institutions that automatically that converts it to trade or commerce. So if there is no message that get out there, if there is ultimately no margin to the services offered, there is no mission, there is no public charity to be had because the organizations won't exist very long.

So I think in addition to the point your Honor made even taking Mr. Barnes' representations as, you know, part of what he's after in this case, focusing on the advertising tool, that isn't enough to convert this to trade or commerce under the case law from the

Supreme Judicial Court.

THE COURT: Okay. All right, Counsel.

Mr. Barnes --

MR. BARNES: Your Honor?

THE COURT: -- yes, very briefly, sir. Yes?

MR. BARNES: Very briefly. So I'd like to point out the defendant's memorandum on page 13 characterized what it's doing here as quote, "routine commercial behavior." And the precise quote from Linkage Corp -- and it cites to a Planned Parenthood case is "That where an institution has inserted itself into the marketplace in a way that makes it only proper that it be subject to the rules of ethical behavior and fair play."

And I think that language from the case lends itself to what I was speaking about earlier that the CPA is designed not just to protect consumers, but one of its purposes is to make sure there is ethical behavior and fair play in the marketplace. And that means making sure that even nonprofit corporations when they're engaged in revenue enhancing activities in the marketplace they're subject to the CPA.

THE COURT: That would be true for all sorts of activities it seems to me that not-for-profits would be engaged in.

I'm going to dismiss Count Four. Again, SJC has indicated that as a general matter 93A doesn't apply when a charitable institution undertakes activities in furtherance of its core mission. Again, I can't describe these websites as anything other than part of these defendants' core mission. So maybe this is another instance of my clear error. I don't think so, but I'm going to run with it.

All right, let me address the motion for preliminary injunction. Folks, I'm denying that motion. And here's why. I read everything that was supplied to me in the aftermath of our last hearing of the various submissions; the written submissions, the affidavits, the further letters. A preliminary injunction is prospective in nature. And anyone who was alive and listened to or participated in our last hearing on this matter understood that I had very significant concerns that really revolve primarily around issues of notice and consent on the part of users of these websites. And consent seems to me, if it exists, effectively moots all of the plaintiff's claims. So a lot of your fight here is going to be about consent, whether there is in fact consent. By plaintiff's own admission defendants already have gone a long way to solving the problem. I know

that's the same -- that's the equivalent of the sacred language that you're probably going to hear a lot about Mr. Barnes, but by including those cookie banners and other changes in their websites. I mean I got on folks. I looked at the cookie banners. And I -- they're also recited in the papers. And I don't -- I'm not required to say I think in the preliminary injunction context whether those changes are sufficient to eliminate all liability. In fact it seems to me the cookie banners might make some reference to the fact that actually the institutions share some of the data that's collected with third parties. That could be referenced it seems to me in the cookie banners as well. But I'm not -- it's not up to me to dictate the language of the cookie banners. But it does cause me to conclude that in light of those changes and in light of the prospective nature of a preliminary injunction that the defendants -- that the plaintiffs have not demonstrated a likelihood of success going forward.

And I'll also mention that I think the changes that have been made significantly undermine plaintiff's irreparable harm arguments because if the nondisclosure -- if nondisclosure of confidential information is of great importance to a user of those

websites then I suspect that they'll click on those privacy notices that are presented to them in the cookie banner and that they will get a fairly good understanding of what is actually happening with their data and how it can be used.

And so it seems to me in those circumstances they have a means themselves, it's available to them, to address any potential irreparable harm.

So I'm going to -- it seems that this is not a case right now that calls for a preliminary injunction. I'm denying the motion for preliminary injunction for the reasons that I've stated.

Counsel, some of this case is going to survive. I have to get back to you with respect to the count for breach of fiduciary duty. I'm going to do that quickly. It's not going to take me very long. I'm going to do that research. You should get my decision on that by next week.

We need to give you a next date in this case. All right. It's going to take -- regardless of how I rule with respect to the breach of fiduciary duty claim, some of the claims survive, which means that defendant's going to need to respond and then I need to answer the amended complaint in this case.

Mr. Melodia, how long do you think it's going to

take for your client's to do that?

MR. MELODIA: I'd ask if 30 days from your Honor's ruling on the fiduciary duty?

THE COURT: Yes, I'm going to give that to you next week. So let's just pick a date that works.

Mr. Barnes, 30 days, that sounds reasonable in the circumstances, do you agree?

MR. BARNES: More than reasonable, your Honor.

THE COURT: So let's just say -- well, I'll give you until the end of December. That works. So December 31st, Mr. Melodia, you need to get your -- please if you would, get the answers on file, get those served.

Then let me give you -- see if I can set you up for a Rule 16 conference in this case say maybe later in January? Does that work?

MR. MELODIA: It does.

MR. BARNES: Yes, your Honor.

THE COURT: How's the 26th look, or the 27th look Ms. Brooks?

MR. MELODIA: We will make either work, your Honor.

THE COURT: Are they problematic Mr. Barnes? If those are problematic I can give you other dates. There's no urgency to those dates?

MR. BARNES: I don't believe so at this point in time.

THE COURT: Maybe move it to the first week of February, is that better? I want to give --

MR. BARNES: I've pulled up --

THE COURT: -- the parties are going to need to get together. You're going to get a Rule 16 order in this case which is going to require you to confer, come up with some -- a proposed agenda for Rule 16. I just want to leave you enough time in this case to do that.

MR. MELODIA: The first week in February would work for me, your Honor if it works for Mr. Barnes.

THE COURT: Mr. Barnes, you get to choose --

MR. BARNES: I'm sorry. As soon as you give me -- it will -- tell me, I can look at my calendar, your Honor. I'm -- it's -- my computer is locking up a little bit here.

THE COURT: All right.

MR. BARNES: Hold on.

THE COURT: That's okay.

MR. BARNES: Okay. The --

THE COURT: Yes, this is going to be on Zoom, so no travel required.

MR. BARNES: -- yes. Okay. Earlier in the week

is better for me, your Honor.

THE COURT: All right. How about the 2nd of February?

MR. MELODIA: Groundhog Day, works, your Honor.

THE COURT: Mr. Barnes, February 2nd, is that early enough?

MR. BARNES: Yes, your Honor.

THE COURT: All right. Let's do it 2:00 p.m. please on February 2nd is going to be your Rule 16 conference. Again, it will almost certainly be a Zoom folks, unless those vaccines are available in vending machines in the next eight weeks.

So with that, we'll do it via Zoom on the 2nd. Again, you're going to get a notice and an order from the court that tells you what needs to be done in advance of the Rule 16. Please come with an agenda. And actually if you get that to the Court in advance that would be appreciated.

Also, we'll invite you -- you're going to need to work out some tracking order dates in this case, meaning discovery deadlines; things of that nature. I ask you in this first instance to confer. We try to be pragmatic about that in this session which means we're interested in your input and what you think works in this case. So again I will give you

the dates that you propose but we're very interested in what you think is reasonable in the circumstances. So please --

MR. MELODIA: Your Honor, we've been cooperating already on discovery, notwithstanding the pending motions. So I suspect we'll have no problem doing that.

THE COURT: Good. Okay. So I'll give you a new date for a next date for a Rule 16 conference on the 2nd of February. I will get you a decision on that one remaining count, which I think is Count Three; the breach of fiduciary duty count. I want to take a look at the case law on that. So you'll get that by next week. I'm not expecting to do anything elaborate folks, but I will give you an answer by next week.

Is there anything else that we can accomplish on this case today, Counsel? No?

MR. MELODIA: No, your Honor. Thank you your Honor.

THE COURT: Thank you.

MR. BARNES: Thank you, your Honor.

THE COURT: Stay well everyone.

MR. MELODIA: Thank you. You too. Have a good weekend.

(Hearing ends at 3:18 p.m.)

C E R T I F I C A T E

I, Raymond F. Catuogno, Jr., do hereby certify that the foregoing is a true and accurate transcript, prepared to the best of my ability, of an audio recording provided to me in the matter of John Doe vs. Partners Healthcare System, Inc.

I, Raymond F. Catuogno, Jr., further certify that the foregoing is in compliance with the Administrative Office of the Trial Court Directive on Transcript Format.

I, Raymond F. Catuogno, Jr., further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.



Raymond F. Catuogno, Jr.
November 25, 2020
9 Hammond Street
Worcester, MA 01610
raycatuogno@realtimereorting.net

The Commonwealth of Massachusetts
**OFFICE OF COURT MANAGEMENT, Transcription Services**

## AUDIO ASSESSMENT FORM

***For court transcribers:*** *Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** 11/25/2020 **TRANSCRIBER NAME:** Raymond F. Catuogno, Jr.

**CASE NAME:** Doe v Partners Healthcare System **DOCKET NUMBER:** 1984CV01651

**RECORDING DATE:** 11/20/2020 **TRANSCRIPT VOLUME:** I OF I

*(circle one)* TYPE: **CD** TAPE QUALITY: EXCELLENT GOOD **FAIR** POOR

*(circle all that apply)* **ISSUES** *(include time stamp):*

**background noise** **time stamp:**__________

**low audio** __________

**low audio at sidebar** __________

**simultaneous speech** __________

**cannot understand** 2:05:10, 2:06:54, 2:08:38, 2:13:15, 2:13:20, 2:22:43, 2:25:30, 2:57:51, 2:58:10, 2:58:23.

**other:**__________ **time stamp:**__________

**COMMENTS:**

Date Filed 8/11/2023 5:27 PM
Superior Court - Suffolk
Docket Number 2384CV01086




**0**

0 ---------------- 1
01 --------------- 3
01610 ----------- 67
04/15/2019 ----- 68
05 ---------- 6, 68
06 ---------- 8, 68
08 ---------- 9, 68

**1**

1 ----------- 1, 68
10 --- 2, 6, 48, 68
100 -------------- 2
1001CR006761 --- 68
103 ------------ 29
104 -------- 29, 30
11 ------------- 68
11/13/2018 ----- 68
11/2 ----------- 68
11/20 ---------- 68
111 -------- 13, 14
12 ---------- 1, 3
13 -- 1, 12, 58, 68
1323CR0284 -- 1, 68
146 ------------ 38
15 -------- 12, 68
1523CR001679 --- 68
1523CR1679 ------- 1
16 - 62, 63, 64, 65
18 ------------- 66
1984CV1651 ------- 3

**2**

2 -- 1, 3, 6, 8, 9,
12, 20, 23, 48,
64, 68
20 -- 1, 12, 23, 68
2001 ----------- 23
2013 ----------- 68
2014 ----------- 32
2015 ----------- 68
2016 ----------- 68
2018 ----------- 68
2019 ----------- 68
2020 ---- 1, 67, 68

22 ----------20, 68
23 ----------48, 68
24 ---------------29
25--1, 23, 29, 67,
68
26th ------------62
272 -------------15
27th ------------62
2nd---------64, 65

**3**

3 -----------66, 68
30------23, 62, 68
327---------14, 22
38------------9, 68
31st ------------62

**4**

40 ---------------20
400 -------------13
43 ----------20, 68

**5**

5 ---------------68
5/2 -------------68
5/20 ------------68
51 ----------48, 68
54 ------------8, 68
57 ----------48, 68
58 ----------48, 68

**6**

6 ---------------68
67 -----------1, 13

**7**

74 --------------14

**9**

9-------54, 56, 67
99 --------------15

**A**

a 3, 4, 5, 7, 8, 9,
10, 11, 12, 13,
14, 15, 16, 17,
18, 19, 20, 21,
22, 23, 24, 25,
26, 27, 28, 29,
30, 31, 32, 33,
34, 35, 36, 37,
39, 40, 41, 42,
43, 44, 45, 46,
47, 48, 49, 50,
52, 53, 54, 56,
57, 58, 59, 60,
61, 62, 63, 64,
65, 67
A ------- 1, 59, 67
abet ------- 20, 21
abetting -------- 19
ability ---- 19, 67
about 7, 8, 9, 10,
11, 12, 13, 14,
15, 19, 22, 25,
30, 32, 34, 35,
37, 38, 40, 42,
46, 47, 53, 55,
56, 58, 59, 64
absolutely 13, 27,
47
absurd --------- 43
ac - 6, 21, 26, 34,
39
accept - 7, 12, 20,
22, 23, 34, 53
access ------ 9, 19
accessed -------- 13
accomplish ----- 65
according 8, 43, 57
accurate -------- 67
acknowledged --- 23
across - 6, 21, 26,
34, 39
Act 5, 16, 27, 28,
31, 54
action ----- 49, 67
actionable - 34, 42
active --------- 43
activities 26, 52,
58, 59

activity --- 25, 38
acts ----------- 56
actual 14, 20, 25, 38
actually -- 14, 24, 27, 30, 34, 44, 55, 57, 60, 61, 64
Actually ------- 13
added ---------- 22
addition 3, 23, 42, 54, 57
address -- 5, 6, 7, 14, 16, 27, 37, 59, 61
addresses ------ 24
Administrative - 67
admission ------ 59
advance ---- 10, 64
advertise ------ 50
advertises ----- 57
advertising 50, 57
advice --------- 56
affidavit - 20, 21, 28
affidavits ----- 59
after ---------- 57
aftermath ------ 59
afternoon ---- 3, 4
again 5, 6, 12, 19, 21, 22, 25, 28, 32, 33, 36, 40, 47, 52, 55, 56, 64
Again -- 3, 15, 28, 32, 35, 59, 64
against 43, 54, 57
agenda ----- 63, 64
ago ------------ 17
agree - 26, 39, 40, 51, 52, 62
agreed --------- 36
ahead --- 8, 13, 45
aid 16, 17, 20, 21
aiding 14, 15, 16, 17, 19, 22
alive ---------- 59
all -- 4, 5, 6, 21, 24, 26, 31, 37, 38, 49, 50, 54, 55, 58, 59, 68
All---4, 5, 6, 17, 32, 35, 48, 57, 58, 59, 61, 63, 64
allegation-10, 16, 17, 22, 25, 26
allegations-7, 12, 15, 22, 26, 32, 36, 44
allege-11, 23, 32, 34, 36, 56
alleged 10, 11, 14, 16, 22, 28, 31, 34, 40, 45, 54
alleges-----16, 40
allow-8, 9, 17, 18
allowing--------10
allows------18, 33
almost------15, 64
along-------22, 31
already-9, 17, 23, 59, 65
also 6, 25, 30, 34, 39, 50, 56, 60
Also------------64
alternative-----35
alternatives----35
Alton------------2
always-------7, 43
am-------6, 33, 67
Am----------28, 46
ambiguous-------44
amended 6, 7, 8, 9, 14, 15, 22, 29, 38, 61
among-------15, 22
amplifies-------57
an 6, 7, 9, 12, 14, 15, 16, 19, 25, 27, 32, 33, 34, 36, 39, 42, 45, 46, 47, 50, 56, 58, 64, 65, 67
An--------------19
analogy-----21, 24
analysis----39, 40
and-3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 46, 47, 48, 49, 50, 51, 52, 53, 55, 56, 57, 58, 59, 61, 64, 67, 68
And 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 15, 16, 18, 20, 21, 22, 24, 25, 26, 28, 29, 30, 31, 32, 34, 35, 36, 37, 39, 40, 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 58, 59, 60, 61, 64
animal --------- 33
anonymous ------ 27
another 15, 19, 22, 43, 47, 49, 56, 59
answer - 40, 61, 65
answered ------- 55
answers -------- 62
any 8, 17, 21, 28, 36, 39, 40, 41, 47, 48, 53, 55, 61, 67
anybody - 6, 9, 26, 36
anyone --------- 59
anything 6, 13, 17, 18, 40, 43, 48, 53, 54, 56, 59, 65
anyway --------- 31
anywhere ---- 9, 36
apologize ------ 10
app ------------ 20
appeals -------- 44
appearance ------ 3
APPEARANCE ------ 1

APPEARANCES -- 1, 2
applied -------- 20
applies ---- 27, 43
apply - 26, 27, 48, 59, 68
appointment 39, 41, 51
appreciate ------ 5
appreciated ---- 64
approach --- 20, 48
appropriate 38, 55
April ----------- 9
are 4, 6, 7, 8, 9, 12, 13, 15, 17, 18, 20, 22, 23, 24, 25, 26, 27, 29, 30, 32, 36, 38, 41, 43, 44, 45, 46, 47, 48, 51, 52, 54, 55, 56, 57, 60, 61, 62, 63, 64
Are ------------ 62
area ----------- 37
argue ---------- 42
arguing ------ 3, 4
argument 4, 14, 22, 25, 42, 46, 50, 56
arguments 4, 6, 15, 16, 39, 43, 44, 60
arise ---------- 56
around 10, 20, 23, 24, 31, 59
as - 2, 6, 7, 8, 9, 11, 13, 14, 15, 16, 19, 20, 21, 22, 23, 26, 28, 32, 35, 37, 38, 41, 44, 45, 47, 48, 49, 50, 51, 52, 56, 57, 58, 59, 60, 63
As ----- 28, 30, 63
aside ------ 16, 40
ask 5, 28, 40, 62, 64
aske ------------ 5
asked ----------- 5
asking ----------31
aspects ----------7
assessment ------68
ASSESSMENT ------68
assume ---7, 17, 24
assuming --------17
attached --------54
attaches --------51
attachments ------5
attendance -------4
attending --------4
attention -------10
attorney/client -24
audibly ---------20
audio -------67, 68
Audio ------------1
authorization ---41
automatically ---57
available --25, 61, 64
Avenue -----------2
away ------------51

**B**

back -5, 7, 10, 14, 16, 22, 23, 32, 35, 37, 40, 49, 52, 53, 61, 68
background ------68
baggage ---------42
banner ----------61
banners ---------60
barging ---------10
BARNES ---3, 4, 17, 29, 30, 40, 41, 44, 48, 49, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65
based -------18, 26
bases -----------15
basic -------39, 50
basically ---42, 45
batch -----------51
be --3, 4, 6, 7, 8, 9, 10, 12, 16, 17, 19, 20, 23, 24, 25, 32, 34, 35, 36, 38, 42, 45, 46, 47, 48, 49, 50, 52, 54, 55, 57, 58, 59, 61, 63, 64
became --------- 36
because -- 7, 8, 9, 12, 13, 14, 16, 22, 24, 30, 31, 33, 37, 45, 49, 53, 54, 57, 60
Because 22, 27, 31, 45
become ----- 23, 39
becomes -------- 38
been -- 20, 23, 24, 48, 51, 60, 65
before - 3, 13, 14, 30, 49
BEFORE ---------- 1
begin ---------- 36
beginning ------- 3
behalf 3, 4, 24, 54
behavior --- 31, 58
behind --------- 38
being - 23, 27, 31, 34, 36, 38, 40, 44, 45
believe 19, 31, 63
Believe -------- 43
best ----------- 67
better ----- 63, 64
between 10, 16, 18, 21, 30, 31, 34, 53
beyond --------- 18
bios ----------- 24
bit 39, 45, 56, 57, 63
block ------ 13, 31
bone ----------- 14
Boston 1, 2, 52, 57
both - 5, 7, 18, 57
bouncing ------- 24
bound ------ 22, 26
Box ------------- 2
Braintree ------- 2
breach - 6, 24, 44, 45, 47, 49, 50, 61, 65
breast - 11, 33, 35

brief ---------- 45
briefly 22, 29, 32, 58
briefs --------- 57
Brigham ----- 2, 47
bring ---------- 49
bringing --- 41, 56
broad ---------- 22
Brooks --------- 62
browser 8, 13, 18, 30, 31
browsers ------- 30
bug ------------ 31
bugs ----------- 32
bulletin ------- 38
bundled -------- 50
business --- 36, 54
businesses ----- 54
but 4, 7, 8, 9, 10, 11, 12, 15, 19, 20, 23, 24, 25, 26, 27, 32, 33, 34, 36, 38, 41, 44, 45, 46, 52, 53, 54, 58, 59, 60, 65
But -- 3, 4, 6, 10, 12, 13, 14, 15, 16, 17, 18, 19, 20, 25, 26, 27, 29, 30, 33, 34, 35, 39, 40, 43, 44, 45, 47, 50, 51, 52, 53, 54, 55, 56, 57, 60
button - 29, 30, 51
buy ------------ 22
buying --------- 42
By ---------- 2, 59

**C**

C ------- 2, 67, 68
calendar ------- 63
call -------- 3, 10
called 18, 21, 31, 32, 42, 50, 57
caller --------- 50
callers -------- 50
Calling --------- 3
calls -------27, 61
cameras----------4
can 3, 7, 8, 9, 10, 11, 12, 14, 15, 17, 20, 21, 23, 24, 25, 27, 32, 35, 37, 39, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 55, 56, 59, 61, 62, 63, 65
Can -------------48
cancer--11, 33, 35
cannot------21, 68
capability------17
case 3, 4, 6, 7, 8, 9, 13, 14, 16, 18, 23, 27, 30, 32, 42, 43, 44, 45, 48, 49, 52, 57, 58, 61, 62, 63, 64, 65
CASE------------68
cases 7, 8, 15, 43, 44, 45, 57
Catuogno-1, 67, 68
cause-------49, 60
caused------31, 53
CD--------------68
Center-----------2
certain-37, 43, 49
certainly--13, 35, 39, 64
Certainly---41, 52
certificate-----68
certify---------67
change----------37
changes------8, 60
Chapter-----15, 56
characterize 52, 56
characterized---58
characterizing--46
charged---------26
charges---------26
charitable-52, 57, 59
charity---------57
Chelsea----------4
chief-------41, 49
choice----------10
choose - 24, 31, 63
Chris ----------- 4
church --------- 46
circle -- 5, 40, 68
circuit 8, 28, 42, 43
circumstances - 25, 30, 34, 52, 61, 62, 65
cite ------------ 8
cited - 15, 22, 45, 57
cites ---------- 58
claim -- 5, 11, 14, 15, 24, 26, 32, 36, 42, 44, 47, 50, 51, 52, 54, 61
claims -- 6, 7, 14, 15, 25, 28, 59, 61
class ---------- 14
clear - 38, 39, 45, 59
clearer -------- 45
clearly -------- 49
click -- 30, 51, 61
clicking 23, 24, 30
clicks ----- 24, 29
client 23, 24, 36, 62
clients ---- 51, 53
clinic --------- 50
closer --------- 52
Clovitz --------- 4
co ------------- 21
code 20, 30, 32, 50
coin ----------- 45
colleague ------- 4
colleagues ------ 4
collected -- 27, 60
colors ----- 42, 50
com -------- 36, 42
come -- 16, 43, 49, 50, 63, 64
comfort -------- 52
comfortable ---- 52
COMMENTS -------- 68
commerce -- 52, 53, 54, 56, 57

commercial ----- 58
common ----- 47, 49
Commonwealth 25, 68
COMMONWEALTH ---- 1
communicate ---- 39
communicated --- 20
communication - 16, 17, 18, 19, 20, 21, 25, 27, 28, 29, 30, 31
communications 14, 16, 18, 20, 22, 27, 29, 31
companies ------ 21
company -------- 51
comparable ----- 47
compete -------- 54
competing ------ 37
competition ---- 54
complaint 6, 7, 8, 9, 10, 13, 14, 15, 18, 22, 26, 28, 29, 31, 32, 37, 40, 41, 44, 51, 55, 61
complaints ----- 15
complete --- 19, 21
Complete ------- 68
completely - 26, 33
completion ----- 21
compliance ----- 67
computer ------- 63
conceded ------- 54
concern ---- 12, 39
concerned ------ 38
concerns ------- 59
conclude --- 11, 60
conclusion ----- 23
condition -- 8, 32, 34, 37
conditions - 27, 34
conduct ---- 43, 57
confer ----- 63, 64
conference 62, 64, 65
confidence 41, 42, 49
confidential -- 12, 25, 32, 35, 44, 47, 60
confidentiality-45
configured-16, 18, 30
confuses--------10
confusing-------47
Conley-----1, 2, 3
connect---------54
connection-------9
Conroy-----------2
consent-----40, 59
consider--------18
considered-------9
constitute------26
consumer--------54
consumers---54, 58
contacting------24
contemporaneous 17, 28
content-21, 30, 31
contents--------14
contested-------45
contesting------45
context 26, 27, 31, 56, 60
continue--------14
continues-------21
contract--------24
convert---------57
converts--------57
conveyed----11, 12
cookie--31, 60, 61
cookies-9, 13, 18, 19, 23, 31, 36
coop------------65
cooperating-----65
Coppola---------68
copy------------68
core 8, 52, 53, 55, 56, 59
Corp--------52, 58
corporate---46, 49
corporations----58
correct------5, 54
Correct------6, 11
correctly-------46
correlate-------33
could--11, 36, 38, 41, 45, 46, 47, 57, 60
Counsel--3, 5, 58, 61, 65
count --- 5, 61, 65
Count - 14, 32, 59, 65
counts ------- 5, 6
couple ----- 17, 55
course 3, 4, 19, 47
Court - 2, 3, 8, 9, 13, 18, 23, 26, 31, 38, 40, 48, 49, 55, 56, 57, 58, 64, 67
COURT - 1, 3, 4, 6, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 29, 30, 32, 33, 34, 35, 39, 40, 41, 43, 44, 45, 46, 47, 48, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65, 68
Courtney -------- 4
covered ---- 15, 34
CPA ------------ 58
crack ---------- 56
create ----- 38, 43
credentials ---- 38
crime ---------- 25
cruising --- 11, 35
cut ------------- 6
CVS -------- 42, 49

**D**

Dana 2, 35, 37, 47, 51
danger --------- 26
data 30, 51, 60, 61
date --- 61, 62, 65
DATE ----------- 68
dates ------ 62, 64
day -------- 37, 50
Day ------------ 64
days --- 17, 55, 62
deadlines ------ 64
deal ------- 26, 44
dealing 15, 22, 39

deals ---------- 13
debate --------- 27
December ------- 62
deception --- 8, 43
deceptive ------ 56
decide --------- 27
decision -- 43, 50, 61, 65
declaration ---- 29
deemed --------- 25
deeply --------- 35
def ------------ 52
default -------- 31
Defendant ------- 1
DEFENDANT ------- 1
defendants -- 4, 6, 11, 16, 19, 32, 43, 49, 53, 59
Defendants 1, 2, 14
defense --------- 3
defer ---------- 52
defined ---- 19, 34
defines 15, 48, 50
definitely ----- 52
definition ----- 20
deflection ----- 27
deliver -------- 55
delivered ------ 31
demonstrated --- 60
demonstratives - 17
deny ------- 32, 44
denying 44, 59, 61
deployment - 31, 56
describe ------- 59
described ------ 18
describing ----- 22
descriptive ---- 10
deserve -------- 38
designed --- 25, 58
detail --------- 41
determination --- 7
device ----- 23, 37
devices - 8, 31, 37
Devine ----- 44, 49
diagnoses ------ 33
diagnosis -- 12, 35
diagram -------- 18
dictate -------- 60
difference - 21, 46
different - 21, 22, 25, 26, 27, 32, 33, 48
difficult---10, 53
diocese---------46
Directive-------67
disagree----26, 49
disclose---35, 44, 45, 47
disclosed---23, 38
discloses--------9
disclosing------32
disclosures-36, 42
discovery--55, 64, 65
discussed--15, 33, 50
discussion------10
disingenuous----48
dismiss---5, 7, 9, 12, 18, 22, 25, 26, 32, 34, 44, 59
dismissal----6, 49
displayed-------38
dispute-----10, 34
disputes--------12
disputing-------33
distinct----18, 39
distinction-----29
disturbing------35
do-5, 6, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 23, 26, 27, 28, 29, 31, 34, 35, 37, 38, 40, 44, 46, 47, 48, 49, 51, 55, 56, 57, 59, 61, 62, 63, 64, 65, 67
Do--------------47
Docket-----------3
DOCKET----------68
doctor--11, 39, 49
doctors---------50
documents-------55
does 4, 17, 24, 26, 28, 29, 32, 37, 38, 40, 47, 51, 60, 62
Does --- 24, 47, 62
doing -- 7, 33, 36, 43, 57, 58, 65
Doing ----------- 2
dollars -------- 54
Don ------------ 12
done ------- 25, 64
door ----------- 48
dots ----------- 54
doubt ------ 50, 54
down ------- 11, 50
drug ----------- 50
due ------------ 55
during ---------- 4
duties --------- 48
duty 6, 24, 44, 45, 46, 47, 48, 49, 50, 61, 62, 65

**E**

E -------------- 67
each 6, 8, 10, 23, 68
earlier 51, 52, 58
Earlier -------- 63
early ---------- 64
eavesdrop ------ 17
eff ------------ 59
effect ---------- 4
effectively ---- 59
effort ----- 54, 56
efforts ---- 43, 54
eight ---------- 64
eighth --------- 37
either - 20, 44, 62
elaborate ------ 65
eliminate ------ 60
else 3, 6, 16, 17, 30, 36, 65
email ---------- 24
employed ------- 67
employer ------- 38
employment ----- 38
end -------- 50, 62
ends ----------- 66
engage --------- 14
engaged 14, 52, 54, 56, 57, 58
engagement ----- 24

enhancing ------ 58
enough - 4, 13, 36, 39, 45, 57, 63, 64
enroll - 29, 30, 51
enter ---------- 27
entered --------- 3
entire ----- 26, 39
entirely 18, 30, 52
entirety -------- 6
entities ------- 50
entity ----- 49, 56
equivalent ----- 60
Eric ------------ 3
error ------ 45, 59
Esquire ------ 1, 2
ethical -------- 58
even 8, 10, 13, 17, 20, 27, 30, 31, 34, 55, 57, 58
event ---------- 55
ever ------- 13, 45
every -- 8, 22, 30, 39, 42, 49, 68
everybody -- 38, 48
everyone 10, 50, 65
everything - 42, 59
exact ---------- 20
exactly -------- 32
example 11, 14, 19, 24, 29, 30, 33, 35, 38, 45, 47, 50
examples ------- 51
exchange ------- 30
Exhibits -------- 1
exist -- 35, 51, 57
existence ------ 27
existing --- 11, 49
exists - 25, 49, 59
expectation ---- 48
expectations --- 50
expecting ------ 65
expert ------ 9, 18
explain -------- 40
explicitly ----- 27
extend - 44, 48, 52
extends -------- 48
extent --------- 18

**F**

F--------1, 67, 68
face-------------9
Facebook 8, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 25, 28, 30, 31, 32, 33, 34, 35, 36, 42
facilities------56
facility--------37
fact 8, 12, 25, 27, 32, 37, 40, 49, 51, 59
facts-----------27
factual---7, 9, 22
factually--------9
failure---------49
fair-----7, 45, 58
fairly------56, 61
faith-----------49
falls-----------56
family----------37
far-------------49
Farber--2, 35, 37, 47, 51
February 63, 64, 65
federal-----29, 38
feel------------10
feet------------14
few--------------8
fiduciary---6, 44, 45, 46, 47, 49, 50, 52, 61, 62, 65
fight-----------59
fighting-----5, 22
figured---------31
file------------62
financially-----67
find 12, 37, 45, 48
finding---------42
finds-----------25
fine------------18
finish----------47
finished--------17
firewall--------38
firm 23, 24, 36, 50
firms-----------21
first - 5, 6, 7, 8, 9, 40, 41, 42, 45, 49, 54, 63, 64
First ------ 31, 49
fit ----------- 45
fits ---------- 49
flip ---------- 45
flow ---------- 39
flows ---------- 12
focus ----------- 6
focusing 16, 56, 57
folks -- 5, 55, 60, 64, 65
Folks -- 44, 51, 59
followed -------- 3
football --- 17, 21
For - 1, 2, 11, 33, 68
foregoing ------ 67
form ------- 46, 68
Format --------- 67
forth ------- 7, 10
forward ----- 6, 60
found -- 27, 28, 49
four ------------ 5
Four ----------- 59
fraud ---------- 24
free ----------- 23
friend --------- 37
frivolous ------ 42
from 1, 4, 5, 7, 8, 9, 10, 21, 23, 29, 31, 32, 34, 36, 37, 41, 42, 49, 54, 57, 58, 62, 64
front -- 29, 52, 55
full ----------- 38
fully ---------- 48
fumble --------- 21
fundamental -- 6, 7
fundamentally -- 46
further 42, 56, 59, 67
furtherance 52, 59
furthered ------ 41

G

gain ---- 7, 19, 53
game ------------- 7
gender --------- 27
general 24, 25, 36, 39, 59
General 2, 30, 41, 49
generalized ---- 15
get 10, 14, 17, 18, 28, 34, 35, 38, 40, 42, 51, 57, 61, 62, 63, 64, 65
gets 11, 12, 21, 30
getting ----- 6, 25
give 6, 43, 50, 51, 61, 62, 63, 64, 65
given ---- 8, 9, 45
go 10, 11, 13, 14, 18, 28, 29, 37, 41, 42, 45, 49, 52
Go ------------- 53
goes --- 24, 41, 53
going 5, 6, 9, 16, 17, 22, 23, 28, 32, 36, 38, 40, 43, 44, 51, 53, 55, 59, 61, 62, 63, 64
gone -------- 5, 59
good 35, 41, 61, 65
Good ----- 3, 4, 65
Google - 8, 13, 14, 16, 21, 22, 23, 28, 33, 34, 36, 42, 43
got 5, 10, 12, 22, 25, 32, 34, 36, 40, 41, 43, 44, 45, 49, 51, 54, 55, 60
Got - 4, 19, 32, 48
grade ---------- 37
graph ---------- 30
grave ---------- 26
great ---------- 60
Groundhog -------64
guess -----------55
guessing --------55
guilty ----------13

H

h -------32, 42, 50
hack ------------31
hacked ----------31
had-8, 13, 31, 43, 50, 57, 59
Hammond ---------67
HAMPDEN ----------1
handle ----------38
happen ------28, 31
happened 15, 31, 42
happening--27, 33, 34, 36, 61
happens-29, 31, 55
happy ------------6
harm --------60, 61
has--3, 8, 11, 17, 18, 20, 21, 23, 25, 29, 35, 37, 38, 39, 44, 45, 46, 52, 58, 59
Has -------------32
hat ---------23, 39
have 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 22, 23, 24, 25, 26, 27, 28, 29, 31, 32, 34, 39, 40, 42, 43, 45, 46, 47, 51, 52, 54, 56, 59, 60, 61, 65
Have --------28, 65
having ----------46
he-21, 37, 38, 48, 57, 67, 68
head ------------24
health--9, 13, 33, 34, 37
healthcare-21, 41, 49, 53, 55
hear 3, 15, 19, 20, 48, 53, 56, 60
heard - 20, 21, 28, 30, 43
hearing 3, 16, 17, 19, 20, 28, 41, 59, 67
Hearing -------- 66
HEARING BEFORE -- 1
held -------- 8, 52
help ------- 22, 35
here 3, 4, 5, 7, 9, 10, 15, 18, 20, 21, 22, 23, 24, 26, 28, 29, 33, 34, 40, 42, 43, 45, 46, 47, 49, 51, 53, 58, 59, 63
Here ------- 32, 44
hereby --------- 67
herring -------- 39
hey ---- 32, 42, 50
highlight ------- 6
highlighting --- 37
highly --------- 48
him ------------- 4
himself --------- 4
HIPAA - 13, 34, 38, 39, 40, 41, 47, 48, 50
HIPPA ------ 48, 50
his ----- 3, 38, 43
hoarding ------- 43
hold ------- 52, 53
Hold ----------- 63
Holland ------ 2, 4
Hollywood ------- 4
Honor - 3, 4, 6, 7, 9, 12, 13, 15, 16, 17, 18, 20, 21, 22, 23, 26, 27, 28, 29, 30, 32, 33, 36, 38, 40, 42, 43, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 58, 62, 63, 64, 65
HONORABLE ------- 1
hospital 9, 17, 18, 21, 23, 36, 45,

46, 51
Hospital 2, 30, 57
hospitals - 33, 34, 37, 38, 46, 48, 49, 54, 57
how 12, 26, 34, 38, 46, 48, 52, 53, 56, 61
How -------- 62, 64
However - 5, 13, 28
huge ----------- 34
hyperbole ------ 43

I

I 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
I know --------- 59
Iaquinto --------- 4
ID ----------- 8, 37
idea 14, 37, 41, 43
identical ------ 28
identifiable 7, 8, 12, 15, 33, 37, 39, 41
identified ----- 34
identifier ----- 11
identifies -- 8, 14
identify ---- 8, 33
identity ------- 25
if -- 6, 8, 10, 12, 13, 17, 18, 19, 21, 22, 23, 24, 29, 31, 33, 34, 36, 38, 41, 42, 43, 45, 47, 51, 54, 55, 57, 59, 60, 62, 63, 64
If-13, 23, 29, 35, 39, 43, 50, 62
ignore-----------40
Illinois----------2
immediately-----30
importance------60
important----9, 37
importantly-----37
impose-----------47
impression------43
improper--------27
in--3, 4, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 67
In--3, 21, 23, 27, 37, 42, 46, 60
inapplicable----13
inaudible-6, 7, 9, 12, 20, 23, 48
Inc-----------2, 67
include-----19, 68
includes--------33
including--14, 21, 23, 32, 48, 60
incorrect--------9
increase 53, 54, 56
increasing------26
indecipherable--6, 8, 9, 12, 20, 23, 48
index------------68
indicated-------59
individual-11, 12, 14, 15, 21, 33, 34, 36, 39, 46
individualized--46
individuals-----54
inference-------12
inform --------- 35
information - 6, 8, 10, 11, 12, 13, 25, 26, 32, 33, 34, 35, 36, 38, 40, 41, 44, 45, 47, 51, 53, 60
informational - 10, 11
injunction -- 5, 9, 10, 18, 54, 59, 61
ink ------------ 44
input ---------- 64
inserted ------- 58
inserting ------ 15
instance --- 59, 64
Instead ----- 9, 38
institution 47, 52, 58, 59
institutions -- 48, 53, 54, 55, 57, 60
insurance ------ 27
intend ---------- 5
inter ---------- 33
interact ------- 55
interaction ---- 53
intercept ------ 17
intercepting 21, 31
interception -- 14, 15, 16, 17, 19, 20
interest ------- 33
interested - 4, 44, 64, 67
interesting 24, 49, 52
interference --- 32
internet 9, 15, 21, 23, 26, 42
into 6, 24, 38, 42, 58
introduce -------- 4
intruded --------- 9
intrusion ------ 32
invasion 5, 32, 33, 34, 36, 40, 44
invisible ------ 56
invite --------- 64

Date Filed 8/11/2023 5:27 PM
Superior Court - Suffolk
Docket Number 2384CV01086



involve -------- 27
involves ------- 54
IP --------- 14, 37
irreparable 60, 61
is - 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 63, 64, 65, 67
Is ------ 6, 28, 65
isn 6, 11, 14, 19, 34, 57
issue - 10, 16, 25, 27
issues - 7, 27, 48, 59
it 4, 7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 36, 38, 39, 41, 43, 44, 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 63, 64, 68
It - 4, 13, 14, 17, 21, 23, 25, 30, 34, 37, 38, 43, 45, 46, 50, 51, 53, 54, 56, 61, 62
italics -------- 41
its 6, 11, 16, 19, 30, 47, 51, 52, 58, 59
itself ----- 18, 58

**J**

J-------------1, 2
James------------2
Jane-------------2
January---------62
Jason---------1, 2
Jay-----------3, 4
John------2, 3, 67
Johnson----------3
Judge-----------42
judicial---------7
jump-----6, 22, 52
jurisdictions---22
jus---4, 7, 8, 15, 16, 18, 20, 22, 26, 28, 29, 33, 37, 39, 49, 51, 54, 55, 58, 62, 63
just--4, 7, 8, 15, 16, 18, 20, 22, 26, 28, 29, 33, 37, 39, 49, 51, 54, 55, 58, 62, 63
Just------------57

**K**

keeps-----------42
kind-----4, 35, 52
kinds-----------51
Knight--------2, 4
know 4, 11, 12, 14, 20, 21, 26, 35, 36, 38, 41, 47, 50, 53, 57
knowing---------26
knowledge-------44
knows--------8, 14

**L**

label-----------22
Lahoy------------4
language---22, 25, 41, 58, 60
last------------59
later ------ 42, 62
law 7, 21, 23, 24, 26, 29, 34, 36, 38, 41, 44, 47, 48, 49, 52, 57, 65
lead ----------- 12
least - 15, 16, 19, 22, 25, 44
leave ------ 38, 63
leaves --------- 52
legal --- 7, 22, 25
legally ------ 7, 8
lends ---------- 58
let -- 4, 6, 7, 14, 17, 20, 22, 25, 31, 37, 40, 47, 52, 55, 59, 62
Let 15, 25, 28, 52, 64
letters - 5, 15, 59
level -- 39, 40, 43
liability ------ 60
light ---------- 60
like 5, 8, 10, 11, 13, 15, 17, 25, 31, 33, 34, 38, 42, 45, 50, 51, 52, 58
likelihood ----- 60
likely --------- 50
lim ------------ 24
limitations ---- 24
line --- 41, 43, 50
Linkage 52, 57, 58
linked --------- 39
list ------------ 1
listen --------- 33
listened ------- 59
listening ------ 16
literally --- 9, 13
little 45, 53, 56, 57, 63
ll -- 4, 6, 15, 17, 22, 25, 32, 39, 40, 43, 53, 60, 62, 64, 65
LLP ------------- 2
locking -------- 63
log ------------ 38

long --- 57, 59, 61
look -- 11, 12, 14, 15, 29, 32, 51, 52, 56, 62, 63, 65
Look ----------- 45
looked 13, 22, 24, 60
looking 11, 23, 25, 35, 53
looks ------ 15, 24
lot -------- 44, 59
low ------------ 68
luddite -------- 20

**M**

MA ------------- 67
machine --------- 8
machines ------- 64
macro ---------- 39
made -- 15, 25, 41, 50, 57, 60
main ----------- 27
maintain ------- 45
make 7, 13, 24, 27, 30, 39, 58, 60, 62
makes - 25, 29, 38, 57, 58
making 15, 42, 50, 56, 58
malpractice ---- 24
MANAGEMENT ----- 68
many ----------- 46
margin --------- 57
Mark ------ 1, 2, 4
marketing - 41, 49, 50, 53, 54, 56
marketplace ---- 58
markets -------- 57
MARONEY --------- 4
Mason ---------- 42
Mass 6, 22, 30, 36, 40, 45, 48, 49, 52
Massachusetts 1, 2, 5, 7, 15, 16, 28, 29, 31, 35, 44, 49, 54, 68
MASSACHUSETTS ----1
match---11, 12, 25
materials----5, 25
matter--3, 23, 26, 32, 36, 59, 67
may 17, 27, 36, 42, 43, 50
maybe---40, 59, 62
Maybe---35, 54, 63
me--3, 4, 5, 6, 7, 10, 12, 14, 15, 17, 20, 22, 25, 26, 28, 33, 35, 40, 43, 44, 45, 47, 48, 52, 55, 56, 58, 59, 61, 62, 63, 64, 67
mean---12, 20, 21, 27, 38, 47, 49, 57, 60
meaning---------64
means--31, 58, 61, 64
measures--------13
meat------------14
medical 11, 27, 32, 34, 37, 40, 44, 45, 47
medications-----27
meet------------48
Melodia 1, 2, 4, 6, 10, 14, 17, 18, 19, 22, 24, 28, 29, 30, 31, 32, 33, 40, 42, 43, 44, 46, 50, 52, 56, 61, 62
Melrose---------57
member------14, 37
memorandum------58
mention-25, 36, 60
mentioned 9, 37, 49
merely----------23
merits-----------7
message---------57
methods---------54
MGH 11, 16, 31, 35, 47
microphone------68
microphones------4
middle --------- 17
might - 41, 45, 51, 60
Mike ------------ 3
mind --- 11, 22, 55
minute --------- 43
minutes -------- 40
misreading ----- 33
missed --------- 24
missing -------- 28
mistake -------- 48
Mitchell --------- 3
mixed ---------- 49
Mm ---------- 4, 40
modulate ------- 10
moment - 8, 10, 16, 17, 19, 24, 28, 33, 43, 55
money ---------- 57
months ----------- 8
moots ---------- 59
more -- 10, 25, 37, 40, 53, 55, 56
More ----------- 62
most 7, 30, 45, 52
mostly --------- 15
motions ---- 18, 65
move ------- 15, 63
moving ------ 6, 43
Mr 1, 3, 4, 6, 10, 14, 17, 18, 19, 22, 24, 27, 28, 29, 30, 31, 32, 33, 37, 40, 42, 43, 44, 46, 48, 50, 51, 52, 56, 57, 58, 60, 61, 62, 63, 64
MR 3, 4, 6, 7, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 26, 28, 29, 30, 33, 34, 35, 36, 39, 40, 41, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 62, 63, 64, 65

Ms ---- 62
much --- 14, 39, 40
mundane ---- 40
mute ---- 6, 10

**N**

NA ---- 68
name 3, 27, 38, 49
NAME ---- 68
named ---- 13, 14
narrow ---- 56
nature ---- 59, 64
necessarily -- 4, 5
need - 5, 7, 9, 12, 17, 26, 40, 42, 52, 53, 61, 62, 63, 64
needed ---- 4
needs 8, 16, 28, 64
negate ---- 51
negligence ---- 47
neither 20, 21, 67
never -- 33, 41, 53
new ---- 38, 65
next -- 20, 21, 61, 62, 64, 65
nine ---- 45
ninth ---- 28, 42
No 1, 3, 6, 16, 20, 24, 39, 55, 65
Nobel ---- 37
nobody ---- 45
Nobody ---- 33
noise ---- 68
nondisclosure -- 60
None ---- 39
Nonetheless ---- 20
nonprofit -- 54, 58
nonprofits ---- 57
nor ---- 20, 38, 67
not 3, 4, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 18, 19, 20, 21, 22, 24, 26, 29, 30, 31, 33, 34, 35, 36, 38, 39, 41, 42, 44, 45, 46, 47, 49, 51, 52, 53, 54, 58, 60, 61, 65, 67
Not 10, 33, 36, 38, 42, 44
note---3, 4, 5, 18
noted ---- 41
notes ---- 50
nothing ---- 14, 30
notice--7, 13, 38, 41, 59, 64
notices ---- 61
notion ---- 52
notwithstanding 14, 65
November ---- 1, 67
now ---- 17, 55, 61
NPP ---- 13, 38, 43
number---4, 8, 16, 17, 18, 19, 20, 21, 25, 28, 37, 41, 49, 51
Number ---- 12
NUMBER ---- 68
numbers--8, 24, 50

**O**

o---12, 33, 55, 67
objection ---- 17
obligation-44, 45, 46, 47, 52
obligations ---- 48
obvious ---- 9
occur ---- 18
occurs ---- 21
OCR ---- 13, 43
odd ---- 45
OF ---- 1, 68
off ---- 4, 50
Off ---- 2, 67
offensive ---- 10
offered ---- 38, 57
Office ---- 2, 67
OFFICE ---- 68
officer ---- 41, 49
officially ---- 5, 6
Okay-3, 6, 14, 22, 28, 29, 34, 39, 42, 43, 49, 50, 58, 63, 65
on - 1, 3, 4, 5, 6, 7, 9, 10, 11, 14, 15, 16, 18, 21, 23, 24, 25, 26, 27, 29, 30, 31, 32, 34, 35, 36, 38, 40, 42, 44, 47, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 65, 67
oncologist ---- 50
one - 8, 9, 10, 11, 12, 13, 15, 16, 17, 18, 20, 21, 22, 24, 27, 28, 29, 32, 33, 37, 40, 43, 44, 45, 47, 49, 50, 51, 52, 57, 58, 65, 68
One 2, 10, 14, 15, 17, 18, 32
ones ---- 50
ongoing ---- 17
only -- 10, 13, 28, 30, 43, 46, 58
onto ---- 36
operator ---- 36
opinion ---- 51
opportunity ---- 6
opposed ---- 15, 20
opposite --- 45, 50
opposition ---- 54
or 6, 8, 9, 11, 12, 13, 15, 16, 17, 19, 20, 21, 24, 26, 27, 28, 29, 30, 32, 33, 36, 38, 42, 44, 45, 46, 47, 49, 51, 52, 53, 54, 55, 56, 57, 59, 62, 64, 67, 68
order 5, 9, 63, 64
organization 46, 52
organizations - 47, 53, 57
organized ---- 25

original ------- 68
other - 14, 15, 21, 22, 30, 35, 40, 42, 48, 50, 53, 54, 56, 57, 59, 60, 62, 68
others - 14, 16, 22
otherwise -- 28, 67
ought ---------- 26
our 10, 26, 34, 45, 50, 56, 57, 59
out 28, 31, 33, 37, 38, 54, 57, 58, 64
outcome -------- 67
outlined ------- 49
outright ------- 43
outset --------- 37
over 5, 13, 21, 27, 37
overcome ------- 13
overlooked ----- 28
owe ------------ 46
own 8, 11, 14, 40, 49, 59

P

p ------- 3, 64, 66
pa ------------- 68
page 9, 11, 13, 14, 37, 58, 68
Page ------------ 1
PAGE ------------ 2
Pages ----------- 1
paid ----------- 38
paper ------ 15, 37
papers 5, 6, 7, 14, 16, 54, 60
Paragraph -- 14, 49
paragraphs - 13, 29
parcel --------- 55
parent --------- 38
parental ------- 38
Parenthood ----- 58
parishioner ---- 45
part -- 14, 18, 21, 41, 44, 47, 52, 53, 55, 57, 59
Part ----------- 53
participated----59
particular-11, 23, 25, 31, 33, 36, 37
particularly----17
parties 32, 34, 40, 44, 60, 63, 67
parts------------7
party--16, 17, 18, 19, 21, 27, 28, 50
pass---------8, 21
passing---------17
password--------39
past------------54
path------------31
patient-8, 10, 12, 29, 30, 31, 32, 35, 36, 38, 40, 41, 44, 45, 46, 47, 51, 54
patients---11, 16, 23, 40, 41, 47, 50, 53, 54, 56
pattern---------49
Pause-----------10
PDF-------------68
pending---------65
people--8, 13, 14, 15, 23, 26, 31, 33, 35, 37, 46, 50, 53, 55
perhaps-11, 12, 33
Perhaps----------6
permit----------19
person---7, 8, 11, 14, 16, 24, 32, 36, 41, 51, 55
personal---10, 35, 37, 40, 41, 45, 46, 48
personally-12, 33, 41
persuaded---22, 39
pharmaceutical--50
pharmacy--------39
phone 3, 24, 31, 50
phonetic--------45
PHR-------------39
physical---------8
physician - 45, 46, 47
physicians - 44, 48
pick ----------- 62
picked ----- 14, 44
piece -- 16, 22, 30
PII ------------ 27
pile ----------- 12
pixel ---------- 30
pixels --------- 23
place ------ 40, 49
places ----- 22, 38
plaintiff 3, 5, 6, 8, 10, 14, 18, 21, 22, 26, 30, 32, 34, 35, 41, 43, 46, 59, 60
Plaintiff ------- 1
plaintiffs - 3, 11, 13, 14, 15, 22, 23, 27, 33, 34, 42, 43, 57, 60
play --- 39, 40, 58
plead ---------- 13
pleading 12, 13, 23
pleadings ------ 15
please - 3, 62, 64, 65
Please --------- 64
pled ---- 7, 28, 51
point 6, 8, 12, 16, 27, 28, 29, 33, 34, 40, 45, 51, 52, 55, 56, 57, 58, 63
pointed -------- 38
points --------- 10
policies -------- 9
policy ----- 13, 38
pop ------------ 41
portal - 10, 38, 51
portals ----- 9, 40
positives ------ 51
possibility ---- 12
possible --- 10, 19
possibly ------- 35
post ------- 18, 19
potential - 35, 47, 49, 61
potentially 25, 45,

50
practice --- 38, 54
practices -- 13, 56
pragmatic -- 40, 64
preamble ------- 25
precise ---- 30, 58
preliminary - 5, 9, 10, 17, 54, 59, 61
prepared ---- 1, 67
presence -------- 3
present ----- 3, 48
presented ------ 61
presents ------- 32
press ---------- 51
pretty --------- 44
prevent -------- 42
previous ------- 41
priest --------- 45
primarily ------ 59
primary -------- 51
principle ------ 39
privacy 5, 7, 8, 9, 13, 32, 33, 34, 36, 38, 40, 42, 43, 44, 48, 61
private --------- 9
privilege ------ 24
probability ---- 12
probable ------- 12
probably 44, 55, 60
problem 24, 47, 59, 65
problematic ---- 62
problems ------- 26
produced ------- 68
products ------- 36
profession ----- 39
profit - 53, 54, 57
profits -------- 58
prohibits ------ 16
prologue ------- 25
prominently ---- 38
promise ---- 39, 43
proper ----- 18, 58
properly ----- 7, 9
properties ----- 41
property ------- 30
propose -------- 65
proposed ------- 63
proprietorship--46
prospective-----59
protect 31, 43, 54, 58
protectable-----39
protected--10, 13, 34, 37, 38
protection------38
protective------13
protects--------41
provide-29, 53, 55
provided----41, 67
provider 35, 41, 49
providers---11, 35
providing--------9
public--9, 23, 26, 34, 36, 39, 42, 50, 57
publicly--------35
pull----11, 25, 52
pulled------15, 63
purportedly-----56
purpose---------56
purposes---12, 16, 24, 40, 41, 58
pursuing--------54
put-11, 30, 38, 50
puts------------30

Q

qualify-----16, 19
QUALITY---------68
question---32, 40, 47, 55
questions--------7
quickly-----44, 61
quote-------49, 58

R

R---------------67
ra--------------52
raised----------52
ran-------------24
random-------8, 50
Rather----------46
Raymond--1, 67, 68
re---5, 6, 11, 12, 13, 16, 17, 19, 20, 21, 22, 23, 24, 27, 30, 31, 32, 33, 34, 35, 36, 38, 40, 41, 43, 44, 45, 46, 47, 49, 51, 52, 53, 54, 55, 56, 58, 60, 63, 64
reach ---------- 40
read - 5, 6, 7, 14, 16, 20, 25, 44, 52, 59
real --- 12, 27, 36
realistically -- 26
reality -------- 46
really 6, 7, 8, 10, 15, 20, 25, 28, 34, 37, 39, 48, 49, 53, 59
reason 30, 35, 39, 45, 53
reasonable - 62, 65
reasons - 6, 7, 49, 61
rec 16, 17, 20, 22, 28, 31, 67
recall --------- 10
received -------- 5
receives ------- 30
recited -------- 60
recognize -- 6, 10, 11, 26, 44, 45, 49
recognized - 44, 48
recognizes ----- 52
recognizing ----- 6
record - 3, 14, 15, 20
recorded 20, 21, 28
Recording ------- 1
RECORDING ------ 68
records ----- 9, 38
red ------------ 39
redirections --- 31
redirects ------ 30
reduce ---------- 4
ref --------- 9, 60
refer ---------- 11
reference --- 9, 60

referenced -- 9, 60
references ----- 23
referencing ---- 10
reflected --- 6, 21
regarding ------- 7
regardless ----- 61
regards -------- 17
regs ----------- 41
regulated ------ 48
related -------- 67
relates ---- 30, 50
relating --- 51, 55
relationship 8, 45, 46, 53
relationships -- 45
rely ----------- 27
remaining ------ 65
remedy --------- 49
remind ---------- 7
reminder -------- 7
repeal --------- 31
repeatedly - 10, 28
report --------- 18
Reporter -------- 1
reposes -------- 49
represent -- 14, 37
representations 57
representative - 15
represented ---- 42
representing --- 11
represents ----- 37
reps ----------- 50
request -------- 51
require - 6, 27, 63
required -- 13, 38, 41, 60, 63
requirement 27, 28
research --- 37, 61
reserve -------- 51
reserved ------- 27
resolve ---- 27, 36
respect - 5, 7, 13, 14, 15, 25, 32, 34, 44, 51, 55, 61
respond ---- 43, 61
responding ----- 15
response ---- 5, 29
rests ---------- 46
result --------- 30
results ---------31
revenue-53, 56, 58
revenues --------56
reviewed------5, 6
revolve ---------59
right-4, 5, 6, 17, 29, 31, 32, 38, 41, 44, 48, 58, 59, 61, 63, 64
Right---23, 29, 40
rights ----------38
Road -------------2
Rogan ------------4
role--------39, 40
room ------------11
routine ---------58
rule ------------61
Rule 3, 62, 63, 64, 65
rules -----------58
ruling ----------62
rummaging -------25
run -------------59

S

s 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64
S ---------------68
sacred--41, 49, 60
safety ----------26
said 27, 42, 49, 50
Saint ------------2
same---17, 20, 21, 23, 29, 30, 36, 38, 45, 46, 60
saw---------33, 53
say--7, 9, 11, 13, 16, 17, 25, 26, 28, 29, 30, 33, 35, 40, 43, 48, 52, 53, 56, 60, 62
saying 20, 22, 43, 47, 56
says 9, 14, 17, 25, 29, 30, 41, 47, 48
scenario ------- 20
school --------- 37
screen - 17, 28, 29
screenshot ----- 29
search - 34, 36, 41
searches --- 24, 34
searching ------ 24
second 16, 40, 42, 51
Second ------ 8, 31
secrecy 9, 16, 23, 26
secret 16, 22, 23, 26, 28
secretly -- 14, 15, 16, 17, 19, 20, 25
Section 15, 54, 56
see 7, 14, 15, 20, 21, 22, 28, 30, 33, 44, 47, 52, 53, 62
See ------------ 24
seem 10, 44, 50, 55
seemed ----- 50, 55
seems -- 7, 12, 22, 25, 26, 35, 38, 44, 45, 56, 58, 59, 61
seen ----------- 18
send ----------- 30
sends ---------- 32
sense - 15, 21, 27, 47
senses --------- 13
sent -------- 5, 50
separate -- 10, 20, 27, 29, 31, 39
separateness --- 21
series ---------- 5

serious 32, 33, 34, 39
served --------- 62
Services --- 57, 68
session ----- 3, 64
set 8, 26, 30, 31, 62
setting ---- 24, 31
settings --- 13, 31
share -- 6, 10, 17, 41, 60
shared - 35, 40, 44
shoes ---------- 42
should - 5, 17, 35, 49, 56, 61
show 20, 29, 41, 57
showed --------- 28
shown ------ 17, 30
shows ------ 20, 37
side ------- 44, 45
sidebar -------- 68
sides -------- 5, 7
sign --- 29, 30, 51
significant ---- 59
significantly -- 60
signify ---- 37, 38
similar ---- 14, 27
similarly ------- 8
Simmons --------- 2
simply 17, 21, 23, 34
simultaneous -- 27, 28, 68
sir ---- 32, 48, 58
situation ------ 22
SJC 32, 44, 47, 52, 59
slide ---------- 20
slides --------- 21
Smith - 20, 21, 28, 29
so -- 7, 9, 10, 15, 18, 19, 21, 22, 25, 37, 41, 43, 53, 59, 61, 63
So - 3, 4, 5, 6, 7, 8, 10, 11, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 25, 26, 28, 31, 32, 33, 34, 36, 40, 43, 44, 45, 46, 47, 51, 52, 53, 54, 56, 57, 58, 59, 61, 62, 64, 65
So the-10, 13, 19, 21, 31, 52
sociologically--26
sole--------29, 46
solving---------59
some---5, 6, 7, 9, 10, 12, 13, 15, 16, 20, 22, 24, 40, 50, 52, 60, 61, 63, 64
somebody 6, 17, 20, 21, 23, 24, 36
somehow--8, 13, 14
someone-10, 11, 16
something--11, 13, 20, 21, 23, 28, 35, 46, 56, 57
somewhat----27, 49
soon------------63
sorry-------37, 63
Sorry-----------49
sort 10, 39, 48, 52
sorts-------21, 58
sounds----------62
source--30, 32, 50
space------------9
speak----6, 42, 55
speaking 32, 46, 58
specialist-11, 33, 36
specialists 11, 33, 35
specific-6, 11, 56
specifically 9, 14, 51
speech----------68
spilled---------44
squarely--------43
Squares----------4
SS---------------1
stack------------5
stage------------7
stamp-----------68
stand-----------14
standard ------- 12
stands --------- 46
start --- 5, 35, 40
starts --------- 30
State ----------- 7
stated ----- 51, 61
statement ------ 23
status ----- 37, 51
statute 15, 16, 24, 26, 41
statutes ------- 27
statutory --- 6, 32
stay ----------- 55
Stay ----------- 65
still ------- 5, 27
Street ------ 2, 67
stretch -------- 49
subject ---- 38, 58
submissions - 5, 59
subscribe ------ 30
subset --------- 50
substantial 32, 33, 34, 39
succeed -------- 26
succeeds ------- 32
success -------- 60
successful ------ 8
such 11, 16, 25, 45
sudden ----- 24, 38
sued ------- 24, 45
sufficient - 23, 60
suggest ---- 48, 50
suggesting - 46, 48
summary --------- 9
supplied ------- 59
support -------- 36
supposition ---- 12
Sure ----------- 15
surprise ------- 49
survive -------- 61
suspect ---- 61, 65
syncing -------- 31
system --------- 46
systems -------- 46

**T**

T ---------- 2, 67
ta ------------ 25
take 7, 8, 12, 26,

Date Filed 8/11/2023 5:27 PM
Superior Court - Suffolk
Docket Number 2384CV01086



40, 45, 52, 56, 61, 62, 65
taken ---------- 67
takes ---------- 25
taking 12, 18, 20, 39, 56, 57
talk 13, 15, 22, 55
talked --------- 32
talking 8, 11, 19, 30, 34, 40, 42, 46, 53, 55
talks ------- 9, 47
TAPE ----------- 68
targeted ------- 26
technically 8, 26, 46, 48
technological -- 21
technology 31, 34, 49
telephone ------ 31
tell -- 13, 24, 37, 39, 63
telling -------- 36
tells ---------- 64
Teresa ---------- 4
term ----------- 37
terms -- 8, 12, 15, 34, 46, 48
test ----------- 49
testing --------- 7
text ----------- 30
than -- 22, 45, 48, 55, 59, 62
Thank -- 5, 11, 18, 32, 43, 65
that 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
That -7, 9, 10, 15, 17, 22, 24, 29, 30, 32, 34, 35, 37, 42, 44, 45, 48, 49, 52, 53, 54, 55, 56, 58, 60, 62, 63
that I ---5, 6, 17, 39, 40, 42, 54, 59, 60, 61, 67
the -1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67, 68
The ---2, 7, 9, 16, 17, 21, 22, 23, 25, 29, 32, 33, 42, 43, 45, 49, 63, 68
THE 1, 3, 4, 6, 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 28, 29, 30, 32, 33, 34, 35, 39, 40, 41, 43, 44, 45, 46, 47, 48, 50, 51, 53, 54, 55, 56, 58, 62, 63, 64, 65
THE CLERK --------3
their 7, 8, 13, 14, 15, 16, 18, 19, 25, 27, 31, 32, 35, 36, 40, 41, 43, 44, 47, 48, 53, 54, 55, 56, 60, 61
them -- 17, 28, 29, 35, 36, 41, 51, 55, 61
themselves - 7, 13, 61
Then -------- 5, 62
theory -- 8, 21, 27
there 6, 7, 9, 10, 12, 13, 14, 15, 16, 18, 20, 21, 22, 25, 26, 28, 29, 31, 34, 35, 38, 40, 41, 42, 46, 47, 49, 50, 52, 54, 57, 58, 59, 65
There -- 7, 16, 23, 27, 28, 43, 46, 47, 50, 54, 55, 57, 62
therefore --- 9, 12
these -- 9, 12, 14, 15, 16, 20, 23, 27, 28, 34, 38, 39, 41, 43, 48, 49, 50, 52, 53, 54, 55, 56, 57, 59
These -- 20, 23, 38
They -- 11, 13, 18, 21, 23, 24, 27, 31, 34, 35, 36, 42, 44, 47
thing - 10, 13, 42, 43, 47, 50, 51
things -- 6, 7, 15, 27, 51, 64
think - 5, 6, 7, 9, 10, 11, 22, 26, 27, 28, 31, 32, 36, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 54, 55, 56, 57, 58, 59, 60, 61, 64, 65
third -- 8, 16, 17, 18, 21, 28, 32, 40, 43, 44, 50,

60
Third ----------- 9
this -- 4, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 20, 21, 22, 23, 25, 26, 27, 30, 31, 32, 34, 36, 37, 39, 40, 41, 44, 45, 49, 50, 51, 53, 54, 55, 56, 57, 59, 61, 62, 63, 64, 65, 67, 68
This 3, 11, 20, 26, 38, 41, 43
those - 4, 5, 6, 8, 12, 13, 25, 33, 34, 36, 41, 42, 43, 44, 45, 51, 54, 56, 60, 61, 62, 64
Those -- 24, 51, 57
though ----- 20, 56
three ------- 9, 37
Three ---------- 65
through 5, 11, 19, 28, 39, 40
time 6, 8, 10, 12, 15, 24, 26, 29, 37, 40, 41, 45, 63, 68
times ------ 41, 46
timing --------- 27
to - 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 34, 35, 36, 37, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 67
To --------- 18, 20
today 5, 18, 36, 65
together----11, 63
too-------------65
took----13, 14, 50
tool------------57
tools---53, 54, 56
top---------29, 30
topics----------50
towards---------26
trace-----------35
tracking---23, 30, 31, 36, 64
trade---52, 53, 57
traditional-----31
TRANSCRIBER-----68
transcribers----68
transcript--67, 68
TRANSCRIPT------68
Transcription---68
transit---------16
transmission 21, 30
transmitted-----34
travel----------63
treatment---35, 50
Trial-----------67
tried-------18, 31
true-7, 8, 12, 13, 21, 22, 23, 26, 28, 30, 34, 36, 43, 58, 67
truly-----------39
trust--24, 41, 42, 49
truth------------7
trying--13, 34, 47
turn-------------4
two 13, 14, 15, 16, 18, 19, 21, 29, 40, 57
tying-----------43
type------------25
TYPE------------68
types---27, 38, 48

**U**

Ultimately------52
under---7, 13, 26, 36, 44, 47, 56, 57
undermine ------ 60
understand 12, 25, 33, 34, 41, 48, 68
understanding - 44, 61
understood ----- 59
Understood ----- 26
undertake ------ 39
undertakes - 52, 59
unfair ----- 54, 56
unfortunately -- 10
unless ----- 10, 64
unreasonable 32, 33
until ---------- 62
unusual -------- 11
unwieldy ------- 49
up - 8, 14, 18, 24, 25, 29, 30, 31, 41, 43, 44, 49, 50, 52, 60, 62, 63
upon 9, 12, 18, 27, 30
urgency -------- 62
URL ------------ 39
URLs ----------- 34
us 13, 27, 37, 43, 49
use 9, 23, 34, 40, 41, 53
used 8, 36, 51, 56, 61
useful --------- 12
user -- 25, 31, 33, 36, 38, 60
users ------ 36, 59
using -- 8, 21, 23, 24, 26

**V**

v ----------- 1, 68
V --------------- 1
vaccines ------- 64
various ---- 15, 59
ve 5, 6, 9, 12, 17, 18, 22, 24, 31, 32, 34, 36, 40, 41, 43, 44, 45,

51, 54, 55, 61, 63, 65
vending -------- 64
version -------- 34
versus - 3, 42, 44, 49, 52
very -- 35, 44, 57, 58, 59, 61, 65
Very ----------- 58
VI -------------- 1
via -------- 55, 64
viability ------- 7
viable -- 7, 26, 44
victim --------- 31
violation ------ 25
Virginia ------- 42
virtually ------ 39
virtue --------- 23
visited -------- 23
visitor - 8, 18, 21
visits --------- 36
Volume ---------- 1
VOLUME --------- 68
voracity -------- 7
vs ------------- 67

W

w -- 9, 10, 11, 13, 17, 18, 19, 21, 23, 24, 27, 30, 31, 34, 35, 36, 38, 40, 51, 53, 55
wait ----------- 55
waiting -------- 11
Wakefield ------ 57
walk ----------- 38
walking -------- 48
walks ---------- 38
want 3, 6, 13, 22, 29, 35, 37, 40, 42, 50, 51, 54, 56, 63, 65
wanted ----- 14, 55
wants ------ 30, 37
warning -------- 53
wary ----------- 42
was 14, 15, 22, 24, 26, 27, 28, 33, 37, 42, 43, 44, 49, 51, 54, 57, 58, 59, 67
way--8, 9, 10, 11, 12, 16, 17, 18, 20, 21, 23, 30, 31, 32, 33, 34, 36, 38, 45, 46, 48, 53, 56, 58, 59
we-5, 7, 8, 9, 11, 13, 14, 15, 17, 18, 19, 20, 22, 25, 27, 30, 31, 33, 35, 40, 41, 43, 44, 45, 47, 49, 50, 53, 54, 55, 64, 65
We---5, 7, 12, 17, 32, 40, 44, 45, 47, 53, 61, 62, 64
web-8, 30, 32, 41, 50
WebMD -----------36
website-9, 10, 11, 13, 17, 18, 19, 21, 23, 24, 27, 30, 31, 34, 35, 36, 38, 40, 51, 53, 55
websites-7, 9, 11, 16, 23, 35, 36, 38, 42, 52, 53, 55, 56, 59, 61
week 61, 62, 63, 65
weekend ---------65
weeks -----------64
Welcome ----------3
welfare ---------26
well-6, 7, 13, 23, 28, 29, 32, 42, 44, 47, 52, 55, 60, 62, 65
Well---13, 17, 29, 33, 34, 40, 42, 46, 49, 53
went --------22, 36
were-5, 9, 13, 15, 22, 34, 39, 50, 57
what 5, 7, 10, 11, 14, 15, 16, 18, 22, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 37, 38, 40, 43, 44, 45, 46, 47, 50, 51, 53, 54, 55, 56, 57, 58, 61, 64
What -- 11, 31, 33, 48, 56
whatsoever ----- 27
when -- 26, 32, 36, 41, 43, 46, 47, 51, 52, 53, 56, 58, 59
When ------- 29, 49
where - 22, 23, 28, 30, 31, 39, 40, 46, 51, 57, 58
Where ---------- 38
whether 12, 13, 22, 32, 36, 39, 52, 59
Whether -------- 26
which - 5, 7, 8, 9, 10, 11, 13, 14, 15, 20, 22, 23, 24, 27, 34, 36, 38, 40, 42, 43, 49, 51, 55, 56, 61, 63, 64, 65, 67
Which ------ 22, 39
while ---------- 16
white ---------- 15
who - 3, 4, 11, 13, 23, 24, 26, 35, 37, 38, 40, 50, 53, 59
whole ------ 21, 43
will 3, 4, 26, 35, 52, 61, 62, 63, 64, 65
win ------------ 22
wire --- 14, 15, 22
wiretap 5, 14, 15, 20, 22, 23, 25,

Date Filed 8/11/2023 5:27 PM
Superior Court - Suffolk
Docket Number 2384CV01086



26, 27, 31, 32
wish ---- 6, 35, 41
wit ------------ 25
with 3, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 17, 22, 24, 26, 32, 34, 35, 36, 38, 39, 40, 41, 43, 44, 45, 46, 51, 52, 53, 55, 59, 60, 61, 63, 64, 67, 68
within --------- 25
without ---- 41, 44
won -------- 37, 57
Worcester ------ 67
word 23, 28, 34, 68
words - 21, 41, 42, 43
work --- 62, 63, 64
work¬ -- 62, 63, 64
works - 21, 23, 26, 34, 62, 63, 64
world --- 9, 36, 39
worry ----------- 5
worse ---------- 43
would 4, 6, 8, 12, 18, 19, 25, 31, 33, 34, 39, 40, 41, 45, 48, 49, 50, 52, 54, 58, 62, 63, 64
Would ---------- 11
wrestling -- 52, 53
written ---- 41, 59
wrong ---------- 36

Y

years ------ 20, 23
yes 19, 20, 26, 29, 44, 58, 63
Yes - 3, 7, 15, 17, 18, 29, 41, 44, 47, 50, 55, 56, 58, 62, 63, 64
yet ---- 25, 39, 48
you 3, 4, 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 20, 21, 22, 24, 26, 27, 28, 29, 31, 32, 33, 35, 37, 38, 39, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 60, 61, 62, 63, 64, 65
You-3, 12, 17, 19, 21, 25, 30, 38, 46, 47, 52, 53, 54, 57, 61, 63, 65
your 3, 4, 6, 7, 9, 10, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22, 23, 26, 27, 28, 29, 30, 32, 33, 35, 36, 38, 40, 41, 42, 43, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 59, 62, 63, 64, 65
Your 3, 17, 29, 43, 58, 65

# Exhibit D

| | | |
|---|---|---|
| **JANE DOE, *on behalf of herself and all others similarly situated*** | * | **IN THE** |
| **Plaintiff** | * | **CIRCUIT COURT** |
| **v.** | * | **FOR BALTIMORE CITY** |
| **MEDSTAR HEALTH, INC., *et al.*** | * | **CASE NO.: 24-C-~~19~~ 20-000~~488~~ 571** |
| **Defendants** | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION**

This matter has come before the Court on Defendants Medstar Health, Inc. and Medstar Good Samaritan's Motion to Dismiss (Docket Entry #5). The Court has considered the briefs of the parties, oppositions, replies, and the oral argument of counsel, held on July 27, 2020.

**I. Background.**

Plaintiff, Jane Doe, is a patient of Defendant, medical provider MedStar Health, Inc. ("MedStar"). MedStar is the owner and operator of hospitals and health care facilities, including MedStar Good Samaritan Hospital. MedStar has public websites that any individual can access to obtain information about general medical topics and information about MedStar and its facilities and services. Patients can also use MedStar's website to log in, access their private medical records, communicate with doctors, and schedule appointments. Plaintiff alleges that MedStar uses computer coding to disclose personally identifiable, private data related to patients' medical care to at least 23 different third parties, including, but not limited to Facebook, Google, LinkedIn, Twitter, and Pinterest. Plaintiff claims that MedStar disclosed: the URLs that Plaintiff visited; "search queries about specific doctors, medical conditions, treatments"; patients' clicks to "Search," "FindADoctor," "Login," or "Enroll' in MyMedStar (Medstar's online patient portal); "summaries of MedStar's responsive communications, the parties to all

communications at MedStar's web properties, and the existence of communications at MedStar's web properties."

Plaintiff raises five claims: 1) violation of the Maryland Wiretap Act, 2) intrusion upon seclusion, 3) publication of private facts, 4) breach of confidence, and 5) violation of the Consumer Protection Act. Plaintiff alleges that her data was disclosed without prior authorization, and that the disclosure of her data harms Plaintiff by invading her privacy and harming her property rights to her data. Plaintiff seeks general damages and economic damages for these harms. Additionally, Plaintiff pursues a theory of unjust enrichment for Defendant's profit from Plaintiff's data, as well as statutory damages.

**II. Applicable Law.**

In deciding a Motion to Dismiss, the Court takes as true all well-pleaded allegations and reviews them in the light most favorable to the plaintiff. *Lloyd v. General Motors Corp.*, 397 Md. 108, 121 (2007). Although a court must assume the truth of all well-pleaded facts, dismissal is proper when the facts alleged, if proven, would fail to afford relief to the plaintiff. Md. Rule 2-322(b)(2); see also *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 561 (2004). The facts as set forth in the complaint must be pleaded with "sufficient specificity; bald assertions and conclusory statements by the pleader will not suffice." *Sutton v. FedFirst Financial Corp.*, 226 Md. App. 46, 74 (2015) (quoting *RRC Northeast, LLC v. BAA MD, Inc.*, 413 Md. 638, 643 (2010)). Any ambiguity or uncertainty in the allegations is construed against the pleader. *Shenker v. Laureate Educ., Inc.*, 411 Md. 317, 335 (2009).

**III. Analysis.**

In Count 1 of the Complaint, Plaintiff alleges that Defendants have violated the Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-402. Maryland's appellate courts have not,

to this Court's knowledge, addressed wiretapping in the context of online data being intercepted and disclosed to third parties. This is apparent from the briefs of the parties, which look extensively to other jurisdictions for persuasive authority to assist in interpreting the Maryland statute.[1]

Despite the paucity of Maryland precedent, the Court feels that the plain language of the statute itself is straightforward and provides a legal foundation for Count 1 of the Complaint. The Maryland Wiretap Act provides as follows with respect to prohibited conduct:

> (a) Except as otherwise specifically provided in this subtitle it is unlawful for any person to:
> (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
> (2) Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or
> (3) Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

Md. Code Ann., Cts. & Jud. Proc. § 10-402. The statute goes on to authorize a civil cause of action for any victim of the unlawful conduct:

---

[1] The Court finds the analysis in *Doe v. Virginia Mason Medical Center*, 2020 WL 1983046, No. 19-2-26674-1 (Kings County, WS Feb. 12, 2020) to be persuasive. In that matter, MedStar presented nearly identical arguments as Defendant in the instant case. The court rejected MedStar's arguments and distinguished that case from *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), noting that the *Smith* Plaintiffs "consented to Facebook tracking . . . and the allegations in this case are broader than sharing URL information only." *Virginia Mason* at 2. Similarly, in the instant matter, Plaintiff alleges to be a patient, that Defendant Medstar's information disclosures were executed without Plaintiff's knowledge, and that the disclosures were made to "at least 23 different third-party marketing firms." The *Virginia Mason* court noted that the case before it, as with the instant case, "involves the allegations of sharing data with more than Facebook and does not hinge on the relationship between the Plaintiff and Facebook." *Id.*

> (a) Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:
> (1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;
> (2) Punitive damages; and
> (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

Md. Code Ann., Cts. & Jud. Proc. § 10-410. In the instant case, the Court finds that Plaintiff has sufficiently plead the elements of a Wiretap Act claim and that such a claim can be maintained by Plaintiff under the Act. The Court further finds that there are questions of fact as to whether Defendant's conduct constitutes an "interception," whether the types of data alleged to have been disclosed constitute "communications" and/or "disclosures," and whether Plaintiff consented to disclosure, thus rendering Defendant's conduct lawful under Md. Code Ann., Cts & Jud. Proc. § 10-402(c)(3).

Counts 2 and 3 of Plaintiff's Complaint assert privacy claims: invasion of privacy – intrusion upon seclusion (Count 2), and invasion of privacy – publication of private facts (Count 3). Intrusion upon seclusion is "the intentional intrusion upon the solitude or seclusion of another or his private affairs or concerns that would be highly offensive to a reasonable person." *Pemberton v. Bethlehem Steel Corp.*, 66 Md. App. 133, 163 (1986) (citing Restatement of Torts, 2d, § 652B). The parties disagree about the kinds of data that Defendant disclosed and whether that data is personally identifiable information. At this stage in the proceedings, and pursuant to a motion to dismiss, the Court assumes the truth of Plaintiff's allegations that Defendant provided express promises of privacy to patients, and that Defendant violated those promises by disclosing Plaintiff's data. Under these circumstances, dismissal of this claim is inappropriate as a

reasonable finder of fact could conclude that, if Plaintiff's disclosed data constitutes personally identifiable information, Defendant's disclosures are highly offensive.

Similarly, Defendant has failed to persuade the Court regarding Count 3 alleging disclosure of private facts. To sustain such a claim, Plaintiff must demonstrate that a party has publicized Plaintiff's "private life" and that the matter publicized "is of a kind which (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Furman v. Sheppard*, 130 Md. App. 67, 77 (2000). Private medical data is not of legitimate concern to the public, and again, assuming the allegations in the Complaint to be true, the data disclosed constitutes personally identifiable information; a reasonable fact-finder could conclude that Defendant's disclosures are highly offensive.

Count 4 of the Complaint alleges a claim for breach of a confidential relationship. Generally, there is no cause of action in Maryland offering relief for a breach of confidence claim involving a patient-provider relationship. Plaintiff likens her case to precedent that addresses confidentiality in the context of business relationships involving free competition and trade secrets, but the comparison is not persuasive. *See Space Aero Prods. Co. v. R. E. Darling Co.*, 238 Md. 93, 208 A.2d 74 (1965). In *Space Aero Prods. Co.*, the breaching party profited by replicating the non-breaching party's product, and the non-breaching party lost profits as a result. The Court in *Space Aero Prods. Co.* provided that compensatory damages are awarded unless they would be inadequate, in which case the Court will issue an injunction. Even assuming *arguendo* that there is a cause of action for a patient-provider relationship, Plaintiff has not demonstrated a monetary loss tied to the data itself, and the purpose of an injunction for this type of claim is meant to curb further economic loss, again not present here. *Id.* at 124. While

Plaintiff's other privacy tort claims may recognize general damages for the loss of privacy itself, the Court has no method to award her relief under a breach of confidence claim.

Finally, in Count 5, Plaintiff alleges a breach of the Consumer Protection Act. To establish a claim under the Consumer Protection Act, a consumer must state "an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation." *Lloyd v. GMC*, 397 Md. 108, 143 (2007). Although Plaintiff cites to cases from other jurisdictions, there is no basis in Maryland law to suggest that Plaintiff is entitled to claim a "privacy injury" under this cause of action. Any recovery for such an injury should be limited to Plaintiff's privacy tort claims. Additionally, Plaintiff argues that she is entitled to this cause of action because she can claim benefit of the bargain damages and unjust enrichment, but Plaintiff is not raising a breach of contract claim, and these are theories for damages under contract law.

**IV. Conclusion.**

For the reasons set forth above, the Court will grant the Motion in part, dismissing Counts 4 and 5.

August 5, 2020
Date

**Judge's Signature appears on the original document**
Jeffrey M. Geller, Judge
Circuit Court for Baltimore City

# Exhibit E

**SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO
GORDON D SCHABER COURTHOUSE**

**MINUTE ORDER**

DATE: 06/09/2022 TIME: 01:30:00 PM DEPT: 28

JUDICIAL OFFICER PRESIDING: Lauri A. Damrell
CLERK: V. Aleman
REPORTER/ERM: Shelia Pham #13293
BAILIFF/COURT ATTENDANT: T. Gonzalez

CASE NO: **34-2019-00258072-CU-BT-GDS** CASE INIT.DATE: 06/10/2019
CASE TITLE: **Doe I vs. Sutter Health**
CASE CATEGORY: Civil - Unlimited

---

**EVENT TYPE:** Motion for Judgment on the Pleadings - Civil Law and Motion - Demurrer/JOP

---

**APPEARANCES**
Jeffrey A Koncius, counsel, present for Plaintiff(s) remotely via video.
Nicole Ramirez, specially appearing for counsel Mitchell M. Breit, present for Plaintiff(s).
Jay Barnes, counsel, present for Plaintiff(s) remotely via video.
Stephen C Steinberg, counsel, present for Defendant(s) remotely via video.
Michael D. Abraham, counsel, present for Defendant(s) remotely via video.

---

**Nature of Proceedings: Motion for Judgment on the Pleadings**

The matter became before the Court his date for a hearing with the above-indicated counsel present.

After hearing from the parties, the Court affirmed the tentative ruling.

**Tentative Ruling:**

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**
Facts
In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (*Id.*, ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (*Id*, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (*Id.*, ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (*Id.*, ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (*Id.*, ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the

California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**
Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**
A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company v. Vaughn* (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal. App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations. (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).) It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to

communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

First Argument: "Without the Consent of All the Parties"
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants must be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In *Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id.* at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id.* at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid.*) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id.* at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid.* (Emphasis added).) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid.*) Sutter argues that, pursuant to *Kight*, the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc.* (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id.* at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id.* at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid.*; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiffs browsers sent to the defendant's servers); *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc.* (W.D.Wash. 2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.") As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement

of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra,* 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra*, 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

<u>Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same Is in Transit or Passing Over any Wire, Line, or Cable"</u>
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra*, 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*) ["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra*, the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument"

and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra*, at *77.) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter. In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra*, at *52); see also (*Yoon v. Lululemon United States* (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications. These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra*, at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner*, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
(ii) who willfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable</u>, or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court

rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person from *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means* of any machine, *instrument*, or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra*, 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra*, 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra*, 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

<u>Disposition</u>
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.*
**Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28*
*To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

Defendant Sutter Health's ("Sutter") Motion for Judgment on the Pleadings against Plaintiffs' Third Amended Complaint ("3AC") is DENIED as follows.

**Background**
Facts
In this putative class action, Plaintiffs are patients of Sutter, a health care provider in Sacramento. (3AC, ¶¶ 14-16.) The action arises out of Plaintiffs' use of Sutter's "My Health Online" patient portal ("Portal"). Plaintiffs allege that Sutter represents that the Portal is secure, but when a person uses it, Sutter discloses certain information about such use to Facebook, Google, and other third parties. (*Id.*, ¶¶ 3-5.) For example, Plaintiffs allege that upon signing into the Portal, Sutter discloses the fact of the sign in and each patient's personally identifiable information to Facebook, Google, and Crazy Egg. (*Id*, ¶¶ 5b, 8.) Once signed-in, if a patient clicks to view allergies, a disclosure of that action is made to Google of the specifics; if a patient clicks "Find-A-Doctor" or set up an appointment, a disclosure of that action is made to Facebook, Google, and others. (*Id.*, ¶5c.) On logoff, Sutter discloses this action to Facebook and Google. (*Id.*, ¶ 5i.) Plaintiffs allege Sutter makes these disclosures by intentionally including source code on its website that commanded Plaintiffs' browser to redirect the contents of HTTPS communications to third parties through invisible tracking pixels that are also code web bugs. (*Id.*, ¶¶ 128-130.)

Plaintiffs' 3AC was filed on December 7, 2021 and contains three causes of action: (1) violation of the California Invasion of Privacy Act ("CIPA"), specifically Penal Code § 631 ("section 631"), (2) breach of contract, and (3) breach of the implied covenant of good faith and fair dealing. This Court has twice sustained Sutter's demurrer to Plaintiffs' cause of action for violation of section 631. (See ROA 134, 206.) However, on November 16, 2021, the Court overruled Plaintiffs' demurrer to that cause of action as stated in the 2AC. (ROA 301.) Sutter now moves for judgment on the pleadings with respect to the 3AC's cause of action for violation of section 631.

**Request for Judicial Notice**
Sutter's request for judicial notice in support of this motion is GRANTED as to request Nos. 1 (the Court's 11/16/2021 Minute Order sustaining portions of Sutter's demurrer to Plaintiffs' 2AC; 2 (the Court's 11/16/2021 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 2AC; 3 (the Court's 11/3/2020 Minute Order sustaining Sutter's demurrer to the 1AC); 4 (the Court's 11/3/20 Minute Order granting parts of Sutter's motion to strike portions of Plaintiffs' 1AC; 5 (the Court's 1/29/2020 Minute Order sustaining Sutter's demurrer to the original complaint); 6 (Plaintiffs' 2AC); 7 (Plaintiffs' 1AC); 8 (Plaintiffs' original complaint); and 10 (the text of AB 860 passed by the Assembly on July 26, 1967 and passed by the California Senate on July 27, 1967). (Evid. Code, § 452(a), (d).)

Sutter's request for judicial notice is DENIED as to request No. 9 (Model Notice of Privacy Practices for health care providers published by the US Department of Health and Human Services' Office for Civil Rights) as this material is irrelevant to the disposition of this motion. (See *State Comp. Ins. Fund* v. ReadyLink Healthcare, Inc. (2020) 50 Cal.App.5th 422, 442.)

**Legal Standard**
A motion for judgment on the pleadings has the same function as a general demurrer, but may be made after the time for demurrer has expired. (See Code Civ. Proc., § 438.) Like a demurrer, the grounds for a motion for judgment on the pleadings must appear on the face of the complaint, or in documents attached to the pleadings and properly incorporated by reference. (Code Civ. Proc., § 438(d); *Lumbermens Mutual Casualty Company* v. Vaughn (1988) 99 Cal.App.3d 171, 178.) The motion may be based on matters of which the court may take judicial notice. (Code Civ. Proc. § 438(d); see also *Howard Jarvis Taxpayers Assoc. v. Riverside* (1999) 73 Cal.App.4th 679, 685.) However, the motion does not lie on grounds previously raised by demurrer unless there has been a "material change in applicable case law or statute" since the demurrer was overruled. (Code Civ. Proc. § 438(g)(1); see *Yancey v. Superior Court* (1994) 28 Cal.App.4th 558, 562, fn. 1.) The motion should be granted if, taking

all of the allegations of the complaint to be true, the defendant is entitled to judgment as a matter of law. (*Consolidated Fire Protection Dis. v. Howard Jarvis Taxpayers' Ass'n* (1998) 63 Cal. App. 4th 211, 219.) A motion for judgment on the pleadings is properly granted without leave to amend when there is no reasonable possibility that the defect can be cured by amendment. (See *Schonfeldt v. State of California* (1998) 61 Cal. App.4th 1462, 1465 ("If there is no liability as a matter of law, leave to amend should not be granted.").)

**Analysis**
Section 631 penalizes various forms of secret monitoring of conversations. (*Ribas v. Clark* (1985) 38 Cal.3d 355, 359 (*Ribas*).) It provides, in pertinent part:

"(a) Any person who, by means of any machine, instrument, or contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and <u>without the consent of all parties</u> to the communication, or in any unauthorized manner, <u>reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable</u>, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in the county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170, or by both a fine and imprisonment in the county jail or pursuant to subdivision (h) of Section 1170. . . ." (Emphasis added.)

Sutter advances two arguments with respect to the construction of the following phrases in section 631 emphasized above: "without the consent of all the parties" and "reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable." The Court discusses each argument separately below.

<u>First Argument: "Without the Consent of All the Parties"</u>
The parties do not dispute that section 631 requires the consent of "all parties" to the communication. (See *People v. Conklin* (1974) 12 Cal.3d 259, 270; RJN Exh. J.) Nor do they dispute that section 631 applies only to third parties and not to a participant to the communication. (See *Warden v. Kahn* (1979) 99 Cal.App.3d 805, 811.) However, Sutter contends that (1) section 631 applies only where there are least two participants to the communication, (2) that both of those participants must be natural persons capable of giving consent, and (3) that Plaintiffs do not allege the presence of "another individual as a second participant who could have given consent." (Mov. Mot. P&A, p. 6: 15-16.) While Sutter's argument is creative, the Court finds it ultimately lacks merit.

As Sutter's argument is based on statutory construction, the Court begins by setting forth the fundamental rules governing such construction. When a court interprets a statute, its fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.) The court first examines the statutory language, giving it a plain and commonsense meaning. (*Ibid.*) The court does not examine the language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. (*Ibid.*) If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. (*Ibid.*)

Sutter's statutory argument relies on *Kight v. CashCall, Inc.* (2011) 200 Cal.App.4th 1377 (*Kight*) . In

*Kight*, the plaintiffs brought claims against a consumer finance company under Penal Code § 632 ("section 632"), which is part of CIPA and prohibits eavesdropping on confidential communications. The plaintiffs alleged that the company monitored their telephone conversations with the company's employees without the plaintiffs' knowledge or consent. (*Id.* at p. 1383.) The trial court determined that eavesdropping under section 632 requires *three* parties and there were only two parties to the conversations – the corporation and the customer. (*Id.* at p. 1391.) The appellate court reversed, finding this interpretation contrary to the statutory language and intent of section 632. (*Ibid.*) With respect to the statutory language, the court focused on the use of the terms "party" and "person" in the statute. The court noted that section 632 prohibits a "person" from overhearing a confidential communication without the consent of "all parties" and that the term "person" is defined, for purposes of section 632, to include both an individual and a corporation. (*Id.* at p. 1391.) By contrast, as the court explained, the statutory term "parties" is used to identify the "*individuals* who are the conversation participants from whom consent is required" before a conversation may be overheard. (*Ibid.* (Emphasis added).) The court determined that this difference in terms supported the interpretation that a corporation is not a single unit for purposes of determining who must give consent and that all participants to the conversation must give consent. The court held that each individual listener should be counted as a person as opposed to all corporate employees counting as one corporate person. (*Ibid.*) Sutter argues that, pursuant to *Kight,* the term "party" in section 631 can only mean an individual and, thus, section 631 cannot apply here where the intended recipient of the communication is not a natural person.

The Court is not convinced. First, the Court does not interpret *Kight* to mean that sections 631 and 632 are inapplicable when a communication is between a natural person and an entity or technology created by other natural persons,. Second, the particular context of *Kight* alone is distinguishable. *Kight* considered a *telephone* conversation between a corporate employee and the plaintiff, a conversation to which another corporate employee listened unbeknownst to the plaintiff. Here, the Court does not consider a telephone conversation but rather click communications by Plaintiffs to Sutter's website. "Tautalogically, a communication will always consist of at least two parties: the speaker and/or sender, and at least one intended recipient." (*In re Google Inc.* (3d. Cir. 2015) 806 F.3d 125, 143.) Courts interpreting section 631 have indicated that a party to a communication, for purposes of section 631, may include an entity or website. In *Revitch v. New Moosejaw* (2019) 2019 U.S. Dist. LEXIS 186955 (*Revitch*), for example, the plaintiff alleged that the defendant, Moosejaw, embedded into its webpages a mechanism that allowed another company, NaviStone, to eavesdrop on the plaintiff's communications. (*Id.* at *2.) The court held that the plaintiff's "interaction with the Moosejaw website was a communication within the meaning of section 631." (*Id.* at *3.) In particular, the court noted that "[a]dmittedly, a customer in [a] brick-and-mortar store does not communicate by searching through the inventory. But the same is not true for off-site shoppers: a customer who calls to inquire about a store's products undoubtedly communicates with the retailer. As does an online patron, [the plaintiff] requested information from Moosejaw by clicking on terms of interest; Moosejaw responded by supplying that information. This series of requests and responses – whether online or over the phone – is communication." (*Ibid.*; see also *Graham v. Noom* (N.D. Cal. 2021) 533 F.Supp.3d 823, 832-833 [concluding that a company was a party to a communication and another company was an extension of that company]; *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 775 (*Flanagan*) [addressing possibility that an auditor to a conversation can be a person or a mechanical device].) The Court disagrees with Sutter that *Revitch* is inapposite here or deviates from California precedents interpreting CIPA. The only precedent Sutter cites is *Kight*, and the Court is unconvinced that precedent dictates a different result than *Revitch*.

Courts have also reached the same result with respect to the federal Wiretap Act, which prohibits similar conduct as section 631 and involves a similar analysis. (See *In re Google Inc.* (3d Cir. 2015) 806 F.3d 125, 143 [concluding defendant advertising companies were parties to a communication for purposes of the federal wiretapping law because they were the intended recipients of requests that plaintiff's browsers sent to the defendant's servers); *Calhoun v. Google LLC* (N.D.Cal. 2021) 526 F.Supp. 3d 605, 623.) [discussing website consent under the federal Wiretap Act]; *Chance v. Ave. A, Inc.* (W.D.Wash.

2001) 165 F.Supp.2d 1153, 1162 [finding it implicit that web pages consented to interception under federal wiretapping law]; *In re Doubleclick Privacy Litig.* (S.D.N.Y. 2001) 154 F.Supp.2d 497, 514 [concluding certain websites were parties to the communications from the plaintiffs and gave sufficient consent]; see also *Cline v. Reetz-Laiolo* (N.D. Cal. 2018) 329 F.Supp.3d 1000, 1051 ["The analysis for a violation of CIPA is the same as that under the federal Wiretap Act.") As stated in the Court's ruling on Sutter's demurrer to the 2AC, "California courts are likely to rely on federal decisions interpreting the federal wiretap statute" when interpreting section 631. (ROA 301, p. 21.)

Second, in addition to considering the text of section 631, the court in *Kight* considered the legislative intent and determined that the Legislature enacted section 632 to "ensure an individual's right to control the firsthand dissemination of a confidential communication, and expressed its intent to strongly protect an individual's privacy rights in electronic communications." (*Id.* at p. 1392.) Based on that legislative purpose, the court construed section 632 broadly in favor of the plaintiff, concluding the required third party to the conversation was present. Accordingly, contrary to Sutter's point, *Kight* does not suggest that section 631 or 632 applies only if the parties to the conversation or communication are natural persons. Instead, it suggests that CIPA, including section 631, should be construed broadly to protect an individual's privacy rights. As *Kight* held with respect to section 632, the privacy rights affected under section 631 are the same regardless whether a communication is with a machine or a human being. (*Id.* at p. 1393.) Interpreting section 631 in the way Sutter suggests would undermine both the requirement of two-party consent and the overall purpose of this section. CIPA was enacted in 1967, "replacing prior laws that permitted the recording of telephone conversations with the consent of one party to the conversation." (*Flanagan, supra,* 27 Cal.4th at p. 768.) "The purpose of the act was to protect the right of privacy by, among other things, requiring that all parties consent to a recording of their conversation." (*Ibid.*) The legislative history is "replete with references to the Legislature's intent to strengthen then existing law by 'prohibiting wiretapping or 'electronic eavesdropping' without the consent of all parties to the communication which is being tapped or overheard." (*Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1487.) "The philosophy [of protecting an individual's privacy right] lie[s] at the heart of virtually all the decisions construing the [Act]." (*Flanagan, supra,* 27 Cal.4th at p. 775.) The addition of all-party consent in section 631 was clearly intended to broaden the coverage of section 631; however, Sutter's suggested interpretation here would limit that coverage by effectively removing entities or technological devices as possible parties to a communication. The Court refuses to adopt such an interpretation.

<u>Second Argument: "Reads, or Attempts to Read, or to Learn the Contents or Meaning of any Message, Report, or Communication While the Same is in Transit or Passing Over any Wire, Line, or Cable"</u>
The California Supreme Court has explained that section 631 contains three operative clauses covering "three distinct and mutually independent patterns of conduct." (*Tavernetti v. Superior Court* (1978) 22 Cal. 3d 187, 192.) Section 631 also includes a fourth clause that establishes liability for anyone "who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the" other three bases for liability. (*Mastel v. Miniclip SA* (E.D.Cal. 2021) 549 F.Supp.3d 1129, 1134 (*Mastel*); see 3AC ¶¶ 367-368 [alleging Sutter aided, agreed with, and conspired with third-party tracking companies in violating section 631].)

The first clause of section 631 has been described as creating "liability for any individual who 'intentionally taps, or makes any unauthorized connection . . . with any *telegraph or telephone* wire, line, cable, or instrument." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57 (emphasis added).) Sutter argues that, according to its plain language, this first clause is limited to only *telegraphic or telephonic* communications and that Plaintiffs' allegations do not involve such a communication. On the one hand, Sutter's argument is supported by precedent. (See *Mastel, supra,* 549 F.Supp.3d at pp. 1133-1135, citing *In re Google Assistant Priv. Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [claim under first clause must be dismissed if allegations do not show technology at issue operates using a telegraph or telephone wires]; *In re Google Inc. Gmail Litig.* (N.D. Cal. 2013 No. 13-MD-02430-LHK) 2013 U.S.Dist.LEXIS 172784, at *77 (*Google Gmail*)

["difference in coverage between first and second clauses suggests that the Legislature intended the two clauses to apply to different types of communication"]; see also *Ward General Insurance Services, Inc. v. Employers Fire Ins. Co.* (2003) 114 Cal.App.4th 548, 554 [adjective in series of nouns generally modifies each noun following the phrase.) On the other hand, other federal courts have suggested, without breaking down the different clauses in section 631, that section 631 covers the type of claims at issue here. In *Revitch, supra*, the plaintiff argued that Moosejaw embedded into its webpages a mechanism that allowed a third party to eavesdrop on the plaintiff's communications with the Moosejaw website. (2019 U.S. Dist. LEXIS 186955 at *2.) The code embedded on the website functioned as a wiretap that redirected the plaintiff's communications to the third party. (*Id.* at *3.) The court held that the plaintiff's allegations were sufficient to state a claim under section 631. (*Id.* at *2.)

However, the Court need not resolve the extent of the first clause's coverage as it finds Sutter's argument as to the second clause of section 631 unpersuasive. "The second clause of [section 631] creates liability for any individual who 'reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state." (*Matera v. Google Inc.* (N.D.Cal. Aug. 12, 2016, No. 15-CV-04062-LHK) 2016 U.S.Dist.LEXIS 107918, at *56-57.) Sutter's argument relies on the absence of the term "instrument" from this clause (whereas "instrument" is included in the first clause). Sutter argues that Plaintiffs' 3AC allegations are premised on connection to an "instrument" and, as a result, Plaintiffs' allegations are outside the scope of the second clause. More specifically, Sutter contends the 3AC alleges that Sutter's "source code connected to and 'commandeer[ed]' an instrument – the visitor's computer – which caused the computer's web browser to react to inputted or received web data in the visitor's web browser and/or computer by sharing information about the data in separate transmissions to third parties." (Mov. Mot. P&A, p. 16: 13-16.) Again, the Court finds Sutter's argument lacks merit.

In support of its argument, Sutter's moving papers do not cite any cases interpreting section 631 and instead rely on general cases for rules of statutory construction. Conducting its own research, the Court has located a single case in which a federal court stated that "the second clause applies only to 'wire[s], line[s], or cable[s]' – not 'instrument[s,]' which are included in the first clause." (*Google Gmail, supra*, at *77.) However, in so doing, the federal court intended to highlight the breadth of the statute, not its limitations. Specifically, the court concluded that, by excluding the term "instrument" in the second clause, the Legislature reflected its intent to have the first and second clauses apply to different types of communications, thereby *expanding* its coverage. The court did not interpret "wire," "line" or "cable" narrowly. Rather, the Court found that the second clause is broad enough to encompass email. (*Id.*)

The Court's research further confirms that other courts have not read the second clause, or section 631 in its entirety, as narrowly as Sutter. In its order with respect to Sutter's demurrer to Plaintiffs' 2AC, this Court noted that "[f]ederal courts . . . have concluded that section 631 applies to communications over the internet." (See ROA 301, p. 4, citing *Matera, supra*, at *52); see also (*Yoon* v. Lululemon United States (C.D.Cal. 2021) 549 F. Supp. 3d 1073, 1080 (*Yoon*) ["[c]ourts agree . . . that [section 631] applies to communications conducted over the internet])").) Such communications by definition involve a computer; thus, Sutter's interpretation would upend the general consensus among federal courts as to Section 631's application to internet-based communications. These cases help illustrate that Sutter's argument with respect to the phrase "wire, line, or cable" is misplaced. That phrase refers to the *device* through which the communication is transmitted. Federal courts have already determined that communications transmitted over the Internet are transmitted over a wire, line, or cable for purposes of section 631. (See *Matera, supra*, at *57.) The parties do not question whether Plaintiffs' communications at issue here were conducted over the Internet – the fact that they involved a computer is part and parcel of the communication occurring over the Internet.

It appears that Sutter's argument also takes issue with the *means* by which the improper interception of

the communication over wire, line, or cable is achieved. In this regard, Sutter directs the Court's attention to the structure of section 631. According to Sutter, when broken down into grammatical clauses, the first two clauses of section 631 read as follows:
"Any person:

(i) who *by means of any machine, instrument, or contrivance, or in any other manner,* intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or
(ii) who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or" (431 (Emphasis added).)

Sutter argues that the italicized phrase specifies the means by which the unlawful activity is achieved but this phrase only appears in the first clause. In Sutter's view, this phrase does not apply to the second clause and, as a result, using an "instrument" to act as described in clause (ii) is not a violation of that clause. However, Sutter's interpretation would make it impossible to violate the second clause of section 631 because any means by which the violation is achieved is not mentioned in that clause. The Court rejects such an interpretation. With respect to the means by which the interception is achieved, the Ninth Circuit has described section 631 as prohibiting "any person from *using electronic means* to 'learn the contents or meaning' of any 'communication' 'without consent' or in an 'unauthorized manner.'" (*Davis v. Facebook, Inc.* (9th Cir. 2020) 956 F.3d 589, 606-607.) Additionally, the Central District of California read the second clause as prohibiting the unlawful reading or learning "*by means* of any machine, *instrument*, or contrivance." (See *Alder v. Cmty.* (C.D.Cal. Aug. 2, 2021, No. 2:21-cv-02416-SB-JPR) 2021 U.S.Dist.LEXIS 201644, at *5 [describing section 631 as imposing "liability on any person who 'by means of any machine, instrument, or contrivance, . . . and without the consent of all parties . . . reads, or attempts to read, or to learn the contents or meaning of any . . . communication while the same is in transit . . . or is being sent from, or received at any place within this state"]; see also *Yoon, supra*, 549 F.Supp.3d 1073, 1080.) Another court described the second clause as applying to "*both* communications 'in transit over any wire, line, or cable' *and* those 'sent from, or received at any place within this state.'" (*Lopez v. Apple, Inc.* (N.D. Cal. 2021) 519 F.Supp. 3d 672, 687; see also *In re Google Assistant Privacy Litig.* (N.D. Cal. 2020) 457 F.Supp.3d 797, 826 [agreeing that second cause could be read in disjunctive].) Under these constructions, the allegation that Sutter used Plaintiffs' computers to enable a third-party's interception of their communications on the Portal does not remove Plaintiffs' claim from section 631.

Lastly, the Court reiterates the California Supreme Court's instruction to interpret CIPA in a manner that "fulfills the legislative purpose of [the Act] by giving greater protection to privacy interests." (*Flanagan, supra*, 27 Cal. 4th at p. 775.) Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed the Act in accordance with the interpretation that provides the greatest privacy protection. (See *Ribas, supra*, 38 Cal. 3d at 360-61.) Sutter's interpretation of section 631 would provide less privacy protection and the Court finds it not well supported by case law. Accordingly, the Court rejects Sutter's second argument with respect the cause of action for violation of section 631.

Disposition
Based on the foregoing, Sutter's Motion for Judgment on the Pleadings is DENIED.

This minute order is effective immediately. No formal order or other notice is required. (Code Civ. Proc., § 1019.5; Cal. Rules of Court, rule 3.1312.)

*To request oral argument on this matter, you must call Department 28 at (916) 874-6695 by 4:00 p.m., the court day before this hearing and notification of oral argument must be made to the opposing party/counsel. If no call is made, the tentative ruling becomes the order of the court. (Local Rule 1.06.) Parties requesting services of a court reporter may arrange for private court reporter services at their own expense, pursuant to Government code §68086 and California Rules of Court, Rule 2.956. Requirements for requesting a court reporter are listed in the Policy for Official Reporter Pro Tempore available on the Sacramento Superior Court website at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-6a.pdf. The list of Court Approved Official Reporters Pro Tempore is available at https://www.saccourt.ca.gov/court-reporters/docs/crtrp-13.Pdf.*
**Please check your tentative ruling prior to the next Court date at www.saccourt.ca.gov prior to the above referenced hearing date.**

***If oral argument is requested, the matter shall be held via Zoom with the links below:***

*To join by Zoom link - https://saccourt-ca-gov.zoomgov.com/my/sscdept28*
*To join by phone dial (833) 568-8864 ID 16039062174*

**Counsel for Plaintiff is directed to notice all parties of this order.**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SACRAMENTO**<br>Gordon D Schaber Courthouse<br>720 Ninth STREET<br>Sacramento, CA 95814-1311 | |
| **SHORT TITLE:** Doe I vs. Sutter Health | |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL (Minute Order)** | CASE NUMBER:<br>**34-2019-00258072-CU-BT-GDS** |

I certify that I am not a party to this cause. I certify that a true copy of the Minute Order was mailed following standard court practices in a sealed envelope with postage fully prepaid, addressed as indicated below. The mailing and this certification occurred at Sacramento, California, on 06/14/2022.

Clerk of the Court, by: /s/ V. Aleman, Deputy

PAUL R KIESEL
KIESEL LAW LLP
8648 WILSHIRE BOULEVARD
BEVERLY HILLS, CA 90211-2910

# Exhibit F

D133503521

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

ENTERED
NOV 23 2021

| | | |
|---|---|---|
| John Doe, on behalf of himself and all others similarly situated, | : | Case No.: A2002633 |
| Plaintiff, | : | Judge Christian A. Jenkins |
| v. | : | |
| Bon Secours Mercy Health, | : | Decision And Entry Granting In Part And Denying In Part Defendant's Motion To Dismiss |
| Defendant. | : | |

## I. Procedural Background

Plaintiff filed a complaint on July 24, 2020. On August 28, 2020, defendant moved to dismiss for failure to state a claim pursuant to Civ.R. 12(B)(6). Defendant's motion was fully briefed on December 2, 2020 when plaintiff filed a motion for leave to file an amended complaint. Defendant opposed plaintiff's motion for leave to amend.

By entry docketed on February 12, 2021, the Court granted plaintiff's motion for leave to file an amended complaint. The Court deemed plaintiff's amended complaint filed as of said date.

Defendant filed a motion to dismiss plaintiff's amended complaint pursuant to Civ.R. 12(B)(6) on March 9, 2021. That motion is now fully briefed and ripe for decision.

## II. Standard of Review

A motion to dismiss for failure to state a claim tests the sufficiency of the complaint. *Assn. for the Defense of the Washington Local School Dist. v. Kiger*, 42 Ohio St.3d 116, 117, 537 N.E.2d 1292 (1989). The material allegations in the complaint are taken as admitted, and all reasonable inferences must be drawn in favor of the nonmoving party. *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988). Before the Court may dismiss the complaint, it must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitlir

VERIFY RECORD

to recovery. *O'Brien v. University Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975).

**III. Plaintiff's Allegations**

The Court accepts the well-pleaded allegations set forth in the amended complaint to consider defendant's motion to dismiss. Plaintiff is a patient of defendant, a health care provider. (Amended Complaint ¶¶ 1-2). Defendant operates a website (i.e., www.mercy.com) that it encourages its patients to utilize. (*Id.* ¶¶ 4, 42). Defendant's website includes a "patient portal" through which patients can access medical records and test results and make appointments. *Id.* Plaintiff has visited and used www.mercy.com. (*Id.* ¶¶ 11, 154-159).

Plaintiff's Amended Complaint explains at length how a website can be designed to cause information about visitors to the website and their activity on the website to be provided to third parties such as Facebook and Google, and that defendant's site employs such tactics. (*Id.* ¶¶ 44-63). Plaintiff alleges that the information provided to third parties includes among other things: (1) information from which individual users can be identified by matching them to their Facebook accounts (*Id.* ¶¶ 64-73); (2) individual users' IP address and thereby their physical location (*Id.* ¶¶ 89-97); (3) the substance of individual users' searches on mercy.com (*Id.* ¶ 140); (4) whether a user logged into the mychart portal (*Id.* ¶ 149); (5) whether a user attempted to schedule a virtual visit (*Id.* ¶¶ 143-145); and (6) the pages visited on mercy.com by a user (*Id.* ¶ 142). The net effect according to plaintiff is that defendant discloses to Google, Facebook and others the identity of patients who visit mercy and the substance of their search and other activity on mercy.com (*Id.* ¶ 159).

Plaintiff alleges that the disclosure of such information is not necessary for the operation of mercy.com, but rather that it enables defendant and others to engage in targeted marketing to

visitors to mercy.com that generates revenue for defendant. (*Id.* ¶¶ 180-181). Plaintiff alleges claims for disclosure of non-public medical information pursuant to *Biddle v. Warren Gen. Hosp.*, 86 Ohio St.3d 395, 715 N.E.2d 518 (1999), breach of confidence, invasion of privacy – intrusion upon seclusion, breach of contract, negligence and breach of fiduciary duty.

## IV. Discussion

### A. The Complaint Adequately Alleges A Claim Under *Biddle v. Warren General Hospital.*

In *Biddle*, the Ohio Supreme Court established a common law tort under Ohio law "for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information that a physician or hospital has learned within a physician-patient relationship." *Id.* at 401. According to the Ohio Supreme Court, the *Biddle* decision represents an effort to provide a "legal identity" for "an evident wrongdoing" that Ohio courts had "shoehorned" into traditional legal theories. *See Menorah Park Center for Senior Living v. Rolston*, 164 Ohio St.3d 400, 2020-Ohio-6658, 173 N.E.3d 400, ¶ 14. Thus, a *Biddle* claim is properly evaluated in this broad light.

Defendant argues that plaintiff's *Biddle* claim fails because: (1) no information learned through the physician-patient relationship was disclosed; (2) there was no disclosure of non-public medical information; and (3) public policy interests favoring the digitization of medical records and defendant's First Amendment right to promote its services on its website outweigh any privacy interest of plaintiff implicated by the conduct alleged in this case. Defendant's first two arguments fail based on the factual allegations in the Amended Complaint. Defendant's third argument cannot be properly assessed on a motion to dismiss on the facts alleged in this case.

Defendant first notes that its website is available to anyone, not just its patients. (Defendant's Memorandum in Support of Motion to Dismiss p. 2). No doubt this is true, but plaintiff is a patient. Plaintiff alleges he and other patients are encouraged by defendant to use its

website to obtain information about medical conditions, access medical records through the mychart portal and schedule appointments. While a non-patient may visit defendant's website to view some of the information thereon, in the absence of a physician-patient relationship with defendant, plaintiff and others would be unlikely to visit defendant's website to access their medical records or schedule appointments, actions that are allegedly disclosed to third parties. Plaintiff alleges that the information disclosed to third parties includes the fact that a visitor to defendant's website is a patient of defendant. (Amended Complaint ¶ 148).

Defendant also argues that visitors to its website are anonymous. (Defendant's Memorandum in Support of Motion to Dismiss p. 4). But this is contradicted by the Amended Complaint. Plaintiff alleges defendant's website deploys Facebook cookies to identify individual patients by matching them to their Facebook accounts. (Amended Complaint ¶¶ 70-71). Coupled with the other information allegedly disclosed such as IP address, user agent and browser fingerprint (*Id.* 89), the clear implication is that third parties are able to identify plaintiff and other patients of defendant and associate their identities with the data about their activity on defendant's website. (*Id.* 99-116). Plaintiff also alleges that defendant's website does not utilize available "anonymization" tools to protect the identities of visitors to its website. (*Id.* 126). One of the authorities relied on by defendant aptly summed up the net effect of these allegations by noting that by "[u]sing these techniques, Facebook can identify individual users and watch as they browse third-party websites . . ." *Smith v. Facebook*, 262 F.Supp.3d 943, 948 (N.D.Ca.2017).

The real question before the Court at this juncture is whether the aggregated information allegedly disclosed to third parties could conceivably constitute information learned within the physician-patient relationship so as to state a claim at this stage of the proceedings. In *Biddle*, the hospital's law firm requested four pieces of information to assess patients for social security

disability eligibility – name, telephone number, age and medical condition. *Biddle*, 86 Ohio St.3d at 396. The information allegedly disclosed in this case appears to be potentially more extensive when considered collectively. (Amended Complaint ¶¶ 134-153). Plaintiff has used defendant's website to research his and his wife's medical conditions, make appointments and access his medical records. (*Id.* 155-156). These actions were purportedly disclosed to third parties. (*Id.* 78-80). According to the allegations of the Amended Complaint, this means that searches for plaintiff's conditions and/or visits to pages containing information about such conditions have been disclosed to third parties and associated with identifying information about plaintiff. The sum and substance of such disclosures appears at least equivalent to the information at issue in *Biddle*. None of this information would be publicly available if not for defendant's disclosure thereof. (*Id.* 164-167). Thus, the Court cannot say from the face of the Amended Complaint at this juncture that plaintiff can prove no set of facts that would support a *Biddle* claim.[1]

With respect to defendant's disclaimer declaring that use of the website does not establish a physician-patient relationship, defendant seemingly misses the point of plaintiff's allegations. Plaintiff does not allege that he became a patient by accessing the website; he is an actual patient of defendant who, at defendant's suggestion, has used defendant's website. If in fact defendant caused the disclosure of nonpublic medical information about one of its patients through the

[1] Defendant's reliance on *Jenkins v. Metro Life Ins. Co.*, 171 Ohio St. 557, 173 N.E.2d 122 (1961) and *Evans v. Toledo Neurological Assocs.*, 2014-Ohio-4336, 20 N.E.3d 333 (6th Dist.) is misplaced. *Jenkins* involved application of the statutory testimonial privilege in a case involving a life insurance claim. The Ohio Supreme Court held that, under the privilege statute and in the context of a dispute about whether the decedent lied on a life insurance application, there was no privilege to prevent a physician from testifying about the fact that the decedent had seen the physician. *Jenkins* predates *Biddle* by 38 years and arises in a completely different context. It does not inform application of *Biddle* in this case. Likewise, *Evans* was a medical malpractice claim in which defense counsel provided a physician with medical records obtained in discovery for his review. The physician being consulted by defense counsel happened to be employed by the same hospital system where plaintiff received care and that he was suing for medical malpractice. There is no allegation in this case that the information allegedly disclosed was provided to third parties other than as a result of the actions of defendant that caused such disclosures. Accordingly, *Evans* is unhelpful.

operation of its website, its self-serving proclamation that use of the website is not part of the physician-patient relationship does not in this Court's view make it otherwise. Thus, the existence of a physician-patient relationship is established for purposes of the current analysis.

Finally, defendant argues that its alleged disclosures are permitted because public policy interests advanced by such disclosures outweigh plaintiff's interest in confidentiality. Defendant relies primarily on the Ohio Supreme Court's decision in *Menorah Park* holding that disclosure of the minimum information necessary to pursue a collection action against a patient is permissible. The *Menorah Park* court based its holding on language in the *Biddle* decision recognizing that "special situations may exist where the interest of the public, the patient, the physician, or a third person are of sufficient importance to justify the creation of a conditional or qualified privilege to disclose in the absence of any statutory mandate or common-law duty." *Biddle*, 86 Ohio St.3d at 402.

In the absence of a statutory mandate or common law duty requiring disclosure, the *Menorah Park* court looked "to HIPAA for guidance in determining how those competing interests should be weighed." *Menorah Park*, 2020-Ohio-6658 at ¶ 32. Federal regulations promulgated pursuant to HIPAA expressly permit disclosure of protected health information "for treatment, payment, or health care operations." 45 C.F.R. 164.502(a)(1)(ii). The *Menorah Park* court went on to find public policy support for a payment-related exception in R.C. 3798.04, which prohibits unauthorized disclosure "except when the use or disclosure is required or permitted without such authorization [under HIPAA regulations]." *Menorah Park* at ¶ 33. Based on these clear recognitions of public policy under which disclosure may be proper, the *Menorah Park* court recognized a qualified privilege under which physicians and hospitals may disclose the minimum amount of patient information necessary to pursue a collection action. *Id.* at ¶ 35.

Looking to HIPAA regulations for guidance as in *Menorah Park* does not yield the same result in this case. HIPAA permits limited disclosures for treatment, payment or health care operations. The alleged disclosures in this case clearly do not facilitate treatment or payment, and review of the regulation defining "health care operations" is equally unavailing. *See* 45 C.F.R. § 164.501.

Without a statute or regulation expressly recognizing that plaintiff's privacy interests are outweighed by a policy interest advanced by the disclosures at issue, defendant argues that federal policy favoring the digitization of medical records and defendant's First Amendment commercial speech rights supply countervailing policy interests. Perhaps they do, but unlike *Menorah Park*, the connection between defendant's asserted policy interests and the disclosures in this case are far from clear. *See e.g. Turk v. Oiler*, 732 F.Supp.2d 758, 776 (N.D. Ohio 2010) (declining to grant judgment on the pleadings where defendant asked court to "extend the countervailing interests doctrine").

To be sure there is a public policy interest in making the delivery of healthcare more effective, efficient and less costly through widespread adoption of electronic medical records. But defendant has failed to sufficiently articulate how that interest is advanced by the disclosure of information about plaintiff's and others' activity on defendant's website to third parties to warrant dismissal as a matter of law. Likewise for defendant's First Amendment argument, unlike the *Menorah Park* court that could look to an unambiguous federal regulation recognizing that the policy interest in allowing providers to pursue payment outweighs patient confidentiality, defendant's claimed commercial speech interests are simply too nebulous and undeveloped at this stage of the proceedings for this Court to hold as a matter of law that plaintiff cannot establish any facts that might entitle him to relief. This is in accord with the decision of the Cuyahoga County

Court of Common Pleas in an analogous case. *See Jane Doe v. University Hospital Health System, Inc.*, Cuyahoga C.P. No. CV-20-933357 (June 25, 2021).

Plaintiff has adequately alleged a claim under *Biddle v. Warren General Hospital*. Defendant's motion to dismiss is denied with respect to Count I of the Amended Complaint.

**B. Breach of Confidence**

Count II of the Amended Complaint alleges a claim for "breach of confidence." This count appears to be a verbatim restatement of the *Biddle* claim stated in Count I. Subsequent to *Biddle* it is unnecessary to "shoehorn a breach-of-confidence theory of recovery into many traditional legal theories . . ." *Menorah Park*, 2020-Ohio-6658, ¶ 14. This claim is duplicative of Count I and is therefore subsumed within it and unnecessary. Defendant's motion to dismiss is granted with respect to Count II of the Amended Complaint.

**C. Invasion of Privacy – Intrusion Upon Seclusion**

Ohio law recognizes the common law tort of invasion of privacy by intrusion upon seclusion where the defendant intentionally intrudes upon the solitude or seclusion or the private affairs or concerns of another, and if such an intrusion would be highly offensive to a reasonable person. *See Housh v. Peth*, 165 Ohio St. 35, 133 N.E.2d 340 (1956), syllabus. Defendant cites *Moran v. Lewis*, 2018-Ohio-4423, 114 N.E.3d 1254, ¶ 5 (8th Dist.) ("In order to properly plead an invasion of privacy claim, there must be allegations that the tracking invaded the seclusion or private affairs of another."). Defendant argues that there was no intrusion in this case, especially not into any secluded or private place.

*Moran v. Lewis* involved a GPS tracker placed on the plaintiff's car that tracked his movement on public roads. The Eighth District Court of Appeals cited authorities noting that the tracking at issue had not "led to the disclosure of private facts" and there was "no evidence that the vehicle was driven into a private or secluded location where one would have a reasonable

expectation of privacy." *Id.* at ¶ 10, citing *Troeckler v. Zeiser*, S.D.Ill. No. 14-cv-40-SMY-PMF, 2015 WL 1042187, *3 (March 5, 2015) and *Villanova v. Innovative Investigations, Inc.*, 21 A.3d 650, 652, 420 N.J.Super. 353 (2011). The *Moran* court held that "[t]he mere act of monitoring another's public movements through the attachment of a GPS tracking device is not, in and of itself, sufficient to state an invasion of privacy claim." *Id.* at ¶ 11.

*Moran* is not analogous to this case. Plaintiff's public movements were not tracked, rather his online engagement with his healthcare provider was allegedly disclosed to third parties. As discussed above, this included the substance of searches for medical conditions that plaintiff submitted on defendant's website, plaintiff's access of his medical records and scheduling of medical appointments. [2]

Indeed, intrusion upon seclusion is a heavily fact-dependent claim. An evidentiary record will likely reveal the substantive details of these disclosures for closer scrutiny, but for purposes of a motion to dismiss the allegations are sufficient. *See e.g. Demo v. Kirksey*, D.Md. No. 8:18-cv-00716-PX, 2018 WL 5994995, *6 ("the trier of fact [must] consider all the circumstances including the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion, as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded.") (citations omitted). Defendant's motion is denied with respect to Count III of the Amended Complaint.

---

[2] Distinguishing decisions like *Moran* involving only tracking in public spaces, courts have noted that other forms of electronic surveillance may be much more intrusive. For example, with respect to cell phone location data, Justice Sotomayor noted in a concurrence that "the time stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter v. U.S.*, 138 S.Ct. 2206, 2217, 201 L.Ed.2d 507 (2018), citing *U.S. v. Jones*, 556 U.S. 400, 415, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012). Based on the allegations of the Amended Complaint, which must be accepted as true, the net effect of the aggregated data allegedly disclosed in this case seems more akin to the latter than the former.

**D. Breach of Contract**

Plaintiff's breach of contract claim is not subsumed because the source of the obligation allegedly breached is a contract rather than the common law duty recognized in *Biddle*. However, the parties disagree about the substance of any alleged contract between patients who utilize defendant's website and defendant. Plaintiff contends that the HIPAA Notice of Privacy Practices contains contractually enforceable promises that defendant made to plaintiff and others, which defendant allegedly breached. (Amended Complaint ¶¶ 270-275). Plaintiff also contends that defendant breached the covenant of good faith and fair dealing implicit in contracts under Ohio law. (*Id.* ¶ 276). Defendant argues that the HIPAA Privacy Notice applies to patients' medical records and information communicated in connection with patients' healthcare but is inapplicable to the information allegedly disclosed in this case. The Court cannot resolve this disagreement in the context of a motion to dismiss on the record presented. Defendant's motion is therefore denied with respect to Count IV.

**E. Negligence and Breach of Fiduciary Duty**

Plaintiff alleges that defendant negligently breached its duty of confidentiality to plaintiff by disclosing the content of plaintiff's communications to third parties, and that plaintiff suffered damages. (Amended Complaint ¶¶ 289-294). Plaintiff also alleges that defendant has a fiduciary duty to its patients, including plaintiff, and that defendant breached that duty by engaging in the conduct alleged in the amended complaint. (Id. ¶¶ 295-303). Defendant argues that these claims are duplicative and are subsumed by plaintiff's *Biddle* claim.

To determine whether these claims are subsumed within plaintiff's *Biddle* claim, this Court questions whether a *Biddle* claim includes a claim for unintentional disclosure. If so, they are

subsumed within plaintiff's *Biddle* claim because these theories do not present distinct theories of recovery for plaintiff.

In *Scott v. Ohio Dept. of Rehab. & Corr.*, 2013-Ohio-4383, 999 N.E.2d 231, ¶ 29 (10th Dist.), the Tenth District Court of Appeals indicated in dicta that a *Biddle* claim could include a claim for negligent disclosure. In *Sheldon v. Kettering Health Network*, 2015-Ohio-3268, 40 N.E.3d 661, the Second District Court of Appeals considered whether a *Biddle* claim could be maintained against a health care provider where an employee allegedly abused his position to disclose his ex-spouse's medical information. Plaintiff did not specifically state a *Biddle* claim and alleged that the medical provider was negligent in failing to detect and prevent the disclosure. The court analyzed plaintiff's claims under *Biddle* and concluded that "an inadvertent disclosure might, under different facts, fulfill the elements of *Biddle*, [but] the present case does not." *Id.* at ¶¶ 32-33.

In *Herman v. Kratche*, 8th Dist. Cuyahoga No. 86697, 2006-Ohio-5938, the Court of Appeals analyzed a *Biddle* claim based on a "mistaken" disclosure as a breach of fiduciary duty relying on *Hammonds v. Aetna Cas. & Sur. Co.*, 243 F. Supp. 793 (N.D. Ohio 1965). The Eighth District held that a medical provider owes a patient a fiduciary duty and reasoned that "a claim for breach of fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Herman* at ¶ 18 (citations omitted). On this basis the Court of Appeals reversed summary judgment in favor of the medical provider. *Id.* at ¶ 39.

The result is a continuing lack of clarity with respect to whether and under what circumstances an unintentional disclosure can support a *Biddle* claim. It is the opinion of this Court that *Biddle* does not require intentional disclosure to support a claim. *Biddle* does not expressly require intentional conduct. The *Scott* court held that an unintentional disclosure claim

can be theoretically maintained under *Biddle*, but not on the facts presented in *Scott*. And no court seems to have clearly held that a disclosure must be intentional to support a *Biddle* claim. Accordingly, defendant's motion to dismiss is granted with respect to Counts V and VI of the Amended Complaint, with the caveat that plaintiff's *Biddle* claim can proceed based on intentional and/or negligent conduct if supported by the evidentiary record to be developed as this matter proceeds.

**V. Conclusion**

For all the foregoing reasons, defendant's motion to dismiss is granted with respect to Count II, V and VI of the Amended Complaint and denied with respect to Counts I, III and IV of the Amended Complaint.

So ordered.

Date: 11/22/21

Judge Christian A. Jenkins

# Exhibit G

CV20933357 115123719

COURT OF COMMON PLEAS
CUYAHOGA COUNTY

| | | |
|---|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.,<br><br>Defendant. | ) | Case No. CV-20-933357<br><br>JUDGE J. PHILIP CALABRESE |

FILED
NOV 16 2020
Clerk of Courts
Cuyahoga County, Ohio

**OPINION AND ORDER**

Plaintiff Jane Doe, proceeding anonymously at this point in the proceedings by agreement of the parties due to the confidential health information underlying the allegations in the complaint, claims that Defendant University Hospitals Health System, Inc. disclosed her confidential health information to Facebook, Google, Microsoft, and other technology and data companies when she used the hospital's website. Defendant moves to dismiss, arguing that Jane Doe lacks standing and that Plaintiff's complaint fails to state claims under *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, or for intrusion upon seclusion. For the reasons that follow, the Court concludes that Plaintiff has standing and so DENIES Defendant's motion to dismiss on that ground. Pending the Ohio Supreme Court's forthcoming decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Court defers ruling on the balance of Defendant's motion to dismiss.

**PLAINTIFF'S ALLEGATIONS**

Plaintiff's complaint contains lengthy and detailed allegations about claimed information-sharing between Defendant's website and various technology and data companies through the use of certain source code, cookies, and browser fingerprints. According to the complaint, various

information shared with or available to the technology and data companies through these means contains or transmits personally identifiable health and similar information. This information allegedly allows technology and data companies to market to those who use Defendant's website or engage in other data mining.

In her complaint, Jane Doe alleges that she is a patient receiving treatment for an unspecified illness at University Hospitals and uses the patient portal on Defendant's website. (Complaint at ¶ 12.) Plaintiff avers that the specific communications she exchanged with University Hospitals through its website include "communications about specific appointments, providers, conditions and treatments." (Complaint at ¶ 173.) She also alleges that she "registered for, used, and exchanged communications with UH inside the MyUHCare patient portal." (Complaint at ¶ 172.) Further, the complaint alleges that the source code of a different domain that hosts the patient portal for University Hospitals causes "data transmissions from patient computers to Google connected to personally identifiable information about patients." (Complaint at ¶ 165.) This information, according to the complaint, constitutes confidential information entitled to privacy protections under State and federal law. Beyond these facts, the complaint scarcely contains any additional information regarding the information Jane Doe claims Defendant improperly disclosed.

Plaintiff's complaint asserts three causes of action. Count I alleges disclosure of non-public medical information under *Biddle*. Count II asserts a claim for breach of confidence, and Count III alleges intrusion on seclusion. Additionally, Plaintiff seeks to maintain this action on behalf of a class of "Ohio residents who are, or were, patients of UH or any of its affiliates, and who used UH's web properties, including but not limited to, [*sic*] www.uhhospitals.org and the Patient Portal at MyUHCare." (Complaint at ¶ 224.)

**ANALYSIS**

The Eighth District set forth the governing standard under which this Court considers a motion to dismiss pursuant to Rule 12(B)(6) as follows:

> Under the notice pleading requirements of Civ.R. 8(A)(1), the plaintiff need only plead sufficient, operative facts to support recovery under his claims. *Doe v. Robinson*, 6th Dist. Lucas No. 1-07-1051, 2007-Ohio-5746, ¶ 17. Nevertheless, to constitute fair notice, the complaint must still allege sufficient underlying facts that relate to and support the alleged claim, and may not simply state legal conclusions. *See DeVore v. Mut. of Omaha Ins. Co.*, 32 Ohio App.2d 36, 38, 288 N.E.2d 202 (7th Dist.1972).

*Henderson v. State*, 8th Dist. Cuyahoga No. 101862, 2015-Ohio-1742, ¶ 10. "[W]hen a party files a motion to dismiss for failure to state a claim, all the factual allegations of the complaint must be taken as true and all reasonable inferences must be drawn in favor of the nonmoving party." *Kennedy v. Dottore*, 8th Dist. Cuyahoga No. 108562, 2020-Ohio-3451, ¶ 30.

**I. Standing**

"The Ohio Constitution expressly requires standing for cases filed in common pleas courts." *ProgressOhio.org, Inc. v. JobsOhio*, 139 Ohio St.3d 520, 2014-Ohio-2382, 13 N.E.3d 1101, ¶ 11. A court of common pleas may only exercise jurisdiction over "justiciable matters." Ohio Constitution, Article IV, Section 4(B). To present a justiciable controversy, a plaintiff must have standing to sue. *Federal Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 41.

To have standing, a plaintiff must show that she has suffered an injury fairly traceable to the defendant's allegedly unlawful conduct that is likely to be redressed through the relief requested. *Estate of Mikulski v. Centerior Energy Corp.*, 2019-Ohio-983, 133 N.E.3d 899, ¶ 59 (8th Dist.), citations omitted. "Perhaps the most basic requirement to bringing a lawsuit is that the plaintiff suffer some injury. Apart from a showing of wrongful conduct and causation, proof of

actual harm to the plaintiff has been an indispensable part of civil actions." *Felix v. Ganley Chevrolet, Inc.*, 145 Ohio St.3d 329, 2015-Ohio-3430, 49 N.E.3d 1224, ¶ 36. Injury results from "an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not hypothetical or conjectural." *City of Athens v. Testa*, 2019-Ohio-277, 119 N.E.3d 469, ¶ 60 (10th Dist.), quotations omitted. Plaintiff's attempt to proceed on behalf of a class does not change this threshold standing requirement. *Estate of Mikulski* at ¶ 60, quotation omitted. Indeed, "[i]ndividual standing is a threshold to all actions, including class actions." *Id.*

Defendant makes two separate arguments that Plaintiff lacks standing. The Court addresses each in turn.

**I.A. The Allegations of the Complaint**

Defendant maintains that Plaintiff fails to allege concrete and particularized injury in fact. Instead, according to this argument, the complaint details the operation of the website of University Hospitals and its alleged disclosure of protected health information to third parties. In this way, Defendant contends that the complaint presents circumstances involving hypothetical patients or visitors to the website or patient portal. In light of the complaint's voluminous allegations about the technology at issue and the comparatively few facts alleged about Jane Doe herself, Defendant makes an understandable, though misplaced, argument.

Plaintiff pleads that she is a patient of University Hospitals who communicated with the hospital through its website about specific conditions, appointments, and providers. (Complaint at ¶ 12, 173.) Similarly, she alleges that she exchanged communications with the hospital through the patient portal. (Complaint at ¶ 172.) Although she fails to identify specific protected information or data allegedly disclosed to third parties, one may fairly infer from the allegations of the complaint that transmission of Jane Doe's private data is at least plausible. Construing these

allegations in Plaintiff's favor, as the Court must at this stage of the proceedings, the complaint pleads sufficient operative facts under Ohio's notice pleading requirements that Jane Doe has allegedly suffered an injury in fact.

**I.B. Economic Harm**

Defendant also argues that Plaintiff cannot establish standing based on generic allegations that the personal data and information at issue may have value in the marketplace. University Hospitals pins this argument on the absence of any allegation that Jane Doe has lost value in her data. Defendant's position misunderstands Plaintiff's claims. The complaint does not allege unjust enrichment, loss of value of her data, or another sort of claim rooted in pecuniary value. Instead, Plaintiff asserts privacy claims. Valuing such an injury, if proved, may present challenges, but any such difficulties do not warrant dismissal at the pleading stage.

**II. Motion to Dismiss the Three Counts of the Complaint**

In *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, the Ohio Supreme Court *sua sponte* ordered post-argument briefing on whether to overturn or modify *Biddle* in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. Because the Ohio Supreme Court's ruling may well bear on each of Plaintiff's claims, the Court defers ruling on Defendant's motion to dismiss the three counts of the complaint at this time. Doing so will not prejudice the parties because the Ohio Supreme Court's ruling will likely come before the end of the year. Once it does, the Court requests the parties to submit supplemental briefs, not to exceed fifteen pages, by January 18, 2021 on how, if at all, the Ohio Supreme Court's ruling affects Plaintiff's claims. Alternatively, the parties may advise that they are standing on their previous briefing on Defendant's motion to dismiss the three counts of the complaint.

## CONCLUSION

For the foregoing reasons, the Court concludes that the allegations of the complaint establish that Jane Doe has standing. Following the Ohio Supreme Court's forthcoming ruling on whether to overturn or modify *Biddle*, the Court requests supplemental briefing from the parties on how, if at all, the ruling affects the claims in this case.

If Plaintiff's claims survive the Ohio Supreme Court's ruling, it may turn out in discovery that the evidence does not support Jane Doe's factual allegations. Because of the costs and burdens associated with discovery of the technological matters underlying Plaintiff's claims and the likely scope of such discovery Plaintiff will seek, the Court directs the parties to direct their discovery efforts to those matters relating specifically to Jane Doe's use of Defendant's website and the patient portal first. If discovery shows that Defendant has not in fact transmitted Jane Doe's personal health information to any technology or data company as alleged, then an early summary judgment may be appropriate in this case or Plaintiff may lack standing to maintain her claims in in whole or in part. On the other hand, if discovery tends to corroborate Jane Doe's factual allegations, then the case may proceed with that assurance. Such an approach is consistent with the proportionality requirement of Rule 26(B)(1) and the mandate of Rule 1(B).

ORDER:

For the foregoing reasons, the Court DENIES Defendant's motion to dismiss for lack of standing and defers ruling on the balance of Defendant's motion to dismiss pending the Ohio Supreme Court's forthcoming ruling in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582, and supplemental briefing regarding the same.

Dated: November 16, 2020

Judge J. Philip Calabrese

117625842

FILED
JUN 28 2021
Clerk of Courts
Cuyahoga County, Ohio

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

JANE DOE, ON BEHALF OF HERSELF AND ALL OTHERS, ETC
Plaintiff

UNIVERSITY HOSPITALS HEALTH SYSTEM, INC.
Defendant

Case No: CV-20-933357

Judge: WILLIAM F. B. VODREY

## JOURNAL ENTRY

THIS CASE IS BEFORE THE COURT ON DEFENDANT'S MOTION TO DISMISS. FOR THE REASONS STATED IN THE ATTACHED DECISION, DEFENDANT'S MOTION TO DISMISS IS HEREBY DENIED.

Judge Signature    Date 6-25-21

06/25/2021

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JANE DOE, ON BEHALF OF HERSELF AND ALL OTHERS, ETC | ) | CASE NO. CV-20-933357 |
| | ) | Judge: WILLIAM F.B. VODREY |
| Plaintiff, | ) | |
| v. | ) | **JOURNAL ENTRY** |
| UNIVERSITY HOSPITAL HEALTH SYSTEM, INC. | ) | |
| Defendant. | ) | |

This case is before the court on defendant's motion to dismiss. On Nov. 16, 2020, the court issued an order that denied defendant's motion to dismiss on the grounds that plaintiff lacked standing. At that time, the court deferred ruling on defendant's motion to dismiss the three counts of plaintiff's complaint pending the Supreme Court of Ohio's decision in *Menorah Park Center for Senior Living v. Rolston*, 159 Ohio St.3d 1405, 2020-Ohio-3206, 146 N.E.3d 582. The parties have completed supplemental briefing on the issue, and the remainder defendant's motion to dismiss is now ripe for review.

In *Menorah Park*, the Supreme Court of Ohio, *sua sponte*, ordered post-argument briefing on whether the court should overturn or modify its previous decision in *Biddle v. Warren General Hospital*, 86 Ohio St.3d 395, 1999-Ohio-115, 715 N.E.2d 518, in light of the enactment of certain provisions of the Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat. 1936. The court held that "*Biddle* remains good law and it continues to permit a cause of action for the unauthorized, unprivileged disclosure to a third party of nonpublic medical information." *Menorah* at ¶40.

A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests the legal sufficiency of the complaint. *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 605 N.E.2d 378 (1992). A complaint is subject to dismissal for failure to state a claim upon which relief can be granted when it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claim that would entitle plaintiff to relief. *Doe v. Archdiocese of Cincinnati*, 109 Ohio St.3d 491, 2006-Ohio-2625, 849 N.E.2d 268, ¶11. When considering a Civ.R. 12(B)(6) motion, the court must construe all factual allegations of the complaint as true, and all reasonable inferences shall be drawn in favor of the nonmoving party. *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 144, 573 N.E.2.d 1063 (1991).

Here, in accepting plaintiff's allegations as true and acknowledging the Supreme Court of Ohio's ruling in *Menorah Park*, the court finds that plaintiff has adequately stated claims upon which relief can be granted. Defendant's motion to dismiss is hereby denied.

In accordance with this court's prior order on Nov. 16, 2020, the court hereby orders the parties to direct their initial discovery efforts to those matters relating specifically to Jane Doe's use of defendant's website and patient portal. If discovery reveals that defendant did not, in fact, transmit her personal health information to any technology or data company as alleged, an early motion for summary judgment may then be appropriate.

W. Vodrey 6-25-21
William F.B. Vodrey, Judge

# Exhibit H

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 11-2808-BLS1

DEBRA L. MARQUIS

v.

GOOGLE INC.

**MEMORANDUM OF DECISION AND ORDER ON DEFENDANT GOOGLE INC.'S MOTION TO DISMISS**

This action arises from the alleged monitoring of emails by defendant Google Inc. ("Google") in order to sell advertisements based on keywords that appear in those emails. Google operates Gmail, which is an electronic communications or email service. The plaintiff, Debra L. Marquis, represents a putative class of Massachusetts residents who have non-Gmail email accounts, but who exchange emails with Gmail users. Marquis alleges that Google's monitoring of emails sent from non-Gmail email accounts violates the Massachusetts wiretap statute, G.L. c. 272, § 99.

Google has now moved to dismiss this action on the grounds that the wiretap statute does not apply to email communications or to its conduct. For the reasons discussed below, Google's motion to dismiss is denied.

## BACKGROUND

The court takes as true all well-pled factual allegation set forth in Marquis's Complaint, see *Marshall* v. *Stratus Pharms., Inc.*, 51 Mass. App. Ct. 667, 670-71 (2001). Marquis is a Massachusetts resident who has a non-Gmail email account.

Compl. ¶ 3. Google is a Delaware corporation with its principal place of business in California. Compl. ¶ 4. It operates Gmail, which is an electronic communication service that is free to its users. Compl. ¶¶ 6-8. While Google does not charge Gmail account holders for using its service, Google generates revenue through advertisements that it presents to Gmail users. Compl. ¶ 8. Google intercepts and scans emails sent from non-Gmail users, such as Marquis, in order to find keywords or content in the emails that will enable it to target advertisements specifically at Gmail users. Compl. ¶ 9. Once targeting individual emails, Google now focuses on numerous emails to find keywords. Compl. ¶ 11. This system is known as "interest-based advertising." Compl. ¶ 11.

Marquis has an America-On-Line ("AOL") email account that she has used since the late 1990s. Compl. ¶ 13. While she routinely exchanged emails with Gmail users, Marquis did not consent to Google's secret interception, disclosure, or scanning of her emails. Compl. ¶¶ 12, 14. Marquis seeks to represent a class of Massachusetts residents who have non-Gmail email accounts and who exchange emails with Gmail users, and who have their emails intercepted and/or scanned without their consent. Compl. ¶ 15.

Marquis alleges that Google's conduct violates the Massachusetts Wiretap statute, G.L. c. 272, § 99. The statute "was enacted to give due protection to the privacy of individuals by barring the secret use of electronic surveillance devices for

eavesdropping purpose . . . ." *Dillon* v. *Massachusetts Bay Transp. Auth.*, 49 Mass. App. Ct. 309, 310 (2000). It prohibits any person from intercepting or attempting to intercept "any wire or oral communication." G. L. c. 272, § 99(C)(1). A wire communication is defined as "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." *Id.* at § 99(B)(1). An intercepting device does not include "any telephone or telegraph instrument, equipment facility, or a component thereof . . . being used by a communications common carrier in the ordinary course of business." *Id.* at § 99(B)(3).

Google has now moved to dismiss the Complaint. First, it contends that the Massachusetts wiretap statute does not apply to electronic communications, and if it does, then it is preempted by the federal wiretap statute. Second, it argues that Marquis was aware that Google intercepted and scanned her emails, and the statute requires that the interception be done secretly. Third, Google's alleged interception occurred in the ordinary course of business and is therefore exempted from the statute.

## DISCUSSION

In order to withstand a motion to dismiss, a plaintiff's complaint must contain "allegations plausibly suggesting (not merely consistent with) an entitlement to relief,

in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief." *Iannacchino* v. *Ford Motor Co.*, 451 Mass. 623, 636 (2008), quoting *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1966 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, the plaintiff is required to present more than labels and conclusions, and must raise a right to relief "above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* See also *Harvard Crimson, Inc.* v. *President & Fellows of Harvard Coll.*, 445 Mass. 745, 749 (2006). The court will examine the Complaint under this standard.

Google's first argument is that the Massachusetts wiretap statute does not include a prohibition against monitoring emails. In essence, it contents that had the Legislature desired to include such electronic communications in the statute, then it would have done so expressly.[1] The Massachusetts wiretap statute was originally intended to mirror its federal counterpart. See *O'Sullivan* v. *NYNEX Corp.*, 426 Mass. 261, 264 (n.5) (1997). In 1986, the federal statute was "recognized to be hopelessly out of date," and it was amended by the Electronic Communications Privacy Act ("ECPA") in order to cover "electronic communication," which encompasses email. *Dillon*, 49 Mass. App. Ct. at 314-15 (citations omitted); 18

---

[1] Google presents G.L. c. 276, § 1B, which expressly defines "electronic communication services" and "remote computing services,"as one such example. In contrast, the Massachusetts wiretap statute does not define these terms.

U.S.C. § 2510(12). The Massachusetts Legislature did not provide for a similar amendment. However, "the fact that there has been no amendment of the Massachusetts statute comparable to the Congressional action of 1986 does not bar us from reading [an exception] so as to preserve it in its intrinsic intended scope and maintain its viability in the broad run of cases." *Dillon*, 49 Mass. App. Ct. at 315.

This court declines to accept Google's contention that the Massachusetts wiretap statute does not prohibit the secret interception of emails. First, the statute's definition of "wire communications" is sufficiently broad to include electronic communications, as it includes "the aid of wire, cable, or *other like connection* between the point of origin and the point of reception." G.L. c. 272, § 99(B)(1) (emphasis supplied). Permitting the interception of private emails, while prohibiting the same conduct for oral telephone conversations, is an inconsistency that contravenes the purpose of the statute. Second, a Massachusetts court has recently held that the Massachusetts wiretap statute cover email, and the court finds its reasoning persuasive. See *Rich* v. *Rich*, 2011 WL 3672059, *5 (Mass. Super. July 8, 2011) (McGuire, J.).

At this stage of the litigation, the court must accept the factual allegations of the Complaint. Marquis alleges that Google intercepts and scans private emails that she sends from her AOL account to Gmail account users, and that she did not consent to Google's interception. Compl. ¶¶ 9, 13-14. This alleged conduct violates

the Massachusetts wiretap statute.

Google's second argument is that federal law preempts the Massachusetts wiretap statute. Federal law may preempt state law "when it explicitly or by implication defines such an intent, or when a State statute actually conflicts with Federal law or stands as an obstacle to the accomplishment of Federal objectives. Whether a Federal statute preempts State law is ultimately a question of Congress's intent." *City of Boston* v. *Commonwealth Employment Relations Bd.*, 453 Mass. 389, 396 (2009) (internal citations omitted). A court should be hesitant to find preemption, as "[u]nless Congress's intent to do so is clearly manifested, a court does not presume that Congress intended to displace State law on a particular subject. . . ." *Id.*

Prior to the 1986 amendments to the federal wiretap statute, the Supreme Judicial Court determined that the federal statute did not preempt the Massachusetts wiretap statute. See *Commonwealth* v. *Vitello*, 367 Mass. 224, 249-53 (1975). Google maintains that the ECPA's comprehensive regulatory scheme indicates Congress's intent to occupy the field. However, this is insufficient to warrant a finding that the federal wiretap statute preempts the Massachusetts wiretap statute. The ECPA does not contain language expressly, or by implication, preempting state law. See 18 U.S.C. §§ 2510-2522. In addition, the ECPA does not occupy the entire field of interception of electronic surveillance, as Google contends. As long as the Massachusetts wiretap statute does not conflict with the federal wiretap statute, then

it is a valid law under principles of federalism. *Vitello*, 367 Mass at 247 ("[A] State statute may adopt standards more stringent than the requirements of Federal law."). As Google itself notes, the federal wiretap statute prohibits the secret interception of electronic communications, just like the Massachusetts wiretap statute, see *supra*. In the absence of manifest Congressional intent to preempt state law, the ECPA does not preempt the Massachusetts wiretap statute.

Google's next contention is that while the Massachusetts wiretap statute prohibits "secret" interceptions, its advertisement policy is publicly disclosed and transparent. As a result, Google argues that its conduct does not violate the Massachusetts wiretap statute. Under the statute, an interception "means to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication. . . ." G.L. c. 272, § 99(B)(4). Marquis alleges that Google "secretly" intercepts her electronic communications with Gmail users. Compl. ¶¶ 14, 27. To rebut that allegation, Google has submitted an affidavit that includes Google's Terms of Service and Privacy Center screen. See Burhans Affidavit at Tabs 1 and 2. These documents illustrate that Google's "interest-based advertising" is fully disclosed.

The Burhans Affidavit does not rebut the Complaint's allegations. First, Google's attempt to introduce documents outside the pleadings is improper at the

motion to dismiss stage.[2] Second, the court accepts as true Marquis's allegation that Google secretly intercepted her electronic communications with Gmail users. Additionally, Marquis is entitled to the reasonable inference that she, as an AOL account holder, would not be privy to or have notice of Google's Terms of Use and Privacy Center policy for Gmail users. The Complaint alleges sufficient facts that Google secretly intercepted electronic communications between non-Gmail users and Gmail users.

Google's final argument is that it is exempt from liability because it is a communications common carrier, and that it conducted the alleged interceptions "in the ordinary course of its business." G.L. c. 272, § 99(B)(3). In support of this contention, Google presents two cases that involve employers who secretly intercepted communications between their employees and third-parties. Google's reliance on these cases is misplaced, as it does not have an employer-employee relationship with Gmail users. While Gmail is a free service, Google generates revenue through selling advertising. Compl. ¶ 8. It intercepts and scans emails sent to Gmail users by non-Gmail users such as Marquis in order to find keywords so that

---

[2] "In evaluating a rule 12(b)(6) motion, we take into consideration the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000) (quotation omitted). Google's Terms of Use and Privacy Center policy, external to the Complaint, are not appropriate for consideration at this stage.

it can target Gmail users with relevant advertisements. Compl. ¶¶ 9, 11. At this preliminary stage, the court cannot conclude as a matter of law that intercepting and scanning emails for purposes of "interest-based advertising" is "in the ordinary course of [Google's] business" under the Massachusetts wiretap statute.

**ORDER**

For the foregoing reasons, Defendant Google Inc.'s Motion to Dismiss is **DENIED**.

Peter M. Lauriat
Justice of the Superior Court

Dated: January 17, 2012

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**SUPERIOR COURT**
**BUSINESS LITIGATION SECTION**
**CIVIL ACTION NO. 2384CV01086 BLS1**

kg

**ELIZABETH NOVA, for herself and the Class,**

*Plaintiff,*

**v.**

**BOSTON MEDICAL CENTER CORPORATION,**

*Defendant.*

**NOTICE OF APPEARANCE OF WYSTAN M. ACKERMAN**

Please enter my appearance as counsel to the Defendant, Boston Medical Center Corporation, in connection with the above-referenced action.

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION**

Wystan M. Ackerman (BBO #651086)
wackerman@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Tel: (860) 275-8388
Fax: (860) 275-8299

**CERTIFICATE OF SERVICE**

I, Wystan M. Ackerman, hereby certify that, on this 29th day of August, 2023, a copy of the foregoing was e-mailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wystan M. Ackerman

PO

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

ELIZABETH NOVA

For herself and the Class,

v.

BOSTON MEDICAL CENTER
CORPORATION

Defendant.

CIVIL NO. 2384CV01086–BLS1

**NOTICE OF APPEARANCE OF PATRICK J. VALLELY**

Please enter the appearance of Patrick J. Vallely of Shapiro Haber & Urmy LLP, One Boston Place, Suite 2600, Boston MA 02108, on behalf of Plaintiff Elizabeth Nova, for herself and the Class, in the above-captioned matter.

Dated: 08/29/2023

Respectfully submitted,

*/s/ Patrick J. Vallely*
Patrick J. Vallely (BBO#663866)
SHAPIRO HABER & URMY LLP
One Boston Place
Suite 2600
Boston, MA 02108
Tel: (617) 439-3939
pvallely@shulaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record for Defendant by email on August 29, 2023.

*/s/ Patrick J. Vallely*
Patrick J. Vallely

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER<br>2384CV01086 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
| TO: Michelle H Blauner, Esq.<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
    a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
    b. Phased discovery as to certain subjects areas;
    c. Limitations on the number of discovery events;
    d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER<br>2384CV01086 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
| TO: Patrick Vallely, Esq.<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Suite 2600<br>Boston, MA 02108 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER<br>2384CV01086 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
| TO: Wystan Michael Ackerman, Esq.<br>Robinson and Cole LLP<br>One State St<br>Hartford, CT 06103 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www. zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

CASE NAME:
**Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation**

John E. Powers III, Acting Clerk of Court
Suffolk County Civil

TO: **Linn Foster Freedman, Esq.**
**Robinson and Cole LLP**
**One Financial Plaza Suite 1430**
**Providence, RI 02903**

COURT NAME & ADDRESS
Suffolk County Superior Court - Civil
Suffolk County Courthouse, 12th Floor
Three Pemberton Square
Boston, MA 02108

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www. zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER<br>2384CV01086 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
| TO: William Maxwell Daley, Esq.<br>Robinson and Cole LLP<br>One Financial Plaza<br>14th Floor<br>Providence, RI 02903 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | Hon. Peter B Krupp | John E. Powers III, Acting Clerk of Court |

VM

COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.** **SUPERIOR COURT**
**BUSINESS LITIGATION SECTION**
**CIVIL ACTION NO. 2384CV01086 BLS1**

**ELIZABETH NOVA, for herself and the Class,**

*Plaintiff*,

**v.**

**BOSTON MEDICAL CENTER CORPORATION,**

*Defendant*.

**RULE 9A NOTICE OF FILING**

In accordance with Superior Court Rule 9A(b)(2), Boston Medical Center Corporation ("Defendant") provide this Notice of Filing in connection with its Motion to Dismiss. The Rule 9A Package includes the following documents:

1) BMC's Motion to Dismiss;
2) BMC's Memorandum of Law in Support of Defendant's Motion to Dismiss;
3) Pl.'s Opposition to Defendant's Motion to Dismiss; and
4) BMC's Reply Memorandum in Further Support of Its Motion to Dismiss.

[SIGANTURE ON FOLLOWING PAGE]

Dated: August 11, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
**ROBINSON & COLE LLP**
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

I HEREBY ATTEST AND CERTIFY ON ____________, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY:____________________

**CERTIFICATE OF SERVICE**

I, Wm. Maxwell Daley, hereby certify that, on this 11th day of August, 2023, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: **Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation** | | John E. Powers III, Acting Clerk of Court<br>Suffolk County Civil |
| TO: **File Copy** | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 01/15/2025**

**Time: 11:00 AM**

**Event Type: Virtual**

**Session/ Courtroom Location:**

*The QR Code below can be used with a cell phone QR Code scanner to open the Zoom meeting from a cell phone.*

**Zoom Conference Call Details**
**Meeting ID: 161 888 7367**
**Meeting URL: https://www.zoomgov.com/j/1618887367**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/06/2025 | **Hon. Peter B Krupp** | **John E. Powers III, Acting Clerk of Court** |

Date Filed 8/29/2023 5:43 PM
Superior Court - Suffolk
Docket Number 2384CV01086

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV01086 BLS1

| | |
|---|---|
| ELIZABETH NOVA, for herself and the Class,<br>*Plaintiff*,<br>v.<br>BOSTON MEDICAL CENTER CORPORATION,<br>*Defendant*. | : |

**NOTICE OF APPEARANCE OF WM MAXWELL DALE**

Please enter my appearance as counsel to the Defendant, Boston Medical Center Corporation, in connection with the above-referenced action.

**DEFENDANT,**
**BOSTON MEDICAL CENT**
**CORPORATION**

Wm Maxwell Daley (BBO #694
wdaley@rc.com
ROBINSON & COLE LLP
One Financial Plaza, 14th Floor
Providence, RI 02903
Tel: (401) 709-3300
Fax: (401) 709-3399

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E Powers, III<br>Suffolk County Civil |
| TO: Michelle H Blauner, Esq.<br>Shapiro Haber and Urmy LLP<br>One Boston Place<br>Boston, MA 02108 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | Hon. Peter B Krupp | John E Powers, III |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: **Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation** | | John E Powers, III<br>Suffolk County Civil |
| TO: **Patrick Vallely, Esq.**<br>**Shapiro Haber and Urmy LLP**<br>**One Boston Place**<br>**Suite 2600**<br>**Boston, MA 02108** | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | **Hon. Peter B Krupp** | **John E Powers, III** |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER<br>2384CV01086 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|
| CASE NAME:<br>Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E Powers, III<br>Suffolk County Civil |
| TO: Wystan Michael Ackerman, Esq.<br>Robinson and Cole LLP<br>One State St<br>Hartford, CT 06103 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | Hon. Peter B Krupp | John E Powers, III |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E Powers, III<br>Suffolk County Civil |
| TO: Linn Foster Freedman, Esq.<br>Robinson and Cole LLP<br>One Financial Plaza Suite 1430<br>Providence, RI 02903 | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | Hon. Peter B Krupp | John E Powers, III |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation | | John E Powers, III Suffolk County Civil |
| TO: William Maxwell Daley, Esq. Robinson and Cole LLP One Financial Plaza 14th Floor Providence, RI 02903 | | COURT NAME & ADDRESS Suffolk County Superior Court - Civil Suffolk County Courthouse, 12th Floor Three Pemberton Square Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | Hon. Peter B Krupp | John E Powers, III |

| NOTICE TO APPEAR FOR BLS Rule 16 Litigation Control Conference | DOCKET NUMBER 2384CV01086 | Trial Court of Massachusetts The Superior Court |
|---|---|---|
| CASE NAME: **Nova, For Herself And The Class, Elizabeth vs. Boston Medical Center Corporation** | | John E Powers, III<br>Suffolk County Civil |
| TO: **File Copy** | | COURT NAME & ADDRESS<br>Suffolk County Superior Court - Civil<br>Suffolk County Courthouse, 12th Floor<br>Three Pemberton Square<br>Boston, MA 02108 |

The Court will hear the following event:

**BLS Rule 16 Litigation Control Conference**

Counsel should appear as follows:

**Date: 03/19/2025**

**Time: 02:00 PM**

**Event Type: In Person**

**Session/ Courtroom Location: BOS-10th FL, CR 1015 (SC)**

Counsel shall kindly confer prior to date and be prepared to discuss any and all matters within the Rule, but in particular:

1. Proposed agenda for the conference;
2. Issues of confidentiality and impoundment;
3. Agreements with respect to:
   a. Initial disclosure of relevant documents by both sides without the necessity of a Rule 34 request;
   b. Phased discovery as to certain subjects areas;
   c. Limitations on the number of discovery events;
   d. Limitations on the scope of discovery;
4. E-Discovery pursuant to Mass. R. Civ. P. 26(f);
5. Any other issues with respect to the case management; and
6. Proposed Tracking Order tailored to the needs of your case. Please bring a written proposal to the conference for discussion indicating areas of agreement or disagreement.

Please note that the Superior Court encourages lawyers with cases filed in our civil docket to take affirmative steps to promote the participation of less senior lawyers in courtroom proceedings. Those affirmative steps could include, but
are not limited to, encouraging participation of relatively inexperienced attorneys in initial scheduling conferences, status conferences, hearings on discovery and dispositive motions, and examination of witnesses at trial.

| DATE ISSUED | ASSOCIATE JUSTICE | |
|---|---|---|
| 01/15/2025 | Hon. Peter B Krupp | John E Powers, III |

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**SUPERIOR COURT**
**BUSINESS LITIGATION SECTION**
**CIVIL ACTION NO. 2384CV01086 BLS1**

**ELIZABETH NOVA, for herself and the Class,**

*Plaintiff,*

**v.**

**BOSTON MEDICAL CENTER CORPORATION,**

*Defendant.*

**NOTICE OF MOTION TO DISMISS**

In accordance with Superior Court Rule 9E, Defendant Boston Medical Center Corporation respectfully provides this Notice that, on June 21, 2023, it served a Motion to Dismiss under Mass. R. Civ. P. 12(b)(1) and (6) on counsel for the other party in the above-captioned matter.

Dated: June 21, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

/s/ Linn F. Freedman

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
ROBINSON & COLE LLP
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

**CERTIFICATE OF SERVICE**

I, Wm. Maxwell Daley, hereby certify that, on this 21st day of June, 2023, a copy of the foregoing was filed via the Court's electronic filing portal emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley

VM

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss. SUPERIOR COURT
BUSINESS LITIGATION SECTION
CIVIL ACTION NO. 2384CV01086 BLS1

**ELIZABETH NOVA, for herself and the Class,**

*Plaintiff,*

**v.**

**BOSTON MEDICAL CENTER CORPORATION,**

*Defendant.*

**AFFIDAVIT OF COMPLIANCE WITH SUPERIOR COURT RULE 9A**

I, William Maxwell Daley, on oath, hereby stating the following as it relates Boston Medical Center Corporation's Motion to Dismiss the Complaint under Mass. R. Civ. P. 12(b)(1) and (6):

1. I am an attorney duly admitted to practice in the Commonwealth of Massachusetts and counsel for the defendant, Boston Medical Center Corporation ("BMC").

1. On or about June 21, 2023, Robinson & Cole LLP served a copy of BMC's Motion to Dismiss the Complaint under Mass. R. Civ. P. 12(b)(1) and (6) (the "Motion") on Plaintiff's counsel, with the parties agreeing on a briefing schedule for the Motion.[1]

2. Subsequently, on or about August 1, 2023, Plaintiff's counsel provided a copy of the opposition to BMC's Motion.

[1] The parties also filed a joint motion for leave to exceed the Court's page limitations for Plaintiff's opposition and BMC's reply, which was denied on or about July 31, 2023. Accordingly, the parties allotted additional time, by agreement, for the parties to conform their submissions to the Court's page limitations.

4. The parties agreed that BMC would file the Rule 9A package, including BMC's reply memorandum, by August 11, 2023. BMC is submitting it's reply brief contemporaneously with the Rule 9A package, consistent with the parties' agreement.

5. On August 11, 2023 BMC is filing the aforementioned documents, consistent with Superior Court Rule 9A, and has therefore complied with the Rule.

Signed under the pains and penalties of perjury this 11th day of August 2023.

Wm Maxwell Daley

Dated: August 11, 2023

Respectfully submitted,

**DEFENDANT,**
**BOSTON MEDICAL CENTER CORPORATION,**

Linn F. Freedman, BBO #639564
Wystan M. Ackerman, BBO #651086
Wm Maxwell Daley, BBO #694729
ROBINSON & COLE LLP
One Boston Place, 26th Floor
Boston, Massachusetts 02108
Tel: 800-762-2678
Fax: 617-557-5999
lfreedman@rc.com
wackerman@rc.com
wdaley@rc.com

I HEREBY ATTEST AND CERTIFY ON ____________, THAT THE FOREGOING DOCUMENT IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE, AND IN MY LEGAL CUSTODY.

John E. Powers, III
Clerk Magistrate
SUFFOLK SUPERIOR CIVIL COURT
DEPARTMENT OF THE TRIAL COURT

BY: ____________________

**CERTIFICATE OF SERVICE**

I, Wm. Maxwell Daley, hereby certify that, on this 11th day of August, 2023, a copy of the foregoing was mailed, postage prepaid, and emailed to the following counsel of record:

Edward F. Haber
ehaber@shulaw.com
Michelle H. Blauner
mblauner@shulaw.com
Patrick J. Vallely
pvallely@shulaw.com
**SHAPIRO HABER & URMY LLP**
One Boston Place, Suite 2600
Boston, MA 02108

Wm Maxwell Daley
Wm Maxwell Daley